## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** ) | **Chapter 11** |
| ) | |
| **Urban Brands, Inc., et al.,**[1] ) | **Case No. 10-_____ (___)** |
| ) | |
| **Debtors.** ) | **Joint Administration Pending** |
| ) | |

## MOTION OF DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER (A) AUTHORIZING DEBTORS TO (I) CONTINUE PREPETITION INSURANCE COVERAGE AND (II) MAINTAIN PREPETITION PREMIUM FINANCING AGREEMENTS AND (B) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") file

this motion (the "Motion") for entry of an order, substantially in the form attached hereto as

Exhibit A, (a) authorizing the Debtors to (i) continue prepetition insurance coverage and

(ii) maintain prepetition premium financing agreements; and (b) authorizing and directing

financial institutions to receive, process, honor and pay checks presented for payment and

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Urban Brands, Inc. (3678), 100% Girls Ltd. (4150), 100% Girls of Georgia, Inc. (4159), 100% Girls of New York, Inc. (2149), 100 Percent Girls of New Jersey, Inc. (4167), A.S. Interactive, Inc. (3472), Ashley Stewart Ltd. (4541), Ashley Stewart Apparel Corporation (4049), Ashley Stewart Clothing Company, Inc. (4051), Ashley Stewart Management Co., Inc. (4053), Ashley Stewart Woman Ltd. (4152), ASIL 6, Inc. (3996), ASNJ 10, Inc. (4004), Carraizo Alto Apparel Corporation (4651), Church Street Retail, Inc. (5954), Kid Spot Ltd. (2585), Kidspot of Delaware, Inc. (2596), Kidspot of Illinois, Inc. (2606), Kidspot of Michigan, Inc. (2603), Kidspot of New Jersey, Inc. (2601), Kidspot of Ohio, Inc. (4705), Kidspot of Pennsylvania, Inc. (2599), Kidspot of Texas, Inc. (3809), Large Apparel of Alabama, Inc. (0624), Large Apparel of California, Inc. (2129), Large Apparel of Connecticut, Inc. (5161), Large Apparel of District of Columbia, Inc. (8613), Large Apparel of Florida, Inc. (2209), Large Apparel of Georgia, Inc. (3894), Large Apparel of Illinois, Inc. (4650), Large Apparel of Indiana, Inc. (4055), Large Apparel of Louisiana, Inc. (3790), Large Apparel of Maryland, Inc. (5158), Large Apparel of Michigan, Inc. (9420), Large Apparel of Mississippi, Inc. (5913), Large Apparel of Missouri, Inc. (2135), Large Apparel of New Jersey, Inc. (5157), Large Apparel of New York, Inc. (5956), Large Apparel of North Carolina, Inc. (8611), Large Apparel of Ohio, Inc. (3815), Large Apparel of Pennsylvania, Inc. (4057), Large Apparel of South Carolina, Inc. (2029), Large Apparel of Tennessee, Inc. (3895), Large Apparel of Texas, Inc. (3787), Large Apparel of Virginia, Inc. (2809), Large Apparel of Wisconsin, Inc. (3898), Marianne Ltd. (3940), Marianne USPR, Inc. (2193), Marianne VI, Inc. (2206), Metro Apparel of Kentucky, Inc. (7533), Metro Apparel of Massachusetts, Inc. (1367), The Essence of Body & Soul, Ltd. (4165), Urban Acquisition Corporation of New Jersey, Inc. (2976), Urban Acquisition Corporation of New York, Inc. (4103), and Urban Brands TM Holding Co. (5909). The Debtors' corporate offices are located at 100 Metro Way, Secaucus, New Jersey 07094.

electronic payment requests related thereto. In support of this Motion, the Debtors rely on the *Declaration of Michael A. Abate in Support of First Day Motions* (the "Abate Declaration") and respectfully state as follows:

## JURISDICTION

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are sections 105(a), 361, 363, 364, 541 and 1112 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.    Introduction**

3.    On September 21, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.

4.    The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

**B.    Overview of the Debtors' Business**

5.    The Debtors are a leading specialty retailer of fashion-forward and inspirational apparel for plus sized urban women under the brand name of Ashley Stewart. Urban Brands,

2

Inc., a Delaware corporation, is the direct or indirect parent company of all of the Debtors. Until 2009, the Debtors also operated stores under the brand name of Marianne.

6.     The Ashley Stewart concept was founded in 1991 and has grown to become a nationally-recognized brand. According to an October 2009 industry survey by the NPD Group, a nationally recognized firm specializing in apparel research, plus sized African American women ranked Ashley Stewart third of all retailers, behind only Wal-Mart and Lane Bryant, as their favorite place to shop.

7.     Ashley Stewart operates broadly in the women's apparel market, which the NPD Group estimates is approximately $107 billion. Within women's fashion, Ashley Stewart focuses on the plus sized market, which is estimated to be over $18 billion and growing. Within this subset of the market, Ashley Stewart focuses on the underserved urban market, particularly the African American and Hispanic consumer, two of the fastest growing segments of the U.S. population. Ashley Stewart is one of the few concepts focusing directly on these particular niche markets.

8.     As of the Petition Date, the Debtors operate approximately 210 stores in 26 states with approximately 2,100 employees, the majority of which are minority women. The store base is reinforced by a strong online presence through AshleyStewart.com, providing both a marketing tool as well as an additional outlet for Ashley Stewart customers.

