## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **Urban Brands, Inc., et al.,**[1] | ) | **Case No. 10-_____ (___)** |
| | ) | |
| **Debtors.** | ) | **Joint Administration Pending** |
| | ) | |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, AND 364 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND LOCAL BANKRUPTCY RULES 2002-1 AND 4001-2 (1) AUTHORIZING INCURRENCE BY THE DEBTORS OF POST-PETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL OVER SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING LIENS, (3) AUTHORIZING USE OF CASH COLLATERAL BY THE DEBTORS AND PROVIDING FOR ADEQUATE PROTECTION, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SCHEDULING A FINAL HEARING

The above captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") for the entry of interim and final orders (together, the "DIP Orders") authorizing the Debtors to, among other

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Urban Brands, Inc. (3678), 100% Girls Ltd. (4150), 100% Girls of Georgia, Inc. (4159), 100% Girls of New York, Inc. (2149), 100 Percent Girls of New Jersey, Inc. (4167), A.S. Interactive, Inc. (3472), Ashley Stewart Ltd. (4541), Ashley Stewart Apparel Corporation (4049), Ashley Stewart Clothing Company, Inc. (4051), Ashley Stewart Management Co., Inc. (4053), Ashley Stewart Woman Ltd. (4152), ASIL 6, Inc. (3996), ASNJ 10, Inc. (4004), Carraizo Alto Apparel Corporation (4651), Church Street Retail, Inc. (5954), Kid Spot Ltd. (2585), Kidspot of Delaware, Inc. (2596), Kidspot of Illinois, Inc. (2606), Kidspot of Michigan, Inc. (2603), Kidspot of New Jersey, Inc. (2601), Kidspot of Ohio, Inc. (4705), Kidspot of Pennsylvania, Inc. (2599), Kidspot of Texas, Inc. (3809), Large Apparel of Alabama, Inc. (0624), Large Apparel of California, Inc. (2129), Large Apparel of Connecticut, Inc. (5161), Large Apparel of District of Columbia, Inc. (8613), Large Apparel of Florida, Inc. (2209), Large Apparel of Georgia, Inc. (3894), Large Apparel of Illinois, Inc. (4650), Large Apparel of Indiana, Inc. (4055), Large Apparel of Louisiana, Inc. (3790), Large Apparel of Maryland, Inc. (5158), Large Apparel of Michigan, Inc. (9420), Large Apparel of Mississippi, Inc. (5913), Large Apparel of Missouri, Inc. (2135), Large Apparel of New Jersey, Inc. (5157), Large Apparel of New York, Inc. (5956), Large Apparel of North Carolina, Inc. (8611), Large Apparel of Ohio, Inc. (3815), Large Apparel of Pennsylvania, Inc. (4057), Large Apparel of South Carolina, Inc. (2029), Large Apparel of Tennessee, Inc. (3895), Large Apparel of Texas, Inc. (3787), Large Apparel of Virginia, Inc. (2809), Large Apparel of Wisconsin, Inc. (3898), Marianne Ltd. (3940), Marianne USPR, Inc. (2193), Marianne VI, Inc. (2206), Metro Apparel of Kentucky, Inc. (7533), Metro Apparel of Massachusetts, Inc. (1367), The Essence of Body & Soul, Ltd. (4165), Urban Acquisition Corporation of New Jersey, Inc. (2976), Urban Acquisition Corporation of New York, Inc. (4103), and Urban Brands TM Holding Co. (5909). The Debtors' corporate offices are located at 100 Metro Way, Secaucus, New Jersey 07094.

things: (i) obtain post-petition financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of the Bankruptcy Code in the amount of up to $6 million; (ii) use cash collateral pursuant to section 363 of the Bankruptcy Code; and (iii) grant adequate protection pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code to Bank of America, N.A. (successor by merger to LaSalle Retail Finance, a Division of LaSalle Business Credit, LLC, as agent for LaSalle Bank Midwest National Association f/k/a Standard Federal Bank National Association) (the "Pre-Petition Lender"), under the Loan and Security Agreement, dated as of September 3, 2004, as amended and in effect as of the Petition Date (the "Pre-Petition Financing Agreement"). Pending a final hearing on this Motion (the "Final Hearing"), the financing will be implemented on an interim basis pursuant to the Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"), substantially in the form attached hereto as Exhibit A, between the DIP Lender (defined below) and Urban Brands, Inc. as the lead borrower and agent for itself and the borrowers listed in Exhibit A to the DIP Loan Agreement (collectively, the "Borrowers"). A copy of the proposed interim order (the "Interim DIP Order") is attached hereto as Exhibit B.

