## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **Urban Brands, Inc., et al.,**[1] | ) | **Case No. 10-_____ (___)** |
| | ) | |
| **Debtors.** | ) | **Joint Administration Pending** |
| | ) | |

## DECLARATION OF MICHAEL A. ABATE IN SUPPORT OF FIRST DAY MOTIONS

I, Michael A. Abate, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Vice President Finance/Treasurer of each of the above captioned debtors and debtors in possession (collectively, the "Debtors"). I am familiar with the Debtors' day-to-day operations, financial condition, books and records, and business affairs.

2.      On September 21, 2010 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Urban Brands, Inc. (3678), 100% Girls Ltd. (4150), 100% Girls of Georgia, Inc. (4159), 100% Girls of New York, Inc. (2149), 100 Percent Girls of New Jersey, Inc. (4167), A.S. Interactive, Inc. (3472), Ashley Stewart Ltd. (4541), Ashley Stewart Apparel Corporation (4049), Ashley Stewart Clothing Company, Inc. (4051), Ashley Stewart Management Co., Inc. (4053), Ashley Stewart Woman Ltd. (4152), ASIL 6, Inc. (3996), ASNJ 10, Inc. (4004), Carraizo Alto Apparel Corporation (4651), Church Street Retail, Inc. (5954), Kid Spot Ltd. (2585), Kidspot of Delaware, Inc. (2596), Kidspot of Illinois, Inc. (2606), Kidspot of Michigan, Inc. (2603), Kidspot of New Jersey, Inc. (2601), Kidspot of Ohio, Inc. (4705), Kidspot of Pennsylvania, Inc. (2599), Kidspot of Texas, Inc. (3809), Large Apparel of Alabama, Inc. (0624), Large Apparel of California, Inc. (2129), Large Apparel of Connecticut, Inc. (5161), Large Apparel of District of Columbia, Inc. (8613), Large Apparel of Florida, Inc. (2209), Large Apparel of Georgia, Inc. (3894), Large Apparel of Illinois, Inc. (4650), Large Apparel of Indiana, Inc. (4055), Large Apparel of Louisiana, Inc. (3790), Large Apparel of Maryland, Inc. (5158), Large Apparel of Michigan, Inc. (9420), Large Apparel of Mississippi, Inc. (5913), Large Apparel of Missouri, Inc. (2135), Large Apparel of New Jersey, Inc. (5157), Large Apparel of New York, Inc. (5956), Large Apparel of North Carolina, Inc. (8611), Large Apparel of Ohio, Inc. (3815), Large Apparel of Pennsylvania, Inc. (4057), Large Apparel of South Carolina, Inc. (2029), Large Apparel of Tennessee, Inc. (3895), Large Apparel of Texas, Inc. (3787), Large Apparel of Virginia, Inc. (2809), Large Apparel of Wisconsin, Inc. (3898), Marianne Ltd. (3940), Marianne USPR, Inc. (2193), Marianne VI, Inc. (2206), Metro Apparel of Kentucky, Inc. (7533), Metro Apparel of Massachusetts, Inc. (1367), The Essence of Body & Soul, Ltd. (4165), Urban Acquisition Corporation of New Jersey, Inc. (2976), Urban Acquisition Corporation of New York, Inc. (4103), and Urban Brands TM Holding Co. (5909). The Debtors' corporate offices are located at 100 Metro Way, Secaucus, New Jersey 07094.

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

3.　　To minimize any adverse effects on their business as a result of the commencement of these Chapter 11 Cases, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to: (a) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases. Gaining and maintaining the support of the Debtors' employees and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be crucial to the success of the Debtors' efforts in these Chapter 11 Cases.

4.　　I submit this Declaration in support of the First Day Motions. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

## I.

## GENERAL BACKGROUND

### A.　　Overview of the Debtors' Business

5.　　The Debtors are a leading specialty retailer of fashion-forward and inspirational apparel for plus sized urban women under the brand name of Ashley Stewart. Urban Brands,

RLF1 3608007v. 3

Inc., a Delaware corporation, is the direct or indirect parent company of all of the Debtors. Until 2009, the Debtors also operated stores under the brand name of Marianne.

6.     The Ashley Stewart concept was founded in 1991 and has grown to become a nationally-recognized brand. According to an October 2009 industry survey by the NPD Group, a nationally recognized firm specializing in apparel research, plus sized African American women ranked Ashley Stewart third of all retailers, behind only Wal-Mart and Lane Bryant, as their favorite place to shop.

7.     Ashley Stewart operates broadly in the women's apparel market, which the NPD Group estimates is approximately $107 billion. Within women's fashion, Ashley Stewart focuses on the plus sized market, which is estimated to be over $18 billion and growing. Within this subset of the market, Ashley Stewart focuses on the underserved urban market, particularly the African American and Hispanic consumer, two of the fastest growing segments of the U.S. population. Ashley Stewart is one of the few concepts focusing directly on these particular niche markets.

8.     As of the Petition Date, the Debtors operate approximately 210 stores in 26 states with approximately 2,100 employees, the majority of which are minority women. The store base is reinforced by a strong online presence through AshleyStewart.com, providing both a marketing tool as well as an additional outlet for Ashley Stewart customers.

9.     Despite the strength of their brand names and success at individual store locations, the Debtors began suffering from cash flow/liquidity problems in 2007, especially in their Marianne division. The Debtors' financial difficulties continued in 2008 with the slow down in the overall economy. As part of a strategic initiative to strengthen their balance sheet and improve their liquidity by focusing exclusively on the Ashley Stewart brand, in February

3

2008, the Debtors began divesting themselves of all of their Marianne stores. The proceeds from the Marianne divestitures, coupled with the reduction of the working capital investment needed to support the Marianne brand name, provided improvement in operating results and cash flow during fiscal year 2009 (ending January 30, 2010). Unfortunately, although the Debtors significantly reduced their net losses from approximately $44.3 million in 2008 to $28.6 million in 2009, the business continued to operate at a loss. Additionally, from fiscal year 2008 to fiscal year 2009, the Debtors net sales decreased from $179.6 million to $174.6 million.

**B.**     **The Debtors' Capital and Debt Structure**

10.     The Debtors were borrowers under a Loan and Security Agreement dated as of September 3, 2004 (the "Prepetition Financing Agreement"), with Bank of America, N.A. (successor by merger to LaSalle Retail Finance, a Division of LaSalle Business Credit, LLC, as agent for LaSalle Bank Midwest National Association f/k/a Standard Federal Bank National Association) (the "Lender"). The Prepetition Financing Agreement was an asset-based facility with a maturity date of September 10, 2010 (pursuant to extensions discussed in paragraph 14 below). The availability for borrowings and letter of credit obligations under the Prepetition Financing Agreement was capped at $6.5 million and was further limited to an amount supported by a borrowing base consisting of certain cash, certain accounts receivable and eligible inventory. As of the Petition Date, the Debtors owe only approximately $2,251,651 plus interest on the facility with an additional $2,366,324 in outstanding letters of credit (all of which are fully collateralized by the Debtors' cash).

11.     In April 2004, the Debtors entered into a Note Purchase Agreement with a group of institutional investors led by Trimaran Fund II, L.L.C. ("Trimaran"), the Debtors' largest equity holder, and certain officers, employees and consultants of the Debtors. From August 2007 to November 2009, the Debtors entered into five additional note purchase agreements to

4

raise additional capital. In total, the Debtors sold $58,500,000 in senior unsecured notes (the "Notes"). As of the Petition Date, the Debtors owe approximately $81.3 million on account of outstanding principal and interest on the Notes.

