# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **Urban Brands, Inc., *et al.*,**[1] | ) | **Case No. 10-13005 (KJC)** |
| | ) | |
| **Debtors.** | ) | **Joint Administration Pending** |
| | ) | |
| | ) | **Proposed Bid Procedures Hearing Date:** |
| | ) | **October 4, 2010 at 4:00 p.m.** |
| | ) | **Proposed Bid Procedures Objection Deadline:** |
| | ) | **September 30, 2010 at 11:00 a.m.** |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 365, AND BANKRUPTCY RULES 2002, 6004, AND 6006 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING RELATED BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND LEASES TO BE ASSIGNED; AND (E) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) ESTABLISHING ASSUMPTION AND REJECTION PROCEDURES FOR CERTAIN ADDITIONAL EXECUTORY CONTRACTS AND UNEXPIRED LEASES;**

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Urban Brands, Inc. (3678), 100% Girls Ltd. (4150), 100% Girls of Georgia, Inc. (4159), 100% Girls of New York, Inc. (2149), 100 Percent Girls of New Jersey, Inc. (4167), A.S. Interactive, Inc. (3472), Ashley Stewart Ltd. (4541), Ashley Stewart Apparel Corporation (4049), Ashley Stewart Clothing Company, Inc. (4051), Ashley Stewart Management Co., Inc. (4053), Ashley Stewart Woman Ltd. (4152), ASIL 6, Inc. (3996), ASNJ 10, Inc. (4004), Carraizo Alto Apparel Corporation (4651), Church Street Retail, Inc. (5954), Kid Spot Ltd. (2585), Kidspot of Delaware, Inc. (2596), Kidspot of Illinois, Inc. (2606), Kidspot of Michigan, Inc. (2603), Kidspot of New Jersey, Inc. (2601), Kidspot of Ohio, Inc. (4705), Kidspot of Pennsylvania, Inc. (2599), Kidspot of Texas, Inc. (3809), Large Apparel of Alabama, Inc. (0624), Large Apparel of California, Inc. (2129), Large Apparel of Connecticut, Inc. (5161), Large Apparel of District of Columbia, Inc. (8613), Large Apparel of Florida, Inc. (2209), Large Apparel of Georgia, Inc. (3894), Large Apparel of Illinois, Inc. (4650), Large Apparel of Indiana, Inc. (4055), Large Apparel of Louisiana, Inc. (3790), Large Apparel of Maryland, Inc. (5158), Large Apparel of Michigan, Inc. (9420), Large Apparel of Mississippi, Inc. (5913), Large Apparel of Missouri, Inc. (2135), Large Apparel of New Jersey, Inc. (5157), Large Apparel of New York, Inc. (5956), Large Apparel of North Carolina, Inc. (8611), Large Apparel of Ohio, Inc. (3815), Large Apparel of Pennsylvania, Inc. (4057), Large Apparel of South Carolina, Inc. (2029), Large Apparel of Tennessee, Inc. (3895), Large Apparel of Texas, Inc. (3787), Large Apparel of Virginia, Inc. (2809), Large Apparel of Wisconsin, Inc. (3898), Marianne Ltd. (3940), Marianne USPR, Inc. (2193), Marianne VI, Inc. (2206), Metro Apparel of Kentucky, Inc. (7533), Metro Apparel of Massachusetts, Inc. (1367), The Essence of Body & Soul, Ltd. (4165), Urban Acquisition Corporation of New Jersey, Inc. (2976), Urban Acquisition Corporation of New York, Inc. (4103), and Urban Brands TM Holding Co. (5909). The Debtors' corporate offices are located at 100 Metro Way, Secaucus, New Jersey 07094.

**(D) APPROVING GUIDELINES FOR CONDUCTING STORE CLOSING SALES;
(E) APPROVING AGENCY AGREEMENT; AND (F) EXTENDING THE DEADLINE
TO ASSUME OR REJECT UNEXPIRED LEASES OF NONRESIDENTIAL
REAL PROPERTY PURSUANT TO 11 U.S.C. § 365(d)(4)**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby move this Court (the "Motion") for entry of an order (the "Bidding Procedures Order"),

substantially in the form attached hereto as Exhibit A, (A) establishing bidding and auction

procedures (the "Bidding Procedures") in connection with the potential sale of substantially all

of the Debtors' assets (the "Assets"), free and clear of all claims (as defined by section 101(5) of

the Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights

of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the

"Interests"), except to the extent identified in a Successful Bidder's (as defined below) asset

purchase agreement; (B) approving the proposed bid protections, the break-up fee (the "Break-

Up Fee," which is defined in the Stalking Horse Asset Purchase Agreement as the "Termination

Fee") and the Overbid Amount (as defined in the Bidding Procedures) (the Break-Up Fee and the

Overbid Amount together, the "Bid Protections"), to New Ashley Stewart, LLC ("New Ashley"

or the "Stalking Horse Bidder") in accordance with that certain Asset Purchase Agreement dated

September 21, 2010, (the "Stalking Horse Asset Purchase Agreement") for the purchase of the

Assets, a copy of which is attached hereto as Exhibit B;[2] (C) scheduling an auction (the

"Auction") and setting a date and time for a sale hearing (the "Sale Hearing") for the sale of

Assets (the "Sale"), and approving the form and manner of noticed thereof; (D) establishing

procedures for noticing and determining cure amounts for executory contracts ("Executory

Contracts") and unexpired nonresidential real property leases ("Real Property Leases") to be

---

[2] The Stalking Horse Asset Purchase Agreement attached as Exhibit B does not include the referenced schedules. The schedules to the Stalking Horse Asset Purchase Agreement shall be filed separately upon completion.

2

assigned (the "Cure Procedures"); and (E) granting certain related relief. The Debtors further request that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter an order (the "Sale Order"), substantially in the form attached hereto as Exhibit E, (A) approving and authorizing the Sale, free and clear of all Interests, except to the extent set forth in the Successful Bidder's (as defined below) asset purchase agreement; (B) authorizing the assumption and assignment of certain Executory Contracts and Real Property Leases; (C) establishing assumption and assignment procedures (the "Assumption Procedures") and rejection procedures (the "Rejection Procedures"); (D) establishing guidelines (the "Store Closing Guidelines") for conducting store closing sales (the "Store Closing Sales"); (E) approving an agency agreement (the "Agency Agreement")[3] between the Debtors and Gordon Brothers Retail Partners, LLC (the "Agent") in connection with the Store Closing Sales; and (F) extending the deadline to assume or reject Real Property Leases pursuant to section 365(d)(4) of the Bankruptcy Code. In support hereof, the Debtors respectfully represent:

## JURISDICTION

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

---

[3] The Debtors intend to file a copy of the Agency Agreement with the Court within 5 business days of the filing of this Motion.

RLF1 3607171v. 9

## A.    Overview of the Debtors' Business

3.    The Debtors are a leading specialty retailer of fashion-forward and inspirational apparel for plus sized urban women under the brand name of Ashley Stewart.  Urban Brands, Inc., a Delaware corporation, is the direct or indirect parent company of all of the Debtors.  Until 2009, the Debtors also operated stores under the brand name of Marianne.

4.    The Ashley Stewart concept was founded in 1991 and has grown to become a nationally-recognized brand.  According to an October 2009 industry survey by the NPD Group, a nationally recognized firm specializing in apparel research, plus sized African American women ranked Ashley Stewart third of all retailers, behind only Wal-Mart and Lane Bryant, as their favorite place to shop.

5.    Ashley Stewart operates broadly in the women's apparel market, which the NPD Group estimates is approximately $107 billion.  Within women's fashion, Ashley Stewart focuses on the plus sized market, which is estimated to be over $18 billion and growing.  Within this subset of the market, Ashley Stewart focuses on the underserved urban market, particularly the African American and Hispanic consumer, two of the fastest growing segments of the U.S. population. Ashley Stewart is one of the few concepts focusing directly on these particular niche markets.

6.    As of the Petition Date, the Debtors operate approximately 210 stores in 26 states with approximately 2,100 employees, the majority of which are minority women.  The store base is reinforced by a strong online presence through AshleyStewart.com, providing both a marketing tool as well as an additional outlet for Ashley Stewart customers.

7.    Despite the strength of its brand names and success at individual store locations, the Debtors began suffering from cash flow/liquidity problems in 2007, especially in their Marianne division.  The Debtors' financial difficulties continued in 2008 with the slow down in

4

the overall economy. As part of a strategic initiative to strengthen its balance sheet and improve its liquidity by focusing exclusively on the Ashley Stewart brand, in February 2008, the Debtors began divesting itself of all of its Marianne stores. The proceeds from the Marianne divestitures, coupled with the reduction of the working capital investment needed to support the Marianne brand name, provided improvement in operating results and cash flow during fiscal year 2009 (ending January 30, 2010). Unfortunately, although the Debtors significantly reduced their net losses from approximately $44.3 million in 2008 to $28.6 million in 2009, the business continued to operate at a loss. Additionally, from fiscal year 2008 to fiscal year 2009, the Debtors net sales decreased from $179.6 million to $174.6 million.

**B.** **The Debtors' Capital and Debt Structure**

8.     The Debtors are borrowers under a Loan and Security Agreement dated as of September 3, 2004 (the "Prepetition Financing Agreement"), with Bank of America, N.A. (successor by merger to LaSalle Retail Finance, a Division of LaSalle Business Credit, LLC, as agent for LaSalle Bank Midwest National Association f/k/a Standard Federal Bank National Association) (the "Lender"). The Prepetition Financing Agreement was an asset-based facility with a maturity date of September 10, 2010. The availability for borrowings and letter of credit obligations under the Prepetition Financing Agreement was capped at $6.5 million and is further limited to an amount supported by a borrowing base consisting of certain cash, certain accounts receivable and eligible inventory. As of the Petition Date, the Debtors owe only approximately $2,251,651 plus interest on the facility with an additional $2,366,324 in outstanding letters of credit (all of which are fully collateralized by the Debtors' cash).

