# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Urban Brands, Inc., et al.,[1] | Case No. 10-13005 (KJC) |
| Debtors. | Jointly Administered |
| | Objection Deadline: October 6, 2010 at 4:00 p.m. (EDT) |
| | Hearing Date: October 13, 2010 at 10:00 a.m. (EDT) |

## APPLICATION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR AN ORDER PURSUANT TO SECTIONS 327(a), 328 AND 1107 OF THE BANKRUPTCY CODE AND RULE 2014 OF THE BANKRUPTCY RULES AUTHORIZING THE RETENTION OF PRICEWATERHOUSECOOPERS LLP AS FINANCIAL ADVISOR TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE AND GRANTING RELIEF UNDER LOCAL RULE 2016-2

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, hereby submit this application (the "Application") for entry of an Order pursuant to sections 327(a), 328 and 1107 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") authorizing the retention and employment of

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Urban Brands, Inc. (3678), 100% Girls Ltd. (4150), 100% Girls of Georgia, Inc. (4159), 100% Girls of New York, Inc. (2149), 100 Percent Girls of New Jersey, Inc. (4167), A.S. Interactive, Inc. (3472), Ashley Stewart Ltd. (4541), Ashley Stewart Apparel Corporation (4049), Ashley Stewart Clothing Company, Inc. (4051), Ashley Stewart Management Co., Inc. (4053), Ashley Stewart Woman Ltd. (4152), ASIL 6, Inc. (3996), ASNJ 10, Inc. (4004), Carraizo Alto Apparel Corporation (4651), Church Street Retail, Inc. (5954), Kid Spot Ltd. (2585), Kidspot of Delaware, Inc. (2596), Kidspot of Illinois, Inc. (2606), Kidspot of Michigan, Inc. (2603), Kidspot of New Jersey, Inc. (2601), Kidspot of Ohio, Inc. (4705), Kidspot of Pennsylvania, Inc. (2599), Kidspot of Texas, Inc. (3809), Large Apparel of Alabama, Inc. (0624), Large Apparel of California, Inc. (2129), Large Apparel of Connecticut, Inc. (5161), Large Apparel of District of Columbia, Inc. (8613), Large Apparel of Florida, Inc. (2209), Large Apparel of Georgia, Inc. (3894), Large Apparel of Illinois, Inc. (4650), Large Apparel of Indiana, Inc. (4055), Large Apparel of Louisiana, Inc. (3790), Large Apparel of Maryland, Inc. (5158), Large Apparel of Michigan, Inc. (9420), Large Apparel of Mississippi, Inc. (5913), Large Apparel of Missouri, Inc. (2135), Large Apparel of New Jersey, Inc. (5157), Large Apparel of New York, Inc. (5956), Large Apparel of North Carolina, Inc. (8611), Large Apparel of Ohio, Inc. (3815), Large Apparel of Pennsylvania, Inc. (4057), Large Apparel of South Carolina, Inc. (2029), Large Apparel of Tennessee, Inc. (3895), Large Apparel of Texas, Inc. (3787), Large Apparel of Virginia, Inc. (2809), Large Apparel of Wisconsin, Inc. (3898), Marianne Ltd. (3940), Marianne USPR, Inc. (2193), Marianne VI, Inc. (2206), Metro Apparel of Kentucky, Inc. (7533), Metro Apparel of Massachusetts, Inc. (1367), The Essence of Body & Soul, Ltd. (4165), Urban Acquisition Corporation of New Jersey, Inc. (2976), Urban Acquisition Corporation of New York, Inc. (4103), and Urban Brands TM Holding Co. (5909). The Debtors' corporate offices are located at 100 Metro Way, Secaucus, New Jersey 07094.

PricewaterhouseCoopers LLP ("PwC") as financial advisor to the Debtors *nunc pro tunc* to the Petition Date (as defined below) and granting relief under and Rule 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). The Debtors seek to employ PwC pursuant to the terms of that certain engagement letter, dated September 10, 2010, between PwC and the Debtors, (the "Engagement Letter"), a copy of which is attached hereto as Exhibit B. In support of this Application, the Debtors rely on the Declaration of Perry M. Mandarino (the "Mandarino Declaration"), a copy of which is attached hereto as Exhibit A.

