# Exhibit A

**PURCHASE AGREEMENT**

AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

BY AND AMONG

URBAN BRANDS, INC.

EACH OF THE SUBSIDIARIES OF URBAN BRANDS, INC.

LISTED ON SCHEDULE I

AND

NEW ASHLEY STEWART LLC

DATED AS OF OCTOBER 27, 2010

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS .................................................................................................................2

Section 1.1    Definitions...........................................................................................................2
Section 1.2    Construction.......................................................................................................13

ARTICLE II PURCHASE AND SALE ........................................................................................14

Section 2.1    Purchase and Sale of Assets...............................................................................14
Section 2.2    Excluded Assets................................................................................................17
Section 2.3    Assumed Liabilities .........................................................................................17
Section 2.4    Excluded Liabilities.........................................................................................17
Section 2.5    Assumption and Assignment of Contracts.......................................................19
Section 2.6    Allocation..........................................................................................................23
Section 2.7    Non-Continuing Stores and Continuing Stores...............................................24

ARTICLE III PURCHASE PRICE; DEPOSIT...............................................................................25

Section 3.1    Purchase Price; Closing Payment. ..................................................................25
Section 3.2    Post-Closing Purchase Price Adjustment.........................................................26
Section 3.3    Deposit Escrow .................................................................................................29

ARTICLE IV THE CLOSING ........................................................................................................30

Section 4.1    Time and Place of the Closing..........................................................................30
Section 4.2    Deliveries by the Seller....................................................................................30
Section 4.3    Deliveries by the Buyer ...................................................................................30

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLING ENTITIES....31

Section 5.1    Organization, Standing and Corporate Power ................................................31
Section 5.2    Subsidiaries.......................................................................................................31
Section 5.3    Authority Relative to this Agreement .............................................................31
Section 5.4    No Violation; Consents.....................................................................................32
Section 5.5    Legal Proceedings and Orders .........................................................................33
Section 5.6    Compliance with Law ......................................................................................33
Section 5.7    Financial Statements. .......................................................................................33
Section 5.8    Benefit Plans; Employees and Employment Practices. ...................................33
Section 5.9    Contracts. ..........................................................................................................35
Section 5.10   Intellectual Property.........................................................................................35
Section 5.11   Taxes...............................................................................................................36
Section 5.12   Insurance..........................................................................................................37
Section 5.13   Title to Assets; Real Property. ........................................................................37
Section 5.14   Permits .............................................................................................................37
Section 5.15   Inventory...........................................................................................................37

Section 5.16    Accounts and Notes Receivable and Payable ............................................38
Section 5.17    Banks.........................................................................................................38
Section 5.18    Brokers.......................................................................................................38

ARTICLE VI   REPRESENTATIONS AND WARRANTIES OF BUYER........................38

Section 6.1    Organization and Good Standing...............................................................38
Section 6.2    Authority Relative to this Agreement. ......................................................38
Section 6.3    No Violation; Consents. .............................................................................39
Section 6.4    Legal Proceedings and Orders ...................................................................40
Section 6.5    Brokers.......................................................................................................40
Section 6.6    Limited Guaranty .......................................................................................40

ARTICLE VII   COVENANTS OF THE PARTIES.......................................................40

Section 7.1    Conduct of Business of Selling Entities......................................................40
Section 7.2    Access to and Delivery of Information; Maintenance of Records.............42
Section 7.3    Expenses. ...................................................................................................44
Section 7.4    Further Assurances......................................................................................44
Section 7.5    Public Statements.......................................................................................45
Section 7.6    Governmental Authority Approvals and Cooperation. ...............................45
Section 7.7    Employee Matters. .....................................................................................46
Section 7.8    Tax Matters. ...............................................................................................49
Section 7.9    Submission for Bankruptcy Court Approval. .............................................46
Section 7.10   Overbid Procedures; Adequate Assurance...................................................50
Section 7.11   Termination Fee..........................................................................................51
Section 7.12   Transfer of Acquired Assets; Substitution of Letters of Credit. ...............52
Section 7.13   Post-Closing Operation of the Seller; Name Changes...............................52
Section 7.14   Damage or Destruction ..............................................................................53
Section 7.15   Permits .......................................................................................................53
Section 7.16   Suppliers; Certain Avoidance Actions; Policies Regarding Personally
Identifiable Information; Insurance Policies; Employment Arrangements. ......................53
Section 7.17   Notification of Certain Matters...................................................................54
Section 7.18   Acquired Assets "AS IS"; Certain Acknowledgements............................55
Section 7.19   Collection of Accounts Receivable.............................................................56

ARTICLE VIII   CONDITIONS TO CLOSING............................................................57

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing ...................57
Section 8.2    Conditions to Obligations of the Buyer ......................................................58
Section 8.3    Conditions to Obligations of the Selling Entities .......................................59
Section 8.4    Frustration of Closing Conditions...............................................................59

ARTICLE IX   TERMINATION; WAIVER....................................................................59

Section 9.1    Termination.................................................................................................59
Section 9.2    Procedure and Effect of Termination..........................................................61
Section 9.3    Extension; Waiver.......................................................................................62

ARTICLE X MISCELLANEOUS PROVISIONS ...................................................................62

    Section 10.1   Amendment and Modification .....................................................62
    Section 10.2   Survival..........................................................................................62
    Section 10.3   Notices ...........................................................................................62
    Section 10.4   Assignment ....................................................................................63
    Section 10.5   Severability ....................................................................................64
    Section 10.6   Governing Law ..............................................................................64
    Section 10.7   Acknowledgement and Release. ....................................................64
    Section 10.8   SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.........64
    Section 10.9   Counterparts..................................................................................65
    Section 10.10  Incorporation of Schedules and Exhibits ....................................65
    Section 10.11  Entire Agreement..........................................................................65
    Section 10.12  Remedies.......................................................................................65
    Section 10.13  Seller Disclosure Schedule ..........................................................66
    Section 10.14  Mutual Drafting; Headings; Information Made Available .......................66
    Section 10.15  No-Third Party Beneficiaries. ......................................................66
    Section 10.16  Bulk Sales Law. ............................................................................66

**SCHEDULES**

| | |
|---|---|
| Schedule I | Subsidiaries of the Seller which are Selling Entities |
| Schedule 1.1(a) | Continuing Stores, Non-Continuing Stores and Designated Stores |
| Schedule 1.1(b) | Excluded Insurance Policies |
| Schedule 1.1(c) | Encumbrances |
| Schedule 1.1(d) | Real Property Leases |
| Schedule 2.2 | Excluded Assets |
| Schedule 2.3(g) | Additional Assumed Liabilities |
| Schedule 2.4(i) | Certain Actions |
| Schedule 2.5(b) | Designation Schedule |
| Schedule 3.1(a) | Adjusted Minimum Purchase Price Schedule |
| Schedule 3.2(a) | Post Closing Purchase Price Adjustment |
| Schedule 7.1 | Exceptions to Conduct of the Business Covenant |
| Schedule 7.9(a) | DIP Facility Budget |
| Schedule 7.16 | Certain Acquired Assets |
| Schedule 7.16(e) | Certain Employees |
| Schedule 8.2(e) | Certain Consents |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Bidding Procedures |

# AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This Amended and Restated Asset Purchase Agreement (this "Agreement") is made and entered into as of October 27, 2010, by and among Urban Brands, Inc., a Delaware corporation (the "Seller") and each of the subsidiaries of the Seller listed on Schedule I (together with the Seller, the "Selling Entities"), and New Ashley Stewart LLC, a Delaware limited liability company (the "Buyer"). Each of the Selling Entities and the Buyer are referred to herein as a "Party" and together as the "Parties."

## RECITALS

WHEREAS, the Selling Entities have filed Chapter 11 bankruptcy petitions pursuant to the Bankruptcy Code in the Bankruptcy Court (as such terms are defined below);

WHEREAS, the Buyer desires to purchase from the Selling Entities, directly and/or in the Buyer's sole discretion, through one or more Buyer Designees, and the Selling Entities desire to sell to the Buyer and/or such Buyer Designees, substantially all of the Selling Entities' assets, and the Buyer desires to assume from the Selling Entities, directly and/or in the Buyer's sole discretion, through one or more Buyer Designees, certain specified liabilities, in each case pursuant to the terms and subject to the conditions set forth herein, and further subject to any Final Orders in the Bankruptcy Case;

WHEREAS, in connection therewith, the Buyer and the Selling Entities entered into that certain Asset Purchase Agreement, dated as of September 21, 2010 (the "Original Agreement");

WHEREAS, following the conclusion of the Auction (as defined herein), the Selling Entities and the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case (as defined herein) determined the Buyer's bid (as such bid was revised at the Auction) to be the highest and best offer and, in connection therewith, the Buyer and the Selling Entities have agreed to amend and restate the Original Agreement to reflect the Buyer's revised offer to acquire substantially all of the Selling Entities' assets, which offer is subject to the terms and conditions of the transactions described herein;

WHEREAS, concurrently with the execution of the Original Agreement, and as a condition to the willingness of the Selling Entities to enter into this Agreement, 1903 Equity Fund, L.P. a Delaware limited partnership, entered into a Limited Guaranty (the "Limited Guaranty") in favor of the Selling Entities pursuant to which, among other matters, 1903 Equity Fund, L.P. guaranteed a portion of the payment obligations of the Buyer through and including the Closing in connection with this Agreement; and

WHEREAS, the terms of this Agreement are subject to approval by the Bankruptcy Court and the Selling Entities are not bound to consummate the transactions contemplated hereby until such approval is obtained.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.    A defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined.  As used in this Agreement, the following terms have the meanings specified below:

"Accountant" has the meaning given to such term in Section 3.2(c)(iv).

"Accounts Receivable" means any and all (i) accounts receivable, notes receivable and other amounts receivable owed to the Selling Entities (whether current or non-current), other than Credit Card Receivables, together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Actions pertaining to the collection of amounts payable, or that may become payable, to the Selling Entities with respect to products sold or services performed on or prior to the Closing Date, (ii) construction allowances and other amounts due from landlords (including in respect of prior overcharges and insurance recoveries), (iii) rebate receivables from suppliers (iv) insurance claims receivables (other than claims receivable under the Excluded Insurance Policies), and (v) other amounts due to the Selling Entities which the Selling Entities have historically classified as accounts receivable in the consolidated balance sheet of the Seller.

