Section 5.5    Legal Proceedings and Orders. Except as described in Section 5.5 of the Seller Disclosure Schedule, other than in connection with the Bankruptcy Case, there is no Legal Proceeding pending before any Governmental Authority and, to the Knowledge of the Seller, no Person has threatened in writing to commence any such Legal Proceeding, (a) that relates to any of the Acquired Assets or (b) that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement. As of the date of this Agreement and except as described in Section 5.5 of the Seller Disclosure Schedule, there is no Order to which any of the Selling Entities are subject.

Section 5.6    Compliance with Law. Except as would not reasonably be expected to result in a Material Adverse Effect, each of the Selling Entities (i) is, in material compliance with all Laws and Orders relating to the Acquired Assets (including the use thereof) and the conduct of the Business, and (ii) has not received any written notice from any Governmental Authority that any violation of any such Law or Order exists, in each case except as set forth in Section 5.6 of the Seller Disclosure Schedule.

Section 5.7    Financial Statements.

(a)    (i) The unaudited consolidated financial statements of the Seller for the fiscal year ended January 30, 2010 (the "Seller Financial Statements") present fairly on a going concern basis, in all material respects, the consolidated financial position of the Seller as of the respective dates thereof and the consolidated statements of operations, stockholder's equity and cash flows of the Seller for the respective periods indicated therein (subject, to normal period end adjustments).

(b)    The Selling Entities do not have any Indebtedness or other Liabilities of a nature (whether accrued, absolute, contingent or otherwise) that would be required by GAAP to be reflected on a consolidated balance sheet of the Seller (or in the notes thereto) that were not disclosed or reserved against in the Seller Financial Statements (including the notes thereto), except for indebtedness or other Liabilities (i) that were incurred after January 30, 2010, in the ordinary course of business, (ii) that were incurred under this Agreement or in connection with the transactions contemplated hereby, or (iii) that will be or are Liabilities of the Selling Entities as debtors in the Bankruptcy Case and that will not result in any Encumbrance (other than a Encumbrances expressly identified by the Sale Order) on the Acquired Assets following the entry of the Sale Order.

Section 5.8    Benefit Plans; Employees and Employment Practices.

(a)    Section 5.8(a) of the Seller Disclosure Schedule sets forth a complete and correct list of each (i) Seller Benefit Plan (or other arrangement) which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA), that is subject to Section 302 or Title IV of ERISA or Code Section 412, including a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA), with respect to which the Selling Entities have or could have Liability, including as a result of its or their ERISA Affiliates, and (ii) Seller Benefit Plan which provides for post-employment life or health insurance, benefits or coverage for any participant or any beneficiary of a participant, excluding any Seller Benefit Plan which provides such insurance, benefits or coverage as may be required under the Consolidated Omnibus Budget Reconciliation

33

Act of 1985, as amended and Section 4980B of the Code and at the expense of the participant or the participant's beneficiary .

(b) Except as set forth in <u>Section 5.8(b)</u> of the Seller Disclosure Schedule, and except for such exceptions that would not reasonably be expected to result in a Material Adverse Effect, (i) each Seller Benefit Plan has been maintained and administered in accordance with its terms and with all applicable provisions of ERISA, the Code and other applicable Laws, and (ii) there are no audits, inquiries or proceedings pending or, to the Knowledge of any of the Selling Entities, threatened by the U.S. Internal Revenue Service or any other Governmental Authority with respect to any Seller Benefit Plan (other than routine claims for benefits in the ordinary course of business).

(c) To the Knowledge of any of the Selling Entities and except as set forth on <u>Section 5.8(c)</u> of the Seller Disclosure Schedule, (i) the Pension Benefit Guaranty Corporation ("PBGC") has not initiated any proceeding, or asserted any rights, under Section 4041 or 4042 of ERISA and (ii) neither the Selling Entities nor any of their Affiliates have received an inquiry, whether written or oral, from the PBGC, under its so-called "Early Warning Program" or otherwise, regarding the funded status of any pension plan of the Selling Entities or any of their Affiliates.

(d) None of the Selling Entities is a party to, or otherwise bound by or subject to, any collective bargaining or other labor union contracts and, to the Knowledge of any of the Selling Entities, no Current Employees are represented by any labor organization, trade union, works council, employee representative, employee congress or other form of employee association or representative. No labor organization (or representative thereof) or Current Employee or group of Current Employees has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of any of the Selling Entities, threatened to be brought or filed, with the National Labor Relations Board or other labor relations tribunal, or provincial or foreign or other Governmental Authority. To the Knowledge of any of the Selling Entities, there is no organizing activity involving the Selling Entities or any of their Affiliates pending or threatened by any labor organization (or representative thereof) or employee or group of employees to organize Current Employees. There are no material lockouts, or strikes pending, or threatened between the Selling Entities or any of their Affiliates, on the one hand, and their respective Current Employees, on the other hand, and there have been no such material lockouts or strikes for the past three (3) years.

(e) As of the date of this Agreement and except as set forth in <u>Section 5.8(e)</u> of the Seller Disclosure Schedule, each of the Selling Entities and their Affiliates is in compliance with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, pay equity, employment equity, conditions of employment, employment standards, human rights, employee privacy, the WARN Act, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding Taxes and/or social security Taxes and contributions and any similar Tax or contribution, except in each case or in the aggregate as would not reasonably be expected to result in a Material Adverse Effect. Except as set forth in <u>Section 5.8(e)</u> of the Seller Disclosure Schedule, there has been no "mass layoff" or "plant closing" (as defined by the

34

WARN Act), or "collective redundancy" or similar process, with respect to the Selling Entities or any of their Affiliates within the six (6) months prior to Closing.

(f)     There are no notices of assessment, provisional assessment, reassessment, supplementary assessment, penalty assessment or increased assessment (collectively, "assessments") or any other communications related thereto which any Selling Entity has received from any workers' compensation or workplace safety and insurance board or similar authorities in any jurisdictions where the Business is carried on which are unpaid on the date hereof or which will be unpaid at the Closing Date, and to the Knowledge of any of the Selling Entities there are no facts or circumstances which may result in an increase in liability to any Buyer or any Buyer Designee under any applicable workers' compensation or workplace safety and insurance Law after the Closing Date.

Section 5.9     Contracts.

(a)     Each Non-Real Property Contract and each Real Property Lease is a valid and binding obligation of each Selling Entity party thereto, and to the Knowledge of the Seller, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, (i) as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar Laws affecting or relating to enforcement of creditors' rights generally or general principles of equity, or (ii) as set forth in Section 5.9(a)(i) of the Seller Disclosure Schedule. On or prior to the date of the hearing with respect to the Bidding Procedures Order, the Seller shall deliver to the Buyer a list of each material Non-Real Property Contract and good faith estimates of all Cure Payments with respect thereto.

(b)     None of the Selling Entities, or, to the Seller's Knowledge, the other parties thereto, are in breach in any material respect of any Non-Real Property Contract, or any Real Property Lease, and none of the Selling Entities has received any written notice of any such breach, except, in each case, (i) as a result of the Bankruptcy Case, (ii) as set forth in Section 5.9(b) of the Seller Disclosure Schedule to be delivered by the Seller to the Buyer two (2) Business Days prior to the date of the hearing with respect to the Bidding Procedures Order, or (iii) as will be cured upon entry of the Sale Order and payment of the Cure Payments.

Section 5.10     Intellectual Property.

(a)     Section 5.10(a) of the Seller Disclosure Schedule sets forth a complete and accurate list, as of the date hereof, of (i) each item of Registered IP in which any Selling Entity has an ownership interest of any nature (whether exclusively, jointly with another Person or otherwise), (ii) the jurisdiction in which each such item of Registered IP has been registered or filed and the applicable registration or serial number, (iii) any other Person that has an ownership interest in each such item of Registered IP and the nature of such ownership interest, (iv) all material Contracts pursuant to which any Selling Entity obtains the right to use any Intellectual Property, and (v) all material Contracts pursuant to which any Selling Entity grants to any other Person the right to use any Seller IP. Except as set forth in Section 5.10(a) of the Disclosure Schedule, no Selling Entity has abandoned or assigned any material Intellectual Property right in the three years preceding the date of this Agreement.

35

(b)      Except as set forth in Section 5.10(b) of the Seller Disclosure Schedule, (A) the Selling Entities own or possess valid rights to use and to transfer to the Buyer: (i) all Seller IP and all Licensed Intellectual Property; and (ii) all Intellectual Property used in the conduct of the Business in the two years preceding the date of this Agreement; and (B) the Seller IP and the Licensed Intellectual Property constitute all the Intellectual Property that is necessary for the conduct of the Business as currently conducted.

(c)      To the Knowledge of the Seller, none of the Selling Entities has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating any Intellectual Property right of any other Person, except as set forth in Section 5.10(c) of the Seller Disclosure Schedule. Except as set forth in Section 5.10(c) of the Seller Disclosure Schedule, none of the Selling Entities has received any written claim or written notice from any Person alleging infringement, misappropriation or any other violation of Intellectual Property rights, offering a license to Intellectual Property Rights, or challenging the validity, enforceability, use or ownership of the Seller IP or the Selling Entities' interest in Seller IP. To the Knowledge of the Seller, no Person has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating any Seller IP. Except as set forth in Section 5.10(c) of the Disclosure Schedule, there are no pending or threatened administrative or judicial proceedings or actions involving the Seller IP or the Seller's use of Intellectual Property rights. Except as set forth in Section 5.10(c) of the Disclosure Schedule, the Seller has not: i) pledged, mortgaged or granted any lien in or to Seller IP; or ii) granted any contingent interest in, or option to acquire an interest in, Seller IP. Except as set forth in Section 5.10(c) of the Disclosure Schedule, the Seller is not in default or breach of any Contract listed in Section 5.10(a) of the Disclosure Schedule. The Buyer shall have the right, immediately after the Closing, to use all Intellectual Property owned or used by the Selling Entities immediately prior to Closing, on the same terms as the Selling Entities immediately prior to Closing.