9.     Despite the strength of their brand names and success at individual store locations, the Debtors began suffering from cash flow/liquidity problems in 2007, especially in their Marianne division. The Debtors' financial difficulties continued in 2008 with the slow down in the overall economy. As part of a strategic initiative to strengthen their balance sheet and improve their liquidity by focusing exclusively on the Ashley Stewart brand, in February

3

2008, the Debtors began divesting themselves of all of their Marianne stores. The proceeds from the Marianne divestitures, coupled with the reduction of the working capital investment needed to support the Marianne brand name, provided improvement in operating results and cash flow during fiscal year 2009 (ending January 30, 2010). Unfortunately, although the Debtors significantly reduced their net losses from approximately $44.3 million in 2008 to $28.6 million in 2009, the business continued to operate at a loss. Additionally, from fiscal year 2008 to fiscal year 2009, the Debtors net sales decreased from $179.6 million to $174.6 million.

**C.      The Debtors' Capital and Debt Structure**

10.      The Debtors are borrowers under a Loan and Security Agreement dated as of September 3, 2004 (the "Prepetition Financing Agreement"), with Bank of America, N.A. (successor by merger to LaSalle Retail Finance, a Division of LaSalle Business Credit, LLC, as agent for LaSalle Bank Midwest National Association f/k/a Standard Federal Bank National Association) (the "Lender"). The Prepetition Financing Agreement was an asset-based facility with a maturity date of September 10, 2010. The availability for borrowings and letter of credit obligations under the Prepetition Financing Agreement was capped at $6.5 million and is further limited to an amount supported by a borrowing base consisting of certain cash, certain accounts receivable and eligible inventory. As of the Petition Date, the Debtors owe only approximately $2,251,651 plus interest on the facility with an additional $2,366,324 in outstanding letters of credit (all of which are fully collateralized by the Debtors' cash).

11.      In April 2004, the Debtors entered into a Note Purchase Agreement with a group of institutional investors led by Trimaran Fund II, L.L.C. ("Trimaran"), the Debtors' largest equity holder, and certain officers, employees and consultants of the Debtors. From August 2007 to November 2009, the Debtors entered into five additional note purchase agreements to raise additional capital. In total, the Debtors sold $58,500,000 in senior unsecured notes (the

4

"Notes"). As of the Petition Date, the Debtors owe approximately $81.3 million on account of outstanding principle and interest on the Notes.

**D.** **Objectives Of Chapter 11 Filing**

12.     In April 2010, the Debtors engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist the Debtors in searching for additional equity and/or mezzanine financing. Following exhaustive efforts to locate additional capital, the Debtors determined that there was insufficient interest in the market for this additional financing and, as a result, the Debtors' best alternative to preserve the Debtors' business as a going concern and maximize the value of their assets was to pursue a sale of all or substantially all the Debtors' assets.

13.     Accordingly, in August 2010, Oppenheimer expanded its marketing efforts to solicit interest from prospective purchasers of the Debtors and their assets as a going-concern. As a result of this process, New Ashley Stewart, LLC ("New Ashley" or the "Stalking Horse Bidder") emerged as the party submitting the highest and best bid for the Debtors' assets. Accordingly, the Debtors, with the approval of their board of directors, engaged in active negotiations with New Ashley regarding a potential going concern transaction and, on September 8, 2010, the Debtors and New Ashley executed a non-binding letter of intent. Following the execution of the letter of intent, the Debtors and their advisors actively negotiated with New Ashley regarding the definitive terms and conditions of an asset purchase agreement. The Debtors expect that on or shortly after the Petition Date, they will execute an asset purchase agreement with New Ashley (the "New Ashley Purchase Agreement"), which the Debtors will seek Court approval of pursuant to section 363 of the Bankruptcy Code following a Court sanctioned auction process.

14.     The Debtors believe that a going-concern sale of the Debtors' business presents the best opportunity to maximize recoveries for creditors and preserve thousands of jobs for the

5

Debtors' employees. Accordingly, the Debtors expect to file a sale procedures motion on the first day of these Chapter 11 Cases and continue their efforts to solicit bids from other potentially interested parties.

### E.    The Insurance Policies

15.    As set forth in the Abate Declaration, in the ordinary course of business, the Debtors maintain a number of insurance policies that provide coverage for, among other things, workers' compensation liability, general commercial liability, property damage, umbrella liability, excess liability, business automotive liability, ocean cargo liability, and directors' and officers' liability (collectively, the "Policies").[2]  Not only are some of these Policies required by various state and federal regulations,[3] but further, section 1112 of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.[4]  A schedule of the current Policies, coverage amounts, terms and coverage dates is attached hereto as Exhibit B and incorporated herein by reference (the "Policy Schedule").

---

[2]  The Debtors maintain the following insurance policies through a First Insurance Funding Corporation portfolio: umbrella-primary policy (policy no. QK06502774), umbrella-excess policy (policy no. ECO1153737485), commercial property policy (policy no. V15WT810P), and director and officer liability policy (policy no. 18197763, 17730864) (collectively, the "PFA Policies").

The Debtors maintain the following insurance policies directly: general liability policy (policy nos. TBKZ91449131029, TB2Z91449131029), business automobile policy (ASKZ91449131019), workers compensation policy (policy nos. YJUB6229C28309, Z11204997), ocean cargo policy (policy no. NYOMC01345001), criminal liability policy (policy no. 8210-3482), local store policy (policy nos. 87044336152010, 87044336122010, 87044336082010, 87044336062010, 87044335802010, 87044335772010, 87044758842010, 87044335682010, 87044572742010, 87044540872010, 87046150972010, 87046151022010), property damage policy (policy no. PHPK346167), customs bonds policy (policy no. 30805039), and sales tax bond policy (policy no. 285079).

[3]  For example, under California state law, if an employer fails to obtain required coverage and an accident occurs, the injured employee either files a lawsuit against the employer in civil court or files a claim against the state workers' compensation system.  Not only can the monetary exposure to a suit in civil court be extremely significant to the employer, stop-work orders and fines can be levied in addition to injunctions and assessments against the employer. Furthermore, in some instances, employers who lack workers' compensation coverage risk exposure to their personal assets and other business assets as well.  See Cal. Labor Code § 3700.