## BANKRUPTCY RULE 4001 CONCISE STATEMENT

1.     Material provisions of the DIP Loan Agreement are set forth in the following sections of the DIP Loan Agreement and/or the Interim DIP Order:[2]

(a)     ***Borrower:*** The borrowers listed in Exhibit A to the DIP Loan Agreement.

---

[2] All terms used but not defined herein shall have the meanings ascribed to them in the DIP Loan Agreement. The summaries and descriptions of the terms and conditions of the DIP Loan Agreement and the Interim DIP Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Loan Agreement and the Interim DIP Order. In the event that there is a conflict between this motion and the DIP Loan Agreement or the Interim DIP Order, the DIP Loan Agreement or the Interim DIP Order, as applicable, shall control in all respects.

(b)     ***Post-Petition Lender:*** Bank of America, N.A., as the post-petition lender (the "DIP Lender").

(c)     ***Maximum Borrowing Available Under Revolver.*** The maximum amount available to the Debtors under the Revolving Credit (the "DIP Facility") is $6 million (the "Revolving Credit Ceiling"). DIP Loan Agreement § 1; Interim DIP Order ¶ 2.

(d)     ***Revolver Advances.*** During the term of the DIP Loan Agreement, the DIP Lender agrees to make revolving advances in accordance with the DIP Loan Agreement including the definition of Overall Availability. DIP Loan Agreement §§ 1, 2.1.

(e)     ***Use of Proceeds:*** The proceeds shall be used (a) solely for (i) working capital and general corporate purposes, (ii) payment of costs of administration of the Cases, to the extent set forth in the Budget and the Carve-Out, and (iii) payment of the Adequate Protection Payments, and (b) upon entry of the Final DIP Order, all letters of credit issued and all obligations on account of cash management services and bank products incurred under the Pre-Petition Financing Agreements shall be deemed issued and incurred under the DIP Financing Agreements and deemed to constitute "Obligations" thereunder, and (c) upon entry of the Final DIP Order, payment in full of the remaining Pre-Petition Senior Debt. DIP Loan Agreement § 2.1(c) and Interim DIP Order ¶¶ H, 3.

(f)     ***Creeping Roll-Up.*** The DIP Facility effects a "creeping roll-up" of the Debtors' pre-petition facility. In essence, the Debtors' pre-petition facility is frozen and capped as of the Petition Date (as defined below). Post-petition collections are swept by the DIP Lenders and applied to the pre-petition facility which then creates availability under the DIP Facility and, as a result of such availability, post-petition loans may be made to the Debtors as needed. As post-petition collections are continually applied to the pre-petition facility, the pre-petition debt is gradually reduced while, at the same time, the amount of the post-petition loans increase. Interim DIP Order ¶ 14.

(g)     ***Interest Rate.*** Each Revolving Credit Loan shall bear interest at a rate per annum equal to the DIP Lender's "prime rate" plus the 7%. DIP Loan Agreement §§ 1, 2.11.

(h)     ***Termination Date.*** The DIP Facility will expire and become immediately due and payable upon the date (the "Termination Date") that is the earliest to occur of: (i) the 25th day following execution of the DIP Loan Agreement, unless the Final DIP Order has been entered by such date (which order shall not have been stayed, modified, appealed, reversed, or otherwise affected), and if the Final DIP Order has been so entered by such date, "Termination Date" shall mean the earliest of (a) October 29, 2010; or (b) the DIP Lender's notice to Urban Brands, Inc. setting the Termination Date on account of the occurrence of any Event of Default; or (c) the entry of an order in these Chapter 11 Cases approving the sale of the

Borrowers or substantially all of their assets; or (d) the effective date of a Plan of Reorganization relating to the Borrowers and their assets. DIP Loan Agreement §§ 1, 2.10; Interim DIP Order ¶ 13.