**C.     Objectives Of Chapter 11 Filing and Proposed Sale**

12.     As discussed above, the Debtors' Marianne and Ashley Stewart brands each enjoyed profitable expansion until 2007 when the Debtors began suffering from cash flow/liquidity problems, especially in their Marianne division. The Debtors' Ashley Stewart division likewise began to struggle during the second half of 2008 as a result of an overall weak economy. Both divisions of the Debtors' business required significantly larger capital expenditures than the Debtors had anticipated in terms of the expansion of the newly acquired Marianne division and the marketing and promotion of each brand. From August 2007 to November 2009, the Debtors attempted to address these capital needs through the issuance of the Notes.

13.     Additionally, in January 2009, the Debtors sold their Marianne division and began to focus solely on the Ashley Stewart brand. In fiscal 2009, despite a difficult economy and limited liquidity, the current management team turned the business around. From 2008 to 2009, about 14% or $11 million of corporate expenses were cut, 7 stores were closed, and same store sales turned positive, averaging +5.2% from September 2009 through January 2010, with leaner and more productive inventory. In Q1 2010, the Debtors achieved sales of $47 million, a comparative same store sales increase of 3.7%. As noted above, however, the Debtors' business continued to operate at a loss and the Debtors' net sales continued to decrease.

14.     In early 2010, the Debtors approached the Lender regarding an extension of the maturity date under the Prepetition Financing Agreement. The Lender expressed a reluctance to provide a long-term extension of the maturity date or provide addition financing to the Debtors,

but did agree to a series of amendments to the Prepetition Financing Agreement that provided periodic extensions of the maturity date. These amendments, however, also resulted in additional fees being owed to the Lender and restrictions on loan availability under the Prepetition Financing Agreement.

15. As a result of this liquidity constraint, the Debtors' sought (albeit unsuccessfully) to locate a new lender and, thereafter, retained an investment banker to assist in their search for additional equity and/or mezzanine financing. In April 2010, the Debtors engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist in raising additional financing. During the course of the marketing effort, Oppenheimer contacted approximately 40 potential investors, but were unable to reach a definitive agreement with any of these interested parties. Following these exhaustive efforts to locate additional capital, the Debtors determined that their best alternative to preserve their business as a going concern and maximize the value of their assets was to pursue a sale of all or substantially all the Debtors' assets (the "Assets").

16. Accordingly, in August 2010, Oppenheimer expanded its marketing efforts to solicit interest from prospective purchasers of the Debtors and the Assets as a going-concern. Prior to the Petition Date, the Debtors executed confidentiality agreements with seven prospective acquirers. After discussions with a number of these interested parties, New Ashley Stewart, LLC ("New Ashley" or the "Stalking Horse Bidder"), an affiliate of GB Merchant Partners, LLC emerged as the party submitting the highest and best bid for the Debtors' Assets. Accordingly, the Debtors, with the approval of their board of directors, engaged in active negotiations with New Ashley regarding a potential going concern transaction and, on September 8, 2010, the Debtors and New Ashley executed a non-binding letter of intent. Following the execution of the letter of intent, the Debtors and their advisors actively negotiated with New

6

Ashley regarding the definitive terms and conditions of an asset purchase agreement. The Debtors expect that, on or shortly after the Petition Date, they will enter into an asset purchase agreement (the "Stalking Horse Asset Purchase Agreement") with New Ashley, which the Debtors will seek Court approval of pursuant to section 363 of the Bankruptcy Code following a Court sanctioned auction process.

17.     The Debtors believe that the Stalking Horse Asset Purchase Agreement represents the best opportunity to maximize recoveries for creditors and preserve thousands of jobs for the Debtors' employees. The Stalking Horse Asset Purchase Agreement is not exclusive and is subject to higher and better offers pursuant to a court approved auction process. The Debtors and their advisors continue to provide data to and engage in active discussions and negotiations with all interested parties. Indeed, the Debtors have retained PricewaterhouseCoopers LLP ("PwC") to assist them with, among other things, the continued marketing of the Debtors' assets. With the assistance of PwC, the Debtors have identified approximately 75 financial and 25 strategic potential partners that they intend to contact in connection with the bidding process. The Debtors are in the process of sending out informational items intended to garner interest in the Assets and have also established an interactive data room for purposes of assisting prospective purchasers in performing their due diligence.

18.     In connection with the sale process, the Debtors will be filing a motion (the "Sale Motion") seeking (i) the entry of an order (the "Bidding Procedures Order") establishing bidding and auction procedures in connection with the sale of the Assets, approving certain bid protections, scheduling an auction and setting a date and time for a sale hearing (the "Sale Hearing") and granting certain related relief and (ii) at the Sale Hearing, the entry of an order approving and authorizing the sale to the Successful Bidder (as defined therein).

RLF1 3608007v. 3

19. As the Debtors' proposed debtor-in-possession credit facility will provide sufficient funding for operations only through the end of October 2010, the Debtors are requesting that the Court set a hearing to consider entry of the Bidding Procedures Order on or before October 4, 2010; and set the Sale Hearing for on or before October 26, 2010. The Debtors presently face severe liquidity constraints and the possibility of continued financial deterioration. The Debtors, however, have managed to obtain the necessary financing to conduct the sale process along the timeframe proposed herein. In the event that the Debtors are forced to prolong the sale process beyond the proposed timeline, the Debtors likely will not have sufficient liquidity to support a going concern sale of the Assets.

## II.

## FIRST DAY MOTIONS[2]

20. Concurrently with the filing of these Chapter 11 Cases, the Debtors will be filing a number of First Day Motions. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' Chapter 11 Cases (the "First Day Hearing"), at which the Court will hear the First Day Motions.

21. Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of customers, employees and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases. I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is tailored to

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motion.

RLF1 3608007v. 3

meet the goals described above and, ultimately, will be critical to the Debtors' ability to maximize the value of their assets for the benefit of all of the Debtors' economic stakeholders.

## A. Debtors' Motion for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases

22. The Debtors seek joint administration of the Chapter 11 Cases. There are fifty-five Debtors and Urban Brands, Inc. is the ultimate parent entity of all the Debtors.

23. The joint administration of the Debtors' cases will facilitate and promote an economically efficient administration of these cases, permit the Clerk of the Court to utilize a single general docket for these cases, and combine notices to creditors of the Debtors' respective estates and other parties in interest which will result in savings to the estates.

24. If joint administration is ordered, the Debtors, the Court, creditors and other parties in interest will be able to avoid incurring considerable unnecessary time and expense in connection with, among other things, the need to file duplicative motions, enter duplicative orders, and forward duplicative notices to creditors and other parties in interest.

25. Joint administration will further enable parties in interest in these Chapter 11 Cases to be aware of the various matters before the Court in all of the Debtors' cases.

26. To the best of my knowledge, the joint administration of these Chapter 11 Cases will not adversely affect the Debtors' respective constituencies and will not harm parties in interest. Rather, all of these parties will benefit from the cost reductions associated with the joint administration of these cases.

27. Consequently, I believe and submit that the joint administration of these Chapter 11 Cases is in the best interest of the Debtors, the Debtors' estates, their creditors and other parties in interest.

RLF1 3608007v. 3

**B.**     ***Motion of the Debtors and Debtors-in-Possession for Entry of An Order Appointing BMC Group, Inc. As Claims and Noticing Agent***

28.     The Debtors have thousands of creditors. The sheer size and magnitude of the Debtors' creditor body would most likely make it impracticable for the Clerk's Office of the Court to undertake that task.

29.     I believe that the most effective and efficient manner of noticing creditors and parties in interest in these Chapter 11 Cases, and administering the claims process, is for the Debtors to engage an independent third party to act as the Debtors' notice and claims agent. The Debtors may also require the services of an agent to administer votes pursuant to a plan of reorganization. Accordingly, the Debtors propose to employ BMC Group, Inc. ("BMC") as the claims and noticing agent, inter alia, to assist the Debtors in distributing notices, as necessary, and to process other administrative information pertaining to these Chapter 11 Cases.