9.     In April 2004, the Debtors entered into a Note Purchase Agreement with a group of institutional investors led by Trimaran Fund II, L.L.C. ("Trimaran"), the Debtors' largest equity holder, and certain officers, employees and consultants of the Debtors. From August

5

2007 to November 2009, the Debtors entered into five additional note purchase agreements to raise additional capital. In total, the Debtors sold $58,500,000 in senior unsecured notes (the "Notes"). As of the Petition Date, the Debtors owe approximately $81.3 million on account outstanding principle and interest on the Notes.

## BACKGROUND ON THE SALE

### A. The Debtors' Marketing and Sales Efforts

10.     As discussed above, the Debtors' Marianne and Ashley Stewart brands each enjoyed profitable expansion until sometime in 2007 when the Debtors began suffering from cash flow/liquidity problems, especially in their Marianne division. The Debtors' Ashley Stewart division likewise began to struggle during the second half of 2008 as a result of an overall weak economy. Both divisions of the Debtors' business required significantly larger capital expenditures than the Debtors had anticipated in terms of the expansion of the newly acquired Marianne division and the marketing and promotion of each brand. From August 2007 to November 2009, the Debtors attempted to address these capital needs through the issuance of the Notes.

11.     Additionally, in January 2009, the Debtors sold their Marianne division and began to focus solely on the Ashley Stewart brand. In fiscal 2009, despite a difficult economy and limited liquidity, the current management team turned the business around. From 2008 to 2009, about 14% or $11 million of corporate expenses were cut, 7 stores were closed, and same store sales turned positive, averaging +5.2% from September 2009 through January 2010, with leaner and more productive inventory. In Q1 2010, the Debtors achieved sales of $47 million, a comparative same store sales increase of 3.7%. As noted above, however, the Debtors' business continued to operate at a loss and the Debtors' net sales continued to decrease.

RLF1 3607171v. 9

12.     In early 2010, the Debtors approached the Lender regarding an extension of the maturity date under the Prepetition Financing Agreement. The Lender expressed a reluctance to provide a long-term extension of the maturity date or provide addition financing to the Debtors, but did agree to a series of amendments to the Prepetition Financing Agreement that provided periodic extensions of the maturity date. These amendments, however, also resulted in additional fees being owed to the Lender and restrictions on loan availability under the Prepetition Financing Agreement.

13.     As a result of this liquidity constraint, the Debtors' sought (albeit unsuccessfully) to locate a new lender and, thereafter, retained an investment banker to assist in their search for additional equity and/or mezzanine financing. In April 2010, the Debtors engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist in raising additional financing. During the course of the marketing effort, Oppenheimer contacted approximately 40 potential investors, but was unable to reach a definitive agreement with any of these interested parties. Following these exhaustive efforts to locate additional capital, the Debtors determined that their best alternative to preserve their business as a going concern and maximize the value of their assets was to pursue a sale of all or substantially all the Debtors' assets (the "Assets").

14.     Accordingly, in August 2010, Oppenheimer expanded its marketing efforts to solicit interest from prospective purchasers of the Debtors and the Assets as a going-concern. Prior to the Petition Date, the Debtors executed confidentiality agreements with seven prospective acquirers. After discussions with a number of these interested parties, New Ashley Stewart, an affiliate of GB Merchant Partners, LLC emerged as the party submitting the highest and best bid for the Debtors' Assets. Accordingly, the Debtors, with the approval of their board of directors, engaged in active negotiations with New Ashley regarding a potential going concern

transaction and, on September 8, 2010, the Debtors and New Ashley executed a non-binding letter of intent. Following the execution of the letter of intent, the Debtors and their advisors actively negotiated with New Ashley regarding the definitive terms and conditions of an asset purchase agreement. On September 21, 2010, the Debtors entered into the Stalking Horse Asset Purchase Agreement with New Ashley, and by this Motion the Debtors are seeking Court approval of the Sale pursuant to section 363 of the Bankruptcy Code following a Court sanctioned auction process.

15.     As described in further detail below, the Stalking Horse Asset Purchase Agreement provides for a going concern sale of substantially all of the Debtors' Assets, which the Debtors believe presents the best opportunity to maximize recoveries for creditors and preserve thousands of jobs for the Debtors' employees. Pursuant to the terms of the Stalking Horse Asset Purchase Agreement, assuming it is the successful bidder for the Assets, New Ashley shall (i) assume the Assumed Liabilities and (ii) pay a Purchase Price consisting of (x) an amount equal to $13 million in cash and (y) a note in the initial aggregate outstanding principal amount of $2 million (the "Note Amount"). Both components of the Purchase Price are subject to adjustment in accordance with Section 3.2 of the Stalking Horse Asset Purchase Agreement and, in the case of the Note Amount, subject to the Stalking Horse Bidder having assumed the Real Property Leases on more than twenty (20) stores which are to be operated by the Stalking Horse Bidder following such assumption. Notwithstanding any such adjustments, the Stalking Horse Agreement provides that the Purchase Price shall not be less than $6,000,000 or all outstanding amounts owing under the DIP Facility on the Closing Date, whichever is lesser.

16.     While it is anticipated that a significant number of the Real Property Leases will be assumed and assigned to the Stalking Horse Bidder at closing, the Stalking Horse Asset

Purchase Agreement does provide the Stalking Horse Bidder with the flexibility to defer its decision on certain store locations after the proposed closing date through a 120 day designation period. During this 120 day period, the Stalking Horse Bidder will have the ability to direct the Debtors to assume and assign to the Stalking Horse Bidder or its designee or reject the underlying Real Property Leases with respect to certain store locations and, to the extent that the Stalking Horse Bidder intends to reject certain leases, allow the Agent to conduct Store Closing Sales at such locations during the designation period in accordance with the terms of the Agency Agreement. The proposed procedures for implementing the Stalking Horse Bidder's designation of Real Property Leases and any related Executory Contracts and the implementation of the Store Closing Sales are set forth herein.

17.     As described in further detail below, the Stalking Horse Asset Purchase Agreement provides for a going concern sale of substantially all of the Debtors' Assets, which the Debtors believe presents the best opportunity to maximize recoveries for creditors and preserve thousands of jobs for the Debtors' employees. The Stalking Horse Asset Purchase Agreement also provides the Stalking Horse Bidder with the flexibility to defer its decision on certain store locations after the proposed closing date through a 120 day designation period. During this 120 day period, the Stalking Horse Bidder will have the ability to direct the Debtors to assume and assign to the Stalking Horse Bidder or its designee or reject the underlying Real Property Leases with respect to certain store locations and, to the extent that the Stalking Horse Bidder intends to reject certain leases, allow the Agent to conduct Store Closing Sales at such locations during the designation period in accordance with the terms of the Agency Agreement. The proposed procedures for implementing the Stalking Horse Bidder's designation of Real

9

Property Leases and any related Executory Contracts and the implementation of the Store Closing Sales are set forth herein.

18.    The Stalking Horse Asset Purchase Agreement is not exclusive and is subject to higher and better offers pursuant to a court approved auction process. The Debtors and their advisors continue to provide data to and engage in active discussions and negotiations with all interested parties. Indeed, the Debtors have retained PricewaterhouseCoopers LLP ("PwC") to assist them in, among other things, the continual marketing of the Assets. With the assistance of PwC, the Debtors have identified approximately 75 financial and 25 strategic potential partners that they intend to contact in connection with the bidding process. The Debtors are in the process of sending out teasers and other informational items intended to garner interest in the Assets and have also established an interactive data room for purposes of assisting prospective purchasers in performing their due diligence.

**B.    Proposed Timeline for Sale of Assets**

19.    Accordingly, the Debtors have proposed the following timeline for the Sale of the Assets:[4]

| **Action** | **Deadline** |
| --- | --- |
| Bidding Procedures Hearing | October 4, 2010 |
| Submission Deadline for Required Bid Materials (as defined below) | October 22, 2010 |
| Auction | October 25, 2010 |
| Sale Hearing | October 26, 2010 |
| Consummation of Sale | October 26, 2010[5] |

**C.    The Asset Purchase Agreement**

---

[4] The Debtors, in the exercise of their business judgment, reserve the right to change these sale-related dates in order to achieve the maximum value for the Assets. Any change must comply with the terms of the Stalking Horse Asset Purchase Agreement.

[5] This date may be extended by the Stalking Horse Bidder under the terms of the Stalking Horse Asset Purchase Agreement for up to five (5) days.