## JURISDICTION

1. This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 327, 328 and 1107 of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2016-2.

## BACKGROUND

### A. **Introduction**

2. On September 21, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.

3. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

B. **Overview of the Debtors' Business**

4. The Debtors are a leading specialty retailer of fashion-forward and inspirational apparel for plus sized urban women under the brand name of Ashley Stewart. Urban Brands, Inc., a Delaware corporation, is the direct or indirect parent company of all of the Debtors. Until 2009, the Debtors also operated stores under the brand name of Marianne.

5. The Ashley Stewart concept was founded in 1991 and has grown to become a nationally-recognized brand. According to an October 2009 industry survey by the NPD Group, a nationally recognized firm specializing in apparel research, plus sized African American women ranked Ashley Stewart third of all retailers, behind only Wal-Mart and Lane Bryant, as their favorite place to shop.

6. Ashley Stewart operates broadly in the women's apparel market, which the NPD Group estimates is approximately $107 billion. Within women's fashion, Ashley Stewart focuses on the plus sized market, which is estimated to be over $18 billion and growing. Within this subset of the market, Ashley Stewart focuses on the underserved urban market, particularly the African American and Hispanic consumer, two of the fastest growing segments of the U.S. population. Ashley Stewart is one of the few concepts focusing directly on these particular niche markets.

7. As of the Petition Date, the Debtors operate approximately 210 stores in 26 states with approximately 2,100 employees, the majority of which are minority women. The store base is reinforced by a strong online presence through AshleyStewart.com, providing both a marketing tool as well as an additional outlet for Ashley Stewart customers.

8. Despite the strength of their brand names and success at individual store locations, the Debtors began suffering from cash flow/liquidity problems in 2007, especially in their Marianne division. The Debtors' financial difficulties continued in 2008 with the slow

3

down in the overall economy. As part of a strategic initiative to strengthen their balance sheet and improve their liquidity by focusing exclusively on the Ashley Stewart brand, in February 2008, the Debtors began divesting themselves of all of their Marianne stores. The proceeds from the Marianne divestitures, coupled with the reduction of the working capital investment needed to support the Marianne brand name, provided improvement in operating results and cash flow during fiscal year 2009 (ending January 30, 2010). Unfortunately, although the Debtors significantly reduced their net losses from approximately $44.3 million in 2008 to $28.6 million in 2009, the business continued to operate at a loss. Additionally, from fiscal year 2008 to fiscal year 2009, the Debtors net sales decreased from $179.6 million to $174.6 million.

C. **The Debtors' Capital and Debt Structure**

9. The Debtors are borrowers under a Loan and Security Agreement dated as of September 3, 2004 (the "Prepetition Financing Agreement"), with Bank of America, N.A. (successor by merger to LaSalle Retail Finance, a Division of LaSalle Business Credit, LLC, as agent for LaSalle Bank Midwest National Association f/k/a Standard Federal Bank National Association) (the "Lender"). The Prepetition Financing Agreement was an asset-based facility with a maturity date of September 10, 2010. The availability for borrowings and letter of credit obligations under the Prepetition Financing Agreement was capped at $6.5 million and is further limited to an amount supported by a borrowing base consisting of certain cash, certain accounts receivable and eligible inventory. As of the Petition Date, the Debtors owed only approximately $2,251,651 plus interest on the facility with an additional $2,366,324 in outstanding letters of credit (all of which are fully collateralized by the Debtors' cash).

10. In April 2004, the Debtors entered into a Note Purchase Agreement with a group of institutional investors led by Trimaran Fund II, L.L.C. ("Trimaran"), the Debtors' largest

4

equity holder, and certain officers, employees and consultants of the Debtors. From August 2007 to November 2009, the Debtors entered into five additional note purchase agreements to raise additional capital. In total, the Debtors sold $58,500,000 in senior unsecured notes (the "Notes"). As of the Petition Date, the Debtors owed approximately $81.3 million on account outstanding principle and interest on the Notes.

**D.     The Objectives of the Chapter 11 Filing**

11.     In April 2010, the Debtors engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist the Debtors in searching for additional equity and/or mezzanine financing. Following exhaustive efforts to locate additional capital, the Debtors determined that there was insufficient interest in the market for this additional financing and, as a result, the Debtors' best alternative to preserve the Debtors' business as a going concern and maximize the value of their assets was to pursue a sale of all or substantially all the Debtors' assets.