"Acquired Assets" has the meaning given to such term in Section 2.1.

"Action" means any claim, as defined in the Bankruptcy Code, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Legal Proceeding, investigation or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority.

"Adjusted Minimum Purchase Price" has the meaning given to such term in Section 3.1(a).

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person.  For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the affairs of another Person by reason of ownership of voting stock or by contract or otherwise.

"Agreement" has the meaning given to such term in the Preamble hereto.

"Allocation" has the meaning given to such term in Section 2.6.

2

"Alternative Transaction" means a transaction pursuant to one or more bids made by one or more Persons other than the Buyer or an Affiliate of the Buyer which is, or together are, selected by the Seller as the "highest and best offer" in accordance with the Bidding Procedures Order.

"AS IP Holdings" means AS IP Holdings, Inc., a Delaware corporation and an Affiliate of the Buyer that is the Buyer's Designee with respect to the acquisition of the Seller IP and all Acquired Assets and all Assumed Liabilities pertaining thereto.

"Assumed Contracts" has the meaning given to such term in <u>Section 2.1(e)</u>.

"Assumed Liabilities" has the meaning given to such term in <u>Section 2.3</u>.

"Assumed Real Property Leases" has the meaning given to such term in <u>Section 2.1 (f)</u>.

"Assumption Agreement" means one or more Assumption and Assignment Agreements, in a form reasonably acceptable to Buyer, and to be executed and delivered by the Buyer or one or more Buyer Designees, and the Selling Entities at the Closing.

"Assumption Approval" has the meaning given to such term in <u>Section 2.5(g)</u>.

"Auction" has the meaning given to such term in <u>Section 7.10(a)</u>.

"Bankruptcy Case" means the Selling Entities' cases commenced under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Bankruptcy Case.

"Bidding Procedures Order" means the order of the Bankruptcy Court in a form reasonably acceptable to the Buyer approving, among other matters, (i) implementation in all material respects of the bidding procedures attached as <u>Exhibit A</u>, and (ii) payment of the Termination Fee in accordance in all material respects with <u>Section 7.11</u>.

"Bill of Sale" means one or more Bill of Sale and Assignment Agreements, in a form reasonably acceptable to Buyer, and to be executed and delivered by the Selling Entities to the Buyer or one or more Buyer Designees at the Closing.

"Business" means the business conducted by the Seller and the other Selling Entities prior to the date of this Agreement.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York.

"Buyer" has the meaning given to such term in the Preamble hereto.

3

"Buyer Default Termination" has the meaning given to such term in <u>Section 3.3</u>.

"Buyer Designee" means New Ashley Stewart, AS IP Holdings, and one or more Affiliates of the Buyer designated by the Buyer in writing to the Seller prior to the Closing; *provided, however,* that with respect to the designation of Real Property Leases, such Buyer Designee may be a non-Affiliate of the Buyer.

"Cash" means cash and cash equivalents and restricted cash of the <u>Selling Entities</u> as determined in accordance with the GAAP.

"Claim" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning given to such term in <u>Section 4.1</u>.

"Closing Date" has the meaning given to such term in <u>Section 4.1</u>.

"Closing Date Cost Value of the Inventory" has the meaning given to such term in <u>Section 3.2(b)</u>.

"Closing Date Credit Card Receivables Amount" has the meaning given to such term in <u>Section 3.2(b)</u>.

"Closing Date Store-Level Cash Amount" has the meaning given to such term in <u>Section 3.2(b)</u>.

"Closing Payment" has the meaning given to such term in <u>Section 3.1(b)</u>.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality and Non-Disclosure Agreement, dated as of June 1, 2010, between GB Merchant Partners, LLC and the Seller.

"Consent" means any approval, consent, ratification, permission, waiver or authorization, or an order of the Bankruptcy Court that deems, or renders unnecessary, the same.

"Consumer Liabilities" means all Liabilities of the Selling Entities with respect to returns of goods or merchandise, store or customer credits, gift cards and certificates, customer prepayments, customer loyalty programs and customer refunds.

"Continuing Store" means all of the Selling Entities' store locations listed on <u>Schedule 1.1(a)</u> under item I as such store locations may be changed in accordance with Section 2.5(b) and Section 2.7.

"Contract" means any lease, contract, deed, mortgage, license or other legally enforceable agreement or instrument.

"Credit Card Receivables" means all accounts receivables and other amounts owed to any of the Selling Entities (whether current or non-current) in connection with any customer purchases from any of the Selling Entities or stores operated thereby that are made with credit

4

cards or any other amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from the credit card processors to the Selling Entities, in each case which are not subject to offset, chargeback or other reduction.

"Cure Notice" has the meaning given to such term in <u>Section 7.9(c)</u>.

"Cure Payments" has the meaning given to such term in <u>Section 2.5(f)</u>.

"Current Employees" means all employees of the Selling Entities employed as of immediately prior to the Closing, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Damage or Destruction Loss" has the meaning given to such term in <u>Section 7.14</u>.

"Deposit" has the meaning given to such term in <u>Section 3.3</u>.

"Designation Deadline" means 5:00 p.m. (prevailing Eastern time) on the date that is one hundred twenty (120) days from the Closing Date.

"Designated Store" means all of the Selling Entities' store locations listed on <u>Schedule 1.1(a)</u> under item III as such store locations may be changed in accordance with Section 2.5(b) and Section 2.7.

"DIP Facility" means that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement (including the exhibits thereto and the DIP Facility Budget) by and among Bank of America, N.A., as lender, and the Seller, as borrower, and as the same may be amended from time to time in accordance with the terms thereof, *provided*, that such amendment is permitted hereunder.

"DIP Facility Budget" means the budget set forth in the DIP Facility.

"Dispute Notice" has the meaning given to such term in <u>Section 3.2(b)</u>.

"Documentary Materials" has the meaning given to such term in <u>Section 2.1(k)</u>.

"Encumbrances" means any charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment or similar restriction.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any Person, any other Person (whether or not incorporated) that, together with such Person, would be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Escrow Agent" has the meaning given to such term in <u>Section 3.3</u>.

"Estimated Closing Date Cost Value of the Inventory" has the meaning given to such term in <u>Section 3.2(a)</u>.

5

"Estimated Closing Date Credit Card Receivables Amount" has the meaning given to such term in <u>Section 3.2(a)</u>.

"Estimated Closing Date Store-Level Cash Amount" has the meaning given to such term in <u>Section 3.2(a)</u>.

"Estimated Credit Card Receivables Adjustment Amount" has the meaning given to such term in <u>Section 3.2(a)</u>.

"Estimated Inventory Adjustment Amount" has the meaning given to such term in <u>Section 3.2(a)</u>.

"Estimated Store-Level Cash Adjustment Amount" has the meaning given to such term in <u>Section 3.2(a)</u>.

"Excluded Assets" has the meaning given to such term in <u>Section 2.2</u>.

"Excluded Employees" has the meaning given to such term in <u>Section 7.7(b)</u>.

"Excluded Insurance Policies" means all insurance policies of the Selling Entities, including those insurance policies listed on <u>Schedule 1.1(b)</u> and all director and officer, fiduciary, employment practices and similar insurance policies maintained by or on behalf of any Selling Entity.

"Excluded Liabilities" has the meaning given to such term in <u>Section 2.4</u>.

"Final Calculations" has the meaning given to such term in <u>Section 3.2(c)</u>.

"Final Order" means an order of the Bankruptcy Court which has not been reversed, stayed, modified or amended.

"Former Employees" means all individuals who have been employed by the Selling Entities (or any of their predecessors) who are not Current Employees.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means any federal, municipal, state, provincial, local or foreign governmental, administrative or regulatory authority, department, agency, commission or body (including any court or similar tribunal).

"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"Holdback Amount" has the meaning given such term in <u>Section 3.1(b)</u>.

"Indebtedness" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii)

indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the ordinary course of business), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations of the type referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction in the world, including: (a) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof, (b) trademarks, service marks, trade names, service names, brand names, including the names "Ashley Stewart" and "Urban Brands," trade dress rights, logos, corporate names, trade styles, logos and other source or business identifiers and general intangibles of a like nature, along with applications, registrations, renewals and extensions thereof, (c) trade secrets, (d) patents and applications therefore, including all continuations, divisionals, and continuations-in-part thereof and patents issuing thereon, along with all reissues, reexaminations and extensions thereof, (e) all internet domain names, and (f) all other intellectual property rights arising from or relating to Technology.

"Inventory" means all inventory (including raw materials, products in-process and finished products) owned by any of the Selling Entities, whether in transit to or from the Selling Entities and whether in the Selling Entities' warehouses, distribution facilities, stores, outlets, held by any third parties or otherwise.

"IP Assignment Agreement" means one or more Intellectual Property Assignment Agreements, in a form reasonably acceptable to Buyer, and to be executed and delivered by the Seller to the Buyer or one or more Buyer Designees at the Closing.

"Knowledge" means, as to a particular matter, the actual knowledge, after due inquiry, of (a) with respect to the Buyer, James C. Rhee, Matthew R. Kahn and Scott Strasser, and (b) with respect to any Selling Entity, Laura Weil, Chief Executive Officer of the Seller, Michael Abate, Vice President Finance and Treasurer of the Seller, Stephen Feldman, former Chief Financial Officer of the Seller and financial consultant to the Seller, Steven Newman, President and David Brown, Executive Vice President and Secretary.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree,

7

proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, determination, decision or opinion of any Governmental Authority.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits or legal proceedings (public or private) by or before a Governmental Authority.

"Liability" means any debt, obligation or liability of any nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Licensed Intellectual Property" means all Intellectual Property and Technology licensed to the Selling Entities by third parties pursuant to the Assumed Contracts.

"Limited Guaranty" has the meaning given to such term in the Recitals hereto.

"LOI" has the meaning given to such term in Section 7.3(c).