(d)      The information technology systems of the Selling Entities, including material software, servers and hardware, are sufficient to operate the Business as it is currently conducted. All licenses to material software used in the Business are valid and unexpired. The Selling Entities have taken commercially reasonable security measures in accordance with normal industry practice to protect the information technology systems against intrusion. The Selling Entities are in material compliance with any posted privacy policies and any Laws relating to personal data or other information.

Section 5.11    Taxes.

(a)      Subject, in each case, to such exceptions that would not reasonably be expected to result in a Material Adverse Effect, and except as set forth on Section 5.11(a) of the Seller Disclosure Schedule, all Tax Returns required to be filed by or with respect to any Selling Entity have been timely filed (taking into account any extension of time within which to file) and all such Tax Returns are true, correct, and complete in all material respects.

(b)      Except as set forth on Section 5.11(b) of the Seller Disclosure Schedule, subject to such exceptions that would not reasonably be expected to result in a Material Adverse Effect, all Taxes of the Selling Entities have been timely paid.

36

Section 5.12 <u>Insurance</u>. All material casualty and property insurance policies of the Selling Entities or covering the Acquired Assets, the Assumed Liabilities and the Current Employees (i) are, to the Knowledge of the Seller, in full force and effect and all premiums thereon have been paid, and, to the Knowledge of the Seller, the Selling Entities are otherwise in compliance in all material respects with the terms and provisions of such policies, (ii) such policies provide insurance in such amounts and against such risks as is sufficient to comply with applicable Law, and (iii) the Selling Entities are not in breach or default, and none of the Selling Entities has taken any action or failed to take any action which, with notice, the lapse of time or the happening of any other event or condition, would constitute such a breach or default, or permit termination or modification of, any of such insurance policies. To the Seller's Knowledge there are no pending notices of cancellation or nonrenewal of any insurance policy referred to in this <u>Section 5.12</u> nor has the termination of any such insurance policy been threatened, and, to the Knowledge of the Seller, there exists no event, occurrence, condition or act (including the purchase of the Acquired Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such insurance policies.

Section 5.13 <u>Title to Assets; Real Property</u>.

(a) The Selling Entities have good and valid title to, or, in the case of leased assets have good and valid leasehold interests in, all tangible personal property that is used in the Business (other than the Excluded Assets), free and clear, as of the Closing, of all Encumbrances (other than Permitted Encumbrances and except to the extent that such Encumbrances will not be enforceable against such tangible personal property following the Closing in accordance with the Sale Order).

(b) A Selling Entity has valid leasehold interests in the Real Property Leases (such leasehold interests, the "<u>Seller Properties</u>"), in each case sufficient to conduct the Business as currently conducted and free and clear, as of the Closing, of all Encumbrances (other than Permitted Encumbrances and except to the extent that such Encumbrances will not be enforceable against the Real Property Leases following the Closing in accordance with the Sale Order), assuming the timely discharge of all obligations owing under or related to the Seller Properties.

Section 5.14 <u>Permits</u>. Except as set forth in <u>Section 5.14</u> of the Seller Disclosure Schedule, to the Knowledge of Seller, the Selling Entities have obtained and possess all material Permits necessary for the lawful conduct of the Business as presently conducted and operated, or necessary for the lawful ownership of their properties and assets or the operation of the Business as presently conducted and operated. Each such Permit of the Selling Entities is valid and in full force and effect, except as would not reasonably be expected to have a Material Adverse Effect.

Section 5.15 <u>Inventory</u>. The consolidated inventory of the Seller set forth in the Seller Financial Statements was stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and presents fairly, in all material respects, the consolidated inventory of the Seller as of the respective dates thereof. The inventories of the Selling Entities constitute sufficient quantities for the normal operation of the Business as of the date hereof.

Section 5.16   Accounts and Notes Receivable and Payable.   All accounts and notes receivable of the Selling Entities including the Accounts Receivable, reflected in the Seller Financial Statements have arisen in the ordinary course of business.   The consolidated accounts receivable of the Seller set forth in the Seller Financial Statements were stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated and presents fairly, in all material respects, the consolidated accounts receivable of the Seller as of the respective dates thereof (subject, in the case of unaudited financial statements, to normal period end adjustments).   All accounts payable of the Selling Entities reflected in the Seller Financial Statements have arisen in the ordinary course of business.

Section 5.17   Banks.  Section 5.17 of the Seller Disclosure Schedule contains a complete and correct list of the names and locations of all banks in which any Selling Entity has accounts or safe deposit boxes and the names of all persons authorized to draw thereon or to have access thereto.  Except as set forth in Section 5.17 of the Seller Disclosure Schedule, no Person holds a power of attorney to act on behalf of any Selling Entity with respect to any such accounts or safe deposit boxes.

Section 5.18   Brokers.   No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by any Selling Entity in connection with the transactions contemplated by this Agreement.  Any fee owed by Seller or any of the Selling Entities to Oppenheimer & Co. (or any of its affiliates) in connection with this Agreement and its subject matter shall be paid by the Seller.

### ARTICLE VI
### REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer hereby represents and warrants to the Selling Entities as follows:

Section 6.1   Organization and Good Standing.   The Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Any Buyer Designee that executes and delivers any Transaction Document will be a corporation or other entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization as of the Closing Date.

Section 6.2   Authority Relative to this Agreement.

(a)   The Buyer has all necessary limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is party and to consummate the transactions contemplated hereby and thereby.   The execution and delivery of this Agreement and the other Transaction Documents to which the Buyer is party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the board of directors or equivalent governing body of the Buyer, and no other limited liability company proceedings on the part of the Buyer are necessary to authorize this Agreement or the other Transaction Documents to which it is party or to consummate the transactions contemplated hereby or thereby.   This Agreement has been duly and validly executed and delivered by the Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the other Transaction Documents to which the Buyer is a

party will have been duly and validly executed and delivered by the Buyer, and, assuming that this Agreement and such other Transaction Documents constitute valid and binding agreements of the Selling Entities party thereto, constitute valid and binding agreements of the Buyer, enforceable against the Buyer in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar Laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

(b)     Each Buyer Designee that executes and delivers a Transaction Document shall have, as of the Closing Date, all necessary corporate or other power and authority to execute and deliver the Transaction Documents to which it is party and to consummate the transactions contemplated thereby. The execution and delivery of each Transaction Documents to which any Buyer Designee is party and the consummation of the transactions contemplated thereby shall have been duly and validly authorized by the board of directors or equivalent governing body of each Buyer Designee that executes and delivers a Transaction Document prior to such execution and delivery, and no other corporate proceedings on the part of such Buyer Designee shall be necessary at the time of such execution and delivery to authorize the Transaction Documents to which it is party or to consummate the transactions contemplated thereby. The Transaction Documents to which a Buyer Designee is party shall have been duly and validly executed and delivered prior to the Closing by each Buyer Designee that executes and delivers a Transaction Document, and, assuming that the Transaction Documents constitute valid and binding agreements of the Selling Entities party thereto, shall constitute valid and binding agreements of such Buyer Designee, enforceable against such Buyer Designee in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar Laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

Section 6.3     No Violation; Consents.

(a)     Neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer and/or any applicable Buyer Designees of the Acquired Assets and the assumption by the Buyer and/or such Buyer Designees of the Assumed Liabilities pursuant to this Agreement will (with or without notice or lapse of time) conflict with or result in any breach of (i) any provision of the Buyer's limited liability company agreement or any such Buyer Designee's Certificate of Incorporation or Bylaws (or similar organizational documents) or (ii) subject to the matters referred to in Section 6.3(b), any Law applicable to Buyer or any such Buyer Designee or their respective properties or assets, except as would not prevent or materially delay the consummation of the transactions contemplated by this Agreement.

(b)     No Consent of any Governmental Authority or any third party is required to be obtained by or with respect to Buyer and/or any applicable Buyer Designee in connection with the execution and delivery of this Agreement, or the consummation by Buyer or such Buyer Designee of the transactions contemplated by this Agreement, except for (i) the entry of the Sale Order by the Bankruptcy Court, and (ii) such other Consents where the failure to obtain such Consents would not prevent or materially delay the consummation of the transactions contemplated by this Agreement.

Section 6.4     Legal Proceedings and Orders. To the Knowledge of Buyer, there is no Legal Proceeding, and no Person has threatened in writing to commence any Legal Proceeding that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement, except for the Bankruptcy Case. There is no Order to which the Buyer is subject that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement.

Section 6.5     Brokers. No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement.

Section 6.6     Limited Guaranty. The Buyer has delivered to the Seller a true, complete and correct signed copy of the Limited Guaranty, pursuant to which 1903 Equity Fund, L.P. has guaranteed the payment obligations of the Buyer, subject to the terms and limitations set forth therein. The Limited Guaranty, in the form delivered, is in full force and effect and is a legal, valid and binding obligation of 1903 Equity Fund, L.P.

Section 6.7     No Other Representations or Warranties. Except for the representations and warranties contained in this Article VI, neither Buyer nor any other Person makes any other express or implied representation or warrant on behalf of Buyer.