[4]  11 U.S.C. § 1112(b)(4)(C).

16.     The total annual premiums for the Policies in 2010 are approximately $1.7 million.  It is not always economically advantageous for the Debtors to pay the premiums on all of the Policies on a lump-sum basis.  Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the payment of insurance premiums for some of their Policies (collectively, the "Financed Policies") pursuant to installment plans offered by some of the insurance carriers ("Installment Plans"), as well as pursuant to a premium financing agreement (the "PFA") with a third-party premium finance company, First Insurance Funding Corporation ("First Insurance").  Specifically, as of the Petition Date, the Debtors' umbrella-primary policy (policy no. QK06502774), umbrella-excess policy (policy no. ECO1153737485), commercial property policy (policy no. V15WT810P), and fiduciary and director and officer liability policy (policy no. 18197763, 17730864), were paid under the PFA.  The general liability policy (policy nos.     TBKZ91449131029,     TB2Z91449131029),     business     automobile     policy (ASKZ91449131019), workers compensation policy (policy no. YJUB6229C28309), and ocean cargo policy (policy no. NYOMC01345001) (jointly, the "Separate Policies") were all paid in installments outside of the PFA.

17.     The PFA provides financing subject to, among other things, the following terms:

| PFA Date | Total Premium Amount | Down Payment | Amount Financed | Finance Charge | Monthly Payment | Final Payment Due Date |
|---|---|---|---|---|---|---|
| 4/30/10 | 460,145.15 | 69,021.77 | 391,123.38 | 9,473.02 | 40,059.64 | 02/15/11 |

18.     The terms of the PFA provide that the Debtors pay $69,021.77 as an initial down payment, followed by 10 monthly installments (bearing an annual interest rate of 5.25%) in exchange for First Insurance's agreement to pay the annual insurance premiums to the Debtors' various insurers.  Spreading out the cost of the premiums on these policies over the applicable coverage period helps the Debtors manage their cash flow.  Pursuant to the PFA, the Debtors

7

assigned return premiums, dividend payments, and certain loss payments to First Insurance as security.

19.    If the Debtors fail to pay the monthly premium obligations, First Insurance has the right to terminate the PFA Policies and accelerate the entire unpaid premium. Upon such termination, First Insurance has the right to set off the amount owed by the Debtors against the amount of unearned premiums returned to First Insurance by the insurance carriers. If First Insurance chose to cancel the Debtors' insurance coverage under the PFA, the Debtors would then be forced to obtain replacement insurance on an expedited basis and at a significant cost to the estates, which would be unnecessarily disruptive. Moreover, even if First Insurance did not terminate the PFA, the Debtors' non-payment of the monthly premium could have an adverse effect on the Debtors' ability to finance premiums for future policies.

20.    As of the Petition Date, both through the PFA and directly to insurers, payments totaling approximately $700,000.00 have been made against the total annual insurance cost of approximately $1.7 million, leaving an open amount of approximately $954,000.00 to be paid post-petition.

21.    In light of the importance of maintaining insurance coverage and preserving the Debtors' liquidity by financing the insurance premiums, it is in the best interests of the Debtors' estates to authorize them to honor their obligations under the PFA and the Installment Plans.

22.    In the ordinary course of business, the Debtors engaged HUB International Northeast Ltd. (the "Broker") to act the consultant and insurance broker in placing their annual insurance program. The Debtors intend to continue their contacts with the Broker in the ordinary course of business.

**RELIEF REQUESTED**

23.     By this Motion, the Debtors request authority to:  (a) continue insurance coverage entered into prepetition, including, without limitation, the Policies; (b) maintain the Financed Policies; and (c) continue the PFA.

24.     The Debtors also seek authority to pay, in their discretion, up to $175,000 in prepetition amounts owing in respect of the Policies.

25.     The Debtors also request that financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and electronic payment requests relating thereto, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date.  The Debtors further request that all financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion.

**BASIS FOR RELIEF**

**A.     Payment of the Insurance Obligations is Appropriate Under the Bankruptcy Code**

26.     Courts generally acknowledge it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances.  See, e.g., In re: Wickes Holdings, LLC, Case No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008); In re: Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007); In re: Pope & Talbot, Inc., Case No. 07-11738 (CSS) (Bankr. D. Del. Nov. 21, 2007); In re: Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. Mar. 22, 2007); In re: Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006); In re: J.L. French Auto. Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. Mar. 9, 2006).

27.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, a debtor-in-possession is a fiduciary "holding the bankruptcy estate and operating the business for the benefit

9

of its creditors and (if the value justifies) equity owners." In re: CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor-in-possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." Id. Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The CoServ court specifically noted that the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id.

28.    Consistent with the debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. See, e.g., In re: Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to justify payment of prepetition wages); see also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re: James A. Phillips, Inc.), 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors).

29.    In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, the

Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

30. The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the United States Supreme Court in Miltenberger v. Logansport, C.&S.W.R. Co., 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors in the mid-century. See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where the alternative was the cessation of operations).

31. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in In re: Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re: Penn Central Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); In re: Just for Feet, Inc., 242 B.R. 821, 824-845 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re: Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

32. Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." In re:

11

Ionosphere Clubs, Inc., 98 B.R. at 176; see also In re: Just For Feet, Inc., 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re: Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re: Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); Burchinal v. Cent. Wash. Bank (In re: Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation " is appropriate); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re: Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 COLLIER ON BANKRUPTCY, 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

33.     Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. See In

RLF1 3610190v. 3

re: UNR Indus., 143 B.R. 516, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); Ionosphere Clubs, 98 B.R. at 167-77 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

34.     This flexible approach is particularly critical where a prepetition creditor provides vital goods or services to a debtor that would be unavailable if the Debtors did not satisfy their prepetition obligations. In In re: Structurlite Plastics Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that it "may exercise its equity powers under §105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'" Id. The court explained that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932. The relief sought by this Motion is appropriate under each of the foregoing standards. To maximize the value of the Debtors' estates, the Debtors must continue to operate the businesses as normal during these Chapter 11 Cases, with minimal disruptions and distractions. As described above, it is essential to the Debtors' day-to-day-operations that they have authority to continue the Policies, including payment of any prepetition amounts owed under or in connection with the Policies.