(i) **_Events of Default._** Events of Default under the DIP Loan Agreement which are identified in Article 11 of the DIP Loan Agreement include, but are not limited to, (i) failure to pay when due any principal, interest, or fees when due; (ii) failure to pay any other payment liabilities; (iii) failure to perform covenants and liabilities; (iv) material misrepresentations; (iv) an event causing the acceleration of other debt in excess of the $250,000 or the termination of a material lease without the Borrowers' consent; (iv) certain cross-defaults; (v) the occurrence of uninsured loss, theft, damage, or destruction of or to more than $500,000 of the Collateral; (vi) entry of any final judgment or order against any Borrower for the payment of money exceeding applicable insurance coverage by an amount aggregating in excess of $250,000.00, which judgment or order is not satisfied, vacated or discharged within thirty (30) days of its entry or the entry of any final order or imposition of any other process having the force of law, the effect of which is to restrain the conduct by any Borrower, of its business in the ordinary course, where the result of that restraint could reasonably be expected to have a Material Borrower Adverse Effect and where such order is not vacated or discharged within thirty (30) days of its entry; (vii) indictment of, or institution of any legal process or proceeding against, any Borrower, under any Applicable Law where which could be to restrain the conduct by any Borrower of its business in the ordinary course; (viii) challenge by or on behalf of any Borrower to the validity or enforceability of any Loan Document or a determination by any court or governmental authority that any Loan Document is not enforceable according to its terms or termination or attempted termination of any guaranty of the Liabilities or any challenges to encumbrances created by ay Loan Document; (ix) any subordination provisions ceasing to be effective or any challenge to such effectiveness by any Borrower; (x) change in control; (xi) failure to comply with the Intercreditor Agreement; (xii) an event or circumstance likely to result in Material Adverse Effect; (xiii) the failure to comply with the Budget; (xiv) the appointment of a chapter 11 trustee or examiner; (xiv) conversion to a chapter 7 case; (xv) relief from the automatic stay as to any material asset; (xvi) application by any Borrower without the DIP Lender's prior written consent of approval of superpriority claim which is _pari passu_ with or senior to the priority of the claims of the DIP Lender, or the granting of a superpriority claim under the Bankruptcy Code; (xvi) the payment of other discharge by the Debtors of any Pre-Petition Indebtedness; (xvii) the failure of any Borrower to comply with the DIP Orders; (xviii) filing of any motion by any Borrower or the entry of any order in the Bankruptcy Case: (i) (A) permitting working capital or other financing (other than ordinary course trade credit or unsecured debt) for any Borrower from any Person other than the DIP Lender (unless the proceeds of such financing are used to pay in full all Liabilities, to cash collateralize all L/C's and to establish a reserve account for all indemnification obligations as required hereunder), (B) granting an Encumbrance in any of the Collateral, other than Permitted Encumbrances pursuant to clause (a) of the definition thereof, other than with respect to the DIP

Loan Agreement (unless such Encumbrances are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Liabilities, to cash collateralize all L/C's and to establish a reserve account for all indemnification obligations as required hereunder), (C) permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (E) dismissing the Bankruptcy Case; or (ii) the filing of any motion by any party in interest or any Creditors' Committee seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within ten (10) days of the date of the filing of such motion; (xix) filing of a motion by any Borrower seeking approval of a Disclosure Statement and a Plan of Reorganization, or the entry of an order confirming a Plan of Reorganization that does not require repayment in full in cash of all Liabilities and all Pre-Petition Liabilities on the effective date of such Plan of Reorganization; (xx) the filing of any pleading by any Borrower challenging the validity, priority, perfection, or enforceability of the Loan Documents or any encumbrance granted therein; and (xxi) the failure to timely file bidding procedures and sale motions or the determination of the Bankruptcy Court not to enter a bidding procedures order or sale order in a form acceptable to the DIP Lender. DIP Loan Agreement § 11.

(j) **_Liens._** The DIP Lender is to be granted priming first-priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in the DIP Orders, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors, provided, however, that the Collateral shall include recoveries or settlements arising under Chapter 5 of the Bankruptcy Code (i) to the full amount of any such recovery or settlement if made under Section 549 of the Bankruptcy Code, and (ii) only in an amount necessary to reimburse the DIP Lender for the amount of the Carve-Out, if any, used to finance the pursuit of such recovery or settlement with respect to any other recovery or settlement under Chapter 5 of the Bankruptcy Code. In the event any or all of the provisions of the Interim DIP Order are thereafter modified, amended, or vacated by a subsequent order of the Court or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made thereunder or the liens or priority authorized or created thereby. DIP Loan Agreement § 9.1; Interim DIP Order ¶¶ 2(e), 19(a).