30.     BMC specializes in noticing, claims processing, balloting, and other administrative tasks in Chapter 11 Cases. Therefore, the Debtors wish to engage BMC to send out certain designated notices and to collect and monitor claims and perform certain ballot-related functions with respect to these Chapter 11 Cases. The Debtors chose BMC based on both its experience and the competitiveness of its fees. I believe that BMC is well-qualified to serve in this capacity and that BMC's retention is in the best interests of the Debtors' estates and their creditors.

**C.**     ***Motion of Debtors for Entry of an Order Extending Time Within Which to File Schedules and Statements***

31.     Completing the Debtors' schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules") requires the expenditure of considerable time and effort on the part of the Debtors' employees and advisors to collect, review, and assemble

RLF1 3608007v. 3

copious amounts of information. Prior to the Petition Date, the Debtors' primary focus has been preparing these cases for filing and finalizing the Stalking Horse Asset Purchase Agreement. Given the amount of work entailed in completing the Schedules, and the competing demands upon the Debtors' limited staff to address numerous critical operational matters during the initial postpetition period, the Debtors will not be in a position to properly and accurately complete the Schedules within the required 30-day period. Nevertheless, recognizing the importance of the Schedules in these Chapter 11 Cases, the Debtors intend to complete the Schedules as quickly as possible under the circumstances. Accordingly, the Debtors respectfully request that the Court extend the deadline by when the Debtors must file their Schedules to and including the forty-fifth (45th) day after the Petition Date.

**D.**     ***Motion of the Debtors and Debtors in Possession for an Order Confirming the Administrative Expense Priority Status of the Debtors' Undisputed Obligations for the Postpetition Delivery of Goods and Services***

32.     The Debtors seek entry of an order confirming that the Debtors' undisputed obligations to the Suppliers under Outstanding Orders for (a) shipments of goods delivered to and requested and accepted by the Debtors on and after the Petition Date, and (b) the provision of services to the Debtors on and after the Petition Date will be entitled to administrative expense priority status.

33.     In the ordinary course of the Debtors' business, numerous suppliers and service providers provide the Debtors with goods and services that are integral to the Debtors' business operations. As of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "Outstanding Orders") with certain suppliers (collectively, the "Suppliers") for such goods and services.

34.     As a result of the commencement of these Chapter 11 Cases, the Debtors believe that the Suppliers may perceive a risk that they will be treated as prepetition general unsecured

11

creditors for the cost of any shipments made or services provided after the Petition Date pursuant to the Outstanding Orders. As a result, the Suppliers may refuse to ship such goods to the Debtors or provide such services to the Debtors unless the Debtors issue substitute postpetition purchase orders or provide other assurances of payment.

35. Issuing substitute purchase orders on a postpetition basis would be administratively burdensome, time-consuming, and counterproductive to the Debtors' continuing operations. Such a requirement imposed by Suppliers – or other requests for assurance of payment – inevitably will lead to delays in the Debtors' receipt of goods and services.

36. Under these circumstances, the Debtors believe that relief is needed to permit the Debtors to obtain the timely delivery of goods and uninterrupted provision of services from the Suppliers pursuant to the Outstanding Orders.

**E.**  ***Motion of the Debtors and Debtors-in-Possession for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services***

37. In the normal course of their business, the Debtors have relationships with certain utility providers (the "Utility Providers") for the provision of natural gas, electricity, telephone, sewer, sanitation and other services (the "Utility Services").

38. The Debtors expect to have sufficient liquidity to timely pay all postpetition obligations owed to their Utility Providers.

39. To provide additional assurance of payment for future services to the Utility Providers, the Debtors will deposit $200,000 (the "Utility Deposit") into a newly created, segregated, interest-bearing account within 20 days of the Petition Date (the "Utility Deposit Account," and together with the DIP Facility and cash flow from operations, collectively, the "Proposed Adequate Assurance"). This amount represents a sum equal to 50% of the Debtors' estimated monthly cost of utility service. The Utility Deposit Account shall be maintained with

RLF1 3608007v. 3

a minimum balance equal to 50% of the Debtors' estimated monthly cost of utility service, which may be adjusted by the Debtors to account for the termination of utility services by the Debtors and/or agreements with Utility Providers.

40.     Notwithstanding the Proposed Adequate Assurance, if a Utility Provider is not satisfied that the establishment of the Utility Deposit Account provides adequate assurance of future payment, the Debtors propose the following procedures (the "Procedures") under which the Utility Provider may make additional requests for adequate assurance:

a)      If a Utility Provider is not satisfied with the assurance of future payment provided by the Debtors, the Utility Provider must serve a written request setting forth the location(s) at which the given utility services are provided, the account number(s) for such location(s), the outstanding balance for each account and a summary of the Debtors' payment history in each account (each, a "Request").

b)      The Request must be served upon the Debtors at the following addresses: (i) Urban Brands, Inc., 100 Metro Way, Secaucus, New Jersey, Attn.: Michael Abate; and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn.: Mark D. Collins, Esq., Michael J. Merchant, Esq., and Paul N. Heath, Esq..

c)      Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider serving a timely Request if the Debtors in their discretion determine that the Request is reasonable or if the parties negotiate alternate consensual provisions.

d)      If the Debtors believe that a Request is unreasonable, the Debtors shall file a motion pursuant to section 366(c) of the Bankruptcy Code (a "Determination Motion") within 30 days or receipt of a Request. The Determination Motion shall seek a determination from the Court that the Utility Deposit Account, plus any additional consideration offered by the Debtors, constitutes adequate assurance of payment. Pending notice and a hearing of the Determination Motion, the Utility Provider that is the subject of the Determination Motion may not alter, refuse or discontinue services to the Debtors or recover or set off against a prepetition deposit.

e)      Any Utility Provider that fails to make a Request shall be deemed to be satisfied that the Debtors' Adequate Assurance provides adequate

13

assurance of payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code.

41. To the extent the Debtors subsequently identify additional providers of utilities, the Debtors seek authority, in their sole discretion, to amend the Utility Service List to add or remove any Utility Provider. Any subsequently added Utility Provider that objects to the Debtors' Adequate Assurance will be subject to the Procedures.

42. The Debtors submit that the Utility Deposit Account provides more than adequate assurance of future payment. Furthermore, contemporaneously herewith, the Debtors are seeking approval of a debtor-in-possession financing facility that will enable them to pay their operating costs, including utility costs, as they come due. The Debtors anticipate having sufficient resources to pay, and intend to pay, all valid postpetition obligations for utility services in a timely manner, especially considering that the aggregate amount of the Debtors' utility obligations is not overwhelming. In addition, the Debtors have a powerful incentive to stay current on their utility obligations because of their reliance on utility services for the operation of their business. These factors, which the Court may and should consider when determining the amount of any adequate assurance payments, justify a finding that the Debtors' Proposed Adequate Assurance is more than sufficient to assure the Utility Providers of future payment.

**F.** ***Motion of the Debtors and Debtors-in-Possession for Entry of an Order (A) Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; and (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests. ("Employee Wages Motion")***

43. The Debtors' workforce consists of both hourly and salaried employees (the "Employees"). The Debtors pay approximately 1,552 Employees on an hourly basis and pay approximately 527 Employees on a salaried basis. Additionally, the Debtors utilize 2 independent contractors in the ordinary course of business. The Independent Contractors are

14

critical to the management and operation of the Debtors. Of the Employees, approximately 1,515 are part-time Employees and approximately 564 are full-time Employees. None of the Debtors' Employees are covered by a collective bargaining agreement.