10

20.     A summary of the principal terms of the Sale, set forth in full in the Stalking

Horse Asset Purchase Agreement, is as follows:[6]

- Purchase Price. As set forth more fully in Sections 3.1 and 3.2 of the Stalking Horse Asset Purchase Agreement, the Purchase Price shall be (x) an amount equal to $13,000,000 in cash (as finally adjusted in accordance with Section 3.2 of the Stalking Horse Asset Purchase Agreement) *plus* (y) pursuant to the Promissory Note, the Note Amount (subject to the terms and conditions of Section 3.1(c) of the Stalking Horse Asset Purchase Agreement and, for the avoidance of doubt, as such amount may be adjusted in accordance with Section 3.2 of the Stalking Horse Asset Purchase Agreement) (the amounts set forth in clauses (x) and (y) above, collectively, the "Purchase Price"); *provided, however,* that notwithstanding any adjustments required to be made pursuant to Section 3.2 of the Stalking Horse Asset Purchase Agreement, in no event shall the Purchase Price be an amount equal to less than the lesser of (x) $6,000,000 and (y) all outstanding amounts owing under the DIP Facility on the Closing Date (the "Minimum Purchase Price"); *provided, further* that if (i) the Buyer has not assumed the Real Property Leases on more than twenty (20) stores as of the Closing Date, which are to be operated by the Buyer following such assumption and (ii) the Closing Date Cost Value of the Inventory is greater than $8,500,000, then in no event shall the Purchase Price be an amount equal to less than the applicable amount set forth on Schedule 3.1(a), as such amount is adjusted pursuant to Section 3.1(b) below (the "Adjusted Minimum Purchase Price")

- Deposit. In accordance with Section 3.3 of the Stalking Horse Asset Purchase Agreement, within four (4) business days following the Petition Date, the Buyer shall deposit into escrow an amount equal to $1,500,000.

- Acquired Assets. Section 2.1 of the Stalking Horse Asset Purchase Agreement lists the Acquired Assets, and provides that at the Closing the Selling Entities shall sell, assign, convey, transfer and deliver to the Buyer and/or one or more Buyer Designees, and the Buyer and/or such Buyer Designees shall, by the Buyer's and/or such Buyer Designees' payment of the Purchase Price, purchase and acquire from the Selling Entities all of the Selling Entities' right, title and interest, free and clear of all Encumbrances (other than Permitted Encumbrances), in and to all of the properties, rights, interests and other tangible and intangible assets of the

---

[6] The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Asset Purchase Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Asset Purchase Agreement and the terms herein, the terms of the Stalking Horse Asset Purchase Agreement shall control. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Stalking Horse Asset Purchase Agreement.

11

Selling Entities (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any assets acquired by the Selling Entities after the date hereof but prior to the Closing (collectively, the "Acquired Assets"); *provided, however,* that the Acquired Assets shall not include any Excluded Assets.

- Assumed Liabilities. Pursuant to Section 2.3 of the Stalking Horse Asset Purchase Agreement, on the Closing Date, the Buyer and/or one or more Buyer Designees shall execute and deliver to the Selling Entities the Assumption Agreement pursuant to which the Buyer and/or such Buyer Designees shall assume and agree to pay, perform and discharge when due the Assumed Liabilities. For purposes of the Stalking Horse Asset Purchase Agreement, "Assumed Liabilities" means only the following Liabilities (to the extent not paid prior to the Closing): (a) all Cure Payments; (b) the Liabilities of the Selling Entities arising under the Assumed Contracts and Assumed Real Property Leases, to the extent such Liabilities arose from and after the Closing; (c) the Liabilities of the Selling Entities arising in the ordinary course of business under purchase orders with suppliers open as of the Closing Date for which the Buyer expressly agrees to accept delivery of the goods under such purchase orders post-Closing; (d) the Liabilities to the extent expressly assumed by the Buyer pursuant to Sections 7.7(a), 7.7(d), or 7.7(e), of the Stalking Horse Asset Purchase Agreement; (e) all Taxes to the extent expressly payable by the Buyer pursuant to Section 7.8 of the Stalking Horse Asset Purchase Agreement; and (f) all other Liabilities set forth on Schedule 2.3(g) of the Stalking Horse Asset Purchase Agreement.

- Avoidance Actions. The Selling Entities shall not pursue any litigation claims and causes of action (including causes of action under chapter 5 of the Bankruptcy Code) against landlords, vendors or other counterparties under Assumed Contracts, the Assumed Real Property Leases, or otherwise arising under or related to the Acquired Assets (including, for the avoidance of doubt, all Assumed Contracts and the Assumed Real Property Leases), including such causes of action arising under, or available pursuant to, the Bankruptcy Code other than the Retained Avoidance Actions.

- Agreements with Management. The Debtors shall allow the Stalking Horse Bidder or any applicable designee of the Stalking Horse Bidder reasonable access upon reasonable advance notice to meet with and interview the Current Employees who are members of executive management and other employees reasonably requested during normal business hours; *provided, however,* that such access shall not unduly interfere with the operation of the business prior to the Closing.

- Records. Between the Closing Date and complete dissolution and liquidation of the Selling Entities, the Selling Entities and their

12

Representative shall have reasonable access, and the assistance of, the employees of the Stalking Horse Bidder and its designees, and to the assets, software and systems of the Stalking Horse Bidder and its designees, in connection with the winding down of any remaining business and assets of the Selling Entities, the dissolution and liquidation of the Selling Entities, and the performance of the obligations of the Selling Entities hereunder and under the other Transaction Documents, and the Stalking Horse Bidder and its designees shall cooperate, to the extent reasonably requested, therewith; *provided* that such access or assistance does not interfere in any material respect with the operation of the business following the Closing; and *provided, further* that should the Selling Entities request assistance above and beyond that contemplated by this section 7.2 of the Stalking Horse Asset Purchase Agreement (e.g., as to the incurrence by Buyer or a Buyer Designee of out-of-pocket expenses), Buyer or such Buyer Designee will cooperate reasonably with the Selling Entities subject to the Selling Entities' reimbursement of such actual out-of-pocket expenses.

- <u>Break-Up Fee</u>. If the Stalking Horse Asset Purchase Agreement is terminated pursuant to Section 9.1 of the Stalking Horse Purchase Agreement other than pursuant to Section 9.1(c), the Break-Up Fee shall be an amount in cash equal to three percent (3%) of the Estimated Closing Date Cost Value of the Inventory (defined in the Stalking Horse Asset Purchase Agreement as the "Termination Fee") and is payable on the day such Alternative Transaction, Restructuring Transaction or other sale is consummated.[7]

- <u>Expense Reimbursement</u>. The Debtors paid the Stalking Horse Bidder an expense reimbursement in the amount of $150,000 which was paid (i) $100,000 upon execution and delivery of the Letter of Intent and (ii) $50,000 on September 13, 2010. This motion does not seek authorization to pay further expense reimbursement to the Stalking Horse Bidder.

21.    The Stalking Horse Asset Purchase Agreement contemplates a going concern sale of the Debtors' Assets with the option for the Stalking Horse Bidder to conduct Store Closing Sales at certain store locations where the underlying Real Property Leases have not been assumed and assigned as of the closing of the Sale (the "<u>Closing Date</u>") and to designate Executory Contracts and Real Property Leases which are not assumed on the Closing Date for

---

[7] For purposes of the Bidding Procedures proposed herein, the Debtors have estimated the amount of the Break-up Fee to be $325,000 based on the Debtors' current estimate of the aggregate cost value of Saleable Inventory as of the Closing Date.

assumption and assignment to the Stalking Horse Bidder or its designee or for rejection, as explained more fully below.

## RELIEF REQUESTED

22. The Debtors have determined that given their liquidity and current market conditions, a prompt Sale of the Assets is the best way to maximize the value of the Assets for their respective estates and creditors.

23. Accordingly, by this Motion, the Debtors seek entry of the Bidding Procedures Order: (A) approving the Bidding Procedures; (B) approving the Break-up Fee to the Stalking Horse Bidder in accordance with the Stalking Horse Asset Purchase Agreement; (C) scheduling the Auction and a Sale Hearing with respect to any bid accepted by the Debtors, and approving the form and manner of notice thereof; and (D) establishing the Cure Procedures.

24. The Debtors also request that this Court set a Sale Hearing on or about October 26, 2010. At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtors intend to seek entry of a Sale Order (A) approving the Sale, free and clear of all Interests; (B) authorizing the assumption and assignment of certain Executory Contracts and Real Property Leases; (C) establishing Assumption Procedures and Rejection Procedures for those Executory Contracts and Real Property Leases not assumed and assigned on the Closing Date; (D) approving the Store Closing Guidelines; (E) approving the Agency Agreement; and (F) extending the deadline to assume or reject Real Property Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

RLF1 3607171v. 9

## BASIS FOR RELIEF

### A.    Necessity for Sale

25.    The Debtors face severe liquidity constraints and have exhausted their options for addressing this issue, including an attempt to raise cash through a refinancing of their prepetition credit facility, additional investment, and other strategic transactions. To date, none of these options has been successful. Given current economic market conditions, the Debtors' liquidity situation has not improved.

26.    As set forth above, the Debtors presently face the possibility of continued financial deterioration. However, the Debtors have managed to obtain necessary financing to conduct the Sale process proposed herein on the timeline set forth herein. If the Sale process is not conducted on the timeline set forth in this Motion, the Debtors may not have sufficient liquidity to maintain the inventory levels necessary for a going concern sale of their Assets and may be forced to liquidate their Assets. Accordingly, the Debtors have decided to pursue the Sale of the Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Bidding Procedures.

### B.    The Bidding Procedures[8]

27.    In order to maximize the value of the Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors seek to implement a competitive bidding process that is designed to generate maximum recovery. As described more fully in the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order attached hereto as Exhibit A, the Debtors may sell all of the Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Assets.

---

[8] Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.

28.     As described more fully in the Bidding Procedures, the Debtors propose that competing bids for the Assets be governed by the following:[9]

- **Bid Deadline.** A Potential Bidder that desires to make a bid shall deliver written copies of its bid and the Required Bid Materials not later than 5:00 p.m. (prevailing Eastern time) on October 22, 2010 (the "Bid Deadline").