12.     Accordingly, in August 2010, Oppenheimer expanded its marketing efforts to solicit interest from prospective purchasers of the Debtors and their assets as a going-concern. As a result of this process, New Ashley Stewart, LLC ("New Ashley" or the "Stalking Horse Bidder") emerged as the party submitting the highest and best bid for the Debtors' assets. Accordingly, the Debtors, with the approval of their board of directors, engaged in active negotiations with New Ashley regarding a potential going concern transaction and, on September 8, 2010, the Debtors and New Ashley executed a non-binding letter of intent. Following the execution of the letter of intent, the Debtors and their advisors actively negotiated with New Ashley regarding the definitive terms and conditions of an asset purchase agreement. The Debtors executed an asset purchase agreement with New Ashley on September 21, 2010.

5

13. The Debtors believe that a going-concern sale of the Debtors' business presents the best opportunity to maximize recoveries for creditors and preserve thousands of jobs for the Debtors' employees. Accordingly, the Debtors filed a sale procedures motion on September 22, 2010 [Docket No. 34].

**RELIEF REQUESTED**

14. By this Application, the Debtors request that the Court enter an order pursuant to sections 327(a), 328 and 1107 of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2016-2 authorizing the Debtors to employ and retain PwC as financial advisor to the Debtors *nunc pro tunc* to the Petition Date.

**QUALIFICATIONS of PwC**

15. The Debtors chose PwC to serve as their financial advisor, in part, because of PwC's substantial expertise in providing financial advisory services to companies in financial distress. In addition, prior to the Petition Date, PwC provided advisory services to the Debtors in connection with their attempt to market their assets to potential purchasers and to prepare for the commencement of the Chapter 11 Cases. Accordingly, the Debtors believe that PwC is well-qualified to perform all services contemplated by the Engagement Letter, and to represent the Debtors' interests in the Chapter 11 Cases.

16. PwC has acted as financial advisor in both in-court and out-of-court restructurings of companies of various sizes across a wide array of industries. PwC's clients include debtors, creditors, corporate parents, financial sponsors and indenture trustees. Of relevance to the Debtors' circumstances, PwC has considerable experience providing financial advisory services to businesses in a chapter 11 environment, and has been employed in numerous chapter 11 cases within this district, including: In re AbitibiBowater Inc., Case No. 09-11296 (KJC); In re Aleris

International, Inc., Case No. 09-10478 (BLS); In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (CSS); In re Autobacs Strauss, Inc., Case No. 09-10358 (CSS); In re Buffets Holding, Inc., Case No. 08-10141 (MFW); In re Building Materials Holding Corporation, Case No. 09-12074 (KJC); In re Cadence Innovation, LLC, Case No. 08-11973 (KG); In re Constar International Inc., Case No. 08-13432 (PJW); In re Filene's Basement, Inc., Case No. 09-11525 (MFW); In re Foamex International Inc., Case No. 09-10560 (KJC); In re Midland Food Services, LLC, Case No. 08-11802 (PJW); In re Muzak Holdings LLC, Case No. 09-10422 (KJC); In re Sea Containers Ltd, Case No. 06-11156 (KJC); In re Smurfit-Stone Container Corporation, Case No. 09-10235 (BLS); In re Tribune Company, Case No. 08-13141 (KJC); In re Visteon Corporation, Case No. 09-11786 (CSS); In re Washington Mutual, Inc., Case No. 08-12229 (MFW).

17. To the best of the Debtors' knowledge, information and belief, and based upon the Mandarino Declaration: (a) PwC does not hold an interest adverse to the Debtors related to any of the matters for which PwC is to be retained; and (b) PwC has no connection to the Debtors, their creditors, shareholders or related parties except as disclosed in the Mandarino Declaration.

18. To the extent that PwC discovers any facts during the course of its retention that could impact the truthfulness of the statements made herein or in the Mandarino Declaration, PwC will supplement the information contained in the Mandarino Declaration.

19. In view of PwC's experience, the Debtors' retention of PwC is necessary to enable the Debtors to execute faithfully their duties as debtors-in-possession and to confront issues that may arise in the context of the Chapter 11 Cases in an efficient and timely manner.