"Material Adverse Effect" means any event, condition, circumstance, development, or change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, (a) has had or would reasonably be expected to have or result in a material adverse effect on the condition of the Acquired Assets and the Assumed Liabilities, taken as a whole, or (b) would reasonably be expected to prevent or materially impair the ability of the Selling Entities to consummate the transactions contemplated by this Agreement except, in each case, for any such events, changes, conditions, circumstances, developments or effects resulting from or attributable to: (i) the announcement of the signing of this Agreement or the filing of the Petitions, compliance with the express provisions of this Agreement or the consummation of the transactions contemplated hereby, (ii) reasonably anticipated actions, omissions, events and circumstances arising out of the filing of the Petitions, (iii) actions or omissions taken or not taken by or on behalf of the Selling Entities or any of their respective Affiliates at the express request of the Buyer or its Affiliates, (iv) the failure of any Selling Entity to meet any internal or published projections, forecasts, estimates or predictions (it being the understanding of the Parties that the underlying cause of such failure may otherwise constitute a Material Adverse Effect if such event is not otherwise excluded from the definition of Material Adverse Effect), (v) changes or proposed changes in Law or interpretations thereof by any Governmental Authority, (vi) changes or proposed changes in generally accepted accounting principles in the United States or elsewhere, (vii) changes in general economic conditions, currency exchange rates or United States or international debt or equity markets, (viii) events or conditions generally affecting the industry or markets in which the Selling Entities operate, or (ix) national or international political or social conditions or any national or international hostilities, acts of terror or acts of war; *provided* that, in the case of clauses (v) through (ix), inclusive, such events, changes, conditions, circumstances, developments or effects shall be taken into account in determining whether any such material adverse effect has occurred to the extent that any such events, changes, conditions, circumstances, developments or effects have a material and disproportionate adverse effect on the Acquired Assets and the Assumed Liabilities, taken as a whole.

RLF1 3607469v. 5
8491118v7

"Minimum Aggregate Cost Value of the Inventory" means a minimum aggregate cost value (as defined as the Seller's perpetual inventory at cost and foreign in-transit inventory) of the Saleable Inventory of $11,000,000 on the Closing Date.

"Minimum Aggregate Amount of Credit Card Receivables" means a minimum aggregate value of all Credit Card Receivables owed to the Selling Entities of $1,000,000 on the Closing Date.

"Minimum Closing Payment" has the meaning given to such term in Section 3.1(b).

"Minimum Purchase Price" has the meaning given to such term in Section 3.1(a).

"Motions" has the meaning given to such term in Section 7.9(a).

"Necessary Consents" has the meaning given to such term in Section 2.5(g).

"New Ashley Stewart" means New Ashley Stewart, Inc., a Delaware corporation and an Affiliate of the Buyer that is the Buyer's Designee with respect to all Acquired Assets and all Assumed Liabilities other than (i) the Seller IP and (ii) the Acquired Assets and Assumed Liabilities pertaining to the Seller IP.

"Non-Continuing Store" means any store location of the Selling Entities that is listed on Schedule 1.1(a) under item II, which store location has been identified by the Buyer as a store location whose tangible contents, inventory, furniture, fixtures and equipment will be sold pursuant to the Sales Agency Agreement, as such store locations may be changed in accordance with Section 2.5(b) and Section 2.7.

"Non-Real Property Contracts" means the Contracts to which any Selling Entity is a party other than the Real Property Leases.

"Offeree" has the meaning given to such term in Section 7.7(a).

"Operational Expenses" means to the extent incurred in the ordinary course of business, all operating costs and expenses of the Selling Entities, including, but not limited to, employee and occupancy expenses, all costs and expenses associated with any Real Property Lease or Non-Real Property Contract, including, but not limited to, rent, ground lease rent, common area maintenance, utilities, real estate taxes, insurance, security, and other actual out-of-pocket costs.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"Original Agreement" has the meaning given to such term in the Recitals hereto.

"Party" or "Parties" has the meaning given to such term in the Preamble hereto.

"PBGC" has the meaning given to such term in Section 5.8(c).

"Permits" means all franchises, permits, certificates, clearances, approvals, exceptions, variances and authorizations of or with any Governmental Authority held, used by, or made by any of the Selling Entities in connection with the operation of the Acquired Assets.

"Permitted Encumbrances" means: (a) liens for Taxes, special assessments or other governmental charges not yet due and payable or that are being contested in good faith, (b) immaterial statutory liens and rights of set-off of banks, carriers, warehousemen, mechanics, repairmen, workmen, customs brokers or agencies, suppliers and materialmen, and other Encumbrances imposed by Law, in each case, incurred in the ordinary course of business, (c) deposits and pledges securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits (other than valid obligations incurred in respect of any defined benefit pension plan) or (ii) obligations on performance, surety or appeal bonds, (d) Laws now or hereafter in effect relating to real property, easements and similar Encumbrances which do not have a material adverse effect on the current use by the Selling Entities of the real property subject thereto, or materially impair the value thereof, (e) statutory liens creating a security interest in favor of landlords with respect to property of the Selling Entities which do not interfere with the current use of such leased real property by the Selling Entities in any material respect, (f) Encumbrances set forth in the Assumed Contracts or the Assumed Real Property Leases, (g) any Encumbrances affecting the landlords or ground lessors underlying interest in any of the Real Property Leases and/or the underlying interests in land from time to time and (h) Encumbrances that are disclosed on Schedule 1.1(c).

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or Governmental Authority. References to any Person include such Person's successors and permitted assigns.

"Petition" means the voluntary petition or petitions under Chapter 11 of the Bankruptcy Code filed by the Selling Entities with the Bankruptcy Court.

"Petition Date" means the date on which any of the Selling Entities first file the Petition, or, if such date is not a Business Day, the first Business Day following such date.

"Pre-Closing Non-Continuing Stores" shall mean the Non-Continuing Stores identified on Schedule 2.5(b) whose associated Real Property Leases shall be rejected as of November 30, 2010, such date being the Rejection Effective Date for such Real Property Leases, provided, that Buyer has exited the store premises and turned possession of the store premises over to the landlord, the condition of such store premises to be turned over in accordance with the Real Property Lease associated with such store premises.

"Professional Services" has the meaning given to such term in Section 2.4(b).

"Purchase Price" has the meaning given to such term in Section 3.1(a).

"Real Property Leases" means all leases, subleases and other occupancy Contracts with respect to real property to which any Selling Entity is a party listed or described on Schedule

10

1.1(d), which Schedule also sets forth a good faith estimate of all Cure Payments related to such Real Property Leases.

"Registered IP" means all Seller IP that, as of the date of this Agreement, is registered, filed or issued under the authority of, with or by any Governmental Authority, including all patents, registered copyrights, registered mask works and registered trademarks and all applications for any of the foregoing.

"Rejection Effective Date" means the effective date of the rejection of a Real Property Lease or a Non-Real Property Contract, as provided in Section 2.5(b).

"Representatives" means, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

"Restructuring Transaction" means (i) a recapitalization transaction or plan of reorganization or a liquidation or sale, including any such transaction by way of a credit bid or by any creditor of any of the Selling Entities, involving, in whole or in part, any of the Selling Entities and any of their existing security holders or creditors, or (ii) any merger, consolidation, share exchange, business combination or similar transaction with any of the Selling Entities.

"Retained Avoidance Actions" has the meaning given to such term in Schedule 2.2.

"Review Period" has the meaning given to such term in Section 3.2(c)(ii).

"Sales Agency Agreement" means that certain Sales Agency Agreement, dated as of September 21, 2010, between Gordon Brothers Retail Partners, LLC (or an agent selected by Gordon Brothers Retail Partners, LLC) and the Selling Entities.

"Sales Agency Agreement Net Proceeds" means all of the sale proceeds generated as a result of the Sales Agency Agreement net of any expenses, costs, fees, expenses, reimbursements or other deductions owed to Sales Agent or the Selling Entities, as such net proceeds are determined in accordance with the Sales Agency Agreement.

"Sales Agent" has the meaning given to such term in the Sales Agency Agreement.

"Sale Motion" means one or more motions and notices filed by the Selling Entities and served on creditors and parties in interest, in accordance with the Bidding Procedures Order, other orders of the Bankruptcy Court, the Federal Rules of Bankruptcy Procedures and Local Rules, which motion(s) seeks authority from the Bankruptcy Court for the Selling Entities to enter into this Agreement and consummate the transactions contemplated by this Agreement.

"Sale Order" has the meaning given to such term in Section 8.1(b).

"Saleable Inventory" means all saleable and first-quality finished goods inventory of the Selling Entities included in the Acquired Assets, *provided* that the level (as to quantity) and mix (as to type, category, style, brand and description) of the goods shall be consistent with the historical levels and mix of the Selling Entities' inventory (accounting for seasonal adjustments).

"Seller" has the meaning given to such term in the Preamble hereto.

"Seller Benefit Plan" means any employment, consulting, severance, termination, retirement, profit sharing, bonus, incentive or deferred compensation, retention or change in control agreement, equity or equity-based compensation, stock purchase, severance pay, defined benefit pension, defined contribution pension, savings, retirement, individual account-based savings, supplemental executive retirement, sick or other leave, life, health, salary continuation, disability, hospitalization, accident, medical, insurance, vacation, paid time off, long term care, or other employee compensation or benefit plan, program, arrangement, agreement, fund or commitment (including any "employee benefit plan" as defined in Section 3(3) of ERISA), sponsored, maintained by, contributed to or required to be contributed to by any Selling Entity, any Subsidiary of any Selling Entity or any of its or their ERISA Affiliates.

"Seller Disclosure Schedule" means the disclosure schedule delivered by the Seller to the Buyer concurrently with the execution and delivery of this Agreement.

"Seller Financial Statements" has the meaning given to such term in <u>Section 5.7(a)</u>.

"Seller IP" means all rights, title and interest in and to the Intellectual Property and the Technology owned by the Selling Entities.

"Seller Properties" has the meaning given to such term in <u>Section 5.13(b)</u>.

"Selling Entities" has the meaning given to such term in the Preamble hereto.

"Store-Level Cash" means all cash located at a Continuing Store, Designated Store or Non-Continuing Store as of the Closing, which shall be at least on average $800 per store; *provided* that any store existing on the date hereof (whether or not operating on the Closing Date) shall constitute a Continuing Store, a Designated Store or a Non-Continuing Store for the purposes of determining the average minimum amount of cash per store required for the purpose of this definition.