**ARTICLE VII**
**COVENANTS OF THE PARTIES**

Section 7.1     Conduct of Business of Selling Entities. Except (v) as set forth on Schedule 7.1, (w) as required by any Order of the Bankruptcy Court, (x) as required by applicable Law, (y) as contemplated or required by the terms of any Transaction Document, or (z) as otherwise consented to in writing by the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms:

(a)     each of the Selling Entities shall use its commercially reasonable efforts to: (i) operate the Business in the ordinary course of business, including ordering and purchasing Inventory, making capital and sales and marketing expenditures each in the ordinary course of business, (ii) preserve in all material respects the Acquired Assets (excluding sales of Inventory in the ordinary course of business), and (iii) preserve its current relationships with the suppliers, vendors, customers, clients, contractors and others having business dealings with the Business, but taking into account, in each case, the fact that the Bankruptcy Case has commenced, and the fact that the Business will be operated while in bankruptcy; and

(b)     without limiting the generality of Section 7.1(a), the Selling Entities shall not:

(i)     sell, lease (as lessor), transfer or otherwise dispose of (or permit to become subject to any additional Encumbrance, other than Permitted Encumbrances, Encumbrances arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code), Encumbrances arising in connection with

40

any debtor-in-possession financing of the Selling Entities and Encumbrances that will not be enforceable against any Acquired Asset following the Closing in accordance with the Sale Order) any material Acquired Assets, other than (A) the sale of Inventory in the ordinary course of business, (B) the collection of receivables, (C) the use of prepaid assets and Documentary Materials in the conduct of the Business in the ordinary course of business, and (D) in connection with store closings made pursuant to the Sales Agency Agreement or store closings listed on Schedule 7.1;

        (ii)     conduct any store closings or "going out of business," liquidation or similar sales, other than those listed on Schedule 7.1, made pursuant to the Sales Agency Agreement or made with respect to stores with Real Property Leases which by their terms or pursuant to a court order terminate prior to the Closing;

        (iii)    increase the compensation payable or benefits provided to any director of any Selling Entity or any of their Affiliates or to any Current Employee, or adopt, modify or amend any Seller Benefit Plan (which for purposes of this section shall include any non-competition or similar agreement), other than (A) as required by the terms of any Contract or Seller Benefit Plan in effect on the date of this Agreement, (B) as provided in any incentive or retention program or similar arrangement approved by the Bankruptcy Court with the written consent of the Buyer, (C) increases for nonexecutive management Current Employees in the ordinary course of business that are not material in the aggregate, or (D) any termination of, or reduction in benefits payable under, a Seller Benefit Plan prior to the Closing;

        (iv)    solely with respect to any action which could have an adverse effect on the Buyer or any of its Affiliates following the Closing, make or rescind any material election relating to Taxes, settle or compromise any material claim, action, suit, litigation, Legal Proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of Tax accounting, methods of reporting income or deductions for Tax or Tax accounting practice or policy from those employed in the preparation of its most recent Tax Returns;

        (v)     acquire, dispose of, or allow to lapse, any material assets or properties or make any other material investment in any such event outside the ordinary course of business, except as may otherwise be required by the terms of any Contract in effect as of the date of this Agreement as set forth on Schedule 7.1;

        (vi)    enter into or agree to enter into any merger or consolidation with any corporation or other entity;

        (vii)   except in the ordinary course of business, cancel or compromise any material debt or claim or waive or release any material right, in each case, that is a debt, claim or right that is an Acquired Asset or Assumed Liability;

        (viii)  introduce any material change with respect to the operation of the Business, including any material change in the types, nature, composition or quality of

41

products or services sold in the Business, other than, in each case, in the ordinary course of business;

(ix)    enter into any material new Contract (other than the DIP Facility) or modify, terminate, amend, restate, supplement, renew or waive any rights under or with respect to any existing material Contract or the DIP Facility;

(x)    enter into any Contract, understanding or commitment that restrains, restricts, limits or impedes the ability of any Selling Entity to compete with or conduct any business or line of business in any geographic area, other than (A) real property leases containing customary geographic or location restrictions or (B) licenses of Seller IP, in each case that are entered into in the ordinary course of business;

(xi)    terminate, amend, restate, supplement, renew or waive any rights under or with respect to, any Real Property Lease, or, other than in the ordinary course of business, any material Contract or Permit, or increase any payments required to be paid thereunder (whether or not in connection with obtaining any Consents) by the Buyer or any Buyer Designee after the Closing, or increase, or take any affirmative action not required by the terms thereof that would result in any increase in, any operating expenses of any Real Property Leases without the Buyer's written consent, not to be unreasonably withheld, conditioned or delayed, *provided,* that such consent of the Buyer may be conditioned on a reasonable valuation adjustment based on the increased costs in an amount to be determined in good faith;

(xii)    deviate from past practice in the ordinary course of business with respect to ordering or maintenance of Inventory;

(xiii)    file any motion to pay any pre-Petition Date Claims of any Person without the express written consent of the Buyer, unless such payments are consistent with the terms and conditions of the DIP Facility and with the DIP Facility Budget; or

(xiv)    prepay any expenses unless expressly set forth in the DIP Facility Budget or request or accept an increase, directly or indirectly, in the advance rate in the DIP Facility as originally approved, unless with the Buyer's consent the date of the Auction is delayed beyond the date provided herein.

Section 7.2    Access to and Delivery of Information and Assets; Maintenance of Records.

(a)    Between the date of this Agreement and the Closing Date, to the extent permitted by Law, the Selling Entities shall, during ordinary business hours and upon reasonable prior notice (i) give the Buyer and the Buyer's Representatives reasonable access to the Selling Entities accountants, counsel, financial advisors and other authorized outside Representatives, officers and senior management in their respective principal places of business, all books, records and other documents and data in the locations in which they are normally maintained, and all offices and other facilities of the Selling Entities; *provided* that, in connection with such access, the Buyer and the Buyer's Representatives shall minimize disruption to the Business, the Bankruptcy Case, and the Auction; *provided further* that in connection with the Buyer's and/or

the Buyer's Representatives' access of such offices and other facilities, the Buyer and/or the Buyer's Representatives shall be accompanied at all times by a representative of the Selling Entities unless the Seller otherwise agrees, shall not materially interfere with the use and operation of such offices and other facilities, and shall comply with all reasonable safety and security rules and regulations for such offices and other facilities, (ii) permit the Buyer and the Buyer's Representatives to make such reasonable inspections and copies of all books, records and other documents of the Selling Entities as the Buyer may reasonably request, and (iii) furnish the Buyer with such reasonably available financial and operating data and other information as the Buyer and the Buyer's Representatives may from time to time reasonably request. Notwithstanding anything to the contrary set forth in this Section 7.2(a), no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client or other privilege.

(b)     Between the Closing Date and complete dissolution and liquidation of the Selling Entities, the Selling Entities and the Seller's Representatives shall have reasonable access to all of the books and records of the Selling Entities delivered to the Buyer or any Buyer Designee at Closing, including all Documentary Materials and all other information pertaining to the Assumed Contracts and Assumed Real Property Leases to the extent that (i) such books, records and information relate to any period prior to the Closing Date and (ii) such access is reasonably required by the Selling Entities in connection with the Bankruptcy Case, the Excluded Liabilities, the Excluded Assets or similar matters relating to or affected by the operation of the Business for periods prior to the Closing.  Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours, and the Buyer shall permit the Selling Entities and the Seller's Representatives to make such reasonable copies of such books, records and information as they may reasonably request at the Buyer's sole and expense.

(c)     Between the Closing Date and complete dissolution and liquidation of the Selling Entities, the Selling Entities and their Representative shall have reasonable access, and the assistance of, the employees of the Buyer and Buyer Designees, and to the assets, software and systems of the Buyer and the Buyer Designees, in connection with the winding down of any remaining business and assets of the Selling Entities, the dissolution and liquidation of the Selling Entities, and the performance of the obligations of the Selling Entities hereunder and under the other Transaction Documents, and Buyer and the Buyer Designees shall cooperate, to the extent reasonably requested, therewith; *provided* that such access or assistance does not interfere in any material respect with the operation of the Business following the Closing; and *provided, further* that should the Selling Entities request assistance above and beyond that contemplated by this Section (e.g., as to the incurrence by Buyer or a Buyer Designee of out-of-pocket expenses), Buyer or such Buyer Designee will cooperate reasonably with the Selling Entities subject to the Selling Entities' reimbursement of such actual out-of-pocket expenses.

(d)     From and after the Closing Date, the Selling Entities shall provide or cause to be provided to the Buyer and Buyer Designees full, complete and unfettered access to the Acquired Assets.

(e)     All information obtained by the Buyer or the Buyer's Representatives pursuant to this Section 7.2 shall be subject to the terms of the Confidentiality Agreement.

43

Section 7.3    Expenses.

(a)    All costs and expenses payable in connection with obtaining any Necessary Consents shall be paid by the Buyer.

(b)    Except to the extent otherwise specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such costs and expenses.

(c)    Notwithstanding the foregoing, the Buyer and the Seller acknowledge that in accordance with the letter, dated September 8, 2010 (the "LOI"), executed by the Buyer and the Seller, that the Seller paid the Buyer $150,000 in consideration for the significant amount of time and resources expended in connection with the preparation and negotiation of the LOI and this Agreement.

Section 7.4    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with its terms, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement, including executing and delivering such documents and other papers as are reasonably required to carry out the provisions of this Agreement and consummate the transaction contemplated hereby; *provided* that no Representative of any of the Selling Entities shall be required to execute any such document or other papers effective prior to the Closing.