35.     Pursuant to the PFA, the Debtors assigned to First Insurance all unearned premiums and loss payments under the PFA Policies as security for payment of all obligations of the Debtors under the PFA. The PFA also grants to First Insurance the right to cancel the PFA Policies in the event of a payment default by the Debtors. As a result, First Insurance may be

entitled to adequate protection of its interests in the PFA Policies pursuant to section 363(e) of the Bankruptcy Code. The Debtors' failure to make the ongoing installment payments due under the PFA as requested herein may result in First Insurance seeking relief from the automatic stay to terminate the PFA Policies. If First Insurance succeeds in obtaining such relief from this Court, the Debtors would be forced to seek replacement insurance coverage and it is doubtful that they would be able to do so on terms and conditions as favorable as those presently in place under the PFA and the PFA Policies. In addition, given the current circumstances, there is no assurance that the Debtors would be able to obtain insurance coverage quickly enough to prevent a lapse in coverage.

36.    Courts in this district regularly authorize debtors to maintain insurance coverage and premium financing of insurance policies where, as here, it is in the best interest of the estates. See, e.g., In re: Filene's Basement, Inc., Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); In re: Abitibibowater, Inc., Case No. 09-11296 (KJC) (Bankr. D. Del. Apr. 17, 2009); In re: Sportsman's Warehouse, Inc., Case No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009); In re: Masonite Corporation, Case No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009); In re: Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Jan. 15, 2009); In re: Tribune Company, Case No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); In re: Motor Coach Industries International, Inc., Case No. 08-12136 (BLS) (Bankr. D. Del. Sept. 16, 2008) (interim order); In re: Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008); In re: Pope & Talbot, Inc., Case No. 07-11738 (CSS) (Bankr. D. Del. Dec. 7, 2007); In re: Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007); In re: Dura Auto. Sys., Inc., Case No. 06-11202 (Bankr. D. Del. Nov. 20, 2006).

RLF1 3610190v. 3

**B.**     **Failure to Honor the Payment Obligations for the Policies Within 21 Days of the Petition Date Would Cause Immediate and Irreparable Harm**

37.     Pursuant to Rule 6003 of the Bankruptcy Rules, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within twenty-one (21) days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.

38.     As described above, the Debtors need these Policies to remain in place uninterrupted by the Chapter 11 Cases. Not only are some of these Policies required by various state and federal regulations, but, further, section 1112 of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.

39.     Moreover, if the Debtors fail to pay their monthly premium obligations under the PFA, First Insurance has the right to terminate the insurance policies and accelerate the entire unpaid premium. If First Insurance chose to cancel the Debtors' insurance coverage under the PFA, the Debtors would then be forced to obtain replacement insurance on an expedited basis and at a significant cost to the estates. Even if First Insurance did not terminate the PFA, the Debtors' non-payment of the monthly premium could have an adverse effect on the Debtors' ability to finance premiums for future policies. The Debtors would face similar adverse effects if the Separate Policies were terminated for failure to pay any installment due on them. Simply put, the Debtors must take action to preserve the Policies during the first twenty-one (21) days of these Chapter 11 Cases. Without the relief requested herein, it is unclear that the Debtors will have the ability to take such action and risk losing their insurance coverage.

40.     Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of prepetition obligations related to the Policies.

15

**C. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

41. The Debtors represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves, expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing. Also, under the Debtors' existing cash management system, the Debtors represent that checks or wire transfer requests can be readily identified as relating to an authorized payment made with respect of the Policies. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. The Debtors therefore request that all applicable financial institutions (collectively, the "Cash Management Banks") be authorized and directed, when asked by the Debtors, to receive, process, honor and pay any and all checks or wire transfers related to the payment of any of the Policies.

## DEBTORS' RESERVATION OF RIGHTS

42. Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to contest any invoice with respect to insurance premiums under applicable non–bankruptcy law. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission of the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

16

## NOTICE

43.     No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases. The Debtors will provide notice of this Motion by facsimile and/or overnight mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims on a consolidated basis; (c) counsel to the Debtors' proposed postpetition secured lender; (d) counsel to Trimaran; (e) the Internal Revenue Service; and (f) the United States Department of Justice. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

## NO PRIOR REQUEST

44.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the Abate Declaration, the Debtors respectfully request that the Court enter an order, substantially in the forms attached hereto as Exhibit A (a) authorizing the Debtors to (i) continue prepetition insurance coverage, (ii) maintain the Financed Policies, and (iii) continue the PFA; (b) authorizing and directing financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests related thereto; and (c) granting such other and further relief as the Court deems appropriate.