(k) **_Fees._** In consideration for the commitment to make loans and advances to the Borrowers under the Revolving Credit, the Borrowers must pay to the DIP Lender a commitment fee in the amount of $60,000. On the first day of each month during the term of the DIP Loan Agreement, an unused line fee in an amount equal to 0.5% per annum of the average difference, during the month just ended (or relevant period with respect to the payment being made on the Termination

Date) between the Revolving Credit Ceiling and the aggregate of the unpaid principal balance of the Loan Account and the undrawn Stated Amount of L/C's outstanding during the relevant period during the immediately preceding month. The Borrowers must also pay a closing commitment fee of $60,000 upon the entry of a Sale Order. For the L/C's, the fees are: (i) with respect to all Standby L/Cs: at a rate per annum equal to five percent (5.00%) per annum of the weighted average Stated Amount of all Standby L/Cs outstanding during the period and with respect of which such fee is being paid; and (ii) with respect to all Documentary L/Cs: at a rate per annum equal to five percent (5.00%) per annum of the weighted average Stated Amount of all Documentary L/Cs outstanding during the period and with respect of which such fee is being paid; and (iii) provided that, during the existence of any Event of Default, such fees set forth in subsection (i) and (ii) above shall be increased by two percent (2%) per annum. Finally, all costs and expenses of the DIP Lender in connection with the DIP Financing Agreements, including, without limitation, reasonable legal, accounting, collateral examination, monitoring, and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Debtors, whether or not the transactions contemplated hereby are consummated. Payment of such fees shall not be subject to allowance by the Court. DIP Loan Agreement §§ 2.12, 2.13, 2.14, 2.20, 3.7; Interim DIP Order ¶ 2(a), 19(b).

2. The Debtors believe the following provisions of the DIP Loan Agreement must be highlighted pursuant to Local Rule 4001-2:

    i. ***Binding the Estate to Validity, Perfection, or Amount of Secured Creditor's Pre-Petition Lien.*** Interim DIP Order ¶ E.

    ii. ***Waiver of Rights of Estate Under Section 506(c) as to the Final DIP Order.*** Interim DIP Order ¶ G, 2(e), 2(f), 2(i), 4(a), 4(b), 10.

    iii. ***Granting Liens Solely on Debtors' Chapter 5 Causes of Action.*** DIP Loan Agreement §§ 9.1; Interim DIP Order ¶ 2(e).

    iv. ***Using Post-Petition Loans from Pre-Petition Secured Creditor to Pay Part or All of Secured Creditor's Pre-Petition Debt upon Entry of a Final Order.*** DIP Loan Agreement §2.1; Interim DIP Order ¶¶ H, 2(c).

3. The provisions of the DIP Loan Agreement were extensively negotiated. The DIP Loan Agreement enables the Debtors to obtain the financing necessary to maintain their operations and pursue reorganization and maximization of value of their estate. In addition, payment of the Pre-Petition Senior Debt in accordance with the Final DIP Order is necessary as

the Pre-Petition Lender will not otherwise consent to the priming of the Pre-Petition Senior Liens.

4. In addition, the provisions described in Rule 4001(e)(1)(B)(i)- (xi) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") are set forth at the following sections of the DIP Loan Agreement and/or the Interim DIP Order:

i. ***Grant of Priority or a Lien on Property of the Estate Under § 364(c) or (d)).*** DIP Loan Agreement §§ 9.7; Interim DIP Order ¶¶ 2(f), 2(i).

ii. ***Providing of Adequate Protection or Priority for a Claim That Arose Before the Commencement of the Case, Including the Granting of a Lien on Property of the Estate to Secure the Claim, or the Use of Property of the Estate or Credit Obtained Under § 364 to Make Case Payments on Account of the Claim.*** DIP Loan Agreement § 4; Interim DIP Order ¶¶ G, 2(c), 4.

iii. ***Determination of the Validity, Enforceability, Priority, or Amount of a Claim That Arose Before the Commencement of the Case, or of Any Lien Securing the Claim.*** Interim DIP Order ¶ E.

iv. ***A Waiver or Modification of Code Provisions or Applicable Rules Relating to the Automatic Stay.*** DIP Loan Agreement § 15.20; Interim DIP Order ¶¶ 6, 17.

v. ***A Waiver or Modification of any Entity's Authority or Right to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request the Use of Cash Collateral under § 363(c), or Request Authority to Obtain Credit Under § 364.*** DIP Loan Agreement § 11.30.

vi. ***Establishment of Deadlines for Filing a Plan of Reorganization, for Approval of a Disclosure Statement, for a Hearing on Confirmation, or for Entry of a Confirmation Order.*** None.

vii. ***A Waiver or Modification of the Applicability of Nonbankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.*** DIP Loan Agreement § 4.7 Interim DIP Order ¶ 2(e).