44. The Debtors' full-time Employees include executives, regional vice presidents, district managers, store managers, assistant managers, sales and support associates, home office employees and distribution center employees. Sales and support associates, assistant managers, non-executive home office and certain distribution center employees are paid by the hour, while executives, regional vice presidents, store managers, and district managers are on salary. The managers employed by the Debtors include store managers, assistant store managers, area managers, district managers, and district sales managers, among others. Store managers report to the district managers, who report to a regional vice president.

45. As more fully described in the Employee Wages Motion, the Debtors seek authority, to be exercised in their sole discretion, to pay and honor certain prepetition claims for the previously described wages, salaries, bonuses and other compensation, federal and state withholding taxes and other amounts withheld (including garnishments, child support orders, Employees' share of insurance premiums, taxes and 401(k) contributions), health benefits, insurance benefits, vacation time, sick leave, life and accidental death and dismemberment insurance, long-term disability coverage, and all other benefits that the Debtors have historically provided in the ordinary course of business (collectively, the "Employee Wages and Benefits"), and to pay all administrative costs associated with such Employee Wages and Benefits. The Debtors also seek authority, to be exercised in their sole discretion, to continue to reimburse Employees for business-related expenses they incur in the ordinary course of business. In addition, the Debtors request the right to modify, change and discontinue any of the Employee

15

Wages and Benefits and the policy related to reimbursable expenses in the ordinary course of business, in their sole discretion, without the need for further Court approval.

46. The payment of the Debtors' prepetition Employee Wages and Benefits will benefit the estates and their creditors by allowing the Debtors' business operations to continue without interruption. In the absence of such payments, the Debtors' Employees may seek alternative employment opportunities. Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations and likely diminishing creditor confidence in the Debtors. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtors should be focusing on stabilizing their operations. Accordingly, the Debtors must pursue all reasonable measures to retain their Employees by, among other things, continuing to honor all wages, benefits and related obligations, including those that accrued prepetition.

**G.** *Motion of the Debtors and Debtors-in-Possession for an Order Authorizing the Debtors to Honor Certain Prepetition Customer Programs ("Customer Programs Motion")*

47. Prior to commencement of these Chapter 11 Cases, both in the ordinary course of their business and as is customary in the retail industry, the Debtors engaged in certain activities to develop and sustain a positive reputation with the consumers and retail customers to whom the Debtors market their products. To that end, the Debtors implemented various customer programs and policies (collectively, the "Customer Programs") designed to ensure customer satisfaction, drive sales, meet competitive pressures, develop and sustain customer loyalty, improve profitability and generate goodwill for the Debtors and their products, thereby retaining current customers, attracting new ones and ultimately enhancing net income. By the Customer

16

Programs Motion, the Debtors seek authority to continue the Customer Programs in the ordinary course of business.[3]

48.    The benefits of the Customer Programs are integral to the Debtors' efforts to stabilize their businesses, restore vitality and ultimately deliver the most value to all stakeholders in these Chapter 11 Cases. The Debtors believe they must quickly assure customers of the Debtors' continued ability to fulfill their obligations under the prepetition Customer Programs in order to maintain their valuable customer relationships following the commencement of these Chapter 11 Cases, particularly given the increased pressure from competitors that the Debtors believe will inevitably arise. General descriptions of the Debtors' Customer Programs are set forth below

### i.    Gift Cards

49.    In the ordinary course of their businesses, the Debtors sell electronic gift cards (the "Gift Cards") to customers. These Gift Cards can be purchased in any increment and do not expire or otherwise diminish in value over time. Gift Cards can be purchased at any of the Debtors' retail locations. Gift Cards are redeemable towards the purchase price of merchandise at any of the Debtors' stores. The typical redemption of Gift Cards is approximately $300,000 on a monthly basis, and as of the Petition Date, the Debtors estimate that they have approximately $1.62 million in Gift Cards issued and outstanding.[4] The Debtors do not maintain

---

[3] Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' right to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code. Likewise, if this Court grants the relief sought in the Customer Programs Motion, any payment made pursuant to the Court's order granting the Customer Programs Motion is not intended and should not be construed to be an admission as to the validity of any claim or a waiver of the Debtors' right to subsequently dispute such claim.

[4] The estimate for outstanding Gift Cards does not include the amount of Gift Cards issued prior to 2006. The Debtors are seeking to honor all such Gift Cards pursuant to the Customer Programs Motion but, based upon historic redemption rates, do not expect that the redemption amount for pre-2006 Gift Cards will be material.

RLF1 3608007v. 3

a cash reserve account to fund outstanding Gift Cards. Unless required by applicable state law, the Debtors do not permit the redemption of Gift Cards for cash.[5] Additionally, the Debtors issue Gift Cards to customers for merchandise returns and/or exchanges. The Gift Cards issued for such returns are, in essence, store credit. The Debtors request authority to honor all Gift Cards in the ordinary course of their business.

### ii. Refunds and Exchanges

50.     In the ordinary course of their businesses, the Debtors honor refunds and exchanges of merchandise purchased at their retail locations. Specifically, customers returning merchandise purchased at any of the Debtors' retail locations within ninety (90) days of its purchase may receive a full refund or exchange for a comparable product so long as the return is accompanied by a copy of the customer's original receipt. Without a receipt, the merchandise is refunded at the lowest price in the form of a Gift Card or exchange.[6] Approximately $350,000 of merchandise, on average, is returned on a monthly basis. The Debtors request authority to continue their ordinary course practices relating to refunds and exchanges.

### iii. Discounts and Coupons

51.     In the ordinary course of their businesses, the Debtors offer various coupons and discounts which are marketed in a variety of ways. The Debtors offer all of their employees 30% off all full-priced merchandise. Also, the Debtors periodically offer coupons and discounts to the public which are marketed in a variety of ways.

52.     Once a month, the Debtors offer 20% off of an entire purchase for a four-day period. Quarterly, the Debtors offer a friends and family discount of 30% off of an entire

---

[5] For example, in California, the Debtors are required by applicable state law to redeem any balance on a Gift Card of $10.00 or less for cash upon customer demand.

[6] Clearance merchandise is only exchanged or returned for a Gift Card.

RLF1 3608007v. 3

purchase and an additional 20% off of an entire purchase for employees. Through the end of September, the Debtors are offering 20% off of one single item through magazine ads. In October, the Debtors will offer (i) 25% off of one regular priced item to certain Ashley Stewart Credit Card holders as well as certain non-card holders for the anniversary sale, (ii) $25 off of a purchase of $125 or more, and (iii) 50% off of the Perfect Collection.

53.     On top of normal promotional discounts, the Debtors also provide 10% off any purchase when a customer applies for an Ashley Stewart Credit Card and 20% if the customer is approved on the spot. These promotions are an important component of the Debtors' business. Accordingly, the Debtors request authority to continue such promotions in the ordinary course of business.

iv.     **Contest**

54.     The Debtors currently are running a contest (the "Contest") from August 16, 2010 through October 12, 2010 for a $2,500 shopping spree and an additional $2,500 in cash. A customer is automatically entered into the Contest when the customer makes any denim purchase online or in-store or when the customer makes a non-denim eligible purchase online or in-store. The customer is eligible for one bonus entry in addition to the entry received when making one of the above purchases when the customer uses an Ashley Stewart Credit Card. Also, a customer may enter the Contest up to once a day by filling out an entry form online at www.fiercesweepstakes.com. The Contest is an important part of the Debtors' business and continuing to honor the Contest will promote goodwill with the Debtors' customers. Accordingly, the Debtors request authority to honor the Contest promotion in the ordinary course of business.