- **Required Bid Materials.** All bids, other than the Stalking Horse Bid, must include, among other things:

    (i)     Identification of Potential Bidder. Identification of the Potential Bidder and any equity holders, in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

    (ii)    an executed copy of a purchase agreement and a redline of a Qualified Bidder's proposed purchase agreement and/or agency agreement reflecting variations from the Stalking Horse Asset Purchase Agreement and/or Agency Agreement (the "Marked Agreements");

    (iii)   Financing Sources: Sufficient information, as may be requested by the Debtors, to allow the Debtors to determine that the bidder has the financial wherewithal to close a sale of the Assets, including:

            (a)     but not limited to, a signed commitment for any debt or equity financing;

            (b)     a bank account statement showing the ability of a Potential Bidder to pay cash for the Assets;

            (c)     contact names and numbers for verification of financing sources; and

            (d)     current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors) of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder.

---

[9] The following description of the Bidding Procedures is only a summary of the terms set forth in the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall control.

(iv) <u>Minimum Bid Amount</u>: Total consideration with a value equal to or greater than $15,525,000 (the "<u>Minimum Bid Amount</u>").

(v) <u>Irrevocability of Bid</u>: A letter stating that the bidder's offer is irrevocable until the first business day after the Assets for which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court.

(vi) <u>Bid Deposit</u>: The cash deposit in the amount of 10% of the total consideration offered in the bid (the "<u>Bid Deposit</u>") (as set forth in the Bidding Procedures).

(vii) <u>Identification of Executory Contracts and Unexpired Real Property Leases</u>: The bid shall identify with particularity the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks to receive an assignment and any designation rights it seeks.

(viii) <u>No Financing or Diligence Constituencies</u>: The bid shall not contain any due diligence, financing or regulatory contingencies of any kind, though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing.

(ix) <u>Consent to Jurisdiction</u>: The bid shall state that the offering party consents to the jurisdiction of the Bankruptcy Court.

(x) <u>Corporate Authority</u>: The bid shall include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase agreement of the bidder.

In addition, the bid must satisfy the other requirements set forth under "Bid Requirements" in the Bidding Procedures.

A "<u>Qualified Bidder</u>" is a potential bidder (a "<u>Potential Bidder</u>") that delivers the documents described in subparagraphs (i)-(x) above, and that the Debtors, in consultation with any official creditors' committee in these chapter 11 cases (the "<u>Committee</u>") and the Lender, determine is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtors) to be able to consummate a sale if selected as the Successful Bidder. Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder. Not later than one (1) business day after a Potential Bidder delivers all of the materials required by subparagraph (i) - (x) above, the Debtors shall determine, in consultation with the Committee and the Lender, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

RLF1 3607171v. 9

- Overbid Amount. There shall be an overbid amount that a Qualified Bidder must bid to exceed the Stalking Horse Bid ("Overbid Amount"), and that amount shall be at least $200,000 in total consideration for all bids made by Qualified Bidders. For example, if a Qualified Bidder bids the Overbid Amount, the next bid cannot be less than $15,525,000 (the $15,000,000 total consideration of the Stalking Horse Bid plus $325,000, the estimated Break-Up Fee plus $200,000, the Overbid Amount) in total consideration.

- Auction. If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtors, the Debtors may conduct an auction (the "Auction") with respect to all or some of the Assets. The Auction shall be conducted at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, 3rd Floor, Wilmington, Delaware 19801 (the "Auction Site") at 10:00 a.m. (prevailing Eastern time) on October 25, 2010 (the "Auction Date"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above. Bidding at the Auction shall be transcribed or videotaped.

- Minimum Bid Increment. Subsequent bids shall not provide consideration of less than $150,000 in total consideration in excess of the preceding bid subject to the Debtors ability to adjust the bidding increments in accordance with the Bidding Procedures. The Debtors will take into account the Break-Up Fee in each round of bidding by the Stalking Horse Bidder.

- Break Up Fee. The Break-Up Fee shall equal an amount in cash equal to three percent (3%) of the Estimated Closing Date Cost Value of the Inventory (as defined in the Stalking Horse Asset Purchase Agreement) and shall be payable in accordance with the terms set forth in the Stalking Horse Asset Purchase Agreement (a summary of which is detailed above).

## C.   Stalking Horse Asset Purchase Agreement and Break-Up Fee

29.    In order to provide an incentive and to compensate the Stalking Horse Bidder for entering into the Stalking Horse Asset Purchase Agreement, the Debtors have agreed to Bid Protections, including a Break-Up Fee of cash in the amount equal to three percent (3%) of the Estimated Closing Date Cost Value of the Inventory (as defined in the Stalking Horse Asset Purchase Agreement to reimburse the Stalking Horse Bidder for costs and expenses incurred in

connection with the Stalking Horse Bidder's anticipated purchase of the Assets). The Debtors will take into account the Break-Up Fee in each round of bidding at the Auction.

30. The Debtors believe that offering the Bid Protections to the Stalking Horse Bidder will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding. The availability of the Bid Protections is necessary in order to provide the Stalking Horse Bidder with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Assets and the risk that arises from participating in the bidding and subsequent Auction process.

**D.      Notice of Bidding Procedures, Auction and Sale**

31.      Notice of Sale Hearing. On the date the notice of motion and hearing with respect to this Motion is filed, the Debtors (or their agents) shall serve this Motion and all exhibits hereto, including the Stalking Horse Asset Purchase Agreement, the Bidding Procedures and a copy of the proposed Bidding Procedures Order, by first-class mail, postage prepaid, upon (a) the United States Trustee for the District of Delaware; (b) counsel to the Lender; (c) counsel for the indenture trustee for the Notes; (d) the creditors listed on the Debtors' consolidated list of 20 largest unsecured creditors, as filed with the chapter 11 petitions; (e) counsel to the Stalking Horse Bidder; (f) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (g) each of the Debtors' landlords and each of the notice parties identified in the Real Property Leases, to the extent possible; (h) the National Association of Attorneys General; (i) the State Attorney General's offices (upon (1) Chief or Director of the Consumer Protection Division or Bureau; and (2) Chief or Director of the Bankruptcy Division or Bureau) and State Consumer Protection Agency for each State where a store or distribution center is located; (j) various federal, state, county and city tax and regulatory authorities; (k) all

entities known to have expressed an interest in a transaction with respect to the Assets or that has been indentified by the Debtors or their advisors as a potential purchaser of the Assets; and (l) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

32.  Sale Notice.  Within two (2) business days of the entry of the Bidding Procedures Order (the "Mailing Date") or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, a sale notice (the "Sale Notice") setting forth the dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached hereto as Exhibit C, and the Bidding Procedures Order upon the Sale Notice Parties.

33.  Publication Notice.  The Debtors also propose, pursuant to Bankruptcy Rule 2002(1) and 2002(d), that the publication of the Sale Notice in the form attached hereto as Exhibit D, once in The New York Times, on the Mailing Date or as soon as practicable thereafter, be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

34.  Post Auction Notice.  As soon as possible after the conclusion of the Auction the Debtors shall file, but not serve, a notice (the "Post Auction Notice") identifying any successful bidder (the "Successful Bidder").

**E.  Designation Rights Under Stalking Horse Asset Purchase Agreement and Extension of Time to Assume/Reject Nonresidential Real Property Leases**

35.  The Stalking Horse Bidder has not yet determined which Executory Contracts and Real Property Leases it will assume and the Stalking Horse Asset Purchase Agreement provides for certain deadlines pursuant to which the Stalking Horse Bidder must select which Executory Contracts and Real Property Leases to assume and assign.  On or before two (2) business days

20

prior to the date scheduled for the Auction, the Stalking Horse Bidder shall identify the Executory Contracts and Real Property Leases to be assumed and assigned to the Stalking Horse Bidder or its designee on the Closing Date. Up to one (1) business day prior to the Closing Date the Stalking Horse Bidder may, in its sole discretion, add or remove any Executory Contract or Real Property Lease to Schedule 2.5(b) of the Stalking Horse Asset Purchase Agreement as an Executory Contract or Real Property Lease to be assumed and assigned on the Closing Date.

36. With respect to any Executory Contract or Real Property Lease not assumed and assigned on the Closing Date, the Stalking Horse Bidder shall have an additional period of time post-closing in which to designate such Executory Contracts and Real Property Leases for assumption and assignment or rejection. Specifically, from and after the Closing Date until 5:00 p.m. (prevailing Eastern Time) on the date that is one hundred twenty (120) days from the Closing Date (the "Designation Deadline"), with respect to Executory Contracts and Real Property Leases that are not included on Schedule 2.5(b) of the Stalking Horse Asset Purchase Agreement to be assumed and assigned on the Closing Date, the Stalking Horse Bidder, in its sole discretion, may (i) designate such Executory Contract or Real Property Lease to be assumed and assigned to the Stalking Horse Bidder or its designee or (ii) designate such Executory Contract or Real Property Lease for rejection.

37. Within two (2) business days of delivery of a notification by the Stalking Horse Bidder with respect to any Executory Contract or Real Property Lease to be assumed and assigned to the Stalking Horse Bidder or its designee from and after the Closing Date until the Designation Deadline, the Debtors shall move to assign such Executory Contract or Real Property Lease to the Stalking Horse Bidder or its designee. Within two (2) business days of delivery of a notification by the Stalking Horse Bidder with respect to any Executory Contract or

Real Property Lease to be rejected from and after the Closing Date until the Designation Deadline, the Debtors shall move to reject such Executory Contract or Real Property Lease. The Debtors intend to effectuate these post-closing assumptions and rejections through the Assumption Procedures and Rejection Procedures requested herein. In addition, if the Stalking Horse Bidder has not provided written designation to assume and assign or reject any Executory Contract or Real Property Lease pursuant to section 2.5(b) of the Stalking Horse Asset Purchase Agreement at least ten (10) business days prior to the Designation Deadline, then the Debtors may move to reject such Executory Contract or Real Property Lease as of the Designation Deadline.