The Debtors believe that PwC is well qualified to serve in the Chapter 11 Cases and that the retention of PwC is in the best interest of the Debtors' estates and their creditors.

## SERVICES TO BE PROVIDED

20. Pursuant to the terms of the Engagement Letter, PwC has agreed to act as financial advisor to the Debtors. As financial advisor, PwC will assist the Debtors in discussions with their various creditors, lenders, and investors, as the case may be, and in the continued marketing and sale of the Debtors' assets. In that regard, PwC will perform the following services, without limitation:

   a) Advise and assist with management with development of revised cash flow projections and business liquidation plans, including related financial forecasts and perform sensitivity analyses on the Debtors' forecasts and assumptions.

   b) Analyze proposed asset sales and other proposed transactions and advise management regarding same.

   c) Advise and assist management in its negotiations with lenders regarding DIP facility.

   d) Investigation and reporting of the facts regarding the Debtors' pre-petition acts, conducts, assets and liabilities, including preference and fraudulent conveyance analysis.

## TERMS OF RETENTION

21. The terms of PwC's proposed compensation are fully set forth in the Engagement Letter, and the Debtors respectfully refer this Court to the Engagement Letter for a full recitation of such terms.

22. In connection with its retention for pre-petition services related to preparation for filing the Chapter 11 Cases, PwC received an advance payment retainer in the amount of $50,000 on September 15, 2010 (the "Advance Payment Retainer"). As compensation for services provided during the ninety days prior to the Petition Date, the Debtors paid PwC

8

RLF1 3613704v. 1

$65,115 on September 17, 2010. Prior to the Petition Date, PwC applied the Advance Payment Retainer towards the amount owed to PwC for such prepetition services. As of the Petition Date, the balance of the Advance Payment Retainer was $31,510, which will be applied towards PwC's post-petition invoices submitted and approved by the Bankruptcy Court.

23. PwC seeks the Court's approval of its compensation and reimbursement of its actual, necessary expenses and other charges incurred by PwC upon the filing of appropriate applications for interim and final compensation and reimbursement pursuant to sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the District of Delaware. As compensation for the financial advisory services to be rendered, PwC requests the following payment amounts pursuant to the Engagement Letter:

   a) <u>Fees and Expenses</u>: Fees and expenses for services will be based on the following agreed upon hourly rates, which will be revised from time to time. Adjusted rates will be reflected in billings. The currently hourly rates are:

   | | |
   |---|---|
   | Partners/Managing Directors | $650-$780 |
   | Director/Manager | $450-$550 |
   | Senior Associate/Associate | $250-$350 |
   | Paraprofessional Staff | $200 |

   b) <u>Expenses</u>. PwC will also bill the Debtors for reasonable out-of-pocket expenses and internal per-ticket charges for booking travel.

24. Pursuant to Local Rule 2016-2(d), in a motion for compensation and reimbursements of expenses, activities must be billed in tenths of an hour. It is not the general practice of PwC employees, however, to keep records in such increments. PwC's customary practice is to provide a detailed description of the services rendered and the amount of time spent on each date in half-hour increments. The Debtors believe that PwC's customary practice with respect to time descriptions will still provide this Court with the ability to appropriately review and evaluate the services provided by PwC. Furthermore, because it would be more efficient for

9

PwC to continue in its customary time-keeping practices, the Debtors respectfully seek a waiver of Local Rule 2016-2(d) to permit PwC to submit its time records in half-hour increments.

*[the remainder of this page intentionally left blank]*

RLF1 3613704v. 1

25.  PwC has agreed not to share with any person or firm the compensation to be paid for services rendered in connection with these Chapter 11 Cases.

## NOTICE

26.  No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases. The Debtors will provide notice of this Application to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims on a consolidated basis; (c) counsel to the Debtors' postpetition secured lender; (d) counsel to Trimaran; and (e) all other parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no other or further notice need be provided.

Respectfully submitted this 27th day of September, 2010.

URBAN BRANDS, INC. AND ITS RELATED ENTITIES, DEBTORS AND DEBTORS-IN-POSSESSION

_____
Michael A. Abate
Vice President Finance/Treasurer

10