"Subsidiary" means, with respect to any Person, (a) any corporation or similar entity of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation or similar entity, is held, directly or indirectly by such Person, and (b) any partnership, limited liability company or similar entity of which (i) such Person is a general partner or managing member or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Tax" means all federal, state, provincial, local or foreign taxes (including any income tax, franchise tax, service tax, capital gains tax, capital tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, profits tax, inventory tax, capital stock tax, license tax, withholding tax, payroll tax, employment tax, social security tax, unemployment tax, employer health tax, severance tax or occupation tax), escheat and abandoned property tax, levies, assessments, tariffs, duties (including any customs duties), deficiencies or fees (including any fine, addition, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental

Authority, including any liability for the foregoing as a transferee or successor under applicable Law.

"Tax Return" means any return, report, information return or other document (including any related or supporting information) supplied or required to be supplied to any Governmental Authority with respect to Taxes.

"Technology" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Termination Fee" means an amount in cash equal to three percent (3%) of the Estimated Closing Date Cost Value of the Inventory.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale and Assignment Agreement, the Sales Agency Agreement, and any other Contract to be entered into by the Parties and/or one or more Buyer Designees, as applicable, in connection with the Closing.

"Transfer Taxes" has the meaning given to such term in <u>Section 7.8(a)</u>.

"Transferred Employees" has the meaning given to such term in <u>Section 7.7(a)</u>.

"Trimaran" means, collectively, Trimaran Fund Management, L.L.C., Trimaran Fund II, L.L.C., Trimaran Parallel Fund II, L.P., Trimaran Capital, L.L.C., CIBC Employee Private Equity Fund (Trimaran) Partners, and CIBC Capital Corporation.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, <i>et seq.</i> (1988) and any similar Laws, including Laws of any state, country or other locality that is applicable to a termination of employees.

Section 1.2    <u>Construction</u>.  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The terms "including," "includes" or similar terms when used herein shall mean "including, without limitation." The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  Any reference to any federal, state, provincial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Unless otherwise indicated, references to (a) Articles, Sections,

13

Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement and (b) references to $ (dollars) are to United States Dollars.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.    Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Selling Entities shall sell, assign, convey, transfer and deliver (x) with respect to all Acquired Assets other than assets constituting or pertaining to the Seller IP, to New Ashley Stewart, and (y) with respect to all Acquired Assets constituting or pertaining to the Seller IP, to AS IP Holdings, and New Ashley Stewart and AS IP Holdings shall, by Buyer's payment of the Purchase Price, purchase and acquire from the Selling Entities, all of the Selling Entities' right, title and interest, free and clear of all Encumbrances (other than Encumbrances expressly identified by the Sale Order), in and to all of the properties, rights, interests and other tangible and intangible assets of the Selling Entities (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any assets acquired by the Selling Entities after the date hereof but prior to the Closing (collectively, the "Acquired Assets"); *provided, however,* that the Acquired Assets shall not include any Excluded Assets. Without limiting the generality of the foregoing, the Acquired Assets shall include the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)    all Store-Level Cash of the Selling Entities as of the Closing, and all restricted cash deposits of the Selling Entities held by any Party and relating to Acquired Assets, or Assumed Contracts, or securing chargebacks, credit card processing claims, or similar claims;

(b)    all Accounts Receivable of the Selling Entities as of the Closing except to the extent relating to an Excluded Contract;

(c)    all Inventory, supplies and materials of the Selling Entities as of the Closing, including all rights of the Selling Entities to receive such Inventory, supplies and materials which are on order as of the Closing;

(d)    without duplication of the above, all royalties, advances, prepaid assets (excluding prepaid income Taxes or Taxes that the Seller is responsible for hereunder), security and other deposits, prepayments and other current assets of the Selling Entities as of the Closing relating to the Acquired Assets (but excluding all interests in the Excluded Insurance Policies and all of the foregoing relating to the Excluded Assets, including Contracts that are not Assumed Contracts or Assumed Real Property Leases);

(e)    all Non-Real Property Contracts that have been assumed by and assigned to the Buyer and/or one or more Buyer Designees pursuant to Section 2.5 (the "Assumed Contracts");

(f)    all Real Property Leases that have been assumed and assigned to the Buyer and/or one or more Buyer Designees, pursuant to Section 2.5 (the "Assumed Real Property Leases");

14

(g)      All Sales Agency Agreement Net Proceeds;

(h)      all Seller IP;

(i)      all purchase orders with suppliers open as of the Closing Date for delivery of goods under such purchase orders post-Closing;

(j)      all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of the Selling Entities' rights to any leasehold improvements under the Assumed Real Property Leases) and other tangible personal property and fixed assets owned by the Selling Entities as of the Closing;

(k)      all books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of the Selling Entities as of the Closing (except as otherwise described in <u>Section 2.2</u>), including customer and supplier lists, mailing lists, sales and promotional literature, other sales-related materials related to the Acquired Assets, and, to the extent not prohibited under applicable Law, all files and data related to the Transferred Employees (collectively, the "<u>Documentary Materials</u>"), in each case subject to <u>Section 7.18(c)</u>;

(l)      all claims (including claims for past infringement or misappropriation of Seller IP) and causes of action (other than, in each case, to the extent related to Excluded Assets or Excluded Liabilities) of the Selling Entities as of the Closing against Persons other than the Selling Entities (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all guaranties, rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by the Selling Entities as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to the Acquired Assets;

(m)      all claims and causes of action of the Selling Entities, their successors (including any subsequently appointed Chapter 7 or Chapter 11 trustee), and their estates, as of the Closing against Trimaran (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities, their successors (including any subsequently appointed Chapter 7 or Chapter 11 trustee), and their estates);

(n)      all goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Seller IP and all rights under any confidentiality agreements executed by any third party for the benefit of any of the Selling Entities to the extent relating to the Acquired Assets;

(o)      all rights of the Selling Entities under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with Current Employees, Former Employees or current or former directors, consultants, independent contractors and agents of any of the Selling Entities or any of their Affiliates or with third parties to the extent primarily relating to the Acquired Assets (or any portion thereof);

(p)    subject to Section 2.5(j), all of the Permits, and all applications therefor, related to the Acquired Assets or to the extent provided in Section 2.5(j), all of the rights and benefits accruing under such Permits;

(q)    the amount of, and all rights to any, insurance proceeds received by any of the Selling Entities after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets of a type set forth in Section 2.1(c), (i), or (j), occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(r)    any rights, demands, claims, credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against the Selling Entities) arising out of or relating to any of the Acquired Assets as of the Closing (but excluding all interests in the Excluded Insurance Policies);

(s)    all prepaid and deferred items (including prepaid real property Tax but excluding prepaid income Taxes) that relate to the Acquired Assets as of the Closing, including all prepaid rentals and unbilled charges, fees and deposits (but excluding all interests in the Excluded Insurance Policies);

(t)    to the extent transferable, all rights and benefits of any of the Selling Entities of any nature from or in connection with all current and prior insurance policies of any of the Selling Entities that relate to the Acquired Assets or Assumed Liabilities (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Court or relating to any debtor-in-possession financing obtained by the Selling Entities), including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, but excluding all interests in any bonds maintained under Section 412 of ERISA and in any insurance policies relating to Seller Benefit Plans, solely to the extent they relate to any assets or liabilities of any of the Seller Benefit Plans which are Excluded Assets or Excluded Liabilities;

(u)    all litigation claims and causes of action (including causes of action under Chapter 5 of the Bankruptcy Code) (i) against landlords, vendors or other counterparties who are party to (or Affiliates of a party to ) any Assumed Contract, Assumed Real Property Lease, or any purchase order with a supplier open as of the Closing Date for delivery of goods under such purchase order post-Closing, or (ii) against Transferred Employees, or any officer or employee retained by Buyer or its Subsidiaries after Closing, or (iii) otherwise arising under or related to the Acquired Assets (including, for the avoidance of doubt, all Assumed Contracts and the Assumed Real Property Leases), including in each of cases (i), (ii) and (iii) such causes of action arising under, or available pursuant to, the Bankruptcy Code other than the Retained Avoidance Actions;

(v)    all rights of the Selling Entities' in and to (i) the company headquarters location located at the address of the Seller provided in Section 10.3(a) and (ii) all warehouse and distribution facilities of the Selling Entities;

(w)    all Credit Card Receivables as of the Closing and all Cash or other property on deposit at credit card processors as of Closing; and

16

(x)   all other assets that are related to or used in connection with the Acquired Assets and that are owned by any Selling Entity as of the Closing.

Section 2.2   Excluded Assets.   Notwithstanding any provision herein to the contrary, the Acquired Assets shall not include the assets set forth Schedule 2.2 hereto (collectively, the "Excluded Assets").

Section 2.3   Assumed Liabilities.   On the Closing Date, the Buyer and/or one or more Buyer Designees shall execute and deliver to the Selling Entities the Assumption Agreement pursuant to which the Buyer and/or such Buyer Designees shall assume and agree to pay, perform and discharge when due the Assumed Liabilities. For purposes of this Agreement, "Assumed Liabilities" means only the following Liabilities (to the extent not paid prior to the Closing):

(a)   all the pro-rated rent, common-area maintenance, and other monthly charges for the period between September 21, 2010 and September 30, 2010, and entitled to administrative status under section 503(b) of the Bankruptcy Code, under any rejected Real Property Leases, subject to an aggregate amount not to exceed $151,606.00;

(b)   all payroll-related expenses accrued prior to the Closing Date, subject to an aggregate amount not to exceed $870,000.00;

(c)   valid claims for the value of goods received by the Selling Entities within 20 days before the Petition Date and entitled to administrative status under section 503(b)(9) of the Bankruptcy Code, to be selected by Buyer, subject to an aggregate amount not to exceed $2,800,000.00, such claims to be paid by Buyer within one hundred eighty (180) days of the Closing Date;

(d)   all Cure Payments;

(e)   the Liabilities of the Selling Entities arising under the Assumed Contracts and the Assumed Real Property Leases, to the extent such Liabilities arose from and after the Closing;

(f)   the Liabilities of the Selling Entities arising in the ordinary course of business under purchase orders with suppliers open as of the Closing Date for delivery of goods under such purchase orders post-Closing;

(g)   the Liabilities to the extent expressly assumed by the Buyer pursuant to Sections 7.7(a), 7.7(d), or 7.7(e);

(h)   all Taxes to the extent expressly payable by the Buyer pursuant to Section 7.8;

(i)   all other Liabilities set forth on Schedule 2.3(g).