(b)    On and after the Closing until the dissolution and liquidation of the Selling Entities, the Selling Entities and the Buyer shall use their commercially reasonable efforts to take, or cause to be taken by the Parties, all appropriate action, to do or cause to be done by the Parties all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in the Buyer all of the Selling Entities' right, title and interest to the Acquired Assets, free and clear of all Encumbrances (other than Encumbrances expressly identified by the Sale Order).

(c)    Nothing in this Section 7.4 shall, except as otherwise set forth in this Agreement, (i) require the Selling Entities to make any expenditure or incur any obligation on behalf of the Buyer or, following the Closing, on their own behalf, (ii) prohibit any Selling Entity from ceasing operations or winding up its affairs following the Closing, or (iii) prohibit the Selling Entities from taking such actions as are necessary to conduct the Auction, as are required by the Bankruptcy Court or as would otherwise be permitted under Section 7.1.

(d)    From and after the Closing Date until (x) the Designation Deadline or (y) if the Buyer has assumed the Real Property Leases on more than twenty (20) stores as of the Designation Deadline, which are to be operated by the Buyer following such assumption, then

44

the date which is forty-five (45) days after the Designation Deadline, the Selling Entities agree to reasonably cooperate, and shall not interfere, with the Buyer and the Buyer Designees with respect to their operation of the Continuing Stores, Designated Stores or Non-Continuing Stores. From and after the Closing Date, none of the Selling Entities shall voluntarily convert its Chapter 11 Bankruptcy Case to a Chapter 7 Bankruptcy Case, or otherwise cause a liquidation or equivalent event, with respect to any of the Selling Entities without providing the Buyer with at least five (5) Business Days prior written notice.

Section 7.5    Public Statements.  Unless otherwise required by or reasonably necessary to comply with applicable Law or the rules or regulations of any applicable securities exchange, and except for disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and any filings or notices related thereto, the Buyer, on the one hand, and the Selling Entities, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other Parties and shall not issue any such release or make any such statement without the prior written consent of the Seller or the Buyer, respectively (such consent not to be unreasonably withheld, conditioned or delayed). Prior to the Closing, the Buyer shall not, and shall cause its Affiliates and the Buyer Representatives not to, contact, or engage in any discussions or otherwise communicate with, any suppliers or significant number of customers of the Selling Entities or other Persons with which the Selling Entities have material commercial dealings without obtaining the prior written consent of Seller.

Section 7.6    Governmental Authority Approvals and Cooperation.

(a)    As promptly as reasonably practicable after the date of this Agreement, each of the Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) use its commercially reasonable efforts to make any filings and notifications, and to obtain any Consents from Governmental Authorities (other than the Bankruptcy Court), required to be made and obtained under applicable Law in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable.

(b)    Each Party (i) shall cooperate with each other Party in connection with the filings and Consents contemplated by this Section 7.6, (ii) shall promptly inform each other Party of any material communication received by such Party from any Governmental Authority (other than the Bankruptcy Court) concerning this Agreement, the transactions contemplated hereby and any filing, notification or request for Consent related thereto, and (iii) shall permit each other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority (other than the Bankruptcy Court) in response thereto. In addition, none of the Selling Entities or the Buyer shall (and shall ensure that their respective Affiliates do not) agree to participate in any meeting with any Governmental Authority (other than the Bankruptcy Court) in respect of any filings, investigation or other inquiry with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for Consent related thereto unless it consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority and applicable Law, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. The Selling Entities and the Buyer shall, and shall cause their respective Affiliates to, furnish the

45

Buyer or the Selling Entities (and the Buyer's Representatives and the Seller's Representatives, as applicable), as the case may be, copies of all material correspondence, filings and communications between it and its Affiliates (and the Buyer's Representatives and the Seller's Representatives, as applicable) on the one hand, and the Governmental Authority (other than the Bankruptcy Court) or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for Consent related thereto (in each case, excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine). Each of the Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) furnish each other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with its preparation of necessary filings, registrations or submissions of information to any Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for Consent related thereto.

Section 7.7    Employee Matters.

(a)    Prior to the Closing, the Buyer shall offer, or cause a Buyer Designee to offer, to employ those Current Employees required, in the Buyer's discretion, to operate the Continuing Stores, with employment commencing as of the Closing.  For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an "Offeree."  At least five (5) Business Days prior to the Closing Date, the Buyer will provide the Seller with a schedule setting forth a list of the names of all Offerees.  Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee."  Except to the extent the Selling Entities fail to comply in any material respects with Section 7.7(c)(i) and Section 7.7(c)(iii), the Buyer hereby agrees that the offer to an Offeree shall include a level of base salary and wages that are substantially comparable in the aggregate to the base salary and wages provided to such Offeree by the Selling Entities as of the Closing Date.

(b)    Each Current Employee of the Selling Entities or any of their Affiliates who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the date of this Agreement,

(i)    the Selling Entities shall allow the Buyer or any applicable Buyer Designee reasonable access upon reasonable advance notice to meet with and interview the Current Employees who are members of executive management and other employees reasonably requested during normal business hours; *provided, however,* that such access shall not unduly interfere with the operation of the Business prior to the Closing;

(ii)    the Selling Entities shall not, nor shall any Selling Entity authorize or direct or give express permission to any Affiliate, officer, director or employee of any Selling Entity or any Affiliate. to (A) interfere with Buyer's or any Buyer Designee's rights under Section 7.7(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment; and

46

(iii)    the Selling Entities shall provide reasonable cooperation and information to Buyer or the relevant Buyer Designee as reasonably requested by Buyer or such Buyer Designee with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(d)    <u>Employee/Employment Related Liabilities</u>.  Notwithstanding anything in this Agreement to the contrary,

(i)    the Selling Entities shall process the payroll for and pay, or cause to be paid, the base wages and base salary that accrued on or prior to the Closing Date with respect to all employees of the Selling Entities;

(ii)    from the Closing Date until (x) the date upon which a Designated Store or a Non-Continuing Store becomes a Continuing Store or (y) the Rejection Effective Date associated with such store has occurred, *provided* that the Buyer has exited the store premises and turned possession of the store premises over to the landlord, the condition of such store premises to be turned over in accordance with the Real Property Lease associated with such store premises,

(A)    if the Buyer has not assumed the Real Property Leases on more than twenty (20) stores as of the Closing Date, which are to be operated by the Buyer following such assumption, the Selling Entities shall process the payroll for, and the Buyer shall be liable for and shall pay, or cause to be paid, the base wages and base salary that accrue after the Closing Date with respect to all employees of the Selling Entities that are required, in the Buyer's or Sales Agent's sole discretion, to remain employed by the Selling Entities to operate such Designated Store or Non-Continuing Store (the "<u>Selected Employees</u>") and the Selling Entities shall be liable for and shall pay, or cause to be paid, all other employee/employment related Liabilities (including Liabilities related to the Seller Benefit Plans) with respect to all Selected Employees; and

(B)    if the Buyer has assumed the Real Property Leases on more than twenty (20) stores as of the Closing Date, which are to be operated by the Buyer following such assumption, the Selling Entities shall process the payroll for and the Buyer shall be liable for and shall pay, or cause to be paid, all employee/employment related Liabilities that accrue after the Closing Date in connection with the employment of the Selected Employees; and

(iii)    the Buyer shall process the payroll for and shall pay, or cause to be paid, the base wages and base salary that accrue after the Closing Date with respect to all Transferred Employees.  The Buyer shall withhold and remit all applicable payroll taxes as required by Law from and after the Closing Date with respect to Transferred Employees.

47

(iv)     For the Pre-Closing Non-Continuing Stores, the Selling Entities shall process the payroll for and the Buyer shall be liable for and shall pay, or cause to be paid, the base wages and base salary that accrue after the Closing Date with respect to the Selected Employees at such Pre-Closing Non-Continuing Stores and the Selling Entities shall be liable for and shall pay, or cause to be paid, all other employee/employment related Liabilities (including Liabilities related to the Seller Benefit Plans) with respect to all Selected Employees at such Pre-Closing Non-Continuing Stores.

(v)     For the avoidance of doubt, if the Buyer prior to the Closing Date has designated a Real Property Lease for a store for rejection by providing written notice to the Seller in accordance with Section 2.5(b), the Buyer shall not be liable for any employee/employment related Liabilities with respect to the employees of such store. Likewise, the Buyer shall not be liable for any employee/employment Liabilities related to the employment of Selected Employees in Designated Store or Non-Continuing Store, with the exception of Buyer's payment obligations to Seller as expressly set out in this Section 7.7.

Notwithstanding anything in this Agreement to the contrary, in no event shall the Buyer assume or be liable for any employee/employment related Liabilities relating to severance benefits in excess of $1,463,000 or any employee/employment related Liabilities for unused and outstanding vacation, sick days, personal days or leave earned and/or accrued in excess of $129,000.

(e)     As of the Closing, the Buyer shall credit each Transferred Employee with the unused and outstanding vacation, sick days, personal days or leave earned and/or accrued by each Transferred Employee from the Selling Entities through Closing pursuant to the Seller Benefit Plans disclosed on Section 7.7(e) of the Disclosure Schedule that are paid time off plans and policies; *provided*, that no later than three Business Days prior to the Auction, the Selling Entities shall provide to the Buyer a schedule setting forth all relevant accruals for each employee.