17

Dated: September 21, 2010
        Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Paul N. Heath (No. 3704)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Proposed Attorneys for the Debtors and
Debtors-in-Possession*

RLF1 3610190v. 3

# EXHIBIT A

**(Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Urban Brands, Inc., et al.,[1] | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Pending |

## ORDER (A) AUTHORIZING DEBTORS TO (I) CONTINUE PREPETITION INSURANCE COVERAGE AND (II) MAINTAIN PREPETITION PREMIUM FINANCING AGREEMENTS AND (B) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order (this "Order") (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and (ii) maintain prepetition premium financing agreements for insurance coverage; and (b) authorizing and directing banks and other financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests related thereto; and upon the *Declaration of Michael A. Abate in*

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Urban Brands, Inc. (3678), 100% Girls Ltd. (4150), 100% Girls of Georgia, Inc. (4159), 100% Girls of New York, Inc. (2149), 100 Percent Girls of New Jersey, Inc. (4167), A.S. Interactive, Inc. (3472), Ashley Stewart Ltd. (4541), Ashley Stewart Apparel Corporation (4049), Ashley Stewart Clothing Company, Inc. (4051), Ashley Stewart Management Co., Inc. (4053), Ashley Stewart Woman Ltd. (4152), ASIL 6, Inc. (3996), ASNJ 10, Inc. (4004), Carraizo Alto Apparel Corporation (4651), Church Street Retail, Inc. (5954), Kid Spot Ltd. (2585), Kidspot of Delaware, Inc. (2596), Kidspot of Illinois, Inc. (2606), Kidspot of Michigan, Inc. (2603), Kidspot of New Jersey, Inc. (2601), Kidspot of Ohio, Inc. (4705), Kidspot of Pennsylvania, Inc. (2599), Kidspot of Texas, Inc. (3809), Large Apparel of Alabama, Inc. (0624), Large Apparel of California, Inc. (2129), Large Apparel of Connecticut, Inc. (5161), Large Apparel of District of Columbia, Inc. (8613), Large Apparel of Florida, Inc. (2209), Large Apparel of Georgia, Inc. (3894), Large Apparel of Illinois, Inc. (4650), Large Apparel of Indiana, Inc. (4055), Large Apparel of Louisiana, Inc. (3790), Large Apparel of Maryland, Inc. (5158), Large Apparel of Michigan, Inc. (9420), Large Apparel of Mississippi, Inc. (5913), Large Apparel of Missouri, Inc. (2135), Large Apparel of New Jersey, Inc. (5157), Large Apparel of New York, Inc. (5956), Large Apparel of North Carolina, Inc. (8611), Large Apparel of Ohio, Inc. (3815), Large Apparel of Pennsylvania, Inc. (4057), Large Apparel of South Carolina, Inc. (2029), Large Apparel of Tennessee, Inc. (3895), Large Apparel of Texas, Inc. (3787), Large Apparel of Virginia, Inc. (2809), Large Apparel of Wisconsin, Inc. (3898), Marianne Ltd. (3940), Marianne USPR, Inc. (2193), Marianne VI, Inc. (2206), Metro Apparel of Kentucky, Inc. (7533), Metro Apparel of Massachusetts, Inc. (1367), The Essence of Body & Soul, Ltd. (4165), Urban Acquisition Corporation of New Jersey, Inc. (2976), Urban Acquisition Corporation of New York, Inc. (4103), and Urban Brands TM Holding Co. (5909). The Debtors' corporate offices are located at 100 Metro Way, Secaucus, New Jersey 07094.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

*Support of First Day Motions*; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors and other parties in interest; and it appearing that failure to grant the relief requested in the Motion immediately will cause immediate and irreparable harm to the Debtors; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this Motion is a core proceeding pursuant to 28 U.S.C. §157(b); and it appearing that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of this Motion and the opportunity for a hearing on this Motion was appropriate under the particular circumstances; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      The Debtors are authorized to continue in place, and honor the terms of, the Debtors' insurance policies (collectively, the "Policies").

3.      The Debtors' payment of prepetition claims in respect of the Policies shall not exceed, in the aggregate, $175,000, unless otherwise ordered by the Court.

4.      The Debtors are authorized to continue and honor the terms of their existing premium financing agreement (the "PFA").

5.      The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

6.      The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

7.      Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

2

8. All applicable banks and other financial institutions are hereby authorized and directed to receive, process, honor and pay any and all checks evidencing amounts paid by the Debtors pursuant to the Motion, whether presented prior to or after the Petition Date.

9. Each of the Debtors' Cash Management Banks are authorized, subject to the terms of this Order, to debit the Debtors' accounts in the ordinary course of business on account of the relief requested in the Motion without the need for further order of the Court for: (i) all checks drawn on the Debtors' accounts that are cashed at such Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of the Debtors' accounts with such Cash Management Bank prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors was responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of the cash management systems.

10. Any Cash Management Bank may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and such Cash Management Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

11. Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, any budget in connection therewith and any order regarding the use of cash collateral.

3

12.     Nothing in the Motion or this Order, nor as a result of the Debtors' payment of claims pursuant to this Order, shall be deemed or construed as: (a) an admission of the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim; or (c) an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code.

13.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

14.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2010
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1 3610190v. 3

# EXHIBIT B

## (POLICIES)

September 10, 2010

Urban Brands, Inc
100 Metro Way
Secaucus, NJ 07094

| Coverage | Amount | Company | Policy # | Eff | Exp | Premium | Financed | Financed/Direct Bill | Installments | Due Date |
|---|---|---|---|---|---|---|---|---|---|---|
| **General Liability** | | Wausau Insurance Co. | TBK291449131029 | 4/15/2010 | 4/15/2011 | $84,956.00 | No | | $ 31,748.25 | 14th |
| General Aggregate | $2,000,000 | | | | | | | | | |
| Products & Completed Ops Aggregate | $2,000,000 | | | | | | | | | |
| Each Occurrence - BI & PD | $1,000,000 | | | | | | | | | |
| Personal & Advertising Injury | $1,000,000 | | | | | | | | | |
| Fire Damage Legal Liability | $1,000,000 | | | | | | | | | |
| Employee Benefits-Claims Made | $1,000,000 | | | | | | | | | |
| Employee Benefits-Aggregate | $2,000,000 | | | | | | | | | |
| Employee Benefits Deductible/claim | $1,000 | | | | | | | | | |
| Medical Expense | $10,000 | | | | | | | | | |
| Designated Location Agg. Limit | $15,000,000 | | | | | | | | | |
| Terrorism | Included | | | | | | | | | |