viii. ***A Release, Waiver or Limitation on any Claim or Other Cause of Action Belonging to the Estate or the Trustee, including Any Modification of the Statute of Limitations or Other Deadline to Commence an Action.*** DIP Loan Agreement §§ 14.2(d), 15.13; Interim DIP Order ¶ 4(d)

ix. ***The Indemnification of Any Entity.*** DIP Loan Agreement §§ 14.2(d), 15.13; Interim DIP Order ¶ E, 7.

x.　***Release, Waiver, or Limitation of Any Right under § 506(c).*** Interim DIP Order ¶ G, 2(e), 2(f), 2(i), 4(a), 4(b), 10.

xi.　***Granting of a Lien on Any Claim or Cause of Action Arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a).*** DIP Loan Agreement § 9.1; Interim DIP Order ¶ 2(e).

## BACKGROUND

5.　On September 21, 2010 (the "Petition Date"),  the Debtors commenced these cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

## Jurisdiction

6.　This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Overview of the Debtors' Business

7.　The Debtors are a leading specialty retailer of fashion-forward and inspirational apparel for plus sized urban women under the brand name of Ashley Stewart.  Urban Brands, Inc., a Delaware corporation, is the direct or indirect parent company of all of the Debtors.  Until 2009, the Debtors also operated stores under the brand name of Marianne.

8.　The Ashley Stewart concept was founded in 1991 and has grown to become a nationally-recognized brand.  According to an October 2009 industry survey by the NPD Group, a nationally recognized firm specializing in apparel research, plus sized African American

women ranked Ashley Stewart third of all retailers, behind only Wal-Mart and Lane Bryant, as their favorite place to shop.

9.     Ashley Stewart operates broadly in the women's apparel market, which the NPD Group estimates is approximately $107 billion.   Within women's fashion, Ashley Stewart focuses on the plus sized market, which is estimated to be over $18 billion and growing.  Within this subset of the market, Ashley Stewart focuses on the underserved urban market, particularly the African American and Hispanic consumer, two of the fastest growing segments of the U.S. population. Ashley Stewart is one of the few concepts focusing directly on these particular niche markets.

10.    As of the Petition Date, the Debtors operate approximately 210 stores in 26 states with approximately 2,100 employees, the majority of which are minority women.  The store base is reinforced by a strong online presence through AshleyStewart.com, providing both a marketing tool as well as an additional outlet for Ashley Stewart customers.

11.    Despite the strength of their brand names and success at individual store locations, the Debtors began suffering from cash flow/liquidity problems in 2007, especially in their Marianne division.  The Debtors' financial difficulties continued in 2008 with the slow down in the overall economy.   As part of a strategic initiative to strengthen their balance sheet and improve their liquidity by focusing exclusively on the Ashley Stewart brand, in February 2008, the Debtors began divesting itself of all of their Marianne stores.  The proceeds from the Marianne divestitures, coupled with the reduction of the working capital investment needed to support the Marianne brand name, provided improvement in operating results and cash flow during fiscal year 2009 (ending January 30, 2010).   Unfortunately, although the Debtors significantly reduced their net losses from approximately $44.3 million in 2008 to $28.6 million

in 2009, the business continued to operate at a loss. Additionally, from fiscal year 2008 to fiscal year 2009, the Debtors net sales decreased from $179.6 million to $174.6 million.

## The Debtors' Capital and Debt Structure

12. The Prepetition Financing Agreement was an asset-based facility with a maturity date of September 10, 2010. The availability for borrowings and letter of credit obligations under the Prepetition Financing Agreement was capped at $6.5 million and was further limited to an amount supported by a borrowing base consisting of certain cash, certain accounts receivable and eligible inventory. As of the Petition Date, the Debtors owe only approximately $2,251,651 plus interest on the facility with an additional $2,366,324 in outstanding letters of credit (all of which are fully collateralized by the Debtors' cash) under the Prepetition Financing Agreement.

13. In April 2004, the Debtors entered into a Note Purchase Agreement with a group of institutional investors led by Trimaran Fund II, L.L.C. ("Trimaran"), the Debtors' largest equity holder, and certain officers, employees and consultants of the Debtors. From August 2007 to November 2009, the Debtors entered into five additional note purchase agreements to raise additional capital. In total, the Debtors sold $58,500,000 in senior unsecured notes (the "Notes"). As of the Petition Date, the Debtors owe approximately $81.3 million on account of outstanding principal and interest on the Notes.