RLF1 3608007v. 3

### v.    **Layaway**

55.    The Debtors offer their customers a layaway program for purchasing merchandise (the "Layaway Program"). Customers are required to put down a minimum deposit of 20% of the layaway purchase price or $25.00 as a prepayment for merchandise the customers wish to layaway. The merchandise is put on hold for fourteen (14) days. There is a $3.00 fee to put merchandise on layaway, and an $8.00 cancellation fee if the merchandise is not picked up within the fourteen (14) days. As of the Petition Date, the Debtors have approximately $80,000 in customer deposits under the Layaway Program. These claims are satisfied in the ordinary course by delivery of goods ordered by the customer upon the Debtors' receipt of the balance of the purchase price. The vast majority of deposits represent only a fraction of the purchase price of the layaway goods. The Debtors request authority to honor the Layaway Program in the ordinary course of their business.

### H.    *Motion of the Debtors and Debtors-in-Possession for Entry of an Order Authorizing Payment of Certain Prepetition Common Carrier, Warehouse and Related Obligations ("Common Carriers Motion")*

56.    The Debtors seek authority, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to pay prepetition shipping, storage and associated fees and expenses to third party shippers, haulers, common carriers, transporters, logistics providers and warehousemen (collectively, the "Common Carriers") that the Debtors determine, in the exercise of their business judgment, are necessary or appropriate to obtain the release of goods and supplies ("Goods") in the possession of such parties and to satisfy the liens, if any, in respect of amounts owed to such parties.

57.    As of the Petition Date, the approximate value, at cost, of Goods ordered and either awaiting transit or in transit to the Debtors' stores and distribution center is $1.4 million.

RLF1 3608007v. 3

In contrast, the Debtors estimate that the total amount owing to all Common Carriers and the maximum amount required to obtain or deliver the Goods is approximately $820,000.

58.     If the Debtors do not pay the prepetition charges, the Common Carriers may refuse to ship Goods to the Debtors, severely disrupting the Debtors' business. Without the performance of services by the Common Carriers, the Debtors face the risk of a serious interruption in the flow of products to their stores.

59.     The Debtors propose that any payments made pursuant to the Common Carrier Motion be subject to the following conditions:

(i)     The Debtors, in their sole discretion, shall determine which parties, if any, are entitled to payment under the Common Carriers Motion; and

(ii)    Prior to making a payment to a party under the Common Carriers Motion, the Debtors may, in their absolute discretion, settle all or some of the prepetition claims of such party for less than their face amount without further notice or hearing.

60.     In the ordinary course of their business, the Debtors employ the services of the Common Carriers to ship, transport, store and deliver goods to and from their distribution center and stores. For the majority of the merchandise shipments received by the Debtors, the merchandise vendor arranges Goods to be shipped to the Debtors, prepays related freight charges and includes those charges in the invoice presented to the Debtors for subsequent payment along with the cost of Goods shipped. In the remaining circumstances, however, the Debtors arrange for the shipment of Goods and pay the related freight charges directly to the Common Carriers. Specifically, the Debtors employ two logistics providers, GIF Services Inc. and APL Logistics, for purposes of importing Goods from overseas to the continental United States. In addition to handling the transportation of Goods, these logistics providers are tasked with consolidating Goods when they arrive in the United States, classifying and declaring Goods pursuant to applicable Untied States law and providing related services. The Debtors also employ other

21

logistics providers specifically for transporting and delivering Goods to the Debtors' store location in the Virgin Islands. Additionally, the Debtors primarily use Federal Express for transporting Goods from the Debtors' distribution center to the Debtors' stores. Lastly, the Debtors use the following logistics providers for warehousing and supplying Goods to stores and customers: Priority Fulfillment Services, which fulfills E-commerce orders from the Debtors' customers, and Diversified Distribution System, which fulfills supply orders to the stores.

61.     Some of the Common Carriers have outstanding invoices for Goods delivered to the Debtors prior to the Petition Date or outstanding invoices related to the storage of such Goods prior to the Petition Date (collectively, the "Charges"). The Debtors believe that if they fail to pay these Charges, the Common Carriers may discontinue or delay services and withhold or prevent shipment and sale of essential Goods. The Debtors seek authority to pay outstanding prepetition Charges in an amount not to exceed $820,000 in the aggregate.

62.     The Debtors seek to pay the prepetition Charges for several reasons. First, if the prepetition Charges are not paid, the Common Carriers may refuse to perform additional services for the Debtors. In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace the Common Carriers.

63.     Second, if shipments to and from the distribution center and the stores are not made promptly and regularly, the Debtors may risk having inadequate in-store inventory, which would frustrate the expectations of their customers and cause a loss of customer confidence. Such an outcome could be potentially devastating to the going-concern value of the Debtors.

64.     Finally, any delays in payment of the Charges with respect to Goods that are in the possession of the Common Carriers as of the Petition Date will likely result in the assertion, under applicable state law, of possessory liens upon the Debtors' property in the possession of

RLF1 3608007v. 3

such parties.  Thus, the Debtors will have no alternative but to pay the Charges in order to effect the release of any liens securing payment of such charges.

**I.**	***Motion of the Debtors and Debtors-in-Possession Pursuant to Sections 105(a), 363(b) and 541 of the Bankruptcy Code for Authorization to Pay Prepetition Sales and Use Taxes***

65.	The Debtors seek authority to pay prepetition sales, use, income, property, franchise, and other tax obligations detailed, to the respective authorities in the ordinary course of the Debtors' businesses.

66.	In the ordinary course of business, the Debtors: (a) collect sales taxes from their customers and incur taxes, including, but not limited to, income, use, property, and franchise taxes and other taxes necessary to operate their businesses (collectively, the "Taxes"); and (b) charge fees, licenses, permits and other similar charges and assessments (collectively, the "Fees") on behalf of various U.S. taxing and licensing authorities (collectively, the "Taxing Authorities"), and pay Fees to such Taxing Authorities for licenses and permits required to conduct the Debtors' businesses.  The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Taxing Authorities, in each case as required by applicable laws and regulations.

67.	The Debtors seek relief in the event and to the extent that any Taxes and Fees accrued prepetition have not been paid or processed prepetition, or were paid in an amount that was less than is actually owed, or in the event that any payments made prepetition were rejected, lost or otherwise not received in full by any Taxing Authorities.  Further, there may be taxes incurred or collected from sales and services provided prepetition that will come due shortly after the Petition Date.

68.	The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Taxing Authorities will not exceed $1.1 million.  Any amounts that are actually due,

RLF1 3608007v. 3

but have not yet been paid to the Taxing Authorities because of the commencement of these Chapter 11 Cases, represent a small fraction of the Debtors' total assets. If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates. Additionally, some, if not all, of the Taxing Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from the restructuring process.

69.     In all cases, the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business. The Debtors operate a transactional business and any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.

### i.     Sales and Use Taxes

70.     In the normal course of business, the Debtors are required to collect sales taxes (the "Sales Taxes") from purchasers of their products on a per sale basis and periodically remit the Sales Taxes to the applicable Taxing Authorities. Typically, Sales Taxes accrue as products are sold, and such taxes are calculated based on a statutory percentage of the sale price. The statutory percentage required to be withheld by each store varies by territory, state and county in which the stores operate. The process by which the Debtors remit the Sales Taxes also varies, depending on the nature of the tax at issue and the Taxing Authority that is to be paid. Most Taxing Authorities require that the Sales Taxes be remitted monthly, whereas others require quarterly or semi-annual remittances. The frequency required by a Taxing Authority is generally dependent upon the level of sales volume of the stores located within that Taxing Authority's jurisdiction.

24

71.     Most jurisdictions require the Debtors to submit the appropriate tax returns and remit the tax withholdings on the 20th day of the month following the end of a tax period; others set the 24th, 25th or 30th day of the month as the date on which tax returns and remittances are due. Sales Taxes are remitted to the relevant Taxing Authorities on the basis of sales tax actually collected from customers during the prior period.