38.     Accordingly, to ensure that none of the Real Property Leases are rejected prior to the Designation Deadline in contravention of the Stalking Horse Asset Purchase Agreement, pursuant to section 365(d)(4) of the Bankruptcy Code, the Debtors request authority to extend the period to assume or reject the Real Property Leases, which currently expires on the date that is 120 days from the Petition Date, through the date which is 210 days from the Petition Date. Such an extension would be without prejudice to the rights of the Debtors to seek further extensions of the time to assume or reject the Real Property Leases with the consent of the affected lessors as contemplated by section 365(d)(4)(B)(ii) of the Bankruptcy Code.

**F.     The Cure Notice Procedures**

39.     The Debtors propose the following procedures for notifying counterparties to Executory Contracts and Real Property Leases of potential Cure Amounts (as defined below) with respect to those Executory Contracts and Real Property Leases that the Debtors may seek to assume and assign on the Closing Date.

22

40.    Within five (5) business days of the filing of this Motion, the Debtors will file a notice identifying all Executory Contracts and Real Property Leases that may be assumed and assigned in connection with the Sale (the "Cure Notice"), and serve the Cure Notice on all non-debtor parties to the Executory Contracts and Real Property Leases (the "Contract Notice Parties").

41.    The Cure Notice shall state the cure amounts that the Debtors believe are necessary to assume such Executory Contracts and Real Property Leases pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify the non-debtor party that such party's Executory Contract or Real Property Lease may be assumed and assigned to a purchaser of the Assets to be identified at the conclusion of the Auction.    The Cure Notice shall also contain information with respect to the Stalking Horse Bidder's proposed adequate assurance of future performance and information regarding how a non-debtor party to an Executory Contract or Real Property Lease may obtain additional information regarding the Stalking Horse Bidder (the "Stalking Horse Adequate Assurance Information").    The Cure Notice shall set a deadline by which the non-debtor party may file an objection to the Cure Amount or the Stalking Horse Adequate Assurance Information.    The Debtors request that this Court set the deadline to object to any Cure Amount or to the Stalking Horse Adequate Assurance Information as fourteen (14) days after service of the Cure Notice.    The Debtors propose that if they file an amended Cure Notice setting forth amended Cure Amounts, any parties affected by the amendment shall have fourteen (14) days after service of the amended Cure Notice to object to the amended Cure Amount.    The Cure Notice shall also provide that objections to any Cure Amount or to the Stalking Horse Adequate Assurance Information will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors in consultation with the Court.    In the event that the

Successful Bidder is not the Stalking Horse Bidder, the Debtors propose that any objections regarding adequate assurance of future performance may be raised at the Sale Hearing.

42. At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder and (ii) request entry of an order requesting approval of the assumption and assignment of any or all Executory Contracts and Real Property Leases to be assumed and assigned on the Closing Date to any Successful Bidder. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

43. As soon as possible after the Closing Date, the Debtors shall file with this Court a post-closing notice that identifies the Executory Contracts and Real Property Leases which were assumed and assigned to the Successful Bidder as of the Closing Date.

## G.    **Assumption and Assignment Procedures**

44. In the case of any Executory Contract and Real Property Lease that the Debtors seek to assume and assign after the Closing Date pursuant to Section 2.5(b) of the Stalking Horse Asset Purchase Agreement, the Debtors request that the Court authorize the following expedited assumption and assignment procedures:

    i. The Debtors shall file with the Court a written notice (an "Assumption Notice") of the Debtors' intent to assume and assign any Executory Contract or Real Property Lease and will serve such Assumption Notice and via overnight delivery on (i) each counter party or landlord to any contract or lease to be assume or assigned by the Debtors, (ii) any other interested parties with respect to such contract or lease, (iii) the U.S. Trustee, (iv) counsel to the Committee, if any, (v) counsel to the Successful Bidder, (vi) counsel to the Lender, and (vii) counsel to the proposed assignee, if applicable (the "Proposed Assignee").

    ii. The Assumption Notice will set forth the following information, to the best of the Debtors' knowledge: (i) the street address of the real property that is the subject of any Real Property Lease that the Debtors seek to assume and assign or a description of the Executory Contract that the Debtors seek to assume and assign, (ii) the name and address of the

24

affected counterparties or landlords (and their counsel, if known), (iii) a description of the deadlines and procedures for filing objections to the Assumption Notice (as set forth below), (iv) the name of the Proposed Assignee, (v) if the Proposed Assignee is not the Successful Bidder, information with respect to the Proposed Assignee's proposed adequate assurance of future performance and information regarding how a non-debtor party to an Executory Contract or Real Property Lease may obtain additional information regarding the Proposed Assignee, and (vi) the proposed order approving the assumption and assignment (the "Assumption Order").

iii.　Should a party in interest object to the proposed assumption and assignment by the Debtors of an Executory Contract or Real Property Lease, such party must file and serve a written objection so that such rejection is filed with this Court and actually received by the Debtors and the Assumption Notice Parties (as defined in and set forth in the Assumption Notice) no later than ten (10) days after the date that the Debtors served the Assumption Notice for the Executory Contract or Real Property Lease at issue.

iv.　If no timely objection is filed and served with respect to the Assumption Notice, the Debtor shall file with the Court a certificate of no objection with the Assumption Order. The Assumption Order shall provide, *inter alia*, (1) that the assumption and assignment of such Executory Contract or Real Property Lease is approved, final and effective, pursuant to section 365 of the Bankruptcy Code as of the date of the Assumption Order and (2) the Proposed Assignee provided adequate assurance of future performance under the applicable Executory Contract or Real Property Lease in accordance with section 365(f)(2)(B), and, if applicable, section 365(b)(3).

v.　If a timely objection is properly filed and served on the Assumption Notice Parties in the manner specified above, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection. If that objection is overruled by the Court or withdrawn, the assumption and assignment of the affected Executory Contract or Real Property Lease shall be deemed effective as of the date of the Assumption Order.

45.　Given that all parties to Executory Contracts and Real Property Leases will receive the Cure Notice as set forth above and an opportunity to object to the assumption and assignment of their particular Executory Contract and Real Property Lease and the applicable Cure Amount in connection with the Sale Hearing, the Debtors respectfully submit that the

25

proposed Assumption Procedures will streamline the Debtors' ability to transfer such Executory Contracts and Real Property Leases to the Successful Bidder or its designee. Upon receipt of the Cure Notice, parties will know that their respective Executory Contract or Real Property Lease is subject to being assumed and assigned and the proposed Cure Amount with respect thereto (and the identity of the Stalking Horse Bidder). In the event that such Executory Contract or Real Property Lease is not assumed and assigned on the Closing Date, the Assumption Notice will alert any counterparties as to the timing of any post-closing assignment and the identity of the Proposed Assignee. Accordingly, the Assumption Notice affords parties-in-interest full notice of the transfer of the applicable Executory Contracts and Real Property Leases and affords parties-in-interest their due process rights with respect to notice and the opportunity to be heard in the event of objections. For the foregoing reasons, the assumption procedures set forth herein should be approved and the Debtors should be authorized to assume and assign the Executory Contracts and Real Property Leases consistent with the terms of such procedures, pursuant to section 365 of the Bankruptcy Code.[10]

## H. Rejection Procedures

46. As set forth more fully in Section 2.5(b) of the Stalking Horse Asset Purchase Agreement, in the case of any Executory Contract or Real Property Lease that the Successful Bidder does not want to assume and assign, within two (2) business days following delivery of a notification by the Successful Bidder that an Executory Contract or Real Property Lease is designated for rejection, the Debtors shall move to reject such Executory Contract or Real Property Lease. Additionally, in the event that the Successful Bidder has not provided a written designation to assume and assign or reject any Executory Contracts or Real Property Leases at

---

[10] Certain of the leases and contracts may contain provisions that restrict, prohibit, condition or limit the assumption and/or assignment of a lease or contract. The Debtors reserve the right to argue that such clauses are unenforceable anti-assignment or ipso facto clauses under section 365 of the Bankruptcy Code.

RLF1 3607171v. 9

least ten (10) business days prior to the Designation Deadline, the Debtors may move to reject such Executory Contracts and Real Property Leases as of the Designation Deadline. Accordingly, the Debtors request that the Court authorize the following expedited Rejection Procedures:

 i. The Debtors will file with the Court a written notice (the "Rejection Notice") of the Debtors' intent to reject any contract or lease, and will serve the Rejection Notice via overnight delivery service upon the following parties (collectively, the "Rejection Notice Parties"): (i) the counterparties or landlords affected by the Rejection Notice and any parties to any subleases, (ii) the U.S. Trustee, (iii) counsel to the Committee, (iv) counsel to the Successful Bidder, (v) counsel to the Lender, and (vi) any other interested parties with respect to such contract or lease. The affected contract or lease which is the subject of a Rejection Notice shall be deemed to be subject to a motion to reject such contract or lease pursuant to section 365 of the Bankruptcy Code.

 ii. The Rejection Notice will set forth the following information, to the best of the Debtors' knowledge: (i) the street address of the real property that is the subject of any Real Property Lease that the Debtors seek to reject or a description of the Executory Contract that the Debtors seek to reject, (ii) the name and address of the affected counterparties or landlords (and their counsel, if known), (iii) a description of the deadlines and procedures for filing objections to the Rejection Notice (as set forth below), and (iv) the proposed order approving the rejection (the "Rejection Order").