Section 2.4   Excluded Liabilities.   Notwithstanding anything to the contrary in this Agreement, the parties expressly acknowledge and agree that neither the Buyer nor any Buyer

17

Designee shall assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of the Selling Entities, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that neither the Buyer or any Buyer Designee is assuming being referred to collectively as the "Excluded Liabilities"). Without limiting the foregoing, the Buyer shall not be obligated to assume, does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any of the Selling Entities or of any predecessor of any of the Selling Entities, whether incurred or accrued before or after the Petition Date or the Closing:

(a) all Taxes of the Selling Entities, including Taxes imposed on the Selling Entities under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax Law, other than Taxes payable by the Buyer pursuant to Section 7.8;

(b) all Liabilities of the Selling Entities relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated, hereby, and any pre-Petition or post-Petition Claims for such Professional Services;

(c) all Liabilities arising out of, relating to, or with respect to any Seller Benefit Plan (including any Liabilities related to any Seller Benefit Plan which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Section 302 or Title IV of ERISA or Code Section 412) (provided that this shall not be interpreted to modify Buyer's payment obligations to Seller as expressly set out in Section 7.7(d) and 7.7(e));

(d) all Liabilities or claims arising out of, relating to or with respect to the employment or performance of services for, or termination of employment or services for, or potential employment or engagement for the performance of services for, any of the Selling Entities (or any predecessor) of any individual Person (including the Transferred Employees) or any Person acting as a professional employer organization, employee leasing company or providing similar services on or prior to the Closing (including as a result of the transactions contemplated by this Agreement), including Liabilities or claims for workers' compensation, severance (including statutory severance), separation, termination, or notice pay or benefits (including under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended and Section 4980B of the Code), claims under the WARN Act, or any other form of accrued or contingent compensation (including leave entitlements), irrespective of whether such Liabilities or claims are paid or made, as applicable, on, before or after Closing (provided that this shall not be interpreted to modify Buyer's payment obligations to Seller as expressly set out in Sections 7.7(d) and 7.7(e));

(e) all Liabilities with respect to any Excluded Employee or Former Employee with respect to any period; and for the avoidance of doubt, Buyer shall not be considered to be or to have become an employer of any Excluded Employee or Former Employee, pursuant to the WARN Act (including, without limitation, pursuant to U.S.C. § 2101(b)) or for any other purpose, and this Agreement shall be interpreted consistent with that intent;

18

(f) all Liabilities relating to Excluded Assets;

(g) all accounts payable and other amounts payable of any Selling Entity owed by it to any other Selling Entity;

(h) all Liabilities of the Selling Entities arising as a result of any Action initiated at any time, to the extent related to the Selling Entities or the Acquired Assets on or prior to the Closing Date (except to the extent that any such Liability is an Assumed Liability), including all Liabilities of the Selling Entities arising in connection with the Actions set forth on Schedule 2.4(i);

(i) all Liabilities of the Selling Entities in respect of Indebtedness;

(j) all Liabilities arising in connection with any violation of any applicable Law or Order relating to the period prior to the Closing by any of the Selling Entities, including any environmental law;

(k) any Consumer Liabilities; *provided*, that, the Buyer will honor all pre-Closing Consumer Liabilities at stores for so long as the stores have not been closed;

(l) any escheat Liabilities with respect to Assumed Liabilities or which otherwise remain with the Seller; and

(m) any other Liability of the Selling Entities that arises in relation to the period prior to the Closing and is not expressly included among the Assumed Liabilities.

Section 2.5    Assumption and Assignment of Contracts.

(a) The Sale Order shall provide for the assumption by the Selling Entities, and the Sale Order shall provide for the assignment to the extent legally capable of being assigned, by the Selling Entities to the Buyer and/or one or more Buyer Designees, of the Assumed Contracts and the Assumed Real Property Leases on the terms and conditions set forth in the remainder of this Section 2.5, and shall provide for the Designation Deadline as defined herein. At the Buyer's request, and at the Buyer's cost and expense, the Selling Entities shall cooperate from the date of execution of this Agreement forward with the Buyer as reasonably requested by the Buyer (i) to allow the Buyer to enter into an amendment of any Real Property Lease upon assumption of such Real Property Lease by the Buyer or a Buyer Designee, and shall cooperate with the Buyer to the extent reasonably requested with the Buyer in negotiations with the landlords thereof, or (ii) to otherwise amend any Real Property Lease to the extent such amendments would not adversely affect any of the Selling Entities; *provided* that the Selling Entities shall not be required to enter into any such amendment if such amendment would result in an assumption by any Selling Entity of such Real Property Lease, unless such Real Property Lease will be assigned to the Buyer or a Buyer Designee at the time of such assumption.

(b) Schedule 2.5(b) sets forth the Non-Real Property Contracts and the Real Property Leases that will be Assumed Contracts or Assumed Real Property Leases to be assumed and assigned to the Buyer or Buyer Designee on the Closing Date. With respect to any Real Property Lease designated for rejection on Schedule 2.5(b), the Buyer may designate the

19

Rejection Effective Date, which Rejection Effective Date shall be not less than twenty (20) days from the date hereof. From and after the Closing Date until the Designation Deadline (subject to the last sentence of this Paragraph), with respect to any Non-Real Property Contract or Real Property Lease that is not included on Schedule 2.5(b) as an Assumed Contract or Assumed Real Property Lease to be assumed and assigned to the Buyer or the Buyer Designee on the Closing Date, the Buyer or the Buyer Designee may, in its sole discretion, (i) designate such Non-Real Property Contract as an Assumed Contract or Real Property Lease as an Assumed Real Property Lease, as applicable, by providing written notice to the Seller, specifying the Non-Real Property Contract(s) or Real Property Lease(s) to be assumed by the respective Selling Entity and assigned to the Buyer or the Buyer Designee specified in such notice or (ii) designate such Non-Real Property Contract or Real Property Lease for rejection by providing written notice to the Seller, specifying the Non-Real Property Contract(s) or Real Property Lease(s) to be rejected by the respective Selling Entity and the applicable Rejection Effective Date, which Rejection Effective Date shall in no event be less than twenty (20) days after the delivery of such notice to the Seller. Upon delivery of a notification by the Buyer or the Buyer Designee with respect to any Non-Real Property Contract or Real Property Lease under Section 2.5(b)(i), the applicable Selling Entity shall move within two (2) Business Days of receipt of such notice to assign such Non-Real Property Contract or Real Property Lease to the Buyer or the Buyer Designee as set forth in the applicable notice and shall assume and assign to, and the Buyer shall or shall cause such Buyer Designee to accept the assignment of, and to assume, such Non-Real Property Contract or Real Property Lease. Upon delivery of a notification by the Buyer or the Buyer Designee with respect to any Non-Real Property Contract or Real Property Lease under Section 2.5(b)(ii), the applicable Selling Entity shall move within two (2) Business Days of receipt of such notice to reject such Non-Real Property Contract or Real Property Lease as of the applicable Rejection Effective Date. In addition, in the event that the Buyer or the Buyer Designee has not provided a written designation to assume and assign or reject any Non-Real Property Contract or Real Property Lease pursuant to this Section 2.5(b) at least ten (10) Business Days prior to the Designation Deadline, then such Non-Real Property Contract or Real Property Lease shall be deemed to be excluded and rejected and the Selling Entities may move to reject such Non-Real Property Contract or Real Property Lease as of the Designation Deadline (which Designation Deadline shall constitute the Rejection Effective Date with respect thereto), and none of the Selling Entities shall have any obligation to assign any such Non-Real Property Contract or Real Property Lease to the Buyer or any Buyer Designee hereunder. After the Closing but prior to the Rejection Effective Date for, or the date Seller assigns and Buyer assumes, as applicable, any Non-Real Property Contract or Real Estate Lease that is identified pursuant to this Section 2.5(b) for rejection, the Buyer shall have the obligation to cause to be satisfied all operational liabilities and the right to all operational benefits of such Non-Real Property Contract or Real Estate Lease.

(c)     After the Closing and prior to the Designation Deadline, the Selling Entities shall not terminate, amend, supplement, modify, waive any rights under, or create any Encumbrance with respect to any Non-Real Property Contract or any Real Property Lease, or take any affirmative action not required by the terms thereof by any of the Selling Entities, without the prior written consent of the Buyer, unless the Buyer has provided notice to the Seller in writing designating such Non-Real Property Contract or Real Property Lease for rejection pursuant to Section 2.5(b).

20

(d)     In the case of any removal or designation notice by the Buyer pursuant to Section 2.5(b), with respect to any Non-Real Property Contract or Real Property Lease, the Seller shall give notice to the other parties to any Contract to which such notice relates of the removal or designation of such Contract as an Assumed Contract or an Assumed Real Property Lease, as applicable, within three (3) Business Days of the Buyer notifying the Seller of such designation or removal or such lesser time as is approved by the Bankruptcy Court.

(e)     As part of the Motions (or as necessary in one or more separate motions), the Selling Entities shall request that by virtue of a Selling Entity providing ten (10) Business Days notice of its intent to assume and assign any Contract, that the Bankruptcy Court deem any non-debtor party to such Contract that does not file an objection with the Bankruptcy Court during such notice period to have given any required Consent to the assumption of the Contract by the Selling Entity and assignment to the Buyer and/or one or more Buyer Designees.

(f)     In connection with the assumption and assignment to the Buyer or a Buyer Designee of any Assumed Contract or Assumed Real Property Lease that is executory pursuant to this Section 2.5, the cure amounts, as determined by the Bankruptcy Court, if any (such amounts, the "Cure Payments"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts and the Assumed Real Property Leases, including any amounts payable to any landlord under any Assumed Real Property Lease that relates to the period prior to the Assumption Approval, shall be paid by the Buyer, on or before the Assumption Approval, and not by the Seller and the Seller shall have no liability therefore.

(g)     The Seller shall use its commercially reasonable efforts to obtain an Order of the Bankruptcy Court to assign the Assumed Contracts and the Assumed Real Property Leases to the Buyer and/or any Buyer Designees (the "Assumption Approval") on the terms set forth in this Section 2.5. In the event the Selling Entities are unable to assign any such Assumed Contract or Assumed Real Property Lease to the Buyer and/or any such Buyer Designee pursuant to an Order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts prior to the Designation Deadline to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Authorities and third parties necessary to assume and assign such Assumed Contracts or Assumed Real Property Lease to the Buyer and/or such Buyer Designee (the "Necessary Consents"), including, in the case of the Buyer, making any applicable Cure Payments and any other payments necessary to obtain such Necessary Consents.