(f)     Nothing contained herein shall be construed as requiring, and neither the Selling Entities nor any of their Affiliates shall take any affirmative action that would have the effect of requiring the Buyer or any applicable Buyer Designee to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of the Buyer, any of its Affiliates or any Seller Benefit Plan, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(g)     From and after the Closing Date until the Designation Deadline, the Selling Entities shall not voluntarily terminate any Selected Employee of the Selling Entities without the prior written consent of the Buyer.

48

Section 7.8    Tax Matters.

(a)    Any sales, use, value added, property transfer, documentary, stamp, registration, recording or similar Tax payable in connection with the sale or transfer of the Acquired Assets and the assumption of the Assumed Liabilities ("Transfer Taxes") shall be borne by each Party as required applicable Law; provided, however, that the Buyer shall be responsible for paying up to a maximum amount of $450,000 of the Transfer Taxes required by applicable Law to be paid by the Selling Entities. The Selling Entities and Buyer shall use their commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes to the extent permitted under applicable Tax Law.

(b)    All real property, personal property and other ad valorem Taxes with respect to the Acquired Assets that are accrued during, or attributable to, the period prior to the Closing and become due after the Closing Date shall be paid by the Seller. All real property, personal property, other ad valorem Taxes, and sales and use Taxes with respect to the Acquired Assets that are accrued and due after the Closing Date, and any sales and use Taxes that are accrued and due after the Closing Date and are related to any of the Continuing Stores or the Non-Continuing Stores, shall be paid by the Buyer.

(c)    All real property, personal property, other ad valorem Taxes, and sales and use Taxes levied with respect to the Acquired Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Selling Entities and the Buyer as of 12:01 a.m. (Eastern Time) on the day following the Closing Date. If the exact amount of any real property, personal property, other ad valorem Taxes, and sales and use Taxes is not known on the Closing Date, the apportionment shall be based upon a reasonable amount, without subsequent adjustment.

(d)    The Buyer agrees to furnish or cause to be furnished to the Seller and Seller's Representatives, upon request and at Seller's sole cost and expense, as promptly as practicable, such information and assistance as is reasonably necessary for the filing of Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or Legal Proceeding relating to any Tax; and provided that any payment or reimbursement to Buyer in connection with its furnishing of any such information or assistance shall be at a rate equal to the actual out-of-pocket expense incurred by Buyer or the applicable Buyer Designee in connection therewith. Such information and assistance shall include providing reasonable access to all of the books and records of the Selling Entities delivered to the Buyer or any Buyer Designee at Closing, and shall include providing reasonable access to, and the assistance of, the employees of the Buyer and the Buyer Designee and to the assets, software and systems of the Buyer and the Buyer Designees; provided that such access or assistance does not interfere in any material respect with the operation of the Acquired Assets following the Closing. From and after the Closing and until the dissolution and liquidation of the Selling Entities, the Selling Entities agree to furnish or cause to be furnished to the Buyer and Buyer's Representatives, upon request and at Buyer's sole cost and expense, as promptly as practicable, such information and assistance as is reasonably necessary for the filing of Tax Returns, the making of any election relating to Taxes, the preparation for

49

any audit by any taxing authority and the prosecution or defense of any claim, suit or Legal Proceeding relating to any Tax. Access to books and records shall be afforded upon receipt of reasonable advance notice and during normal business hours. Nothing in this Section 7.8(d) shall (i) require the Selling Entities to make any expenditure or incur any obligation on behalf of themselves or the Buyer, or (ii) prohibit any Selling Entity from ceasing operations or winding up its affairs following the Closing.

Section 7.9    Submission for Bankruptcy Court Approval.

(a)    In order to implement the transactions contemplated in this Agreement, the Selling Entities shall make all filings necessary to diligently pursue the entry by the Bankruptcy Court of the Sale Order as soon as the Bankruptcy Court's schedule permits.

(b)    The Selling Entities shall give notice under the Bankruptcy Code of the request for the relief specified in the Motions to all Persons entitled to notice pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and orders of the Bankruptcy Court, including all Persons that have asserted Encumbrances in the Acquired Assets, and all non-debtor parties to the Assumed Contracts and the Assumed Real Property Leases, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Legal Proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby. The Selling Entities shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review.

(c)    Following entry of the Bidding Procedures Order the Debtors will serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to Contracts and Real Property Leases. The Cure Notice will inform each recipient that its respective Contract and/or Real Property Lease may be designated by the Buyer as either assumed or rejected, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of Contract or Real Property Lease, (ii) the name of the counterparty to the Contract or Real Property Lease, (iii) the Seller's good faith estimates of the cure amounts required in connection with such Contract or Real Property Lease, (iv) the identity of the Buyer and (v) the deadline by which any such Contract or Real Property Lease counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto.

(d)    Each Selling Entity and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order and the Sale Order. Each Selling Entity shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Selling Entity has in its possession (or receives) pertaining to the motion for approval of the Bidding Procedures Order, the Sale Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to the Buyer and its counsel.

50

(e)     If the Bidding Procedures Order, the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order, or other such order), subject to rights, otherwise arising from this Agreement, the Selling Entities and the Buyer shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

Section 7.10   Overbid Procedures; Adequate Assurance.

(a)     The Selling Entities and Buyer acknowledge that this Agreement and the sale of the Acquired Assets are and have been subject to higher and better bids and Bankruptcy Court approval. The Buyer and the Selling Entities acknowledge that the Selling Entities took reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Selling Entities and other interested parties, providing information about the Selling Entities' business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, conducting an auction (the "Auction").

(b)     [Reserved.]

(c)     Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer or any applicable Buyer Designee of each Assumed Contract and each Assumed Real Property Lease. Buyer agrees that it will, and will cause its Affiliates to, promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Real Property Leases, such as furnishing affidavits, nonconfidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Representatives available to testify before the Bankruptcy Court. Subject to the other terms and conditions of this Agreement, Buyer shall, or shall cause any applicable Buyer Designee to, from and after the Closing Date, (i) assume all Liabilities of the Selling Entities under the Assumed Contracts and Assumed Real Property Leases and (ii) satisfy and perform all of the Liabilities related to each of the Assumed Contracts and each Assumed Real Property Lease when the same are due thereunder.

(d)     The Selling Entities and the Buyer agree, and the motion to approve the Bidding Procedures Order reflects the fact, that the provisions of this Agreement, including this Section 7.10 and Section 7.11, are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best price for the Acquired Assets.

Section 7.11   Termination Fee.

(a)     If this Agreement is terminated pursuant to Section 9.1 other than pursuant to Section 9.1(c) and the Seller consummates either (i) an Alternative Transaction, or (ii) a Restructuring Transaction or any other sale of all or substantially all of the assets of the Selling

51

Entities or of the Acquired Assets to a Person (or group of Persons) other than the Buyer or an Affiliate of the Buyer on or prior to the date that is six (6) months after the date of such termination, the Seller shall pay to the Buyer the Termination Fee on the day such Alternative Transaction, Restructuring Transaction or other sale is consummated; *provided, however,* that no such the Termination Fee shall be payable to the Buyer by reason of any Selling Entity consummating a plan of reorganization under which the Selling Entities' secured lenders as of the date of this Agreement receive substantially all of the equity interests issued by the reorganized Selling Entity or a credit bid by any of the Selling Entities' secured lenders.

(b)     The Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer.

(c)     Each of the Parties hereto acknowledges that the agreements contained in Section 7.3 and this Section 7.11 are an integral part of the transactions contemplated by this Agreement and that the Termination Fee is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Buyer in the circumstances in which such Termination Fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

Section 7.12   Transfer of Acquired Assets; Substitution of Letters of Credit.

(a)     The Buyer will make all necessary arrangements for the Buyer or a Buyer Designee to take possession of the Acquired Assets, and, at the Buyer's expense, to transfer same to a location operated by the Buyer or a Buyer Designee, to the extent necessary, as promptly as practicable following the Closing.

(b)     On the Closing Date, Buyer shall, at its sole cost and expense, (i) replace any letters of credit, banker's acceptance or similar credit transaction that secure any Assumed Liabilities of any Selling Entity relating to the Business and (ii) cause such letters of credit, banker's acceptance or similar credit transaction to be released and returned to the Seller.

Section 7.13   Post-Closing Operation of the Seller; Name Changes.  The Seller hereby acknowledges and agrees that upon the consummation of the transactions contemplated hereby, the Buyer and/or each Buyer Designee shall have the sole right to the use of the names "Urban Brands," "Ashley Stewart" or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems or signs containing or comprising the foregoing, including any name or mark confusingly similar thereto.  After the Closing Date, none of the Selling Entities nor any of their respective Affiliates shall use the name or mark "Urban Brands," "Ashley Stewart" or any derivatives thereof for commercial purposes and shall only use the same for administrative purposes while subject to the jurisdiction of the Bankruptcy Court.  The Sale Order shall provide for the modification of the caption in the proceedings before the Bankruptcy Court to reflect the change in the name of Seller, except that during the pendency of such proceedings, Seller shall be permitted to use the name "Urban Brands, Inc." as its corporate name in connection with matters relating to the Bankruptcy Case and as a former name for legal and noticing purposes, but for no other commercial purpose.  Within five (5) Business Days after the

Closing, the Selling Entities and their Affiliates shall file with the applicable Governmental Authorities all documents reasonably necessary to delete from their names the words "Urban Brands," "Ashley Stewart" or any derivatives thereof and shall do or cause to be done all other acts, including the payment of any fees required in connection therewith, to cause such documents to become effective as promptly as reasonably practicable.