See actual policy for schedule of forms
**GL Based on Est. Sales of $172,000,000**

| Coverage | Amount | Company | Policy # | Eff | Exp | Premium | Financed | Financed/Direct Bill | Installments | Due Date |
|---|---|---|---|---|---|---|---|---|---|---|
| **General Liability - USVI** | | Wausau Insurance Co. | TB2291449131029 | 4/15/2010 | 4/15/2011 | $953.00 | No | | $ 357.39 | 14th |
| General Aggregate | $2,000,000 | | | | | | | | | |
| Products & Completed Ops Aggregate | $2,000,000 | | | | | | | | | |
| Each Occurrence - BI & PD | $1,000,000 | | | | | | | | | |
| Personal & Advertising Injury | $1,000,000 | | | | | | | | | |
| Fire Damage Legal Liability | $1,000,000 | | | | | | | | | |
| Employee Benefits-Claims Made | $1,000,000 | | | | | | | | | |
| Employee Benefits-Aggregate | $2,000,000 | | | | | | | | | |
| Employee Benefits Deductible/claim | $1,000 | | | | | | | | | |
| Medical Expense | $10,000 | | | | | | | | | |
| Terrorism | Included | | | | | | | | | |

See actual policy for schedule of forms
**GL Based on Est. Sales of $820,000**

## Coverage: Umbrella-Primary

| Coverage | Amount | Company | | Policy # | Eff. Date | Exp. Date | Premium | Fin Taxes & Fees | Estimated Payment | Payment Due |
|---|---|---|---|---|---|---|---|---|---|---|
| Umbrella-Primary | | Travelers | | QK06502774 | 4/15/2010 | 4/15/2011 | $36,994.00 | Yes | $ 19,232.90 | 15th |
| Each Occurrence | $25,000,000 | | | | | | | | | |
| Aggregate | $25,000,000 | | | | | | | | | |
| Retained Limit | $10,000 | | | | | | | | | |
| Terrorism | Included | | | | | | | | | |
| See actual policy for schedule of forms | | | | | | | | | | |

| Coverage | Amount | Company | | Policy # | Eff. Date | Exp. Date | Premium | Fin Taxes & Fees | Estimated Payment | Payment Due |
|---|---|---|---|---|---|---|---|---|---|---|
| Umbrella-Excess | | Ohio Casualty Ins. Co. | | ECO115373745 | 4/15/2010 | 4/15/2011 | $19,591.75 | Yes | $ 10,233.79 | 15th |
| Excess Liability Limit over $25,000,000 | $25,000,000 | | | | | | | | | |
| Aggregate | $25,000,000 | | | | | | | | | |
| Terrorism | Included | | | | | | | | | |
| See actual policy for schedule of forms | | | | | | | | | | |

| Coverage | Amount | Company | | Policy # | Eff. Date | Exp. Date | Premium | Fin Taxes & Fees | Estimated Payment | Payment Due |
|---|---|---|---|---|---|---|---|---|---|---|
| Business Auto | | Wausau Insurance Co. | | ASK2914497131019 | 4/15/2010 | 4/15/2011 | $66,577.03 | No | $ 25,335.39 | 14th |
| Combined Single Limit | $1,000,000 | | | | | | | | | |
| Uninsured/Underinsured Motorist | $1,000,000 | | | | | | | | | |
| Hired & Non-Owned Liability | Included | | | | | | | | | |
| Hired Physical Damage | Included | | | | | | | | | |
| Comprehensive Deductible | $1,000 | | | | | | | | | |
| Collision Deductible | $1,000 | | | | | | | | | |
| **37 Scheduled Vehicles** | | | | | | | | | | |

## Coverage

### Workers Compensation

| Carrier | Travelers Ins. Co. | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Policy #** | YUB6229C28309 | | | | | | |
| **Eff** | 6/12/2010 | | | | | | |
| **Exp** | 6/12/2011 | | | | | | |
| **Premium** | $920,154.00 | | | | | | |
| **Financed?** | No | | | | | | |
| **Balance** | $ 612,019.36 | | | | | | |
| **Due Date** | 14th | | | | | | |

**Workers Compensation**
Covered States: All States other than NY

| | Amount |
| --- | --- |
| Coverage A: Workers Comp | Statutory |
| Coverage B: Employer's Liability | |
| Bodily Injury By Accident(Each) | $1,000,000 |
| Bodily Injury By Disease(Policy Limit) | $1,000,000 |
| Bodily Injury By Disease(Each) | $1,000,000 |

**Total Estimated Payroll- $35,713,727**

## Coverage

| Company | N.Y. State Insurance Fund | Policy # | Eff | Exp | Premium | Financed? | Balance | Due Date |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 211204097 | 1/1/2010 | 1/1/2011 | $69,984.09 | No | | |

**Workers Compensation**
Covered States: NEW YORK

| Coverage | Amount |
| --- | --- |
| Coverage A: Workers Comp | Statutory |
| Coverage B: Employer's Liability | |
| Bodily Injury By Accident(Each) | $100,000 |
| Bodily Injury By Disease(Policy Limit) | $500,000 |
| Bodily Injury By Disease(Each) | $100,000 |

## Coverage

| Company | Liberty Mutual Ins. Co. | Policy # | Eff | Exp | Premium | Financed? | Balance | Due Date |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | NYOMC01345001 | 12/18/2009 | 12/18/2010 | $10,000.00 | No | $ 2,500.00 | 14th |