## Objectives Of Chapter 11 Filing

14. In April 2010, the Debtors engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist the Debtors in searching for additional equity and/or mezzanine financing. Following exhaustive efforts to locate additional capital, the Debtors determined that there was insufficient interest in the market for this additional financing and, as a result, the Debtors' best alternative to preserve the Debtors' business as a going concern and maximize the value of their assets was to pursue a sale of all or substantially all the Debtors' assets.

15.     Accordingly, in August 2010, Oppenheimer expanded its marketing efforts to solicit interest from prospective purchasers of the Debtors and their assets as a going-concern. As a result of this process, New Ashley Stewart, LLC ("New Ashley" or the "Stalking Horse Bidder") emerged as the party submitting the highest and best bid for the Debtors' assets. Accordingly, the Debtors, with the approval of their board of directors, engaged in active negotiations with New Ashley regarding a potential going concern transaction and, on September 8, 2010, the Debtors and New Ashley executed a non-binding letter of intent. Following the execution of the letter of intent, the Debtors and their advisors actively negotiated with New Ashley regarding the definitive terms and conditions of an asset purchase agreement. The Debtors expect that on or shortly after the Petition Date, they will execute an asset purchase agreement with New Ashley (the "New Ashley Purchase Agreement"), which the Debtors will seek Court approval of pursuant to section 363 of the Bankruptcy Code following a Court sanctioned auction process.

16.     The Debtors believe that a going-concern sale of the Debtors' business presents the best opportunity to maximize recoveries for creditors and preserve thousands of jobs for the Debtors' employees. Accordingly, the Debtors expect to file a sale procedures motion on the first day of these chapter 11 cases and continue their efforts to solicit bids from other potentially interested parties.

## RELIEF REQUESTED

17.     The Debtors request that the Court authorize the Debtors to obtain senior secured, superpriority post-petition financing in the aggregate not to exceed $6 million pursuant to the terms of this Motion, the DIP Loan Agreement, and the DIP Orders.

18.     The proposed financing will be provided by the DIP Lender. It will be senior to all obligations under the Pre-Petition Financing Agreement. As such, the liens created under the

DIP Loan Agreement are priming liens with respect to liens currently held by the Pre-Petition Lender.

19.     Pending entry of the final order authorizing the DIP Loan Agreement (the "Final DIP Order"), the Debtors request that the Court authorize the Debtor to (i) borrow up to $6 million pursuant to the terms of the DIP Loan Agreement; (ii) deem all pre-petition letters of credit issued under the Pre-Petition Loan Agreement issued under the DIP Loan Agreement; (iii) use cash collateral as provided in the Interim DIP Order; (iv) grant to the DIP Secured Parties the liens and superpriority claims described herein; (v) provide adequate protection to the Pre-Petition Lender, as described herein and in the Interim DIP Order; (vi) approve the proposed notice of the Final Hearing; and (vii) schedule the Final Hearing.

**Funding of the Debtors' Operations**

**A.     The Pre-Petition Financing Agreement**

20.     Prior to the commencement of these Chapter 11 Cases, the Pre-Petition Lender made certain revolving loans to the Debtors (the "Pre-Petition Facility") pursuant to the Pre-Petition Financing Agreement.

21.     The amounts borrowed under the Pre-Petition Financing Agreement were used to fund, among other things, working capital requirements. As mentioned above, as of the Petition Date, the Debtors owe only approximately $2,251,651 plus interest on the facility with an additional $2,366,324 in outstanding letters of credit (all of which are fully collateralized by the Debtors' cash) under the Pre-Petition Financing Agreement (collectively, the "Pre-Petition Debt").

22.     To secure the Pre-Petition Senior Debt, the Debtors granted security interests and liens (the "Pre-Petition Senior Liens") to the Pre-Petition Lender upon substantially all of the Debtors' personal property, including, without limitation, Accounts; Deposit Accounts;

Equipment; General Intangibles; Goods; Inventory; Investment Property; Commercial Tort Claims, and the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the Collateral (each as defined in the Pre-Petition Financing Agreement and/or the Uniform Commercial Code) (collectively, the "Pre-Petition Collateral"), with priority over all other liens except any liens that are valid, properly perfected, unavoidable, and senior to the Pre-Petition First Liens, they are referred to herein as the "Permitted Prior Liens").[3]

### Debtors' Proposed Post-Petition Financing Arrangement

**A.  Need for Post-Petition Financing**

23.     An immediate need exists for the Debtors to obtain funds from the proposed financing arrangement under DIP Loan Agreement (the "DIP Facility") in order to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, to preserve and maintain the value of their assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility. The absence of the requested relief would immediately and irreparably harm the Debtors, their estates and creditors and the possibility for a successful sale of the Debtors' assets as a going concern or otherwise.