72.     The Debtors also incur use taxes (the "Use Taxes"). The Debtors' liability for use tax arises from: (i) purchase of fixed assets without sales tax or (ii) purchase of supplies without sales tax. Purchases without sales tax occur when property or services are purchased from vendors that have no nexus to the resident state of the Debtors and such vendors have no obligation to charge or remit Sales Taxes for sales to parties outside the state of the vendor's operations. Nevertheless, purchasers, such as the Debtors, are obligated to self-assess and pay Use Taxes, when applicable, to the state in which the Debtors are the "end user" of the goods or services provided by the vendor with no nexus to that state. The tax rate for Use Taxes is equal to the tax rate for Sales Taxes. The Debtors traditionally remit Sales Taxes and Use Taxes through an automatic clearing house ("ACH") system or by mailing checks.

73.     As of the Petition Date, the Debtors estimate that approximately $825,000 in Sales Taxes and Use Taxes relating to the prepetition period will become due and owing to the Taxing Authorities in the ordinary course of business.

**ii.     Income and Franchise Taxes**

74.     As a result of their operations throughout the United States, the Debtors incur income tax liabilities (collectively, the "Income Taxes") in certain U.S. states and municipalities, and the Debtors make annual and quarterly estimated payments to the applicable Taxing Authorities in connection with such Income Taxes.

RLF1 3608007v. 3

75.     The Debtors pay franchise taxes and *de minimis* registration fees (collectively, the "Franchise Taxes") to certain of the Taxing Authorities, thus authorizing the Debtors to operate their businesses in the applicable taxing jurisdiction.  Some states assess a flat Franchise Tax on all businesses, while other states assess a Franchise Tax based upon some measure of income, gross receipts, net worth or other measure of value.  Certain states impose personal liability on the directors, officers and employees of a corporation if that corporation fails to pay Franchise Taxes.  Additionally, the Debtors' failure to pay Franchise Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction.  Addressing any subsequent action taken by those states would be costly, place an administrative burden on management, and divert management's attention from the reorganization process.

76.     The Debtors estimate that they owe approximately $100,000 in such Income and Franchise Taxes to certain of the Taxing Authorities for the period prior to and including the Petition Date.  The Debtors are scheduled to next make quarterly estimated payments toward Income Tax obligations in October/November 2010.  The Debtors seek authority to pay up to $100,000 in prepetition Income and Franchise Taxes.

### iii.    **Business License Fees and Related Taxes**

77.     Many municipal and county governments require the Debtors to obtain a business license and to pay corresponding business license fees (collectively, the "Business License Fees").  The criteria that require a company to obtain a business license and the manner in which the Business License Fees are computed vary greatly according to local tax laws.  Some jurisdictions assess Business License Fees based on a flat fee, others upon the number of employees working in the jurisdiction, and others upon gross receipts.  Certain state governments also require the Debtors to pay annual report or bi-annual report taxes (collectively, the "Annual Report Taxes") to be in good standing for purposes of conducting business within that state.  The

26

Debtors estimate that they owe approximately $1,000 in prepetition Business License Fees. The Debtors seek authority to pay up to $1,000 in such Business License Fees.

### iv. **Property Taxes**

78.     Also, the Debtors pay personal and real property taxes to certain of the Taxing Authorities (the "Property Taxes"), thus authorizing the Debtors to operate their businesses in the applicable taxing jurisdiction. The Debtors estimate that they owe approximately $104,000 in such Property Taxes to certain of the Taxing Authorities for the period prior to and including the Petition Date. The Debtors seek authority to pay up to $104,000 in prepetition personal and real property taxes.

### J. *Motion of Debtors and Debtors-in-Possession for Entry of an Order (A) Authorizing Debtors to (I) Continue Prepetition Insurance Coverage and (II) Maintain Prepetition Premium Financing Agreements and (III) Maintain Prepetition Insurance Brokerage Agreements and (B) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests ("Insurance Motion")*

79.     In the ordinary course of business, the Debtors maintain a number of insurance policies that provide coverage for, among other things, workers' compensation liability, general commercial liability, property damage, umbrella liability, excess liability, business automotive liability, ocean cargo liability, and directors' and officers' liability (collectively, the "Policies"). Not only are some of these Policies required by various state and federal regulations,[7] but further, section 1112 of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or

---

[7] For example, under California state law, if an employer fails to obtain required coverage and an accident occurs, the injured employee either files a lawsuit against the employer in civil court or files a claim against the state workers' compensation system. Not only can the monetary exposure to a suit in civil court be extremely significant to the employer, stop-work orders and fines can be levied in addition to injunctions and assessments against the employer. Furthermore, in some instances, employers who lack workers' compensation coverage risk exposure to their personal assets and other business assets as well. See Cal. Labor Code § 3700.

RLF1 3608007v. 3

dismissal of a chapter 11 case.[8]  A schedule of the current Policies, coverage amounts, terms and coverage dates is attached to the Insurance Motion as Exhibit B and incorporated herein by reference (the "Policy Schedule").

80.    The total annual premiums for the Policies in 2010 are approximately $1.7 million.  It is not always economically advantageous for the Debtors to pay the premiums on all of the Policies on a lump-sum basis.  Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the payment of insurance premiums for some of their Policies (collectively, the "Financed Policies") pursuant to installment plans offered by some of the insurance carriers ("Installment Plans"), as well as pursuant to a premium financing agreement (the "PFA") with a third-party premium finance company, First Insurance Funding Corporation ("First Insurance").  Specifically, as of the Petition Date, the Debtors' umbrella-primary policy, umbrella-excess policy, commercial property policy, and fiduciary and director and officer liability policy, were paid under the PFA.  The general liability policy, business automobile policy, workers compensation policy, and ocean cargo policy (jointly, the "Separate Policies") were all paid in installments outside of the PFA.

81.    The PFA provides financing subject to, among other things, the following terms:

| PFA Date | Total Premium Amount | Down Payment | Amount Financed | Finance Charge | Monthly Payment | Final Payment Due Date |
|---|---|---|---|---|---|---|
| 4/30/10 | 460,145.15 | 69,021.77 | 391,123.38 | 9,473.02 | 40,059.64 | 02/15/11 |

82.    The terms of the PFA provide that the Debtors pay $69,021.77 as an initial down payment, followed by 10 monthly installments (bearing an annual interest rate of 5.25%) in exchange for First Insurance's agreement to pay the annual insurance premiums to the Debtors'

---

[8]  11 U.S.C. § 1112(b)(4)(C).

RLF1 3608007v. 3

various insurers. Spreading out the cost of the premiums on these policies over the applicable coverage period helps the Debtors manage their cash flow. Pursuant to the PFA, the Debtors assigned return premiums, dividend payments, and certain loss payments to First Insurance as security.

83.     If the Debtors fail to pay the monthly premium obligations, First Insurance has the right to terminate the PFA Policies and accelerate the entire unpaid premium. Upon such termination, First Insurance has the right to set off the amount owed by the Debtors against the amount of unearned premiums returned to First Insurance by the insurance carriers. If First Insurance chose to cancel the Debtors' insurance coverage under the PFA, the Debtors would then be forced to obtain replacement insurance on an expedited basis and at a significant cost to the estates, which would be unnecessarily disruptive. Moreover, even if First Insurance did not terminate the PFA, the Debtors' non-payment of the monthly premium could have an adverse effect on the Debtors' ability to finance premiums for future policies.

84.     As of the Petition Date, both through the PFA and directly to insurers, payments totaling approximately $700,000 have been made against the total annual insurance cost of approximately $1.7 million, leaving an open amount of approximately $954,000 to be paid post-petition.

85.     The Debtors request authority to: (a) continue insurance coverage entered into prepetition, including, without limitation, the Policies; (b) maintain the Financed Policies; and (c) continue the PFA.