 iii. Should a party in interest object to the proposed rejection by the Debtors of an Executory Contract or Real Property Lease, such party must file and serve a written objection so that such rejection is filed with this Court and actually received by the Debtors and the Rejection Notice Parties as set forth in the Rejection Notice no later than ten (10) days after the date that the Debtors served the Rejection Notice to reject the Executory Contract or Real Property Lease at issue.

 iv. If no timely objection is filed and served with respect to the rejection of a contract or lease, the Debtor shall file with the Court a certificate of no objection with the Rejection Order. The Rejection Order shall provide, inter alia, that the rejection of such contract or lease shall become effective on the later of (i) ten (10) days from the date the applicable Rejection Notice was served on the affected counterparty or landlord (notwithstanding any extension of the objection deadline beyond such date pursuant to Bankruptcy Rule 9006), or (ii) if a Real Property Lease, the date that the Debtor vacated the premises, evidenced by actions such as turning over the keys or "key codes" to the affected landlord.

v.    If a timely objection is properly filed and served on the Rejection Notice Parties as specified above, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection. If that objection is overruled by the Court or withdrawn, the rejection of the affected Executory Contract or Real Property Lease shall be deemed effective on the later of (i) ten (10) days from the date the applicable Rejection Notice was served on the affected counterparty or landlord, or (ii) if a lease, the date that the Debtors vacated the premises to the affected landlord, evidenced by actions such as turning over keys or "key codes" to the affected landlord.

vi.    In connection with the rejection of a Real Property Lease, if the Debtors have deposited monies with a lessor as a security deposit or other arrangement, such lessor may not set off or recoup or otherwise use such deposit without the prior approval of the Court.

vii.    In connection with the rejection of a Real Property Lease, with respect to any personal property of the Debtors located at any of the premises subject to any Rejection Notice, the Debtors shall remove such property prior to the later of (i) the expiration of the period within which a party must file and serve a written objection to the Rejection Notice, and (ii) the date of rejection of the underlying Real Property Lease. If the Debtors determine that the property at a particular location has no value or the cost of removing the property exceeds the value of such property, the Debtors shall generally describe the property in the Rejection Notice and their intent to abandon such property. Absent a timely objection, the property will be deemed abandoned pursuant to section 554 of the Bankruptcy Code, as is, where is, effective as of the date of the rejection of the underlying Real Property Lease. Upon abandonment, the landlord may dispose of such property without further notice or court order and free of liability for such action. The right of any party in interest to assert a claim against the Debtors' estate for costs associated with such abandoned property is fully preserved, provided that such claim must be made in accordance with the procedures established below for the filing of proofs of claim. The Debtors' rights to contest any such claims are fully preserved.

viii.    If an affected landlord or counterparty or any other party in interest (the "Rejection Claimant") asserts a claim or claims against the Debtor arising from the rejection of an Executory Contract or Real Property Lease, such Rejection Claimant shall submit a proof of claim to Urban Brands Claims Processing Center, c/o BMC Group, Inc., P.O. Box 3020, Channassen, Minnesota 55317-3020, on or before the later of (i) the date that is 30 days after the effective date of rejection of the contract or Real Property Lease, or (ii) the bar date established by this Court for filing proofs of claim against the Debtors. If a Rejection Claimant does not timely file such

28

proof of claim, such claimant shall be forever barred from asserting a claim for such rejection damages.

47.     The above proposed Rejection Procedures will streamline the Debtors' ability to reject burdensome Executory Contracts and Real Property Leases that provide no benefit to the Debtors' estates, and thereby minimize unnecessary post-petition obligations, while also providing landlords and other affected parties with adequate notice of rejection of any such leases and contracts and an opportunity to object to such rejection within a reasonable time period. Accordingly, at the Sale Hearing, the Debtors respectfully submit that the Rejection Procedures should be approved as they balance the respective interests of the parties, are an appropriate exercise of the Debtors' business judgment and constitute a common form of relief in many retail bankruptcy cases in this and other jurisdictions.

**I.      Store Closing Guidelines**

48.     In connection with those store locations for which the Stalking Horse Bidder or other Successful Bidder does not assume and assign the underlying Real Property Lease on the Closing Date, the Stalking Horse Bidder or other Successful Bidder may seek to close such stores and liquidate the inventory contained therein pursuant to the Store Closing Sales. Accordingly, by this Motion the Debtors also request that the Court authorize the Successful Bidder or the Agent, as applicable, to conduct Store Closing Sales in accordance with the terms of the Store Closing Guidelines, which are attached hereto as Exhibit F, with such sales to be free and clear of all liens, claims and encumbrances.

**APPLICABLE AUTHORITY**

49.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'"

29

Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore. See In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

50.     The Debtors have sound business justifications for selling the Assets at this time. Success in the retail business requires significant liquidity. While the Debtors currently have limited access to capital, they are endowed with a strong customer base. Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through a Sale of substantially all of the Assets.

**A.     The Bidding Procedures are Fair and Are Designed to Maximize the Value Received for the Assets**

51.     Section 363(b)(1) of the Bankruptcy Code provides that "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors believe that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest and best offer for the sale

30

of substantially all of the Assets as determined by the Debtors, in consultation with the Committee and the Lender.

52. The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing. Accordingly, the Debtors and all parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

## B. The Break-Up Fee Is Necessary to Preserve the Value of the Debtors' Estates

53. Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that having the ability to offer the Bid Protections to the Stalking Horse Bidder will likely maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

54. Approval of the bid protections to the Stalking Horse Bidder is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"); see also Reliant Energy Channelview LP v. Kelson Channelview LLC, 594 F.3d 200, 206-07 (3d Cir. 2010) (hereinafter, "Reliant"). Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the

31

bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Reliant, 594 F.3d at 206-07; O'Brien, 181 F.3d at 537.

55. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Reliant, 594 F.3d at 206-07; O'Brien, 181 F.3d at 537. Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Reliant, 594 F.3d at 206-07; O'Brien, 181 F.3d at 537.

56. In O'Brien, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

A. the presence of self-dealing or manipulation in negotiating the break-up fee;

B. whether the fee harms, rather than encourages, bidding;

C. the reasonableness of the break-up fee relative to the purchase price;

D. whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

E. the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

F. the correlation of the fee to a maximum of value of the debtor's estate;

G. the support of the principal secured creditors and creditors committees of the break-up fee;

32

H.    the benefits of the safeguards to the debtor's estate; and

I.    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

57.    The Break-Up Fee set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Assets and, thus, insist that competing bids be materially higher or otherwise better than the Stalking Horse Asset Purchase Agreement — a clear benefit to the Debtors' estates. Moreover, the Stalking Horse Bidder would not agree to act as a stalking horse without the Break-Up Fee. If the Break-Up Fee is not approved by the Court, pursuant to 9.1(h) of the Stalking Horse Asset Purchase Agreement, the Stalking Horse Bidder has the right to terminate the Stalking Horse Asset Purchase Agreement. Without the Break-Up Fee, the Debtors might lose the opportunity to obtain the highest or best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at Auction for the Assets could be substantially lower than that offered by the Stalking Horse Bidder.

58.    Moreover, payment of the Break-Up Fee will not diminish the Debtors' estates. The Break-Up Fee is only payable if a Sale to a higher or better bidder is consummated.

59.    "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Bid Protections are compensation for the Stalking Horse Bidder's investment of considerable time and expense in negotiating and entering into the Stalking Horse Asset Purchase Agreement. The Debtors do not believe the Break-Up Fee will stifle bidding. To the

33

contrary, the Debtors believe that, should an auction be held, the Break-Up Fee will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." Id. at 662. If the Assets are sold to a competing bidder, the sale likely will be the result of Stalking Horse Bidder's crucial role as an initial bidder generating interest in the assets and establishing a minimum acceptable price and offer against which other parties can bid.

60.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. The Break-Up Fee is equal to three percent (3%) of the Estimated Closing Date Cost Value of the Inventory (as defined in the Stalking Horse Asset Purchase Agreement) and is within the range of break-up fees typically paid in sales transactions that have been approved by this Court. See, e.g., In re Maxide Acquisition, Inc., No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); In re Ameriserve Food Distrib., Inc., No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale). Given the size of the Purchase Price, the Debtors believe the amount of the Break-Up Fee, $325,000, is appropriate.

**C.      Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

61.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not

specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at ¶ 3 (Banter. S.D. Ohio 2005); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bonier. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

62.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"). The Debtors have a sound business justification for selling the Assets at this time. Based on a careful view of the Debtors' liquidity constraints and their ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that an expedited Sale of all of the Assets in accordance with the procedures set

forth in the Bidding Procedures may be the best method to maximize recoveries to the estates. Maximization of the Assets' value is a sound business purpose warranting authorization of any proposed Sale. Absent an ability to auction the Assets in accordance with the Bidding Procedures and related timeline, the Debtors will have no choice but to liquidate their assets, thereby destroying any going concern value that could be obtained for the benefit of creditors.

63. The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of their businesses for the benefit of the Debtors' estates and their creditors. The Sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

64. In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these chapter 11 cases, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and their creditors and parties-in-interest.

**D.      The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

65. Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same

36

rights and priorities therein as in the sold assets). As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). Citicorp Homeowners Servs., Inc. v. Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

66.    The Debtors believe that the Lender will consent to the sale free and clear under section 363(f)(2). In the event they do not, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the Lenders will be paid from the proceeds of the Sale and the Debtors will establish at the Sale Hearing that the Lender can be compelled to accept a monetary satisfaction of their claims.

67.    The Debtors propose that any bona fide and allowed Interests shall attach to the Sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Assets prior to such Sale.