(h)     To the extent that any Consent or Governmental Authorization required to assign to the Buyer and/or any Buyer Designee any Assumed Contract or Assumed Real Property Lease is not obtained by the Designation Deadline, each Selling Entity will, with respect to each such Assumed Contract or Assumed Real Property Lease, from and after the Closing and until the earliest to occur of (x) the date on which such applicable Consent is obtained, and (y) the date on which such Contract is rejected following the written request of the Buyer, use commercially reasonable efforts during the term of such Assumed Contract or Assumed Real Property Lease to (i) provide to the Buyer and/or any Buyer Designee, as applicable, the benefits under such Assumed Contract or Assumed Real Property Lease, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contract in trust for

21

the Buyer and/or any Buyer Designee, as applicable, pending receipt of the required Consent or Governmental Authorization) designed to provide such benefits to the Buyer and/or any Buyer Designee, as applicable, and (iii) enforce for the account of the Buyer and/or any Buyer Designee, as applicable, any rights of such Selling Entity under such Assumed Contract or Assumed Real Property Lease (including the right to elect to terminate such Assumed Contract or Assumed Real Property Lease in accordance with the terms thereof upon the written direction of the Buyer). The Buyer will, and, as applicable, will cause the Buyer Designees to, reasonably cooperate with the Selling Entities in order to enable the Selling Entities to provide to the Buyer and/or any Buyer Designee that purchase any Acquired Assets hereunder the benefits contemplated by this Section 2.5(h), and Buyer shall promptly pay any and all costs and expenses incurred by the Selling Entities or their Representatives in connection with the performance by the Selling Entities of their obligations under this Section 2.5(h).

(i)     The Buyer shall pay, and shall be solely responsible for, any and all Operational Expenses of the Selling Entities that are directly related to the operation of any Designated Store or Non-Continuing Store from and after the Closing until the Non-Real Property Contracts and Real Property Leases that are associated with such Designated Store or Non-Continuing Store have been, in accordance with this Section 2.5, (i) assumed and assigned to the Buyer or a Buyer Designee or (ii) rejected by the applicable Selling Entities, and such Designated Store or Non-Continuing Store has become a Continuing Store or has closed its operations, as applicable; *provided*, that, all Operational Expenses constituting employee Liabilities shall be treated as set forth in Section 7.7(d). For the avoidance of doubt and subject to Section 7.7(d), the Operational Expenses owed by the Selling Entities described above shall include, but are not limited to those Operational Expenses that are obligations of the Selling Entities that accrue at any point during the period from the Closing until either (i) the Real Property Leases and the Non-Real Property Contracts associated with such Designated Store or Non-Continuing Store are assumed and assigned to the Buyer or a Buyer Designee or (ii) the Rejection Effective Date of the Real Property Lease and Non-Real Property Contracts associated with such store has occurred; *provided*, that the Buyer has exited the store premises and turned possession of the store premises over to the landlord, the condition of such store premises to be turned over in accordance with the Real Property Lease associated with such store premises. In addition, the Buyer shall perform, or shall cause to be performed, any and all obligations of the Selling Entities arising under any Non-Real Property Contract or Real Property Lease related to the operation of any Designated Store or Non-Continuing Store from and after the Closing until either (i) the Real Property Leases and the Non-Real Property Contracts associated with such Designated Store or Non-Continuing Store are assumed and assigned to the Buyer or a Buyer Designee or (ii) the Rejection Effective Date of the Real Property Lease and Non-Real Property Contracts associated with such store has occurred; *provided*, that the Buyer has exited the store premises and turned possession of the store premises over to the landlord, the condition of such store premises to be turned over in accordance with the Real Property Lease associated with such store premises. For the avoidance of doubt, nothing contained in this Section 2.5(i) shall require the Buyer to become, or to be considered or deemed, the employer of any person, including that Buyer shall not become, or be considered or deemed to be, the employer of any Selected Employees (as defined in Section 7.7(d)), unless and until Buyer, in its discretion, chooses to employ such person. Any amounts required to be paid, or obligations satisfied, by the Buyer hereunder, including any amounts to be paid or obligations satisfied under Section 7.7(d), shall

be timely paid or satisfied, as applicable, when such amounts or obligations become due, and shall be paid or satisfied by the Buyer on behalf of the Selling Entities.

(j)     Notwithstanding the foregoing, a Contract shall not be an Assumed Contract or Assumed Real Property Lease hereunder and shall not be assigned to, or assumed by, the Buyer (or a Buyer Designee) to the extent that such Contract (i) is rejected by a Selling Entity or terminated by a Selling Entity in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Designation Deadline and is not continued or otherwise extended upon assumption, or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to the Buyer (or a Buyer Designee) of the Selling Entities' rights under such Contract, and no such Consent or Governmental Authorization has been obtained prior to the Designation Deadline. In addition, a Permit shall not be assigned to, or assumed by, the Buyer (or a Buyer Designee) to the extent that such Permit requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to the Buyer (or a Buyer Designee) of the Selling Entities' rights under such Permit, and no such Consent or Governmental Authorization has been obtained prior to the Closing.

(k)     The Buyer shall indemnify and hold each of the Selling Entities and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage arising from or relating to the operation of any of the Non-Continuing Stores or the Continuing Stores after the Closing Date, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) the Buyer's material breach of or material failure to comply with any of its agreements, covenants, representations or warranties contained in any of the Transaction Documents; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees of any of the Selling Entities or the Buyer or agents by the Buyer or any of its representatives; (iii) any claims by any party engaged by the Buyer as an employee or independent contractor arising out of such employment; (iv) the gross negligence (including omissions) or willful misconduct of the Buyer, its officers, directors, employees, agents or representatives; and (v) violations of Law by the Buyer, its officers, directors, employees, agents or representatives.

Section 2.6     Allocation.  The Buyer shall, promptly following the final determination of the Purchase Price in accordance with Section 3.2, deliver to the Seller an allocation of the Purchase Price (and the Assumed Liabilities, to the extent properly taken into account under the Code) among the Acquired Assets and the covenants contained in Section 7.14 (the "Allocation") in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder, which Allocation shall be reasonably acceptable to Seller. Seller agrees to file all Tax Returns (including the filing of Form 8594 with their United States federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Allocation unless otherwise required by applicable Law. In administering the Bankruptcy Case, the Bankruptcy Court shall not be required to apply the Allocation in determining the manner in which the Purchase Price should be allocated as between the Selling Entities and their respective estates.

23

Section 2.7    Non-Continuing Stores, Designated Stores and Continuing Stores.

(a)    The Buyer shall, on or before two (2) Business Days prior to the date scheduled for the Auction, identify the stores of the Selling Entities that are to be Non-Continuing Stores, Designated Stores and Continuing Stores. In accordance with Section 2.5(b), the Buyer shall reclassify any Designated Store (i) as a Continuing Store by designating the Real Property Lease associated with such store as an Assumed Real Property Lease in accordance with Section 2.5(b)(i) or (ii) as a Non-Continuing Store by designating such Real Property Lease associated with such store for rejection by providing written notice to the Seller in accordance with Section 2.5. In accordance with the Sales Agency Agreement, on or before the Designation Date, the Sales Agent shall conduct and conclude store closing sales for each of the Non-Continuing Stores. Notwithstanding anything herein to the contrary, with respect to any store for which the Sales Agent conducts and concludes a store closing sale, all Inventory and all FF&E (as defined in the Sales Agency Agreement) located at such store shall be deemed to be the property of the applicable Selling Entity that is the tenant at such store, and all proceeds from the sale, disposition or liquidation of such Inventory and FF&E shall be deemed to be the property of the Buyer and, to the extent such proceeds are remitted to a Selling Entity, such Selling Entity shall hold such proceeds in trust for the Buyer and shall deliver such proceeds to the Buyer promptly upon receipt. At any time before the Sales Agent completes the store closing sale for a Non-Continuing Store, the Buyer may reclassify such store as a Continuing Store by designating the Real Property Lease associated with such store as an Assumed Real Property Lease in accordance with Section 2.5. Upon such designation, such Non-Continuing Store shall be deemed a Continuing Store. The Seller irrevocably covenants and agrees to direct the Sales Agent to follow the lawful notices and other lawful instructions of the Buyer and the Buyer Designees and shall cooperate with the Buyer with respect to the Sales Agent, to the extent reasonably requested in connection therewith. If in the Buyer's reasonable judgment, the Seller is not directing the Sales Agent and cooperating with the Buyer and the Buyer Designees in accordance with the foregoing sentence, the Seller irrevocably agrees that the Buyer and the Buyer Designees will have the right to directly deliver all lawful notices and otherwise lawfully instruct the Sales Agent with respect to any or all of the Non-Continuing Stores and to enforce the rights of the Seller with respect to the Sales Agent under the Sales Agency Agreement.

(b)    For any store that is a Designated Store or a Non-Continuing Store and whose associated Real Property Leases and Non-Real Property Contracts are rejected in accordance with Section 2.5, within in two (2) Business Days after the Designation Deadline, the Buyer shall pay to the Seller by wire transfer of immediately available funds to an account designated by the Seller any reimbursement for Real Property Lease deposits that are received by the Buyer prior to the Designation Deadline and that are related to such Designated Store or Non-Continuing Store.

(c)    Notwithstanding anything in this Agreement to the contrary but subject to the consummation of the Closing, the Buyer shall have the right to assume any Real Property Leases with respect to any stores at or prior to the Closing Date, *provided* that the Buyer assumes and agrees to pay all Liabilities of such Real Property Lease.