Section 7.14   Damage or Destruction.   Until the Closing, the Acquired Assets shall remain at the risk of the Selling Entities. In the event of any material damage to or destruction of any of the Acquired Assets listed on Schedule 7.16 after the date hereof and prior to the Closing (in any such case, a "Damage or Destruction Loss"), the Seller shall give notice thereof to the Buyer. If any such Damage or Destruction Loss is covered by policies of insurance and is not repaired or replaced by a similar facility in reasonable proximity to any former facility, all right and claim of the Selling Entities to any proceeds of insurance for such Damage or Destruction Loss shall be assigned and (if previously received by the Selling Entities and not used prior to the Closing Date to repair any damage or destruction) paid to the Buyer and/or a Buyer Designee at Closing in accordance with Section 2.1(r). Any receipt of insurance proceeds that relate to the Inventory by the Buyer in accordance with this Section shall increase the Closing Date Cost Value of the Inventory by the amount of such insurance proceeds.

Section 7.15   Permits.   Commencing on the date of this Agreement, the Parties, cooperating in good faith and, at Buyer's sole cost and expense for out-of-pocket expenses, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with Governmental Authorities, as may be necessary (i) to effect the transfer of Permits that are Acquired Assets to the Buyer on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) to enable the Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Business from and after the Closing Date.

Section 7.16   Suppliers; Certain Avoidance Actions; Policies Regarding Personally Identifiable Information; Insurance Policies; Employment Arrangements.

(a)   The Selling Entities shall, following the request thereof by the Buyer, seek and use their respective commercially reasonable efforts to arrange meetings and telephone conferences with material suppliers of the Selling Entities as may be reasonably requested by the Buyer and necessary and appropriate for the Buyer to coordinate transition of such suppliers with the Acquired Assets following the Closing; *provided* that Representatives of Seller shall be entitled to attend and participate in any such meeting or telephone conference.

(b)   The Selling Entities shall not pursue any litigation claims and causes of action (including causes of action under Chapter 5 of the Bankruptcy Code) (i) against landlords, vendors or other counterparties who are party to (or Affiliates of a party to) any Assumed Contract, Assumed Real Property Lease, or any purchase order with a supplier open as of the Closing Date for delivery of goods under such purchase order post-Closing, or (ii) against Transferred Employees, or any officer or employee retained by Buyer or its Subsidiaries after Closing, or (iii) otherwise arising under or related to the Acquired Assets (including, for the

53

avoidance of doubt, all Assumed Contracts and the Assumed Real Property Leases), including in each of cases (i), (ii) and (iii) such causes of action arising under, or available pursuant to, the Bankruptcy Code other than the Retained Avoidance Actions.

(c)     The Buyer shall honor and observe any and all policies of the Selling Entities in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals consistent with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

(d)     (i) To the extent that any current or prior insurance policy of any of the Selling Entities relate to the Acquired Assets or Assumed Liabilities (excluding the Excluded Insurance Policies) and such insurance policy is not transferable to the Buyer or a Buyer Designee at the Closing in accordance with the terms hereof, the Selling Entities shall hold such insurance policy for the benefit of Buyer or such Buyer Designee, shall reasonably cooperate with Buyer (at the Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Acquired Assets or the Assumed Liabilities.  In the event Buyer determines to purchase replacement coverage with respect to any such insurance policy, the Selling Entities shall reasonably cooperate with Buyer to terminate such insurance policy and shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Selling Entities in connection therewith or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

(ii) To the extent that any current or prior insurance policy of any of the Selling Entities relate to the Acquired Assets or Assumed Liabilities (excluding the Excluded Insurance Policies) and the Excluded Assets or the Excluded Liabilities, the Buyer shall hold such insurance policy with respect to the Excluded Assets or Excluded Liabilities, as applicable, for the benefit of the Selling Entities, shall reasonably cooperate with the Seller in pursuing any claims thereunder, and shall pay over to the Seller promptly any insurance proceeds paid or recovered thereunder with respect to the Excluded Assets or the Excluded Liabilities.

(e)     From and after the date of this Agreement, the Buyer shall use its commercially reasonable efforts to enter into, or cause a Buyer Designee to enter into, employment agreements on terms reasonably satisfactory to the Buyer with each Current Employee identified on Schedule 7.16(e).

Section 7.17  Notification of Certain Matters.  Except with respect to the actions required by this Agreement, the Seller shall give prompt notice to the Buyer, on the one hand, and the Buyer shall give prompt notice to the Seller, on the other hand, of (i) the occurrence or nonoccurrence of any event, the occurrence or nonoccurrence of which would cause any of its respective representations or warranties in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date or (ii) any material failure of any of the Selling Entities or the Buyer, respectively, to comply with or satisfy any of its covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; *provided, however,* (x) the delivery of any notice pursuant to this Section 7.17 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement, (y) any failure to comply with this Section 7.17 shall not be taken into account in determining

54

whether the conditions to closing set forth in Article VIII have been or would be satisfied, and (z) no Party shall have any Liability hereunder for failure to deliver any notice required to be delivered pursuant to this Section 7.17.

Section 7.18  Intellectual Property Non-Assertion.  Each Selling Entity agrees that it shall not assert against the Buyer or any of its Affiliates or any of their employees, contractors or successors or assigns any litigation claims or causes of action with respect to Intellectual Property owned or controlled by such Selling Entity or any of its Affiliates as of the Closing Date in connection with the operation of the Business.

Section 7.19  Acquired Assets "AS IS"; Certain Acknowledgements.

(a)  The Buyer agrees, warrants and represents that (a) the Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on the Buyer's own investigation of the Acquired Assets and (b) neither the Selling Entities nor any Seller's Representative has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets, any part of the Acquired Assets, the financial performance of the Acquired Assets or the Business, or the physical condition of the Acquired Assets.  The Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by the Selling Entities and the Buyer after good-faith arm's-length negotiation in light of the Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS." The Buyer agrees, warrants and represents that the Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that the Buyer assumes all risks with respect thereto.  THE SELLING ENTITIES MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE PURCHASED ASSETS.

(b)  The Buyer acknowledges and agrees that it (a) has had an opportunity to discuss the Business with the management of Seller and has been afforded the opportunity to ask questions of and receive answers from management of Seller, and (b) has had reasonable access to the books and records of the Selling Entities, (c) has conducted its own independent investigation of the Selling Entities, the Business, the Acquired Assets, the Assumed Liabilities and the transactions contemplated hereby.  In connection with the investigation by the Buyer, the Buyer has received or may receive from the Selling Entities certain projections, forward-looking statements and other forecasts and certain business plan information.  The Buyer acknowledges and agrees neither the Selling Entities nor any other Person will have or be subject to any Liability or indemnification obligation to the Buyer or any other Person resulting from the distribution to, or use by, the Buyer or any of its Affiliates or any Buyer's Representative of any information provided to the Buyer or any of its Affiliates or any Buyer's Representative by the Selling Entities or any Representative of the Seller, including any information, documents, projections, forward-looking statements, forecasts or business plans or any other material made available in any "data room," any confidential information memoranda or any management presentations in expectation of or in connection with the transactions contemplated by this Agreement.

RLF1 3607469v. 5
8491118v7

(c)     Except for the representations and warranties contained in <u>Article V</u> of this Agreement, Buyer acknowledges that none of the Selling Entities nor any other Person on behalf of any Selling Entity makes any express or implied representation or warranty with respect to the Selling Entities, the Acquired Assets or the Business, or with respect to any information provided to the Buyer or any of its Affiliates or any Representative of the Buyer, and the Selling Entities hereby disclaim any other representations or warranties made by the Selling Entities or any other Person with respect to the execution and delivery of this Agreement, the Acquired Assets, the Business or the transactions contemplated hereby. The Buyer has not relied on any representation, warranty or other statement by any Person on behalf of the Selling Entities, other than the representations and warranties of the Selling Entities expressly contained in <u>Article V</u>. Buyer acknowledges and agrees that the representations and warranties set forth in <u>Article V</u> are made solely by the Selling Entities, and no Affiliate of the Selling Entities, Seller's Representative or other Person shall have any responsibility or Liability related thereto.

Section 7.20     <u>Collection of Accounts Receivable</u>.

(a)     As of the Closing Date, each Selling Entity hereby (i) authorizes the Buyer or any Buyer Designee to open any and all mail addressed to any Selling Entity relating to the Business or the Acquired Assets and delivered to the offices of the Business or otherwise to Buyer or any Buyer Designee if received on or after the Closing Date and (ii) appoints the Buyer, any Buyer Designee or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by the Buyer of any Buyer Designee after the Closing Date with respect to Accounts Receivable that are Acquired Assets or accounts receivable relating to work performed by the Buyer after the Closing, as the case may be, made payable or endorsed to any Selling Entity or Selling Entity's order, for the Buyer's or any Buyer Designee's own account.

(b)     As of the Closing Date, each Selling Entity agrees that any monies, checks or negotiable instruments received by any Selling Entity after the Closing Date with respect to Accounts Receivable (including, without limitation, Credit Card Receivables) that are Acquired Assets or accounts receivable relating to work performed by the Buyer after the Closing, as the case may be, shall be held in trust by such Selling Entity for the Buyer's or any Buyer Designee's benefits and accounts, and promptly upon receipt by a Selling Entity of any such payment (but in any event within five (5) Business Days of such receipt), such Selling Entity shall pay over to the Buyer or its designee the amount of such payments. In addition, the Buyer agrees that, after the Closing, it will hold and will promptly transfer and deliver to the Seller, from time to time as and when received by the Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that the Buyer or its Affiliates may receive on or after the Closing which properly belongs to the Selling Entities hereunder, including any Excluded Assets.