**Ocean Cargo**

| | Amount |
| --- | --- |
| Limit per any vessel/aircraft | $4,000,000 |
| On Deck Limit | $400,000 |
| Overnight Express/Parcel Post | $4,000 |
| Domestic Transit | $1,000,000 |
| Deductible | $5,000 |
| Valuation: Selling Price on Goods Sold | |
| Replacement Cost Unsold | |
| Terrorism | Included |

| Coverage | Amount | Company | Policy # | Eff. Date | Exp. Date | Premium | Proposed | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Commercial Property** | | Beazley Ins Co. | V15W810P | 4/15/2010 | 4/15/2011 | $316,526.00 | Yes | $ 165,338.06 | 15th |
| Schedule of locations on file | | | | | | | | | |
| Contents incl stock Blanket Limit | $149,173,651 | | | | | | | | |
| Business Interruption Blanket Limit | $106,056,324 | | | | | | | | |
| Extra Expense Blanket Limit | $2,550,000 | | | | | | | | |
| Flood Aggregate- all locs except | $25,000,000 | | | | | | | | |
| SFHA, B, or Shaded X Locations Flood Limit | $5,000,000 | | | | | | | | |
| Quake Aggregate-all locs except CA, NV | $25,000,000 | | | | | | | | |
| CA Quake Limit | $5,000,000 | | | | | | | | |
| Nevada Quake Limit | $1,000,000 | | | | | | | | |
| EDP- Computer Equipment | $500,000 | | | | | | | | |
| Unnamed Locations | $2,500,000 | | | | | | | | |
| Transit | $100,000 | | | | | | | | |
| Off Premises Utility Interruption | $1,000,000 | | | | | | | | |
| Debris Removal | Included | | | | | | | | |
| Boiler & Machinery | Included | | | | | | | | |
| Valuation | Replacement Cost | | | | | | | | |
| Cause of Loss | Special | | | | | | | | |
| Co-Insurance | Waived/AA | | | | | | | | |
| Terrorism | Included | | | | | | | | |
| **Policy Deductibles:** | | | | | | | | | |
| All perils except Flood, Quake, select Wind | $50,000 | | | | | | | | |
| Quake except CA & NV locations | $50,000 | | | | | | | | |
| CA Quake | Min. $100,000 or 5% | | | | | | | | |
| New Madrid Fault-line | Min. $100,000 or 2% | | | | | | | | |
| Nevada Quake | $100,000 | | | | | | | | |
| Flood except SFHA, B or X locs | $500,000 | | | | | | | | |
| SFHA Locations | $500,000 | | | | | | | | |
| B or X Locations | $100,000 | | | | | | | | |
| Named Storm First Tier Locations | Min. $250,000 or 5% | | | | | | | | |
| Named Storm Second Tier Locations | Min. $250,000 or 2% | | | | | | | | |

Hub International Northeast Ltd.
100 Sunnyside Blvd.
Woodbury, NY 11797
(516) 677-4700

| Coverage | Amount | Carrier | Policy Number | Effective | Expiration | Premium | Financed |
|---|---|---|---|---|---|---|---|
| Location: Store #278 | | | | | | | |
| 318-320 Boston Avenue Stratford, CT | | Hartford Fire Ins. Co. | 8704433616 2010 | 6/11/2010 | 6/11/2011 | $3,470.00 | No | $ - |
| Flood Limit | $500,000 | | | | | | |
| Deductible | $50,000 | | | | | | |
| Location: Store #234 | | | | | | | |
| 1331 Northwest 40th Ave. Ft. Lauderdale, FL | | Hartford Fire Ins. Co. | 8704433612 2010 | 6/11/2010 | 6/11/2011 | $3,298.00 | No | $ - |
| Flood Limit | $500,000 | | | | | | |
| Deductible | $50,000 | | | | | | |
| Location: Store #376 | | | | | | | |
| 2200 E. Fowler Ave. Tampa, FL | | Hartford Fire Ins. Co. | 8704433608 2010 | 6/11/2010 | 6/11/2011 | $2,612.00 | No | $ - |
| Flood Limit | $500,000 | | | | | | |
| Deductible | $50,000 | | | | | | |
| Location:Store #399 | | | | | | | |
| 8000 W. BROWARD BLVD. PLANTATION, FL | | Hartford Fire Ins. Co. | 8704433606 2010 | 6/11/2010 | 6/11/2011 | $1,587.00 | No | $ - |
| Flood Limit | $500,000 | | | | | | |
| Deductible | $50,000 | | | | | | |
| Location: | | | | | | | |
| 100 Metro Way Secaucus, NJ | | Hartford Fire Ins. Co. | 8704433588 2010 | 6/11/2010 | 6/11/2011 | $2,955.00 | No | $ - |
| Flood Limit | $500,000 | | | | | | |
| Deductible | $50,000 | | | | | | |
| Location:Store #123 | | | | | | | |
| 1905 Third Ave, New York, NY | | Hartford Fire Ins. Co. | 8704433577 2010 | 6/11/2010 | 6/11/2011 | $3,470.00 | No | $ - |
| Flood Limit | $500,000 | | | | | | |
| Deductible | $50,000 | | | | | | |
| Location:Store #444 | | | | | | | |
| 1927 Atlantic Ave.,Atlantic City, NJ | | Hartford Fire Ins. Co. | 8704768842 2010 | 7/30/2010 | 7/30/2011 | $1,364.00 | No | $ - |
| Flood Limit | $500,000 | | | | | | |
| Deductible | $50,000 | | | | | | |

**Location:Store#413**
8000 South Gessner, Suite 8080 Houston, TX
Flood Limit        $500,000
Deductible         $50,000

Hartford Fire Ins. Co.        87044335682010        6/11/2010        6/11/2011        $2,612.00        No        $        -

**Location:Store#408**
1401 W. ESPLANADE AVE. SP 210 KENNER, LA
Flood Limit        $500,000
Deductible         $50,000

Hartford Fire Ins. Co.        87044572742010        7/4/2010        7/4/2011        $1,225.00        No        $        -