**B.  Background of the Post-Petition Financing Arrangement**

24.     Prior to the Petition Date, in exploring financing options, the Debtors recognized that the obligations owed to the Pre-Petition Lender are secured by virtually all of the Debtors'

---

[3]  Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, perfected and unavoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtor, the Agent, and any committee appointed pursuant to Section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection and extent of any such Permitted Prior Lien and/or security interest.

property, such that either (i) the liens of the Pre-Petition Lender would have to be primed to obtain post-petition financing; (ii) a post-petition lender would be required to refinance the obligations owed to the Pre-Petition Lender in full and provide additional loan availability; or (iii) the Debtors would have to find a post-petition lender willing to extend credit that would be junior to the Pre-Petition Lender's liens. Because the Pre-Petition Lender advised the Debtors' representatives that it would not consent to being primed by another lender, borrowing from another post-petition lender or lending group that required liens and claims senior to that of the Pre-Petition Lender likely could only be accomplished through an extended, contested hearing to determine compliance with the requirements of section 364(d) of the Bankruptcy Code.

25. In view of these circumstances, the DIP Lender is willing to extend post-petition financing on the terms and conditions described herein and thus prime its own pre-petition security interests during the interim period. The Debtors concluded that the DIP Lender's proposal was desirable because, among other things, it permits the Debtors to secure necessary post-petition financing to continue operations and avoid an extended, contested hearing under section 364(d) of the Bankruptcy Code.

**C.     Negotiations**

26. The Debtors and the DIP Lender engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the DIP Loan Agreement. Importantly, the DIP Loan Agreement provides that the Debtors may draw immediately (on an interim basis) to meet their administrative and operational obligations during the early stages of the Debtors' Chapter 11 Cases, a very critical period for preserving going concern values.

27. The Debtors and the DIP Lender have also agreed upon a budget (as the same may be modified from time to time consistent with the terms of the DIP Financing Agreements,

the "Budget") projecting cash flow for six (6) weeks. The Debtors believe that the Budget is achievable and will allow them to operate and pay their post-petition obligations as they mature. A copy of the Budget is attached hereto as Exhibit C.

**D.     Use of Cash Collateral and Proposed Adequate Protection**

28.     In order to address their working capital needs and fund their efforts in these Chapter 11 Cases, the Debtors also require the use of cash collateral of the Pre-Petition Secured Parties (the "Cash Collateral"). The use of Cash Collateral will provide the Debtors with the additional necessary capital with which to operate their business, pay their employees, and continue to maintain the going-concern value of their business.

29.     The Pre-Petition Lender has consented to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Budget, subject to the adequate protection liens and payments discussed below and the other terms and conditions set forth in the Interim DIP Order.

30.     The Pre-Petition Lender has requested and is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in collateral under the Pre-Petition Financing Agreement to the extent that there is a diminution in the value of such collateral from and after the Petition Date. As adequate protection for any such diminution in value, the Pre-Petition Secured Parties shall be granted, pursuant to sections 361, 363(e), and 364(c) of the Bankruptcy Code, additional and replacement security interests and liens (the "Pre-Petition Replacement Liens") in and upon all existing and after acquired real and personal, tangible and intangible, assets of the Borrowers (the "Collateral"), but the Collateral shall not include any proceeds of bankruptcy recoveries under chapter 5 of the Bankruptcy Code (other than proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code

and amounts necessary to reimburse the DIP Lender for the amount of the Carve-Out, if any, used to finance the pursuit of such recovery or settlement with respect to any other recovery or settlement under Chapter 5 of the Bankruptcy Code).

31.    The Replacement Liens shall be junior only to the liens granted to the DIP Lender, the Carve-Out (as defined in the Interim Order), and Permitted Prior Liens (as defined in the Pre-Petition Finance Agreement). The Replacement Liens are and shall be valid, perfected, enforceable, and effective as of the date of the entry of the Interim DIP Order without any further action by the parties and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

32.    In addition to the Replacement Liens, the Debtors propose to grant and/or pay the Pre-Petition Lender the following, among other things, as adequate protection:

(a)    an allowed superpriority administrative claim, which shall have priority (except with respect to the DIP Liens, the DIP Superpriority Claim, the Replacement Liens, the Carve-Out, and the Permitted Prior Liens) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and, if approved in the Final DIP Order, section 506(c) of the Bankruptcy Code;

(b)    repayment of the principal amount of the Pre-Petition Debt in accordance with the DIP Orders and payments in the amount of default interest, fees, and expenses with respect to the Pre-Petition Debt in accordance with the Pre-Petition Financing Agreement;

(c)    the establishment of an interest bearing account in the control of the Pre-Petition Lender into which the sum of $100,000.00 shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Pre-Petition Lender under the Pre-Petition Financing Agreement and to pay any expenses (including reasonable attorneys' fees) incurred by the Pre-Petition Lender in connection with these Chapter 11 Cases or any successor case.