86.     The Debtors also seek authority to pay, in their discretion, up to $175,000 in prepetition amounts owing in respect of the Policies

RLF1 3608007v. 3

87.     In light of the importance of maintaining insurance coverage and preserving the Debtors' liquidity by financing the insurance premiums, it is in the best interests of the Debtors' estates to authorize them to honor their obligations under the PFA and the Installment Plans.

88.     In the ordinary course of business, the Debtors engaged HUB International Northeast Ltd. (the "Broker") to act the consultant and insurance broker in placing their annual insurance program. The Debtors intend to continue their contacts with the Broker in the ordinary course of business

**K.      *Motion of the Debtors and Debtors-in-Possession for Entry of an Order (I) Authorizing Debtors to Continue Use of Cash Management System, Bank Accounts and Business Forms and (II) Extending the Debtors' Time to Comply with Section 345 of the Bankruptcy Code***

89.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect funds, transfer them to a concentration account and disburse them, through other accounts, to pay operating expenses (collectively, the "Cash Management System"). In the ordinary course, the Debtors maintain current and accurate accounting records of all daily cash transactions.

**i.     The Debtors' Cash Management System**

90.     As of the Petition Date, the Debtors maintained with various banks (the "Cash Management Banks") the bank accounts (the "Bank Accounts") identified on Exhibit B to the Cash Management Motion. The Debtors maintain that substantially all of the Bank Accounts are in financially stable banking institutions with FDIC or FSLIC insurance (up to an applicable limit on each account). The principal components of the Cash Management System are described below:

> (a)     Bank of America Blocked Control Account: The Debtors maintain a central blocked control account at Bank of America, N.A. (the "Bank of America Blocked Control Account"). In the ordinary course of the Debtors' business, and as described in greater detain in (b), (c), and (d),

RLF1 3608007v. 3

below, the Bank of America Blocked Control Account is funded primarily with the proceeds of sales of merchandise at the Debtors' retail locations. The Bank of America Blocked Control Account is swept daily. Any funds in the Bank of America Blocked Control Account are swept and applied against the Debtors' line of credit with Bank of America, N.A. Consequently, the Bank of America Blocked Control Account is a zero balance account.

(b)     Local Store Depository Accounts:  Each of the Debtors' retail locations intake receipts for the sale of merchandise either in the form of cash, check, or via a credit or debit card transaction.  On a daily basis, all receipts in the form of cash or check are deposited into a depository account at local banks unique to each of the Debtors' retail locations (each, a "Local Store Depository Account" and collectively, the "Local Store Depository Accounts").  The Local Store Depository Accounts are swept on a daily basis and all the proceeds are transferred to the Bank of America Blocked Control Account.

(c)     Chase Management Services:  The Debtors accept Visa, MasterCard, AMEX, and Discover credit and debit cards in their stores and on-line through their websites.  Chase Management Services ("Chase Services") facilitates the settlement of all of the Debtors' transactions involving credit or debit cards.  Once the settlement process has been completed (2-3-day process), Chase Services remits the cash proceeds of the credit or debit card transactions to the Debtors by transferring any such funds to the Bank of America Blocked Control Account.

(d)     Alliance Data Services:  The Debtors maintain their own in-house credit card (the "Ashley Stewart House Card"), which is accepted in their stores and on-line through the Debtors' websites.  Alliance Data Services ("Alliance Services") facilitates the settlement of all of the Debtors' transactions involving the Ashley Stewart House Card.  Once the settlement process has been completed (2-3-day process), Alliance Services remits the cash proceeds of the Ashley Stewart House Card transactions to the Debtors by transferring any such funds to the Bank of America Blocked Control Account.

(e)     Bank of America Corporate Receipt Account:  The Debtors also maintain a corporate receipt account at Bank of America, N.A. (the "Bank of America Corporate Receipt Account") for miscellaneous corporate deposits.  On a regular basis, this account is swept and the proceeds are transferred to the Bank of America Blocked Control Account.

(f)     Bank of America Operating Account:  The Debtors also maintain a central operating account at Bank of America, N.A. (the "Bank of America Operating Account").  On a regular basis, the Debtors will determine the

cash needs of the business based on anticipated operating costs and expenses. Based on these determinations, the Debtors will customarily make a draw request on their revolving credit facility at Bank of America, N.A. Subject to availability on the revolving credit facility, Bank of America, N.A. will transfer the requested funds in to the Bank of America Operating Account. The Bank of America Operating Account is, in turn, linked to a series of controlled disbursement accounts designed to make disbursements for the Debtors' daily operational needs. The Bank of America Operating Account is linked to the Bank of America Merchandise Payables Account, the Bank of America Payroll Account, and the Bank of America Expense Payables Account.

(g) <u>Bank of America Payroll Account</u>: The Debtors maintain a bank account at Bank of America, N.A. to cover the Debtors' payroll disbursements to their employees (the "<u>Bank of America Payroll Account</u>"). The Debtors generally process their payroll through Automatic Data Processing, Inc. ("<u>ADP</u>"), which then pays the Debtors' employees either by direct deposit or by check. The Debtors electronically transfer funds to ADP, which in turn funds all direct deposit payroll obligations through an ADP account. Any of the Debtors' employees that are paid by check, rather than direct deposit, receive a check printed by ADP and drawn on an ADP bank account.

(h) <u>Bank of America Expense Payables Account</u>: The Debtors maintain a bank account at Bank of America, N.A. (the "<u>Bank of America Expense Payables Account</u>") to cover the Debtors' disbursements relating to their operations (including, without limitation, the payment of invoices for lease payments and other operating expenses), other than those made through the Payroll Accounts and the Merchandise Payables Account (defined below). The Bank of America Expense Payables Account is funded automatically on an as-needed basis from the Bank of America Operating Account.

(i) <u>Bank of America Merchandise Payables Account</u>: The Debtors maintain a bank account at Bank of America, N.A. (the "<u>Bank of America Merchandise Payables Account</u>") to cover the Debtors' disbursements relating to their invoices for trade payables. The Bank of America Merchandise Payables Account is funded automatically on an as-needed basis from the Bank of America Operating Account.

91.    The Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity to the Debtors. Indeed, large, multiple-entity businesses use such systems because of the numerous benefits provided, including,

RLF1 3608007v. 3

without limitation, the ability to: (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds. I believe that granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into the Chapter 11 Cases by, among other things, minimizing the disruption to the Debtors' operations, and attendant confusion among the Debtors' vendors and lenders, of having to establish new debtor-in-possession back accounts.

### ii.    The Debtors' Existing Business Forms

92.    In the ordinary course of business, the Debtors use numerous varieties of business forms. To minimize expenses to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession.

**L.    *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 2002-1 and 4001-2 (1) Authorizing Incurrence By the Debtors of Post-Petition Secured Indebtedness with Priority Over All Over Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral By the Debtors and Providing for Adequate Protection, (4) Modifying the Automatic Stay, and (5) Scheduling a Final Hearing ("DIP Motion")***

93.    Pursuant to the DIP Motion, the Debtors seek authority to obtain senior secured, superpriority post-petition financing in the aggregate not to exceed $6 million pursuant to the terms of the DIP Motion, the DIP Loan Agreement, and the DIP Orders.

RLF1 3608007v. 3

94.     The proposed financing will be provided by Bank of America, N.A.  It will be senior to all obligations under the Pre-Petition Financing Agreement.  As such, the liens created under the DIP Loan Agreement are priming liens with respect to liens currently held by the Pre-Petition Lender.

95.     Pending entry of the final order authorizing the DIP Loan Agreement (the "Final DIP Order"), the Debtors request that the Court authorize the Debtor to (i) borrow up to $6 million pursuant to the terms of the DIP Loan Agreement; (ii) deem all pre-petition letters of credit issued under the Pre-Petition Loan Agreement issued under the DIP Loan Agreement; (iii) use cash collateral as provided in the Interim DIP Order; (iv) grant to the DIP Secured Parties the liens and superpriority claims described in the DIP Motion; (v) provide adequate protection to the Pre-Petition Lender, as described in the DIP Motion and in the Interim DIP Order; (vi) approve the proposed notice of the Final Hearing; and (vii) schedule the Final Hearing.