**E.    A Successful Bidder Should be Entitled to the Protections of Section 363(m)**

68.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. See In re Abbotts Dairies, 788 F.2d at 147; In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain V. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

69.    The Stalking Horse Asset Purchase Agreement and Agency Agreement were negotiated at arm's length, with both parties represented by their own counsel. Additionally, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating that any bidder

37

who is deemed a Successful Bidder for all of the Assets had negotiated at arm's length, with all parties represented by their own counsel.

70.     Accordingly, the Sale Order will include a provision that the Successful Bidder for the Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.   The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and that closing of the same will occur promptly.

**F.     The Assumption and Assignment of Executory Contracts and Unexpired Leases**

71.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3rd. Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). Any more exacting scrutiny would slow the administration of a debtors' estate and increase costs, interfere with the Bankruptcy Code's

38

provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

72. Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

73. Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective

assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

74.     Additionally, information will be included in the Cure Notice as part of the Stalking Horse Adequate Assurance Information, which will include contact information on where additional adequate assurance information can be obtained. Adequate assurance of future performance with respect to any Successful Bidder who is not the Stalking Horse Bidder shall be presented at the Sale Hearing. Upon closing, the Stalking Horse Bidder, will have financial resources that are more than sufficient to perform under any Executory Contracts or Real Property Leases it seeks to have assumed by the Debtors. Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Stalking Horse Bidder or any Successful Bidder, and their willingness and ability to perform under the Executory Contracts and Real Property Leases to be assumed and assigned to them. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Executory Contracts and Real Property Leases that it seeks to assume.

75.     With respect to any Executory Contracts and Real Property Leases not assumed and assigned to the Stalking Horse Bidder or other Successful Bidder on the Closing Date, such Executory Contracts and Real Property Leases may be subject to the designation procedures set forth herein and in section 2.5(b) of the Stalking Horse Asset Purchase Agreement. Pursuant to the designation procedures, upon receiving written direction from the Stalking Horse Bidder, the Debtors shall seek to assume and assign the designated Executory Contracts or Real Property Leases to the Stalking Horse Bidder or its designee pursuant to the Assumption Procedures

40

described herein. Pursuant to the proposed Assumption Procedures, the notices filed with the Bankruptcy Court and served on the counterparties to the Executory Contracts and Real Property Leases shall contain adequate assurance information with regards to the proposed assignee and/or contact information as to where adequate assurance information can be obtained.

76.     Accordingly, the Debtors respectfully submit that the procedures proposed herein (both for Executory Contracts and Real Property Leases being assumed and assigned on the Closing Date or subject to the post-closing Designation procedures)  are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Assumption Notice and Cure Notice, as applicable, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

77.     Furthermore, to the extent that any defaults exist under any Executory Contract or Real Property Lease that is to be assumed and assigned in connection with the Sale of the Assets, the Debtors will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such Executory Contract or Real Property Lease.

78.     Accordingly, this Court therefore should have a sufficient basis to authorize the Debtors to assume and assign Executory Contracts and Real Property Leases as may be set forth in any Successful Bidder's asset purchase agreement.

**G.      Extension of Time Under Section 365(d)(4) of the Bankruptcy Code is Appropriate**

79.     Section 365(d)(4) of the Bankruptcy Code provides as follows:

(A)     Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of -

(i)      the date that is 120 days after the date of the order for relief; or

41

(ii)    the date of the entry of an order confirming a plan.

(B)
    (i)     The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

    (ii)    If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

11 U.S.C. § 365(d)(4). Accordingly, if a court finds that cause exists, the court may grant an extension up to 90 days after the initial 120-day period allotted to debtors under the Bankruptcy Code to assume or reject nonresidential real property leases.

80.     Courts have recognized the benefits to granting additional time under section 365(d)(4) of the Bankruptcy Code. See, e.g., In re Channel Home Ctrs., Inc., 989 F.2d 682, 687-88 (3d Cir. 1993), cert. denied, 510 U.S. 865 (1993); In re GST Telecom, Inc., No. 00-1982-GMS, 2001 WL 686971 (D. Del. June 8, 2001). As the Third Circuit Court of Appeals has stated, "nothing prevents a bankruptcy court from granting an extension because a particular debtor needs additional time to determine whether the assumption or rejection of particular leases is called for by the plan of reorganization that it is attempting to develop." Channel Home Ctrs., 989 F.2d at 689; see also Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.), 127 F.3d 904, 909 (9th Cir. 1997), cert. denied, 522 U.S. 1148 (1998) (noting that bankruptcy courts often grant debtor's request for an extension).

81.     The term "cause," as used in section 365(d)(4) of the Bankruptcy Code, is not defined in the Bankruptcy Code. In determining whether cause exists for an extension of the initial 120-day period, courts have relied on a non-exhaustive list of factors, including the following:

(1)     whether the debtor was paying for the use of the property;

42

<ol start="2" type="1">
<li>whether the debtor's continued occupation could damage the lessor beyond the compensation available under the Bankruptcy Code;</li>
</ol>

<ol start="3" type="1">
<li>whether the lease is the debtor's primary asset;</li>
</ol>

<ol start="4" type="1">
<li>whether the debtor has had sufficient time to formulate a plan of reorganization; and</li>
</ol>

<ol start="5" type="1">
<li>the complexity of the case facing the debtor.</li>
</ol>

South St. Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 760-61 (2d Cir. 1996); see also In re Wedtech Corp., 72 B.R. 464, 471-72 (Bankr. S.D.N.Y. 1987); Channel Home Ctrs., 989 F.2d at 689 ("[I]t is permissible for a bankruptcy court to consider a particular debtor's need for more time in order to analyze leases in light of the plan it is formulating.").

82. In this case, the foregoing factors weigh heavily in favor of granting the requested extension. As discussed herein, the Debtors anticipate that many of the Debtors' Real Property Leases will be assumed and assigned to the Stalking Horse Bidder or other Successful Bidder on the Closing Date. The Real Property Leases that are not assumed and assigned on the Closing Date, however, shall be subject to the Stalking Horse Bidders' designation rights under the Stalking Horse Asset Purchase Agreement. Pursuant to such rights, the Stalking Horse Bidder shall have 120 days from the Closing Date in which to decide whether the remaining Real Property Leases should be assumed and assigned to the Stalking Horse Bidder or its designee, or rejected pursuant to section 365 of the Bankruptcy Code. With an anticipated Closing Date on or about October 26, 2010, the Designation Deadline would be on or about February 23, 2011 -- well beyond the initial 120 day period afforded under section 365(d)(4) of the Bankruptcy Code. Additionally, under the Stalking Horse Asset Purchase Agreement, the Stalking Horse Bidder may conduct Store Closing Sales at such locations during the designation period. Accordingly, the proposed extension of the initial 120-day period is necessary to provide the Stalking Horse Bidder the full benefit of the designation rights which it bargained for and to ensure that the

43

Debtors and /or their sales agent will have sufficient time after the Closing Date to conduct any Store Closing Sales. The Debtors submit that any landlords or counterparties to such Real Property Leases will not be prejudiced by the requested extension, as the Debtors shall pay postpetition rent at the applicable lease rates and perform their other obligations under the Real Property Leases in a timely fashion, to the extent required by section 365(d)(3) of the Bankruptcy Code.

83. Accordingly, the Debtors respectfully submit that this Court should grant the Debtors an extension of time within which the Debtors must assume or reject their Real Property Leases, through the date that is 210 days from the Petition Date, without prejudice to the Debtors' rights to seek further extensions of such deadline with the consent of the affected lessors as provided in section 365(d)(4)(B)(ii) of the Bankruptcy Code.

**H.    Approval of the Agency Agreement is Warranted**

84. As previously discussed, the Stalking Horse Asset Purchase Agreement provides for a going concern sale of substantially all of the Debtors' Assets, but also provides the Stalking Horse Bidder with the flexibility to defer its decision on certain store locations after the proposed closing date. During the 120 day period after the closing date, the Stalking Horse Bidder will have the ability to direct the Debtors to assume and assign to the Stalking Horse Bidder or its designee or reject the underlying Real Property Leases with respect to certain store locations and, to the extent that the Stalking Horse Bidder intends to reject certain leases, allow the Agent to conduct Store Closing Sales pursuant to the Agency Agreement at such locations during the designation period.

85. The Agency Agreement will provide the Debtors with several benefits, including, but not limited to, (a) allowing a professional liquidator to sell the merchandise at the stores through the Store Closing Sales and (b) the Agency Agreement represents a cost-effective

44

manner for the Debtors and the Agent to conduct the Store Closing Sales, because the Agent has extensive knowledge, expertise and experience in conducting liquidation sales and is responsible for the payment of all expenses related thereto.

86.     In addition, the terms of the Agency Agreement are fair and reasonable. Accordingly, the Debtors believe that they are exercising sound business judgment and request that the Court approve the Agency Agreement.

87.     Finally, section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Debtors submit that approval of the Agency Agreement is in the best interests of the Debtors' estates and their creditors and is therefore well within the Court's equitable powers under section 105 of the Bankruptcy Code.

**I.      The Store Closing Guidelines Should be Approved**

> **1.      The Court Should Invalidate Any Restrictions in Restrictive Documents That May Impair the Debtors' Ability to Conduct the Store Closing Sales**

88.     As discussed above, the Stalking Horse Asset Purchase Agreement provides the Stalking Horse Bidder or its agent the right to conduct Store Closing Sales at any store location where the underlying Real Property Lease has not been assumed and assigned on the Closing Date. The Debtors lease each of the stores where Store Closing Sales may be conducted. Thus, the contemplated Store Closing Sales may be inconsistent with certain provisions of leases or other documents (the "Anti-Alienation Provisions") whether or not filed of record with respect to any of such leased premises (the "Premises") in the land records, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other

45

similar documents or provisions (collectively, the "Restrictive Documents"),[11] with respect to the Premises, that are intended to protect the image of a shopping center or mall or avoid disruption of normal commerce, including Anti-Alienation Provisions purporting to restrict or prohibit the Debtors or the Agent from conducting the Store Closing Sales.