(d)    Pre-Closing Non-Continuing Stores shall be a subset of the Non-Continuing Stores and, as such, Section 2.5(i) applies to the Pre-Closing Non-Continuing Stores

24

as if such Pre-Closing Non-Continuing Stores are Non-Continuing Stores. For the avoidance of doubt, the Buyer shall pay, and shall be solely responsible for, any and all Operational Expenses of the Selling Entities that are directly related to the operation of any Pre-Closing Non-Continuing Stores from and after the Closing until the Non-Real Property Contracts and Real Property Leases that are associated with such Pre-Closing Non-Continuing Store have been rejected by the applicable Selling Entities; provided, that, all Operational Expenses constituting employee Liabilities shall be treated as set forth in Section 7.7(d). Seller shall cause each of the Non-Real Property Contracts and Real Property Leases associated with the Pre-Closing Non-Continuing Stores to be rejected as of November 30, 2010, provided, that Buyer has exited the store premises and turned possession of the store premises over to the landlord, the condition of such store premises to be turned over in accordance with the Real Property Lease associated with such store premises.

(e)     Notwithstanding anything contained in this Agreement to the contrary, the Buyer agrees to identify no less than 175 stores as Continuing Stores no later than 10 days before the Designation Deadline. It being agreed to by the parties that the calculation of the 175 stores referred to above shall not include (i) the company headquarters located at the address of the Seller provided in Section 10.3(a) and (ii) all warehouse and distribution facilities of the Selling Entities.

## ARTICLE III
## PURCHASE PRICE; DEPOSIT

Section 3.1     Purchase Price; Closing Payment.

(a)     In consideration for the Acquired Assets, and subject to the terms and conditions of this Agreement, and the entry and effectiveness of the Sale Order, at the Closing, the Buyer and/or one or more Buyer Designees shall assume the Assumed Liabilities by executing the Assumption Agreement and the Buyer shall pay, in accordance with Sections 3.1 and 3.2, an amount equal to $15,670,000 in cash (as finally adjusted in accordance with Section 3.2) (the "Purchase Price"); provided, however, that notwithstanding any adjustments required to be made pursuant to Section 3.2, in no event shall the Purchase Price be an amount equal to less than the lesser of (x) $6,000,000 and (y) all outstanding amounts owing under the DIP Facility on the Closing Date (the "Minimum Purchase Price"); provided, further that if (i) the Buyer has not assumed the Real Property Leases on more than twenty (20) stores as of the Closing Date, which are to be operated by the Buyer following such assumption and (ii) the Closing Date Cost Value of the Inventory is greater than $8,500,000, then in no event shall the Purchase Price be an amount equal to less than the applicable amount set forth on Schedule 3.1(a), as such amount is adjusted pursuant to Section 3.1(b) below (the "Adjusted Minimum Purchase Price").

(b)     On the Closing Date, the Buyer shall pay or cause to be paid to the Seller, by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing, an amount in cash equal to (i) $15,670,000, minus (ii) the Deposit, (iii) plus or minus, as applicable, the Estimated Inventory Adjustment Amount, (iv) plus or minus, as applicable, the Estimated Credit Card Receivables Adjustment Amount, (v) plus or minus, as applicable, the Estimated Store-Level Cash Adjustment Amount; and (vi) minus an amount equal to $500,000 (the "Holdback Amount") (such amount, collectively, the "Closing Payment"); it

25

being understood that the Deposit shall be delivered to the Seller or one or more designees of Seller at the Closing in accordance with Section 3.3;

> *provided, however*, that notwithstanding any amounts required to be deducted pursuant to this Section 3.1(b), in no event shall the Closing Payment equal less than (i) the Minimum Purchase Price (ii) *minus* the Deposit (such amount, the "Minimum Closing Payment"); and

> *provided, further*, that if (x) the Buyer has not assumed the Real Property Leases on more than twenty (20) stores as of the Closing Date, which are to be operated by the Buyer following such assumption, (y) the Closing Date Cost Value of the Inventory is greater than $8,500,000 and (z) the Closing Payment equaled the Minimum Closing Payment, then, forty-five (45) days following the Closing Date, or if a party exercises its rights under Section 3.2(c), fifteen (15) days after receipt of the Final Calculations, the Buyer shall pay or cause to be paid to the Seller by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing, an amount in cash equal to (i) the Adjusted Minimum Purchase Price, (ii) *minus* the Closing Payment previously made pursuant to this Section 3.1(b), (iii) *minus* the Deposit, (iv) *minus* the amount, if any, by which the Minimum Aggregate Amount of Credit Card Receivables exceeds the Closing Dated Credit Card Receivables Amount and (v) *minus* the amount, if any, by which the total aggregate minimum amount of Store-Level Cash required under the definition of Store-Level Cash exceeds the Closing Dated Store-Level Cash Amount.

Section 3.2     Purchase Price Adjustment.

(a)     Estimated Closing Adjustments. One (1) Business Day immediately prior to the Closing Date, the Seller shall (i) estimate the aggregate cost value of the Saleable Inventory as of the Closing Date (the "Estimated Closing Date Cost Value of the Inventory"), (ii) estimate the aggregate amount of Credit Card Receivables as of the Closing Date (the "Estimated Closing Date Credit Card Receivables Amount"), and (iii) estimate the total aggregate amount of all Store-Level Cash as of the Closing Date (the "Estimated Closing Date Store-Level Cash Amount"). If the Estimated Closing Date Cost Value of the Inventory differs from the Minimum Aggregate Cost Value of the Inventory, the Purchase Price shall be adjusted in accordance with Schedule 3.2(a) (such adjusted amount, the "Estimated Inventory Adjustment Amount"). If the Estimated Closing Date Credit Card Receivables Amount differs from the Minimum Aggregate Amount of Credit Card Receivables, the Purchase Price shall be adjusted on a dollar for dollar basis by the amount of such difference (such adjusted amount, the "Estimated Credit Card Receivables Adjustment Amount"). If the Estimated Closing Date Store-Level Cash Amount differs from the total aggregate minimum amount of Store-Level Cash required under the definition of Store-Level Cash, the Purchase Price shall be adjusted on a dollar for dollar basis by the amount of such difference (such adjusted amount, the "Estimated Store-Level Cash Adjustment Amount"). All estimates prepared by the Seller under this Section 3.2(a) shall be made in good faith and, with respect to the Estimated Closing Date Cost Value of the Inventory, consistent with the manner in which the Seller has historically calculated the amount reported on Line 11 of the borrowing base certificate under the Seller's existing senior secured facility with

26

Bank of America. As promptly as possible but in any case prior to the Closing, the Seller will deliver to the Buyer a notice of the Estimated Closing Date Cost Value of the Inventory, the Estimated Closing Date Credit Card Receivables Amount and the Estimated Closing Date Store-Level Cash Amount together with sufficient documentation of the information and data used to support the calculations of such estimates.

(b)     Post-Closing Adjustments. As promptly as practicable, but in no event later than thirty (30) days following the Closing Date, the Buyer shall (i) cause to be determined the aggregate cost value of the Saleable Inventory as of the Closing Date (the "Closing Date Cost Value of the Inventory") by retaining an independent inventory taking service provider mutually selected by the Buyer and the Seller on or before the Closing Date to perform such calculation, (ii) determine the aggregate amount of Credit Card Receivables as of the Closing Date (the "Closing Date Credit Card Receivables Amount") and (iii) determine the total aggregate amount of all Store-Level Cash as of the Closing Date (the "Closing Date Store-Level Cash Amount"). If the Closing Date Cost Value of the Inventory differs from the Estimated Inventory Adjustment Amount, the Purchase Price shall be adjusted in accordance with Schedule 3.2(a). If the Closing Date Credit Card Receivables Amount differs from the Estimated Credit Card Receivables Amount, the Purchase Price shall be adjusted on a dollar for dollar basis by the amount of such difference. If the Closing Date Store-Level Cash Amount differs from the Estimated Store-Level Cash Amount, the Purchase Price shall be adjusted on a dollar for dollar basis by the amount of such difference. No adjustments to the Purchase Price shall be made pursuant to this Section 3.2(b) unless the Closing Payment exceeded the Minimum Closing Payment. Subject to the foregoing sentence, any adjustments to the Purchase Price made pursuant to this Section 3.2(b) shall be made within forty-five (45) days of the Closing Date, or if a party exercises its rights under Section 3.2(c), within fifteen (15) days of receipt of the Final Calculations by (x) first, if the adjustments result in a reduction of the Purchase Price, by reducing the amount of the Holdback Amount to the extent of the Holdback Amount by the amount of any such reduction, and (y) second, to the extent any adjustments are not reflected in clause (x) above (whether because the adjustments result in an increase in the Purchase Price or the adjustments result in a reduction of the Purchase Price that exceeds the Holdback Amount) then such payment shall be made in the manner set forth in Section 3.2(d) or if the adjustment requires a payment to be made by the Buyer to the Seller, such payment shall be made by wire transfer of immediately available funds to an account designated by the Seller. The cost of the inventory taking shall be shared equally by the Buyer and the Seller. Following the resolution of all disputes pursuant to Section 3.2(c), the Buyer shall pay to the Seller the Holdback Amount, as may be adjusted by this Section 3.2(b), by wire transfer of immediately available funds to an account designated by the Seller; provided, that the Buyer shall not pay to the Seller the Holdback Amount if the Closing Payment did not exceed the Minimum Closing Payment.

(c)     Review; Disputes.

(i)     The Buyer and the Seller shall, and shall cause their respective Representatives to, cooperate and assist in the calculation of the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount, and in the conduct of the review referred to in this Section 3.2. Without limiting the foregoing, from and after the Closing until the end of the Review Period, the Buyer shall provide the Seller and its Representatives with full access

to the books, records and employees of the Buyer and its Subsidiaries, including any applicable Documentary Materials and any related work papers of Representatives of Buyer, upon reasonable notice and during regular business hours for the purposes of enabling the Seller and its Representatives to calculate, and to review the calculation of, the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount.

(ii)     If the Seller disputes the calculation of the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and/or the Closing Date Store-Level Cash Amount, then the Seller shall deliver a written notice setting forth Seller's disagreement with the calculation of the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and/or the Closing Date Store-Level Cash Amount, as applicable (a "Dispute Notice") to the Buyer at any time during the thirty (30) day period commencing upon receipt by the Seller of the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount (with such thirty (30) day period subject to extension for any failure by Buyer to provide access to Seller and its Representatives as described in, and in accordance with, Section 3.2(b)(i), the "Review Period"). The Dispute Notice shall set forth the basis for the dispute of any relating calculation, to the extent applicable, in reasonable detail.