(c)     As of the Closing Date, the Buyer or any Buyer Designee shall have the sole authority to bill and collect Accounts Receivable that are Acquired Assets and accounts receivable relating to work performed by the Buyer after the Closing.

(d)     Notwithstanding anything to the contrary contained hereto, any Buyer Designees who acquire any Accounts Receivable that are Acquired Assets hereunder shall be express third-party beneficiaries of this <u>Section 7.19</u>.

Section 7.21    Certain Post-Closing Obligations of the Buyer.    No later than 180 days after the Closing Date, (i) Buyer shall satisfy or otherwise cause to be released $1,000,000.00 of Liabilities reflected on Seller's books and records at Closing selected by Buyer for allowed, unsecured non-priority claims against the estate of the Selling Entities; provided, that if Buyer does not satisfy or otherwise cause to be released all $1,000,000.00 of such Liabilities within 180 days after the Closing Date, Buyer shall pay to the Selling Entities in cash an amount equal to 20.44% (or such other percentage as is equal to the distribution to unsecured creditors of the Selling Entities) of the balance of such $1,000,000.00 of Liabilities that have not been satisfied or released, and (ii) Buyer shall satisfy or otherwise cause to be released $1,400,000.00 of cure amounts (which amounts shall have been determined by the Bankruptcy Court) related to Non-Real Property Contracts or related to Real Property Leases in excess of the 175 Real Property Leases to be assumed by Buyer, which shall be selected by Buyer, and which may include any amounts payable to any vendor, supplier, landlord or other counterparty under any Assumed Contract or Assumed Real Property Lease that relates to the period prior to the Assumption Approval; provided, that if Buyer does not satisfy or otherwise cause to be released all $1,400,000.00 of such cure amounts within 180 days after the Closing Date, Buyer shall pay to the Selling Entities in cash an amount equal to 20.44% (or such other percentage as is equal to the distribution to unsecured creditors of the Selling Entities) of the balance of such $1,400,000.00 of cure amounts that have not been satisfied or released. In each case, Buyer shall report on a regular basis to the Selling Entities regarding these matters, such report to include the identity of the related vendors and the original amount of the associated liabilities that have been satisfied or otherwise released, together with reasonable evidence of such satisfaction or release, if requested by the Selling Entities.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing.    The respective obligations of each Party to effect the sale and purchase of the Acquired Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions:

(a)    consummation of the transactions contemplated hereby would not violate any nonappealable Final Order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction and there shall not be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited (unless the consummation of the transactions contemplated hereby in violation of such Law would not reasonably be expected to have a Material Adverse Effect); and

(b)    the Bankruptcy Court shall have entered a sale order in a form reasonably acceptable to the Buyer and including terms substantially similar to those set forth in the form of Sale Order attached to the Sale Motion (or in such other form and with such other terms as may otherwise be agreed to in writing, or on the record at any hearing before the Bankruptcy Court, by the Buyer and the Seller, the "Sale Order") and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by the Buyer).

RLF1 3607469v. 5
8491118v7

Section 8.2    Conditions to Obligations of the Buyer. The obligation of the Buyer to effect the purchase of the Acquired Assets and the assumption of the Assumed Liabilities and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(a)    the Selling Entities shall have performed and complied with the covenants and agreements contained in this Agreement which are required to be performed and complied with by it on or prior to the Closing Date;

(b)    the representations and warranties of the Selling Entities set forth in Article V (disregarding for these purposes any exception in such representations and warranties relating to materiality or a Material Adverse Effect) shall be true and correct as of the date of this Agreement, and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date), except for such failures to be true and correct as would not reasonably be expected to have a Material Adverse Effect;

(c)    the Buyer shall have received a certificate from an officer of the Seller as such to the effect that, to such officer's knowledge, the conditions set forth in Sections 8.2(a) and (b) have been satisfied;

(d)    the Buyer shall have received the other items to be delivered to it pursuant to Section 4.2;

(e)    the Selling Entities shall have received written Consents, in form and substance, and on terms, satisfactory to the Buyer, to the extent necessary to effect the valid and effective assignment to the Buyer of the Contracts set forth on Schedule 8.2(e);

(f)    the Buyer shall be reasonably satisfied that the Estimated Closing Date Cost Value of the Inventory, the Estimated Closing Date Credit Card Receivables Amount, and the Estimated Closing Date Store-Level Cash Amount shall accurately reflect the Seller's good faith estimate of the actual aggregate cost value of the Saleable Inventory, the actual aggregate amount of Credit Card Receivables and the actual total aggregate amount of all Store-Level Cash, respectively, in each case as of the Closing Date; and

(g)    there shall not have occurred any event which would permit the Buyer to terminate this Agreement in accordance with Article IX, whether or not the Agreement has been terminated by the Buyer; and

(h)    with the exception of the Bankruptcy Case, there shall not be pending or threatened by any Government Authority any suit, action or proceeding challenging or seeking to restrain, limit or prohibit any transactions contemplated by this Agreement or seeking to obtain from Buyer in connection with the transactions contemplated by this Agreement any material damages or material commitments or seeking to prohibit or limit the ownership, operation or control by Buyer or any of its Affiliates of any material portion of the business or assets of Buyer (including the Business) or any of its Affiliates.

58

Any condition specified in this <u>Section 8.2</u> may be waived by the Buyer; *provided* that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 8.3    <u>Conditions to Obligations of the Selling Entities</u>. The obligation of the Selling Entities to effect the sale of the Acquired Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(a)    the Buyer shall have performed and complied with the covenants and agreements contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date;

(b)    the representations and warranties of the Buyer set forth in <u>Article VI</u> (disregarding for these purposes any exception in such representations and warranties relating to materiality) shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(c)    the Seller shall have received a certificate from an officer of the Buyer as such to the effect that, to such officer's knowledge, the conditions set forth in <u>Section 8.3(a)</u> and <u>(b)</u> have been satisfied;

(d)    the Seller shall have received the other items to be delivered to it pursuant to <u>Section 4.3</u>; and

(e)    there shall not have occurred any event which would permit the Seller to terminate this Agreement in accordance with Article IX, whether or not the Agreement has been terminated by the Seller.

Any condition specified in this <u>Section 8.3</u> may be waived by the Seller; *provided* that no such waiver shall be effective against the Seller unless it is set forth in a writing executed by the Seller.

Section 8.4    <u>Frustration of Closing Conditions</u>. None of the Selling Entities or Buyer may rely on or assert the failure of any condition set forth in <u>Article VIII</u> to be satisfied if such failure was proximately caused by such Party's failure to comply with this Agreement in all material respects.

## ARTICLE IX
## TERMINATION; WAIVER

Section 9.1    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing by:

(a)    mutual written consent of the Seller and the Buyer;

(b)    the Seller or the Buyer, if:

(i)    there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited (unless the consummation of the transactions contemplated hereby in violation of such Law would not reasonably be expected to have a Material Adverse Effect); or

(ii)    consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction;

*provided* that the Party seeking to terminate this Agreement pursuant to this Section 9.1(b) shall have used its commercially reasonable efforts to challenge such Law, order, decree or judgment;

(c)    the Seller if:

(i)    any of the representations and warranties of Buyer contained in Article VI shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date), and the condition set forth in Section 8.2(b) would not then be satisfied; or

(ii)    Buyer shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Buyer and the condition set forth in Section 8.3(a) would not then be satisfied;

*provided, however,* that if an inaccuracy in any of the representations and warranties of the Buyer or a failure to perform or comply with a covenant or agreement by the Buyer is curable by the Buyer within five (5) Business Days after the date of written notice from the Seller to the Buyer of the occurrence of such inaccuracy or failure, then the Seller may not terminate this Agreement under this Section 9.1(c) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Buyer or during the five (5) Business Day period commencing on the date of delivery of such notice or (y) following such five (5) Business Day period, if such inaccuracy or failure shall have been fully cured during such five (5) Business Day period;

(d)    the Buyer if:

(i)    any of the representations and warranties of the Selling Entities contained in Article V shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date), and the condition set forth in Section 8.2(b) would not then be satisfied; or

(ii)    the Seller shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with

by the Selling Entities and the condition set forth in Section 8.2(a) would not then be satisfied;

provided, however, that if an inaccuracy in any of the representations and warranties of the Selling Entities or a failure to perform or comply with a covenant or agreement by any of the Selling Entities is curable by it within five (5) Business Days after the date of written notice from the Buyer to the Seller of the occurrence of such inaccuracy or failure, then the Buyer may not terminate this Agreement under this Section 9.1(d) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Seller or during the five (5) Business Day period commencing on the date of delivery of such notice or (y) following such five (5) Business Day period, if such inaccuracy or failure shall have been fully cured during such five (5) Business Day period;

(e) by the Seller or the Buyer, if the Bankruptcy Court approves a Restructuring Transaction or an Alternative Transaction or the sale of all or substantially all of the assets of the Selling Entities or of the Acquired Assets to a Person (or group of Persons) other than the Buyer or an Affiliate of the Buyer;

(f) the Buyer or the Seller, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement; provided that the Party seeking to terminate this Agreement pursuant to this Section 9.1(f) shall have used its commercially reasonable efforts to oppose such conversion or dismissal;

(g) the Buyer or Seller, if the Closing shall not have occurred by 5:00 p.m. (Eastern Time) on October 29, 2010, which date may be extended by mutual agreement of the Seller and the Buyer; provided, (i) that the Seller shall not be entitled to terminate this Agreement pursuant to this Section 9.1(g) if, at the time of such termination, Buyer would then be entitled to terminate this Agreement pursuant to Section 9.1(d) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 9.1(d)), and (ii) that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 9.1(g) if, at the time of such termination, Seller would then be entitled to terminate this Agreement pursuant to Section 9.1(c) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 9.1(c)); and

(h) the Buyer, if (i) the Bidding Procedures Order is not entered within the timeframe set forth in Section 7.9, (ii) the interim DIP Facility order is not entered within two (2) Business Days of the Petition Date or the final DIP Facility order is not entered within 21 days of the Petition Date, in each case consistent with the amounts presented in the DIP Facility Budget or (iii) if for any reason the Sales Agency Agreement is not in full force and effect.