**Location:Store#235**
17239 N.W. 27th Ave. Miami, FL
Flood Limit        $500,000
Deductible         $50,000

Hartford Fire Ins. Co.        87044540872010        7/12/2010        7/12/2011        $349.00        No        $        -

**Location:Store#409**
2601 Dawson Rd Albany GA
Flood Limit        $500,000
Deductible         $50,000

Hartford Fire Ins. Co.        87046150972010        5/16/2010        5/16/2011        $322.00        No        $        -

**Location:Store#364**
3602 Village Ct, Gary IN
Flood Limit        $500,000
Deductible         $50,000

Hartford Fire Ins. Co.        87046151022010        5/16/2010        5/16/2011        $322.00        No        $        -

| Coverage | Amount | Company | Policy # | Eff Date | Exp Date | Premium | Financed | Finance Date |
|---|---|---|---|---|---|---|---|---|
| **Crime Coverage** | | | | | | | | |
| Limits of Insurance | | Federal Ins. Co(Chubb) | 8210-3482 | 7/2/2010 | 7/2/2011 | $16,067.79 | 1 Payment | $ |
| Employee Theft | $3,000,000 | | | | | | | |
| Premises | $3,000,000 | | | | | | | |
| In Transit | $3,000,000 | | | | | | | |
| Forgery | $3,000,000 | | | | | | | |
| Computer Fraud | $3,000,000 | | | | | | | |
| Funds Transfer | $3,000,000 | | | | | | | |
| Money Orders/Currency Fraud | $3,000,000 | | | | | | | |
| Credit Card Fraud | $3,000,000 | | | | | | | |
| Expense | $100,000 | | | | | | | |
| **Deductibles** | | | | | | | | |
| Employee Theft | $10,000 | | | | | | | |
| All other | $2,500 | | | | | | | |

| Coverage | Amount | Company | Policy # | Eff Date | Exp Date | Premium | Financed | Finance Date |
|---|---|---|---|---|---|---|---|---|
| **Private Edge Plus Package** | | National Union | 18197763 | 4/30/2010 | 4/30/2011 | $87,033.40 | Yes | 15th |
| **Directors & Officers** | | | | | | | | |
| Limit of Liability | $7,500,000 | | | | | | | |
| Deductibles: | | | | | | | | |
| Crises Management Events | $5,000 | | | | | | | |
| All other Claims | $50,000 | | | | | | | |
| Claims Made Coverage | 4/19/2004 | | | | | | | |
| Continuity Date | | | | | | | | |
| Defense Cost Within Limits | | | | | | | | |
| **Employment Practices Liability** | | | | | | | | |
| Limit of Liability | $7,500,000 | | | | | | | |
| Deductible | $100,000 | | | | | | | |
| Continuity Date | 4/19/2004 | | | | | | | |
| Claims Made Coverage | | | | | | | | |
| Defense Cost Within Limits | | | | | | | | |
| **Fiduciary Liability** | | | | | | | | |
| Limit of Liability | $5,000,000 | | | | | | | |
| Deductible | $5,000 | | | | | | | |
| Continuity Date | 4/15/2008 | | | | | | | |
| Claims Made Coverage | | | | | | | | |
| Defense Cost Within Limits | | | | | | | | |
| **Other Insurance Provision** | Primary Coverage for Trimaran- applies to D&O, EPL, & Fiduciary | | | | | | | | |

| Coverage | Amount | Company | Policy # | Eff Date | Exp Date | Premium Financed | Balance Due |
|---|---|---|---|---|---|---|---|
| **Commercial Package Policy** | | Philadelphia Ins. Co. | PHPK346167 | 10/26/2009 | 10/26/2010 | $1,335.00 | |
| **Ashley Stewart Stores Community Foundation** | | | | | | | |
| **PROPERTY COVERAGES** | | | | | | | |
| Business Personal Property | $10,000 | | | | | | |
| Deductible | $1,000 | | | | | | |
| Valuation | Replacement Cost | | | | | | |
| Cause of Loss | Special | | | | | | |
| Terrorism | Included | | | | | | |
| **GENERAL LIABILITY COVERAGES** | | | | | | | |
| General Aggregate | $2,000,000 | | | | | | |
| Products & Completed Ops Aggregate | $2,000,000 | | | | | | |
| Each Occurrence - BI & PD | $1,000,000 | | | | | | |
| Personal & Advertising Injury | $1,000,000 | | | | | | |
| Fire Damage Legal Liability | $100,000 | | | | | | |
| Medical Expense | $5,000 | | | | | | |
| Hired & Non-Owned Auto | $1,000,000 | | | | | | |
| **PROFESSIONAL LIABILITY COVERAGES** | | | | | | | |
| General Aggregate | $2,000,000 | | | | | | |
| Each Incident | $1,000,000 | | | | | | |

| Coverage | Amount | Company | Policy # | Eff Date | Exp Date | Premium Financed | Balance Due |
|---|---|---|---|---|---|---|---|
| **Customs Bond** | | Travelers | 30805039 | 11/10/2009 | 11/9/2010 | $50,000 | |
| Bond Limit | $50,000 | | | | | $400.00  1 Payment | |

| Coverage | Amount | Company | Policy # | Eff Date | Exp Date | Premium Financed | Balance Due |
|---|---|---|---|---|---|---|---|
| **Sales Tax Bond- USVI** | | United Surety | 285079 | 12/17/2009 | 12/17/2010 | | |
| Bond Limit | $10,000 | | | | | $400.00  1 Payment | |

This coverage summary for your convenience. It is not a legal contract.
It is provided to facilitate your understanding of the insurance program proposed. Please refer to the actual policies
when issued for limits and specific terms, conditions, limitations, and exclusions that will govern in the event of a loss.