33.     The foregoing claims are to be granted and the payments are to be made to the Pre-Petition Lender because, among other things, the Pre-Petition Financing Agreement will be primed and the Debtors will continue to use the Cash Collateral and other collateral under the Pre-Petition Financing Agreement in the Debtors' ongoing operations until the entry of the Final DIP Order. At that time, the Pre-Petition Debt will be satisfied by the proceeds of the DIP Loan Agreement.

## The DIP Facility Should Be Authorized

34.     Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value. The credit provided under the DIP Loan Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Loan Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Loan Agreement will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 Cases. Accordingly, the timely approval of the relief requested herein is imperative.

35.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section

503(b)(1) of the Bankruptcy Code, the court may authorize the debtors to obtain credit or incur

debt (a) with priority over any and all administrative expenses, as specified in section 503(b) or

507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not

otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject

to a lien. 11 U.S.C. § 364. The Debtors propose to obtain the financing set forth in the DIP

Loan Agreement by providing, *inter alia*, superpriority claims, security interests, and liens

pursuant to section 364(c)(1), (2), (3) and section 364(d) of the Bankruptcy Code.

36.     The Debtors' liquidity needs can be satisfied only if the Debtors are immediately

authorized to borrow under the DIP Facility and to use such proceeds to fund their operations.

The Debtors have been unable to procure sufficient financing in the form of unsecured credit

allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in

exchange for the grant of a superpriority administrative expense claim pursuant to section

364(c)(1). The Debtors have not been able to obtain post-petition financing or other financial

accommodations from any alternative prospective lender or group of lenders on more favorable

terms and conditions than those for which approval is sought herein.

37.     Bankruptcy courts grant a debtor considerable deference in acting in accordance

with its business judgment. *See, e.g., Bray v. Shenandoah Fed, Sav. & Loan Ass'n (In re

Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34,

40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section

364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long

as the financing agreement does not contain terms that leverage the bankruptcy process and

powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest");

*see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew*

*Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

38. Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding).

39. Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens. The Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and, accordingly, the DIP Loan Agreement reflects the exercise of their sound business judgment.

40. The terms and conditions of the DIP Loan Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the DIP Lender and all obligations incurred under the DIP Loan Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Use of Cash Collateral Should Be Approved

41. Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or

(b) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U S.C. § 363(c)(2). The Debtors require the use of Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Pre-Petition Lender in the Debtors' Cash Collateral will be protected by the adequate protection set forth above. The Pre-Petition Lender has consented to the use of the Cash Collateral on the terms set forth herein and in the Interim DIP Order. Accordingly, the Debtors' request to use Cash Collateral in the operation of their business and administration of the chapter 11 case should be approved.

## The Proposed Adequate Protection Should Be Authorized

42.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

43. The Pre-Petition Lender has agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP Loan Agreement in consideration for the adequate protection provided under the DIP Loan Agreement. Accordingly, the adequate protection proposed herein to protect the Pre-Petition Lender's interest in the pre-petition collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## The Automatic Stay Should Be Modified on a Limited Basis

44. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lender and the Pre-Petition Lender, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lender to exercise, upon the occurrence of and during the continuance of an event of default (upon five (5) business days notice of such occurrence), all rights and remedies under the DIP Loan Agreement; and (iii) implement the terms of the proposed DIP Orders.

45. Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

46. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

47. Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to use Cash Collateral and borrow under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estate and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

48. The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the motion, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees, and customers of their ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors.

49. The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

50. To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

## NOTICE

51.     No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases.  The Debtors will provide notice of this Motion by facsimile and/or overnight mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims on a consolidated basis; (c) counsel to the DIP Lender; (d) counsel to Trimaran; (e) the Internal Revenue Service.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: September 21, 2010
       Wilmington, Delaware

Respectfully submitted,

_____
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Paul N. Heath (No. 3704)
Chun I. Jang (No. 4790)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Proposed Attorneys for the Debtors and
Debtors-in-Possession*