**i.     The Pre-Petition Financing Agreement**

96.     Prior to the commencement of these Chapter 11 Cases, the Pre-Petition Lender made certain revolving loans to the Debtors (the "Pre-Petition Facility") pursuant to the Pre-Petition Financing Agreement.

97.     The amounts borrowed under the Pre-Petition Financing Agreement were used to fund, among other things, working capital requirements.  As of the Petition Date, approximately $2,251,651 plus accrued interest is outstanding under the Pre-Petition Facility and approximately $2,366,324 is outstanding on pre-petition letters of credit issued under the Pre-Petition Loan Agreement (collectively, the "Pre-Petition Debt").

98.     To secure the Pre-Petition Senior Debt, the Debtors granted security interests and liens (the "Pre-Petition Senior Liens") to the Pre-Petition Lender upon substantially all of the Debtors' personal property, including, without limitation, Accounts; Deposit Accounts;

Equipment; General Intangibles; Goods; Inventory; Investment Property; Commercial Tort Claims, and the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the Collateral (each as defined in the Pre-Petition Financing Agreement and/or the Uniform Commercial Code) (collectively, the "Pre-Petition Collateral"), with priority over all other liens except any liens that are valid, properly perfected, unavoidable, and senior to the Pre-Petition First Liens, they are referred to herein as the "Permitted Prior Liens").

### ii.  Need for Post-Petition Financing

99.     An immediate need exists for the Debtors to obtain funds from the proposed financing arrangement under DIP Loan Agreement (the "DIP Facility") in order to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of their assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility.  The absence of the requested relief would immediately and irreparably harm the Debtors, their estates and creditors and the possibility for a successful sale of the Debtors' assets as a going concern or otherwise.

### iii.  Background of the Post-Petition Financing Arrangement

100.    Prior to the Petition Date, in exploring financing options, the Debtors recognized that the obligations owed to the Pre-Petition Lender are secured by virtually all of the Debtors' property, such that either (i) the liens of the Pre-Petition Lender would have to be primed to obtain post-petition financing; (ii) a post-petition lender would be required to refinance the obligations owed to the Pre-Petition Lender in full and provide additional loan availability; or (iii) the Debtors would have to find a post-petition lender willing to extend credit that would be junior to the Pre-Petition Lender's liens.  Because the Pre-Petition Lender advised the Debtors'

RLF1 3608007v. 3

representatives that it would not consent to being primed by another lender, borrowing from another post-petition lender or lending group that required liens and claims senior to that of the Pre-Petition Lender likely could only be accomplished through an extended, contested hearing to determine compliance with the requirements of section 364(d) of the Bankruptcy Code.

101.    In view of these circumstances, the DIP Lender is willing to extend post-petition financing on the terms and conditions described in the DIP Motion and thus prime its own pre-petition security interests during the interim period.  The Debtors concluded that the DIP Lender's proposal was desirable because, among other things, it permits the Debtors to secure necessary post-petition financing to continue operations and avoid an extended, contested hearing under section 364(d) of the Bankruptcy Code.

### iv.    Negotiations

102.    The Debtors and the DIP Lender engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the DIP Loan Agreement.  Importantly, the DIP Loan Agreement provides that the Debtors may draw immediately (on an interim basis) to meet their administrative and operational obligations during the early stages of the Debtors' Chapter 11 Cases, a very critical period for preserving going concern values.

103.    The Debtors and the DIP Lender have also agreed upon a budget (as the same may be modified from time to time consistent with the terms of the DIP Financing Agreements, the "Budget") projecting cash flow for six (6) weeks.  The Debtors believe that the Budget is achievable and will allow them to operate and pay their post-petition obligations as they mature.

### v.    Use of Cash Collateral and Proposed Adequate Protection

104.    In order to address their working capital needs and fund their efforts in these Chapter 11 Cases, the Debtors also require the use of cash collateral of the Pre-Petition Secured Parties (the "Cash Collateral").  The use of Cash Collateral will provide the Debtors with the

additional necessary capital with which to operate their business, pay their employees, and continue to maintain the going-concern value of their business.

105. The Pre-Petition Lender has consented to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Budget, subject to the adequate protection liens and payments discussed below and the other terms and conditions set forth in the Interim DIP Order.

106. The Pre-Petition Lender has requested and is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in collateral under the Pre-Petition Financing Agreement to the extent that there is a diminution in the value of such collateral from and after the Petition Date. As adequate protection for any such diminution in value, the Pre-Petition Secured Parties shall be granted, pursuant to sections 361, 363(e), and 364(c) of the Bankruptcy Code, additional and replacement security interests and liens (the "Pre-Petition Replacement Liens") in and upon all existing and after acquired real and personal, tangible and intangible, assets of the Borrowers (the "Collateral"), but the Collateral shall not include any proceeds of bankruptcy recoveries under chapter 5 of the Bankruptcy Code (other than proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code and amounts necessary to reimburse the DIP Lender for the amount of the Carve-Out, if any, used to finance the pursuit of such recovery or settlement with respect to any other recovery or settlement under Chapter 5 of the Bankruptcy Code).

107. The Replacement Liens shall be junior only to the liens granted to the DIP Lender, the Carve-Out (as defined in the Interim Order), and Permitted Prior Liens (as defined in the Pre-Petition Finance Agreement). The Replacement Liens are and shall be valid, perfected, enforceable, and effective as of the date of the entry of the Interim DIP Order without any further

37

action by the parties and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

108.   In addition to the Replacement Liens, the Debtors propose to grant and/or pay the Pre-Petition Lender the following, among other things, as adequate protection:

(i)     an allowed superpriority administrative claim, which shall have priority (except with respect to the DIP Liens, the DIP Superpriority Claim, the Replacement Liens, the Carve-Out, and the Permitted Prior Liens) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and, if approved in the Final DIP Order, section 506(c) of the Bankruptcy Code;

(ii)    repayment of the principal amount of the Pre-Petition Debt in accordance with the DIP Orders and payments in the amount of default interest, fees, and expenses with respect to the Pre-Petition Debt in accordance with the Pre-Petition Financing Agreement;

(iii)   the establishment of an interest bearing account in the control of the Pre-Petition Lender into which the sum of $100,000.00 shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Pre-Petition Lender under the Pre-Petition Financing Agreement and to pay any expenses (including reasonable attorneys' fees) incurred by the Pre-Petition Lender in connection with these Chapter 11 Cases or any successor case.

109.   The foregoing claims are to be granted and the payments are to be made to the Pre-Petition Lender because, among other things, the Pre-Petition Financing Agreement will be primed and the Debtors will continue to use the Cash Collateral and other collateral under the Pre-Petition Financing Agreement in the Debtors' ongoing operations until the entry of the Final DIP Order.  At that time, the Pre-Petition Debt will be satisfied by the proceeds of the DIP Loan Agreement.

RLF1 3608007v. 3

110.    Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs.  Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value.  The credit provided under the DIP Loan Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders.  The availability of credit under the DIP Loan Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors.  Finally, the implementation of the DIP Loan Agreement will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 Cases.  Accordingly, the timely approval of the relief requested in the DIP Motion is imperative.

## CONCLUSION

111.    To preserve the value of their business to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these Chapter 11 Cases by minimizing any adverse impact of the chapter 11 filings on the Debtors' operations.  For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First Day Motions.

39

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   September 21, 2010

_____
Michael A. Abate
Vice President Finance/Treasurer
of the Debtors

RLF1 3608007v. 3