89.     Store closing or liquidation sales, such as the sales described herein, are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts, despite provisions of recorded documents or agreements purporting to forbid such sales in the ordinary course of business. Indeed, Anti-Alienation Provisions in leases have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. See, e.g., In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value of the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (finding that "to enforce the anti-GOB sale clause of the lease would contravene overriding federal policy requiring Debtors to maximize estate assets by imposing additional constraints never envisioned by Congress"); see also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-going-out-of-business sales clause in lease unenforceable); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in Chapter 11 case where debtor sought to conduct going-out-of-business sale).

---

[11] With respect to any other documents that may relate to any of the Debtors' Premises, but are not recorded and to which the Debtors are not a party, such documents cannot, as a matter of law, prohibit, restrict or otherwise prevent the Debtors' use of the respective portions of the Premises. See Chevron U.S.A., Inc. v. Traillour Oil Co., 987 F.2d 1138, 1158 (5th Cir. 1993) (holding that lease could not be enforced against sublessee in absence of privity of contract or estate).

90.     The Store Closing Guidelines are similar to store closing guidelines approved in connection with store closing sales by bankruptcy courts in Delaware and other districts. See, e.g., In re Gottschalks, Inc., Case No. 09-10157 (KJC) (Bankr. D. Del. Apr. 1, 2009); In re Whitehall Jewelers Holdings, Inc., Case No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (approving store closing sales pursuant to sale guidelines); In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (same).

91.     The Store Closing Guidelines, like the store closing guidelines approved in other cases, provide appropriate protections to any legitimate concerns that landlords might otherwise have concerning the conduct of the Store Closing Sales. Accordingly, for the reasons set forth above, the Debtors believe that the conduct of the Store Closing Sales by the Agent, pursuant to the terms of the Store Closing Guidelines is the most efficient means of maximizing the value of their assets for the benefit of their stakeholders. The Agent should have the right to use the stores and all related store services, furniture, fixtures, equipment, and other assets for the purpose of conducting the closing sales free of any interference from any entity or person, including, but not limited to, landlords other persons affected, directly or indirectly, by the Store Closing Sales.

92.     Thus, the Court should ensure that no clause in any of the Restrictive Documents for the Premises is an impediment to the Store Closing Sales, the store closures, or the activities connected therewith, as interested parties are adequately protected by the terms and conditions of the Store Closing Guidelines and the notice and objection procedures set forth in the Sale Order. To the extent such Anti-Alienation Provisions exist in any Restrictive Documents, they should

not be permitted to interfere with, or otherwise restrict the Agent from conducting the Store Closing Sales or the closing of such stores. Accordingly, the Debtors request that the Court authorize the Debtors and the Agent to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

2. **The Store Closing Sales Should Be Exempt from Certain Federal, State, and Local Laws, Statutes, Rules, and Ordinances Related to Store Closing and Liquidation Sales**

93. The Debtors operate stores in a number of states, certain of which may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local statutes and regulations establishing licensing or permitting requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws"). Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized, however, then a company need not comply with these Liquidation Sale Laws. See, e.g., Iowa Code § 537.1202 (2004); Tex. Bus. & Com. Code § 17.91 (2004). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Sale Laws. See 11 U.S.C. §105(a).

94. To eliminate the time, delay, and expense associated with the administrative procedures necessary for non-bankruptcy sales, the Debtors request that the Court, pursuant to section 105(a) of the Bankruptcy Code, expressly authorize the Agent to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws. Upon information and belief, the Agent will comply with the state and

local health and safety laws and consumer protection laws in conducting the Store Closing Sales, and seek waiver of Liquidation Sale Laws only.

95.     Because the Debtors, their assets and the Agent are subject to this Court's jurisdiction, this Court will be able to supervise the Store Closing Sales and the liquidation of the assets contained therein. Creditors are adequately protected by the notice of this Motion and the jurisdiction and supervision of this Court. Accordingly, this Court should dispense with any requirement that the Debtors and Agent comply with technical requirements that are not intended to curtail persons from conducting store closing sales with bankruptcy court supervision, including bulk sales laws.

96.     Moreover, 28 U.S.C. § 959, which requires trustees (and, thus, debtors-in-possession) to otherwise comply with state and other laws in performance of their duties, does not apply to the Store Closing Sales. Courts have held that 28 U.S.C. § 959 does not apply to debtors or their agents when they are liquidating assets. See, e.g., Cal. State Bd. of Equalization v. Goggin, 191 F. 2d 726 (9th Cir. 1951) (holding that 28 U.S.C. § 959 does not apply to transactions that are in the nature of liquidation), cert. denied, 342 U.S. 909 (1952); see also In re Borne Chem. Co. 54 B.R. 1260, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is applicable only when property is being managed or operated for purpose of continuing operations).

97.     Here, the Store Closing Sales will continue for a limited duration, all advertising will fairly describe the Store Closing Sales, and no aspect of the relief sought is intended to alter laws or regulations affecting public safety. For these and other reasons, 28 U.S.C. § 959(b) should not be read to apply to the Store Closing Sales, as the Agent will be ceasing their operations at the stores with the knowledge and oversight of their creditors and this Court.

RLF1 3607171v. 9

98.     The Bankruptcy Code preempts state and local laws that conflict with its underlying policies. See, e.g., Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . . [A] state statute [] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997).   While preemption of state law is not always appropriate, as when the protection of public health and safety is involved, see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.), 35 F. 3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety. Id. at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); see also In re Scott Housing Sys. Inc., 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under Section 362 is broad and preempts state law expect for those laws designed to protect public health and safety).

99.     The Debtors also request that no other person or entity, including (but not limited to) any landlords, utilities, creditors, or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of such Store Closing Sales, in the manner set forth in the Store Closing Guidelines, and this Court should retain exclusive jurisdiction to resolve any such dispute, and such parties or persons should take no action against the Debtors, the Agent, the

landlords, or the Sale until this Court has resolved such dispute. The Debtors request that this Court hear the request of such persons or parties with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances. The Debtors do not seek to bind any governmental units by this injunctive provision unless it was either previously served with the Motion or subsequently served with the Order granting the relief requested herein, and has had an opportunity to object and failed to timely file an objection.

100.     In order to maximize the return for their merchandise, Debtors and Agent also seek authorization to conduct, advertise, post signs, and otherwise promote the Sale as a "store closing", "sale on everything", "everything must go," or similar themed sale, without further consent of any person, in accordance with the Store Closing Guidelines, and without further compliance with applicable federal, state or local laws Liquidation Sale Laws, other than those designed to protect public health and safety.

101.     The Debtors further request that the Court direct that each and every federal, state, or local agency, department, or governmental authority with regulatory authority over the sale and all newspapers and other advertising media in which the sale is advertised accept this Court's Sale Order granting the relief requested herein as binding and allow Debtors and Agent to consummate the transactions provided for in the Stalking Horse Asset Purchase Agreement and Store Closing Guidelines, including, but not limited to, the conducting and advertising in the manner contemplated by Store Closing Guidelines, without the necessity of any further approval, license, or permit of any governmental authority.

RLF1 3607171v. 9

**J.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

102.    Bankruptcy Rule 6006(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NOTICE

103.    No trustee, examiner or Committee has been appointed in these chapter 11 cases. The Debtors served a copy of this Motion by first class mail upon:  (a) the United States Trustee for the District of Delaware; (b) counsel to the Lender; (c) counsel for the indenture trustee for the Notes; (d) the creditors listed on the Debtors' consolidated list of 20 largest unsecured creditors, as filed with the chapter 11 petitions; (e) counsel to the Stalking Horse Bidder; (f) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (g) each of the Debtors' landlords and each of the notice parties identified in the real property leases, to the extent possible; (h) the National Association of Attorneys General; (i) the State Attorney General's offices (upon (1) Chief or Director of the Consumer Protection Division or Bureau; and (2) Chief or Director of the Bankruptcy Division or Bureau) and State Consumer Protection Agency for each State where a store or distribution center is located; (j) various federal, state, county and city tax and regulatory authorities; (k) all entities known to have expressed an interest in a transaction with respect to the Assets or that has been indentified by the Debtors or their advisors as a potential purchaser of the Assets; and (l) all parties

52

requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

## <u>NO PRIOR REQUEST</u>

104. No prior motion for the relief requested herein has been made to this Court or any other Court.

*[Remainder of page intentionally left blank.]*

RLF1 3607171v. 9

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order, substantially in the form attached hereto, (A) approving the Bidding Procedures; (B) approving the Break-Up Fee; (C) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; (D) approving the Cure Procedures; and (E) granting such other and further relief as this Court deems appropriate. Additionally, the Debtors request that at the Sale Hearing this Court enter a Sale Order subject to the result of the Auction and to the Bidding Procedures (A) approving and authorizing the Sale; (B) authorizing the assumption and assignment of certain Executory Contracts and Real Property Leases; (C) authorizing the Assumption Procedures and the Rejection Procedures, (D) authorizing the Store Closing Guidelines; (E) approving the Agency Agreement; (F) extending the deadline to reject Real Property Leases pursuant to section 365(d)(4) of the Bankruptcy Code until the date that is 210 days from the Petition Date and (G) granting such other and further relief as this Court deems appropriate.

Dated: September 22, 2010
      Wilmington, Delaware

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
L. Katherine Good (No. 5101)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

54