(iii)     If the Seller does not deliver a Dispute Notice to the Buyer prior to the expiration of the Review Period, the Buyer's calculation, as provided by the Buyer, of the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount, as the case may be, shall be deemed final and binding on the Selling Entities and Buyer for all purposes, except to the extent otherwise agreed in writing by Seller and Buyer.

(iv)     If the Seller delivers a Dispute Notice to the Buyer prior to the expiration of the Review Period, then the Seller and the Buyer shall use commercially reasonable efforts to reach agreement on the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and/or the Closing Date Store-Level Cash Amount. If the Seller and the Buyer are unable to reach agreement on the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and/or the Closing Date Store-Level Cash Amount, within thirty (30) days after the end of the delivery of the Dispute Notice, the Seller and the Buyer shall refer such dispute to RSM McGladrey or such other firm that is mutually agreeable to the Buyer and the Seller (the "Accountant") for resolution and (A) each of the Buyer and the Seller shall have a reasonable opportunity to meet with the Accountant to provide their views as to any disputed issues with respect to the calculation of any of the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount, (B) the Accountant shall determine the final Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount, as applicable, in accordance with the terms of this Agreement within thirty (30) days of such referral and upon reaching such determination shall deliver a copy of its calculations of such Closing Date Cost Value of the Inventory, Closing Date Credit Card Receivables Amount and/or Closing Date Store-

28

Level Cash Amount (the "Final Calculations") to the Buyer and the Seller, and (C) the determination made by the Accountant of the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount shall be final and binding on the Selling Entities and the Buyer for all purposes of this Agreement. In calculating the Final Calculations, the Accountant (x) shall be limited to addressing any particular disputes referred to in the Dispute Notice and (y) any such calculation of the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount shall, with respect to any disputed item, be no greater than the higher amount calculated by the Seller or the Buyer, and no less than the lower amount calculated by the Seller or the Buyer, as the case may be. The Final Calculations shall reflect in detail the differences, if any, from the Final Calculations and the Closing Date Cost Value of the Inventory, the Closing Date Credit Card Receivables Amount and the Closing Date Store-Level Cash Amount provided to the Seller by the Buyer. The cost of the Accountant's review and report shall be borne by the losing Party. For example, should the disputed portions total in amount to $1,000 and the Accountant awards $600 in favor of the Sellers' position, all of the costs of its review and report would be borne by the Buyer.

(d)     Treatment as Administrative Expenses. Any amounts at any time payable by Seller to Buyer under this Agreement or otherwise shall be paid (i) first, through an offset of any other obligation from Buyer to Seller under this Agreement and (ii) second, to the extent not otherwise satisfied under clause (i) above, than such excess amount shall be deemed allowed administrative claims in the Bankruptcy Case of any Selling Entity that is a debtor pursuant to 11 U.S.C. § 503(b)(1)(A).

Section 3.3     Deposit Escrow. Within four (4) Business Days following the Petition Date, the Buyer shall deposit into escrow with Richards, Layton & Finger, P.A. (in such capacity, the "Escrow Agent") an amount equal to $1,500,000 (such amount, together with any interest accrued thereon prior to the Closing Date, the "Deposit") by wire transfer of immediately available funds. The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any of the Selling Entities or the Buyer. The Deposit shall become payable to the Seller upon the earlier of (a) the Closing, or (b) the termination of this Agreement pursuant to Section 9.1(c) (a "Buyer Default Termination"). At the Closing, the Deposit shall be delivered to an account designated by the Seller by wire transfer of immediately available funds as payment of a portion of the Purchase Price and the Closing Payment. In the event the Deposit becomes payable to the Seller by reason of a Buyer Default Termination, the Escrow Agent shall, within two (2) Business Days after receiving notice of such Buyer Default Termination from Seller, disburse the Deposit to an account designated by the Seller by wire transfer of immediately available funds to be retained by the Seller for its own account. If this Agreement or the transactions contemplated herein are terminated other than for a termination which constitutes a Buyer Default Termination, the Buyer shall instruct the Escrow Agent to, and the Escrow Agent shall, within two (2) Business Days after such instruction, return to the Buyer the Deposit by wire transfer of immediately available funds.

## ARTICLE IV
## THE CLOSING

Section 4.1    Time and Place of the Closing.    Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place at the offices of the Seller's counsel, Wilmington, Delaware at 10:00 a.m. (Eastern time) no later than the second (2nd) Business Day following the date on which the conditions set forth in Article VIII have been satisfied or, to the extent permitted, waived by the applicable Party in writing (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of such conditions at or prior to the Closing), or at such other place and time as the Buyer and the Seller may mutually agree. The date on which the Closing actually occurs is herein referred to as the "Closing Date."

Section 4.2    Deliveries by the Seller.    At or prior to the Closing, the Seller shall deliver the following to the Buyer:

(a)    the Bill of Sale, duly executed by the Selling Entities;

(b)    the Assumption Agreement, duly executed by the Selling Entities;

(c)    the IP Assignment Agreement, duly executed by the applicable Selling Entities;

(d)    such other instruments of assignment or conveyance duly executed by the applicable Selling Entities as shall be reasonably necessary to transfer the Acquired Assets to the Buyer in accordance with this Agreement;

(e)    the Sale Agency Agreement;

(f)    a copy of the Sale Order as entered by the Bankruptcy Court; and

(g)    the certificate contemplated by Section 8.2(c).

Section 4.3    Deliveries by the Buyer.    At or prior to the Closing, the Buyer shall deliver the following to the Seller:

(a)    the Closing Payment;

(b)    the Deposit in accordance with Section 3.3;

(c)    certified copies of the resolutions duly adopted by the Buyer's board of directors or equivalent governing body authorizing the execution, delivery and performance of this Agreement and each of the other transactions contemplated hereby;

(d)    the Assumption Agreement and the IP Assignment Agreement, duly executed by the Buyer and, to the extent applicable, one or more Buyer Designees;

(e)     such other instruments of assumption duly executed by the Buyer and/or any applicable Buyer Designees as shall be reasonably necessary for the Buyer and/or any applicable Buyer Designees to assume the Assumed Liabilities in accordance with this Agreement;

(f)     the certificate contemplated by Section 8.3(c); and

(g)     the Limited Guaranty.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLING ENTITIES

Subject to such exceptions as are disclosed in the Seller Disclosure Schedule delivered by the Seller to the Buyer concurrently with the execution and delivery of this Agreement, and such exceptions as result from the filing and commencement of the Bankruptcy Case, the Selling Entities represent and warrant to the Buyer as follows:

Section 5.1     Organization, Standing and Corporate Power.     Each Selling Entity is a corporation or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization, and has all requisite corporate power and authority to own, lease and operate its assets, and to carry on the Business as currently conducted. Each Selling Entity is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed would not reasonably be expected to result in a Material Adverse Effect.

Section 5.2     Subsidiaries.     Section 5.2 of the Seller Disclosure Schedule identifies (i) each direct and indirect Subsidiary of the Seller, its jurisdiction of formation, and all owners of equity interests of each such Subsidiary and the number or percentage of equity interests owned by each such owner and (ii) all equity interests that are owned directly or indirectly by the Seller of Persons who are not direct or indirect Subsidiaries of the Seller. Except as set forth in Section 5.2 of the Seller Disclosure Schedule, all of the outstanding capital stock of, or other ownership interests in, each Selling Entity (other than the Seller) are owned beneficially and of record by the Seller, directly or indirectly.

Section 5.3     Authority Relative to this Agreement.     Subject to the applicable provisions of the Bankruptcy Code, each of the Selling Entities has all necessary corporate or similar authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and, upon entry and effectiveness of the Sale Order in accordance with the terms hereof, will have all necessary corporate or similar authority to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the other Transaction Documents to which any Selling Entity is party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the board of directors or equivalent governing body of each Selling Entity, and no other corporate or similar proceeding on the part of such Selling Entity is necessary to authorize this Agreement or the other Transaction Documents to which it is party or to consummate the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and

31

delivered by each Selling Entity, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the other Transaction Documents to which any Selling Entity is party will have been duly and validly executed and delivered by each Selling Entity, and assuming that this Agreement and the other Transaction Documents to which it is party constitute valid and binding agreements of the Buyer and each applicable Buyer Designee to the extent that it is a party thereto, and, subject to the entry and effectiveness of the Sale Order, and the execution and delivery of such other Transaction Documents in accordance with the terms hereof, this Agreement and the other Transaction Documents constitute valid and binding agreements of each Selling Entity party thereto, enforceable against such Selling Entity in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar Laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

Section 5.4    No Violation; Consents.

(a)    Except as described in Section 5.4(a) of the Seller Disclosure Schedule, except to the extent excused by or rendered unenforceable against the Buyer or a Buyer Designee as a result of the Bankruptcy Case and except for the entry and effectiveness of the Sale Order, neither the execution and delivery of this Agreement nor the sale by any Selling Entity of any Acquired Assets pursuant to this Agreement will (with or without notice or lapse of time) (i) conflict with or result in any breach of any provision of any Selling Entity's Certificate of Incorporation or Bylaws (or similar organizational documents), (ii) subject to the matters referred to in Section 5.4(b), conflict with or result in any breach of any Law applicable to any Selling Entity, the Business, or the Acquired Assets, or (iii) except for any Contract or Permit that is the subject of Section 2.5(h) or (i), violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Contract, agreement, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Selling Entities, is a party as of the Closing and which constitutes an Acquired Asset or Assumed Liability, or result in the creation of any Encumbrance (other than Encumbrances expressly contemplated by the Sale Order) as of the Closing on any of the Acquired Assets, except to the extent that any such rights of termination, amendment, acceleration, suspension, revocation or cancellation as a result of such Encumbrance will not be enforceable against such Acquired Asset or Assumed Liability following the Closing in accordance with the Sale Order, and except, in the case of clauses (ii) and (iii), for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    No Consent of any Governmental Authority is required to be obtained by or with respect to any Selling Entity in connection with the execution and delivery of this Agreement, or the consummation by the Selling Entities of the transactions contemplated by this Agreement, except for (i) the Consents set forth in Section 5.4(b) of the Seller Disclosure Schedule, (ii) the entry of the Sale Order by the Bankruptcy Court, (iii) Consents to the transfer or assignment of Permits that constitute Acquired Assets, and (iv) such other Consents where the failure to obtain such Consents would not reasonably be expected to result in a Material Adverse Effect.

32