Section 9.2 Procedure and Effect of Termination. In the event of termination of this Agreement by either Seller or Buyer pursuant to Section 9.1, written notice thereof shall forthwith be given by the terminating Party to the other Party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the Parties; provided, however, that (a) no Party shall be relieved of or released from any Liability arising from any willful breach by such Party of any provision of this Agreement and

61

(b) this Section 9.2, Section 7.2(c), Section 7.3 and Section 7.11, Article X and the Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement.

Section 9.3    Extension; Waiver.  At any time prior to the Closing, the Selling Entities, on the one hand, or the Buyer, on the other hand, may, to the extent permitted by applicable Law (a) extend the time for the performance of any of the obligations or other acts of the Buyer (in the case of an agreed extension by the Selling Entities) or the Selling Entities (in the case of an agreed extension by the Buyer), (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a waiver by the Selling Entities) or the Selling Entities (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the Buyer (in the case of a wavier by the Selling Entities) or the Selling Entities (in the case of a waiver by the Buyer) contained herein, or (d) waive any condition to its obligations hereunder.  Any agreement on the part of the Selling Entities, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the Selling Entities or the Buyer, as applicable.  The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any rights hereunder.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

Section 10.1    Amendment and Modification.    This Agreement may be amended, modified or supplemented only by a written instrument signed on behalf of each of the Selling Entities and the Buyer.

Section 10.2    Survival.  None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing.  None of the covenants or agreements of the Parties in this Agreement shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the Parties contained in this Article X and in Articles III and IV and (b) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the transaction contemplated by this Agreement until fully performed.

Section 10.3    Notices.  All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) upon confirmation of receipt when transmitted by facsimile transmission, (c) upon receipt after dispatch by registered or certified mail, postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

(a)     If to any Selling Entity or the Selling Entities, to:

Urban Brands, Inc.
100 Metro Way
Secaucus, NJ 07094
Attention:     Ms. Laura Weil
Facsimile:     (201) 319-9582

with a mandated copy (which shall not constitute notice) to:

Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801
Attention:     Mark D. Collins
                   Cynthia D. Kaiser
Facsimile:     (302) 651-7701

(b)     If to the Buyer, to:

GB Merchant Partners, LLC
101 Huntington Avenue, 10th Floor
Boston, MA 02199
Attention:     James C. Rhee
                   Matthew R. Kahn
Facsimile:     (617) 422-6222

with a mandated copy (which shall not constitute notice) to:

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178-0061
Facsimile:     (212) 697-1559
Attention:     Steven J. Reisman

Section 10.4   <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment shall be null and void; *provided* that the rights of the Buyer under this Agreement may be assigned by the Buyer, without the prior written consent of any Selling Entity, to one or more Buyer Designees, so long as the Buyer shall continue to remain obligated in full hereunder.  No assignment by any Party (including an assignment by Buyer to any Buyer Designee) shall relieve such Party of any of its obligations hereunder.  Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of Selling Entities, the trustee in the Bankruptcy Case.

Section 10.5    Severability.    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.    Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.6    Governing Law.    Except to the extent that mandatory provisions of the Bankruptcy Code apply, this Agreement, and all claims and causes of action arising out of, based upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware.

Section 10.7    Acknowledgement and Release.

(a)    The Buyer acknowledges that the Selling Entities are the sole Persons bound by, or liable with respect to, the obligations and Liabilities of the Selling Entities under this Agreement and the other Transaction Documents, and that no Affiliate of any Selling Entity or any of their respective subsidiaries or any current or former officer, director, stockholder, agent, attorney, employee, representative, advisor or consultant of any Selling Entity or any such other Person shall be bound by, or liable with respect to, any aspect of this Agreement and the other Transaction Documents.

(b)    The Seller acknowledges that, except as provided pursuant to the Limited Guaranty, the Buyer and any Buyer Designee are the sole Persons bound by, or liable with respect to, the obligations and Liabilities of the Buyer and any such Buyer Designee under this Agreement and the other Transaction Documents, and that no Affiliate of the Buyer or any current or former officer, director, stockholder, agent, attorney, employee, representative, advisor or consultant of the Buyer shall be bound by, or liable with respect to, any aspect of this Agreement and the other Transaction Documents.

Section 10.8    SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(a)    Any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court). Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction, over the Bankruptcy Court) in respect of any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided, however,* that, if the Bankruptcy Case is dismissed, any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be heard and

determined solely in the Chancery Court of the State of Delaware and any state appellate court herefrom within the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware and any direct appellate court therefrom). Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such action, claim, suit or Legal Proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with Section 10.3, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, action or Legal Proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or Legal Proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts. Each Party agrees that notice or the service of process in any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder or thereunder, shall be properly served or delivered if delivered in the manner contemplated by Section 10.3.

(b) EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF.

Section 10.9  Counterparts.  This Agreement may be executed in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and which shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by facsimile or otherwise) to the other Parties.

Section 10.10  Incorporation of Schedules and Exhibits.  All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 10.11  Entire Agreement.  This Agreement (including all Schedules and all Exhibits) and the Confidentiality Agreement constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the Parties with respect thereto.

Section 10.12  Remedies.  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such

injunction shall be in addition to any other remedy to which any Party is entitled, at law or in equity.

Section 10.13 <u>Seller Disclosure Schedule</u>. It is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other Section or subsection of this Agreement or the Seller Disclosure Schedule, (b) the disclosure of any matter or item in the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, and (c) the mere inclusion of an item in the Seller Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect.

Section 10.14 <u>Mutual Drafting; Headings; Information Made Available</u>. The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement. To the extent this Agreement refers to information or documents to be made available (or delivered or provided) to Buyer or its Representatives, the Selling Entities shall be deemed to have satisfied such obligation if the Seller or any of its Representatives has made such information or document available (or delivered or provided such information or document) to Buyer or any of its Representatives, whether in an electronic data room, via electronic mail, in hard copy format or otherwise.

Section 10.15 <u>No Third-Party Beneficiaries</u>.

Except as expressly provided in <u>Section 7.19</u> and <u>Section 10.7</u>, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

Section 10.16 <u>Bulk Sales Law</u>.

The Buyer hereby waives compliance by the Selling Entities with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Acquired Assets to the Buyer. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

* * * * *

66

RLF1 3607469v. 5
8491118v7

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above.

**SELLER**

URBAN BRANDS, INC.

By: _____
Name:
Title:

**OTHER SELLING ENTITIES**

[NAME OF ENTITY]

By: _____
Name:
Title:

**BUYER**

NEW ASHLEY STEWART LLC

By: _____
Name:
Title:

Schedule I

Subsidiaries of the Seller which are Selling Entities

**Subsidiaries of the Seller which are Selling Entities**

A.S. Interactive, Inc.
Ashley Stewart Ltd.
Ashley Stewart Management Co., Inc.
Ashley Stewart Woman Ltd.
ASNJ 10, Inc.
Large Apparel of Alabama, Inc.
Large Apparel of California, Inc.
Large Apparel of Connecticut, Inc.
Large Apparel of District of Columbia, Inc.
Large Apparel of Florida, Inc.
Large Apparel of Georgia, Inc.
Large Apparel of Illinois, Inc.
Large Apparel of Indiana, Inc.
Large Apparel of Louisiana, Inc.
Large Apparel of Maryland, Inc.
Large Apparel of Michigan, Inc.
Large Apparel of Mississippi, Inc.
Large Apparel of Missouri, Inc.
Large Apparel of New Jersey, Inc.
Large Apparel of New York, Inc.
Large Apparel of North Carolina, Inc.
Large Apparel of Ohio, Inc.
Large Apparel of Pennsylvania, Inc.
Large Apparel of South Carolina, Inc.
Large Apparel of Tennessee, Inc.
Large Apparel of Texas, Inc.
Large Apparel of Virginia, Inc.
Large Apparel of Wisconsin, Inc.
Marianne Ltd.
Marianne USPR, Inc.
Marianne VI, Inc.
Metro Apparel of Kentucky, Inc.
Metro Apparel of Massachusetts, Inc.
Carraizo Alto Apparel Corporation
ASIL 6, Inc.
Church Street Retail, Inc.
Urban Acquisition Corporation of New
Jersey, Inc.
Urban Acquisition Corporation of New
York, Inc.
Urban Brands TM Holding Co.

100% Girls Ltd.
The Essence of Body & Soul, Ltd.
100% Girls of Georgia, Inc.
100 Percent Girls of New Jersey, Inc.
100% Girls of New York, Inc.
Kid Spot Ltd.
Kidspot of Delaware, Inc.
Kidspot of Illinois, Inc.
Kidspot of Michigan, Inc.
Kidspot of New Jersey, Inc.
Kidspot of Ohio, Inc.
Kidspot of Pennsylvania, Inc.
Kidspot of Texas, Inc.