# Exhibit B

## AGENCY AGREEMENT

# AGENCY AGREEMENT

This Agency Agreement is made as of September __, 2010, by and between Urban Brands, Inc., a Delaware corporation, and its affiliated debtors and debtors-in-possession (the "Merchant") and Gordon Brothers Retail Partners, LLC (the "Agent").

## RECITALS

WHEREAS, on September 21, 2010 (the "Petition Date"), each entity comprising the Merchant filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), jointly administered under Case No.10-13005 (KJC) (collectively, the "Bankruptcy Case");

WHEREAS, on the Petition Date the Merchant and New Ashley Stewart, LLC (the "Buyer") entered into that certain Asset Purchase Agreement (the "Purchase Agreement")[1] pursuant to which the Buyer is to acquire certain assets of, and certain rights from, Merchant as specified therein, including the right of Buyer to select Agent to conduct the Sales (as hereinafter defined) pursuant to the terms of this Agreement;

WHEREAS, in accordance with the Purchase Agreement, the Agent shall act as the Merchant's and the Buyer's exclusive agent for the purposes of: (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's retail store location(s) identified on Exhibit 1 attached hereto, as may be amended from time to time in accordance with this Agreement and the Purchase Agreement (each individually, a "Store" and collectively the "Stores"), and certain of the Merchandise located at the distribution centers that has been or will be transferred to the Stores, by means of a promotional, store closing, "going out of business" or similar sale (as further described below, the "Sale") and (b) disposing of substantially all of the owned FF&E in the Stores.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and the Merchant hereby agree as follows:

Section 1.    Definitions. The terms set forth below are defined in the referenced sections of this Agreement:

| Defined Term | Section Reference |
|---|---|
| Additional Goods | Section 8.9(a) |
| Agency Accounts | Section 7.2 |
| Agency Documents | Section 11.1(b) |
| Agent Indemnified Parties | Section 13.1 |
| Approval Order | Section 2.2 |
| Bankruptcy Case | Recitals |

---

[1] For the avoidance of doubt, in the event of any conflict between the terms of this Agency Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

8293803v13
RLF1 3614769v. 2

| Defined Term | Section Reference |
|---|---|
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(b) |
| Buyer | Recitals |
| Central Service Expenses | Section 4.1(i) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 7.2(ii) |
| Display Merchandise | Section 5.2(b) |
| Distribution Center Merchandise | Section 5.2(b) |
| Events of Default | Section 14 |
| Excluded Defective Merchandise | Section 5.2(b) |
| Excluded Benefits | Section 4.1(ii) |
| Expenses | Section 4.1 |
| FF&E Election | Section 15.9 |
| Final Reconciliation | Section 8.6 |
| Inventory Taking | Section 5.1(a) |
| Liquidation Sales Laws | Section 2.2 |
| Merchandise | Section 5.2(a) |
| Merchant Consignment Goods | Section 5.4 |
| Occupancy Expenses | Section 4.1(iii) |
| On Order Merchandise | Section 5.2(b) |
| Petition Date | Recitals |
| Proceeds | Section 7.1 |
| Purchase Agreement | Recitals |
| Retained Employees | Section 9.1 |
| Retention Bonuses | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sales Commencement Date | Section 6.1 |
| Sales Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Sales Taxes Amount | Section 8.3 |
| Secured Lender | Section 10(c) |
| Stores | Recitals |
| Supplies | Section 8.4 |
| Vacate Date | Section 6.1 |
| Vacate Notice | Section 6.1 |

8293803v13
RLF1 3614769v. 2

## Section 2.    Appointment of Agent/Approval Order.

2.1     Effective upon the entry of the Approval Order, the Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as the Merchant's and Buyer's exclusive agent for the purpose of conducting the Sale at the Stores and disposing of the owned FF&E in the Stores in accordance with the terms and conditions of this Agreement.

2.2     Agent's obligation hereunder shall be subject to entry of an order approving this Agreement in its entirety and authorizing Merchant, Buyer, and Agent to conduct the Sale in accordance with the terms hereof (the "Approval Order"). The Approval Order shall provide, in a form reasonably satisfactory to the Agent, *inter alia*, that (i) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (ii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iii) Agent shall be entitled to sell all Merchandise and owned FF&E; (iv) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of Buyer or Merchant, as applicable, as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order; (v) Agent, as agent for Merchant and Buyer, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "going out of business," "store closing", "sale on everything", "everything must go", or similar themed sale (including, without limitation, by means of media advertising, A-frame, interior and exterior banners and similar signage and use of sign walkers), without further consent of any person (other than Merchant as provided for herein), in accordance with the terms and conditions of this Agreement and the Sale Guidelines, and without further compliance with applicable federal, state or local laws governing, *inter alia*, the conduct of store closing sales (the "Liquidation Sale Laws"), subject to compliance with the Sale Guidelines and Approval Order; (vi) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos and customer lists relating to and used in connection with the operation of the Stores and acquired by the Buyer pursuant to the Purchase Agreement, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (vii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (viii) all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (ix) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (x) Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement; (xi) Agent shall not be liable and shall be deemed in compliance with the Liquidation Sale Laws and consumer protection laws if it does not accept Merchant coupons; and (xii) Agent shall be granted a first priority security interest in the Merchandise, the Proceeds and the owned FF&E by Buyer pursuant to terms as mutually agreed upon by the Buyer and the Agent.

8293803v13
RLF1 3614769v. 2

2.3    Non-Continuing Stores. The Stores listed on Exhibit 1 are those retail stores designated by the Buyer on before the date of the Approval Order as "Non-Continuing Stores" in accordance with the procedures set forth in the Purchase Agreement. In the event that Buyer subsequently removes a store location from the "Non-Continuing Stores" in accordance with the procedures set forth in the Purchase Agreement, Exhibit 1 shall be amended at such time as such removal is effectuated to remove store locations that are no longer "Non-Continuing Stores" under the Purchase Agreement (upon which the terms of the Purchase Agreement and any other agreements agreed by Buyer and Agent will govern with respect to such store location for the period from and after such removal).

Section 3.    Consideration to Merchant and Agent. [Intentionally omitted]

Section 4.    Expenses of the Sale.

4.1    Expenses. Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term, which Expenses shall be paid by Agent in accordance with Section 4.2 below. As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term, limited to the following:

(a)    all payroll and commissions, if applicable, for all Retained Employees, used in conducting the Sale for actual days/hours worked during the Sale Term as well as payroll for any of Merchant's former employees or temporary labor retained by Agent for the Sale;

(b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, and vacation benefits that accrue during the Sale Term, but excluding Excluded Benefits) for Retained Employees used in the Sale, in an amount not to exceed 17.6% of the aggregate base payroll for each Retained Employee in the Stores (the "Benefits Cap");

(c)    costs of all security in the Stores including, without limitation, security systems, courier and guard service, building alarm service, and alarm service maintenance;

(d)    50% of the fees and costs of the inventory taking service to conduct the Inventory Taking and Testing at the Stores and the actual payroll and associated benefits (subject to the Benefits Cap) for the Retained Employees used in connection with the Inventory Taking;

(e)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(f)    a pro rata portion of property insurance attributable to the Merchandise and a pro rata portion of comprehensive public liability insurance attributable to the Stores, in each case on a per Store per diem basis reflected on Exhibit 4.1(f);

(g)    advertising and direct mailings relating to the Sale, and Store interior and exterior signage and banners, and signwalkers;

4

(h)     credit card fees, chargebacks and discounts;

(i)     bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses;

(j)     costs for additional Supplies;

(k)     all fees and charges required to comply with applicable laws;

(l)     Store cash theft and other cash shortfalls in the registers;

(m)     any and all costs relating to the processing, transfer and consolidation of Merchandise between and among the Stores, including delivery and freight costs, and it is understood that Agent shall be responsible for coordinating such transfer of Merchandise;

(n)     housekeeping and cleaning expenses related to the Stores;

(o)     Store trash and storm and snow removal;

(p)     on-site supervision, including base fees and bonuses of Agent's field personnel, travel to and from the Stores, and incidental out-of-pocket and commercially reasonable travel expenses relating thereto;

(q)     postage, courier and overnight mail charges to and from or among the Stores and central office (solely to the extent relating to the Sale) or otherwise relating to the Sale;

(r)     actual Occupancy Expenses for the Stores on a per location and per diem basis in an amount not to exceed the per Store per diem amount set forth on Exhibit 4.1(s);

(s)     Agent's actual cost of capital (including letter of credit fees);

(t)     third party payroll processing fees;

(u)     Agent's due diligence costs and reasonable fees of Agent's legal counsel incurred in implementing the transactions contemplated by this Agreement; and

(v)     Agent's actual cost for insurance under Section 12.3.

There will be no double payment of Expenses to the extent that an Expense appears or is contained in more than one category. Notwithstanding anything herein to the contrary, to the extent that any Expense listed in Section 4.1 is also included on Exhibit 4.1(s), then Exhibit 4.1(s) shall control and such Expenses shall not be double counted. For the avoidance of doubt, all monetary obligations with respect to Merchant or Buyer will be as set forth in the Purchase Agreement. For the further avoidance of doubt, nothing in this Agreement shall in any way modify or reduce any obligations of Buyer under the terms of the Purchase Agreement. The fact

that Agent is not obligated to pay certain amounts for which the Buyer is responsible under the terms of the Purchase Agreement shall not excuse Buyer from paying such amounts in accordance with the terms of the Purchase Agreement.

As used herein, the following terms have the following respective meanings:

(i) "Central Service Expenses" means costs and expenses for Merchant's or Buyer's, as applicable, central administrative services necessary for the Sale, including, but not limited to, MIS services, payroll processing, point-of-sale systems, accounting system, cash reconciliation, inventory processing and handling, and data processing and reporting.

(ii) "Excluded Benefits" means (i) the following benefits arising or accruing prior to the Sale Commencement Date: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, termination or severance pay and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including any payments due under the Worker Adjustment Retraining Notification Act ("WARN Act").

(iii) "Occupancy Expenses" means base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, building insurance related to the Stores, personal property leases (including, without limitation, point of sale equipment), cash register maintenance, building maintenance, and rental for furniture, fixtures and equipment, all of the foregoing as categorized and reflected on Exhibit 4.1 hereto.

"Expenses" shall not include: (i) Excluded Benefits; (ii) Central Services Expenses; (iii) any Occupancy Expenses in excess of the amounts set forth on Exhibit 4.1(s); (iv) the cost of transfers of Merchandise from the Distribution Center to the Stores, and (v) any costs, expenses or liabilities arising during the Sale Term in connection with the Sale of Merchandise, other than the Expenses listed above.

4.2 **Payment of Expenses.** Effective from and after entry of the Approval Order:

(a) Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses. All Expenses incurred during each week of the Sale (i.e. Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.6 below; provided, however, in the event that the actual amount of an expense is unavailable on the date of the reconciliation (such as payroll), Merchant, Buyer and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. Agent, Buyer and/or Merchant may review or audit the Expenses at any time.

(b) Notwithstanding anything herein to the contrary, Merchant shall not be required to fund or otherwise pay any Expenses unless Agent has pre-funded such expense (subject to reconciliation) and (ii) without limitation on Expenses that may be funded in advance by Agent, Agent shall fund, in advance, all payroll and related expenses for Retained

6

Employees at least two (2) business days prior to the date that such payments are due by Merchant.

### Section 5. Inventory Taking; Merchandise.

#### 5.1 Inventory Taking.

(a) Inventory Taking. Agent shall permit a physical inventory to be taken of the Merchandise located in the Stores (the "Inventory Taking") as further detailed in the Purchase Agreement.

#### 5.2 Merchandise Subject to This Agreement.

(a) For purposes of this Agreement, "Merchandise" shall mean: (i) all saleable finished goods inventory that is located at the Stores as of the Sale Commencement Date, including, (A) Defective Merchandise, (B) Display Merchandise, and (C) Merchandise subject to Gross Rings; (ii) Distribution Center Merchandise, and (iii) On Order Merchandise. Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) furnishings, trade fixtures, equipment and/or improvements to real property which are located in the Stores (collectively, "FF&E"), provided, that Agent shall be permitted to sell owned FF&E as set forth in Section 15.9; (4) Excluded Defective Merchandise; and (5) Merchant Consignment Goods.

(b) As used in this Agreement the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise that is defective or otherwise not saleable in the ordinary course as first-quality Merchandise because it is worn, scratched, broken, faded, torn, mismatched, tailored or affected by other similar defenses rendering it not first quality. Display Merchandise shall not per se be deemed to be Defective Merchandise.

"Display Merchandise" means those items of inventory used in the ordinary course of business as displays or floor models, including inventory that has been removed from its original packaging where such items of inventory have been removed from its original packaging for the purpose of putting such item on display but not customarily sold or saleable by Merchant, which goods are not otherwise damaged or defective.

"Distribution Center Merchandise" means those items of inventory located at the Merchant's or Buyer's, as applicable, distribution centers as identified on Exhibit 5.2(b) annexed hereto.

"Excluded Defective Merchandise" means those items of Defective Merchandise that are not saleable because they are so damaged or defective that such inventory cannot be used for their intended purpose.

7

"Merchant Consignment Goods" shall have the meaning assigned to such term in Section 5.4 below.

"On Order Merchandise" means goods currently ordered by Merchant that are subsequently delivered to the Stores in the ordinary course of business on or before one week after the Sale Commencement Date unless otherwise agreed to by Agent.

5.3    Valuation. [Intentionally omitted]

5.4    Excluded Goods. Agent shall retain all responsibility for any goods not included as "Merchandise" hereunder. Agent shall accept goods not included as "Merchandise" hereunder for sale as "Consignment Goods" at prices established by the Agent. The Agent shall retain 100% of the sale price for all sales of Consignment Goods (subject to any agreement between Buyer and Agent). Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise (excluding owned FF&E).

Section 6.    Sale Term.

6.1    Term. Subject to the entry of the Approval Order and satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the first business day following the closing of the sale pursuant to the Purchase Agreement (the "Sale Commencement Date"). The Agent shall complete the Sale at each Store and vacate such Store in broom-clean condition by no later than 5:00 p.m. (prevailing Eastern Time) 120 days from the Sale Commencement Date unless the Sale is extended by mutual written agreement of Agent and Merchant (the "Sale Termination Date;" the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term"). The Agent shall terminate the Sale at any Store removed from Exhibit 1 in accordance with Section 2.3 hereof within five (5) days of written notice thereof. The Agent may, in its discretion, terminate the Sale at any Store or upon not less than five (5) days' prior written notice (the "Vacate Notice") to Merchant and Buyer (the end of such notice period, as to each such Store, as applicable, the "Vacate Date"). In the event the Agent fails to provide Merchant and Buyer with such timely notice, Agent shall be liable for and pay the actual amounts payable to landlords for the days by which notice of a Store closing was less than five (5) days. For the avoidance of doubt, nothing in this Section 6.1 shall modify the obligations of the Buyer under the Purchase Agreement relating to, among other things, the notice that must be provided upon conclusion of the Sale Term, the condition that the premises must be in upon surrender or the Buyer's obligations with respect to the payment of rent under section 2.5 of the Purchase Agreement.

6.2    Vacating the Stores. At the conclusion of the Sale, Agent agrees to leave the Stores in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of FF&E (as provided for in section 15.9 below). Agent shall vacate the Stores on or before the Sale Termination Date, as provided for herein, at which time Agent shall surrender and deliver the Store premises and Store keys to Merchant. Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to Vacate Notice shall continue until (a) the applicable Vacate Date for such Store or (b) the 15th day of the calendar month in which

8293803v13
RLF1 3614769v. 2

the Vacate Date for such Store occurs. All assets of Merchant or Buyer used by Agent in the conduct of the Sale (e.g. FF&E, etc.) shall be returned by Agent to Merchant or Buyer, as applicable, or left at the Store at the end of the Sale Term to the extent the same have not been used in the conduct of the Sale or sold (e.g., FF&E). Agent shall be responsible for all Occupancy Expenses (irrespective of any per diem cap on Occupancy Expenses) for a Store for which Merchant is or becomes obligated resulting from Agent's failure to vacate such Store by the applicable Vacate Date.

Section 7.    Sale Proceeds.

7.1    Proceeds. For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise and FF&E made under this Agreement, exclusive of Sales Taxes; and (b) all proceeds of Merchant's or Buyer's, as applicable, insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term.

7.2    Deposit of Proceeds. (i) Agent may establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts") and Merchant shall promptly upon Agent's request execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and the disbursement of amounts payable hereunder, and Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. Upon request, Agent shall deliver to Merchant and Buyer copies of all bank statements and other information relating to such accounts. Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all bank fee and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term. Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

(ii)    During the period between the Sale Commencement Date and the date Agent establishes the Agency Accounts, if any, all Proceeds (including credit card proceeds), shall be collected by Agent and deposited on a daily basis into depository accounts designated by Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds (including credit card proceeds), and the disbursement of amounts payable by Agent hereunder (the "Designated Deposit Accounts").

7.3    Credit Card Proceeds. Agent shall have the right to use Merchant's or Buyer's, as applicable, credit card facilities (including credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and existing bank accounts) during the Sale for credit card Proceeds relating solely to the Sale. In the event that Agent elects to use Merchant's or Buyer's, as applicable, credit card facilities, Merchant or Buyer, as applicable, shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Unless Agent and Buyer otherwise agree, Agent shall not accept Merchant's proprietary card. Without limiting the foregoing, Merchant shall cooperate

9

with Agent to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request following the Payment Date and the payment of all amounts due to Merchant by Agent, Merchant shall cooperate with Agent to establish Merchant identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

7.4 _Petty Cash_. Agent shall account to Buyer for all cash in the Stores at the start of business on the Sale Commencement Date and recognizes that such cash is the sole property of the Buyer.

Section 8. _Conduct of the Sale_. From and after the entry of the Approval Order:

8.1 _Rights of Agent_. Subject to the Approval Order, the Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "everything must go", or similar themed sale throughout the Sale Term, as well as to conduct the Sale as a "going out of business" sale upon mutual agreement with the Buyer. The Agent shall conduct the Sale in the name of and on behalf of the Merchant or Buyer in a commercially reasonable manner and in compliance with the terms of this Agreement, the Approval Order, and the sale guidelines attached hereto as Exhibit 8.1(a) (the " Sale Guidelines"). In addition to any other rights granted to Agent hereunder in conducting the Sale, subject to the Approval Order, the Agent, in the exercise of its reasonable discretion, shall have the right:

(a) to establish Sale prices and Stores hours which are consistent with the terms of applicable leases and local laws or regulations, including without limitation Sunday closing laws;

(b) except as otherwise expressly included as an Expense, to use without charge during the Sale Term all of Merchant's or Buyer's, as applicable, FF&E, Stores-level customer lists, e-mail lists and mailing lists, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers, which name and logo may be sold to the Buyer), Stores keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant or Buyer, as applicable, located at the Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses (except as modified by the Approval Order). Agent shall exercise due care and return to the Merchant or Buyer, as applicable, immediately at the end of the Sale all materials and supplies except materials or supplies expended or abandoned at the Stores;

(c) to the extent not transferred to the Buyer under the Purchase Agreement, to use (i) Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central administrative services necessary for the Sale, at no additional cost to Agent; provided, however, that in the event that Agent expressly

10

requests Merchant to provide services other than those normally provided to the Stores and relating to the sale of merchandise by Merchant, Agent shall be responsible for the actual incremental cost of such services as an Expense, and (ii) one office located at Merchant's central office facility;

(d)     to establish and implement advertising, signage, and promotion programs consistent with the "store closing" or similar theme (including, without limitation, by means of media advertising, A-frame, similar interior and exterior signs and banners, and use of sign walkers) in a manner consistent with the Sale Guidelines and the Approval Order, provided that any advertising, signage and promotion programs consistent with the "going out of business" be used only with the prior mutual agreement of the Buyer;

(e)     to transfer Merchandise between and among the Stores;

(f)     to conduct the Sale in accordance with the provisions of the Sale Guidelines and Approval Order.

8.2     Terms of Sales to Customers.

(a)     All sales of Merchandise will be "final sales" and "as is", and all advertisements (excluding signage) and sales receipts will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers. All sales will be made only for cash, nationally recognized bank credit cards, and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk nonpayment or loss with respect thereto. Agent shall not accept or honor any coupons. Agent shall clearly mark all tickets and receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date. Agent may, but is not obligated to honor either Merchant issued coupons, or coupons issued by Merchant's competitors, during the Sale Term; provided however, Merchant shall have no obligation to Agent in connection with any such honored coupons.

(b)     Gift Certificates. During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, and Merchandise credits issued by Merchant prior to the Sale Commencement Date.

8.3     Sales Taxes.

(a) During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's or Buyer's, as applicable, point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's and Buyer's behalf, at the time of sale. All Sales Taxes shall be deposited into a segregated account designated by Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account"). Buyer shall prepare and file all applicable reports and documents required by the applicable taxing authorities and Buyer shall promptly pay all Sales

11

Taxes from the Sales Taxes Account, Buyer will be given access to the computation of gross receipts for verification of all such tax collections.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that as Agent is conducting the Sale solely as agent for Merchant and Buyer, various payments that this Agreement contemplates that one party may make to the other party do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     <u>Supplies</u>. Agent shall have the right to use, without charge, all existing supplies located at the Stores, including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "<u>Supplies</u>"). Merchant does not warrant that the existing Supplies as of the Sale Commencement Date are adequate for the purposes of the Sale.

8.5     <u>Returns of Merchandise/Price Adjustments</u>. During the Sale Term, Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("<u>Returned Merchandise</u>") provided that such return is accompanied by the original store receipt and is otherwise in compliance with Merchant's return and price adjustment policy in effect as of the date such item was purchased. Any Returned Merchandise will be treated pursuant to terms as mutually agreed upon by the Agent and the Buyer.

8.6.     <u>Sale Reconciliation</u>. On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, receipts of Returned Merchandise in the Stores, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (<u>i.e.</u> Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent. Within thirty (30) days after the end of the Sale Term, Agent and Merchant shall complete a final reconciliation of the Sale, the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent (the "<u>Final Reconciliation</u>").

8.8     <u>Force Majeure</u>. If any casualty, act of terrorism, government recall, or act of God prevents or substantially inhibits the sale of any Merchandise or the conduct of business in the ordinary course at any Store, such Store and the Merchandise, as applicable, located at such Store shall, in Agent's discretion, be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; <u>provided, however</u>, that, subject to the terms of Section 7.1 above, the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder.

8.9     <u>Additional Goods</u>.

(a)     Agent may (but shall not be required to), at Agent's sole cost and expense (which cost and expense may be recovered by Agent as set forth in subparagraph (b) below), supplement the Merchandise in the Stores with goods, of like kind and quality, as is customarily sold in the Stores (the "<u>Additional Goods</u>"). Sales of Additional Goods shall be run through Merchant's or Buyer's, as applicable, cash register systems, provided, however, that Agent shall mark the Additional Goods using either a "dummy" SKU or department number or in such other manner

12

so as to distinguish the sale of Additional Goods from the sale of Merchandise. Merchant, Buyer and Agent agree that the transactions relating to the Additional Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes. At all times and for all purposes, the Additional Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity (including, without limitation, Merchant or Buyer) shall have any claim against any of the Additional Goods or their proceeds, except to the extent set forth in Section 8.10(b). The Additional Goods shall at all times remain subject to the exclusive control of Agent, and Agent shall, at Agent's sole cost and expense (and not as an Expense of the Sale), insure the Additional Goods and, if required, promptly file any proofs of loss with regard thereto with Agent's insurers. Merchant, Buyer and Agent shall reconcile the proceeds from the sale of Additional Goods as part of the Weekly/Final Sales Reconciliation process.

(a)     As consideration for allowing the Agent to supplement the Merchandise with Additional Goods pursuant to the terms and conditions of Section 8.10(a), Agent shall pay to Merchant five percent (5%) of the gross proceeds of the sale of Additional Goods after payment of applicable Sales Taxes.

Section 9.     Employee Matters.

9.1     Merchant's Employees. Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems expedient and Agent may select and schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date. Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant. Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations. Merchant and Agent agree that except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, WARN Act claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees. Agent shall comply in the conduct of the Sale with all of Merchant's employee rules, regulations, guidelines and policies which have been provided to Agent in writing. Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any of the Store employees prior to the Sale Termination Date. Merchant shall not transfer any Retained Employee during the Sale Term without Agent's prior consent, which consent shall not be unreasonably withheld.

9.2     Termination of Employees. Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto so that Merchant may coordinate the termination of such employee; provided however that, in the event that Agent determines to cease using an employee "for

13

cause" (which shall consist of dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply, provided further however that Agent shall immediately notify Merchant of the basis for such "cause" so that Merchant can arrange for termination of such employee. From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee.

9.3     Payroll Matters. During the Sale Term, Merchant shall process the base payroll for all Retained Employees and any former employees and temporary labor retained by Agent. Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Merchant or Agent, as applicable, shall transfer, to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, worker's compensation and benefits for such week which constitute Expenses hereunder.

9.4     Employee Retention Bonuses. Agent shall pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause". The amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system, provided that Buyer shall be responsible for all expenses relating to the processing of the Retention Bonuses as further set forth in the Purchase Agreement. Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within five (5) business days after the Sale Commencement Date, provided, however, the Agent may revise its Retention Bonus Plan from time to time in its sole discretion.

Section 10.     Conditions Precedent and Subsequent. The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)     All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date; and

(b)     Merchant shall have obtained the Approval Order on or before October 27, 2010.

Section 11.     Representations, Warranties and Covenants.

11.1    Merchant's Representations, Warranties and Covenants. Merchant hereby represents, warrants and covenants in favor of Agent as follows:

14

(a)     Each entity comprising Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of the state or province of its formation (except as may be a result of the commencement of the Bankruptcy Case; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Except as may be required in connection with the issuance of the Approval Order, and subject to the consent of Lenders: (i) the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder; (ii) Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (iii) each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

(c)     Merchant has maintained its pricing files, including the Merchant's master inventory cost file (the "Cost File"), in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns), and all pricing files and records (including the Cost File) are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods (without consideration of any point of sale markdowns) as of the dates and for the periods indicated therein. Merchant represents that (a) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (b) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(d)     Merchant has not since September 15, 2010 marked up or raised, and shall not up to the closing of the sale under the Purchase Agreement mark up or raise, the price of any items of Merchandise, or removed or altered any tickets, any indicia of clearance merchandise or any other kind of in-store pricing signage, except in the ordinary course of business and except for the effects of the termination of promotional events.

15

(e)     Up to the closing of the sale under the Purchase Agreement, Merchant shall ticket or mark all items of inventory received at the Stores prior to such date in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(f)     Except with respect to Merchandise in the Distribution Center, since September 15, 2010, Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course and not consistent with historical practices.

(g)     To the best of Merchant's knowledge, all Merchandise is in compliance with all applicable federal, state or local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls and returns prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, throughout the Sale Term, the Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of each of the Stores and the utilities and other services provided at the Stores. Merchant shall throughout the Sale Term maintain in good working order, condition and repair, all cash registers, heating systems, air conditioning systems, elevators, escalators, and all other mechanical devices necessary for the conduct of the Sale at the Stores. Except any amounts owing as a result of the commencement of the Bankruptcy Case, and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables, to the extent they are obligations of the Merchant hereunder or pursuant to the Purchase Agreement, necessary for the conduct of the Sale (other than those relating to any period prior to the commencement of the Bankruptcy Case), subject to any restrictions that may be imposed under the Bankruptcy Code.

(i)     Except any amounts owing as a result of the commencement of the Bankruptcy Case, Merchant had paid and will continue to pay throughout the Sale Term (except to the extent that Buyer becomes obligated to pay such amounts under section 7.7(d) of the Purchase Agreement), all self-insured or Merchant funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs (other than those relating to any period prior to the commencement of the Bankruptcy Case).

(j)     Since September 15, 2010, Merchant has not intentionally taken, and shall not throughout the Sale Term intentionally take without Agent's written consent, any actions with the intent of increasing the Expenses of Sale, including, without limitation, increasing salaries or other amounts payable to employees.

(k)     Merchant has since September 15, 2010, operated, and covenants to continue to operate prior to the closing of the sale under the Purchase Agreement, the Stores in all material respects in the ordinary course of business consistent with historical practices, including, without limitation, with respect to merchandise and its labor force.

16

(l)     To the best of Merchant's knowledge, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement was true and accurate in all material respects at the time provided.

(m)     No action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(n)     Supplies have not been, since September 15, 2010, and shall not be, prior to the closing of the sale under the Purchase Agreement, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

11.2     <u>Agent's Representations, Warranties and Covenants</u>. Each entity comprising Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Each entity comprising Agent: (i) is a limited partnership or limited liability company (as the case may be) duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by the Agent and, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

17

(d)     The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations, and Merchant's leases and other agreements, except as provided for in the Sale Guidelines or Approval Order.

Section 12.     Insurance.

12.1     Merchant's Liability Insurance.  Except to the extent such policies are transferred to the Buyer in accordance with the terms of the Purchase Agreement, Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Agent, or Agent's employees, independent contractors or agents (including Merchant's employees being supervised by Agent).

12.2     Merchant's Casualty Insurance.  Except to the extent such policies are transferred to the Buyer in accordance with the terms of the Purchase Agreement, Merchant will provide throughout the Sale Term, at Agent's cost as an Expense hereunder, fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as loss payee (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise plus any self insurance amounts and the amount of any deductible or self-insured retention (which amounts shall be paid by Agent as an Expense), shall constitute Proceeds hereunder.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming the Agent as loss payee (as its interest may appear), in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3     Agent's Insurance.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named as additional insureds and loss payees with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and

18

naming Merchant as additional insureds, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Merchant or Merchant's independent contractors or agents, other than Agent or Agent's employees, agents or independent contractors (including Merchant's employees under Agent's supervision).

12.4    Worker's Compensation Insurance. Merchant shall at all times during the Sale Term maintain in full force and effect worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.    Indemnification

13.1    Merchant Indemnification. Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's performance and compliance with its obligations hereunder, any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term, (iii) any consumer warranty or products liability claims except to the extent such claims arise from representations made by the Agent relating to the Merchandise, and (iv) the gross negligence (including omissions) or willful misconduct of Merchant, or its officers, directors, employees agents or representatives.

13.2    Agent Indemnification. Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; (iii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iv) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees agents or representatives; and (v) violations of law.

Section 14.    Defaults. The following shall constitute "Events of Default" hereunder:

(a)    The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof; or

19

(b)    Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, shall continue uncured five (5) days after written notice to the defaulting party.

Any party's damages or entitlement to equitable relief on account of an Event of Default shall be determined by the Bankruptcy Court.

Section 15.        Miscellaneous.

15.1    Notices. All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or by Federal Express or other recognized overnight delivery service, as follows:

| If to the Agent: | Gordon Brothers Retail Partners, LLC |
|---|---|
| | 101 Huntington Avenue, 10th Floor |
| | Boston, MA 02199 |
| | Attn: Rafael Klotz |
| | Fax: (617) 531-7929 |
| | Email: rklotz@gordonbrothers.com |
| | |
| If to Merchant: | Urban Brands, Inc. |
| | 100 Metro Way |
| | Secaucus, NJ 07094 |
| | Attn: Laura Weil, CEO and Director |
| | Fax: (201) 319-9582 |
| | Email: laura.weil@urbanbrands.com |
| | |
| With a copy to: | Richards, Layton & Finger, PA |
| | 920 North King Street |
| | Wilmington, Delaware 19801 |
| | Attn: Mark D. Collins, Esq. |
| | Fax: (302) 651-7701 |
| | Email: collins@rlf.com |
| | |
| If to Buyer: | GB Merchant Partners, LLC |
| | 101 Huntington Avenue, 10th Floor |
| | Boston, MA 02199 |
| | Attn: James C. Rhee and Matthew R. Kahn |
| | Fax: (617) 422-6222 |
| | Email: jrhee@gordonbrothers.com and |
| | mkahn@gordonbrobers.com |

20

With a copy to:
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178
Fax: (212) 697-1559
Attn: Steven J. Reisman, Esq. and Timothy A. Barnes, Esq.
Email: sreisman@curtis.com and tbarnes@curtis.com

15.2   Governing Law. This Agreement shall be governed and construed in accordance with the laws of the Delaware without regard to conflicts of laws principles thereof, except where governed by the Bankruptcy.

15.3   Entire Agreement. This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4   Amendments. This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

15.5   No Waiver. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6   Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, and their respective successors and assigns; including, but not limited to, any chapter 11 or chapter 7 trustee, provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

15.7   Execution in Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one agreement. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

15.8   Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.9   Survival. All representations, warranties, covenants and agreements made herein, by the parties hereto, shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

21

15.10  <u>Buyer's Obligations Under Purchase Agreement.</u>  Agent's obligations hereunder shall be in addition to, and not in lieu of, any obligations of Buyer under the terms of the Purchase Agreement and nothing contained in this Agreement shall in any way modify or reduce Buyer's obligations under the Purchase Agreement. Accordingly, to the extent that this Agreement obligates Agent to perform certain acts or pay certain amounts for which the Buyer is also obligated to perform or pay under the terms of the Purchase Agreement, Merchant may look to either party for satisfaction of such obligations, provided that Merchant shall not receive double payment for any amounts covered under the respective agreements. Moreover, to the extent that Buyer is obligated to pay certain amounts under the Purchase Agreement which do constitute obligations of Agent under this Agreement, the Merchant may look to the Buyer for payment of such additional amounts.

15.11  <u>Assets Transferred Under Purchase Agreement.</u>  While the Agreement obligates Merchant to do certain things in connection with the Sale, the parties acknowledge that certain of Merchant's assets will be transferred to Buyer upon closing of the sale pursuant to the Purchase Agreement. Accordingly, to the extent that this Agreement obligates Merchant to perform an act which it can no longer comply with given the transfer of such assets to Buyer, Merchant shall not be liable for or in breach of this Agreement as a result of its failure to comply with the express terms of this Agreement.

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

<u>AGENT:</u>

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name:
Its:

<u>MERCHANT:</u>

URBAN BRANDS, INC,
On Behalf of Itself and its Affiliated Debtors
and Debtors-in-Possession

By: _____
Name:     STEPHEN A. FELDMAN
Its:      EXECUTIVE VICE PRESIDENT & CHIEF FINANCIAL OFFICER

22

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

AGENT:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____

Name: Rafael Klotz

Its: Principal & Managing Director

MERCHANT:

URBAN BRANDS, INC,
On Behalf of Itself and its Affiliated Debtors
and Debtors-in-Possession

By:

# Schedule 1 to Exhibit B

**SALE GUIDELINES**

## SALE GUIDELINES

Notwithstanding anything in the Agency Agreement[4] to the contrary, the following procedures shall apply to any Sales (each a "Sale" and collectively, "Sales") to be held at the Merchant's Stores:

1.    The Sales shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

2.    Within a shopping center, Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the shopping center in which such Store is located. Otherwise, Agent may solicit customers in the Stores themselves.

3.    At the conclusion of the Sales, Agent shall vacate the Stores in broom-clean condition, and shall leave the stores in the same condition as on Sale Commencement Date, ordinary wear and tear, excepted, in accordance with Section 6 of the Agency Agreement. The Agent may abandon any FF&E not sold in the Sale at the Store premises at the conclusion of the Sale in accordance with the Agency Agreement.

4.    All display and hanging signs used by the Agent in connection with the Sales shall be professionally lettered and all hanging signs shall be hung in a professional manner. The Merchant and the Agent may advertise the Sale as a "going out of business," "store closing" or similar themed sale. The Merchant and the Agent shall not use neon or day-glo signs. With respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Store locations; (ii) mall locations if the Store has a separate entrance from a parking lot and (iii) enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store and shall not be wider than the storefront of the Store. The Merchant and the Agent shall be permitted to utilize sign walkers, A-frame, interior and exterior banners and similar signage, notwithstanding any state, county or local law or ordinance. Nothing contained herein shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

5.    Conspicuous signs shall be posted in each of the affected Stores to effect that all sales are "final".

6.    Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

---

[4] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agency Agreement dated as of September 21, 2010, by and between Gordon Brothers Retail Partners, LLC and Urban Brands, Inc. (the "Agency Agreement").

7.      The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sales.

8.      Agent shall keep Store premises and surrounding area clear and orderly consistent with present practices.

9.      The Merchant and/or the Agent may sell the Owned FF&E located in the Stores during the Sale. The Merchant or the Agent, as the case may be, may advertise the sale of the Owned FF&E consistent with the guidelines provided in paragraphs 2 and 4 hereof. Additionally, the purchasers of any Owned FF&E sold during the sale shall only be permitted to remove the Owned FF&E either through the back shipping areas or through other areas after store business hours.

10.     At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases.    The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores

11.     All Additional Agent Merchandise shall be of the same or better like kind and quality of merchandise customarily offered at the Stores prior to the Sale Commencement Date. All relevant advertisements of the Sale shall clearly and conspicuously state that additional non-Merchant merchandise has been purchased and added to the sale. Signage shall be prominently displayed and will conspicuously state that additional non-Merchant merchandise has been purchased and added to the sale.   All Additional Agent Merchandise shall be clearly and conspicuously tagged and/or marked to distinguish such merchandise from Merchandise and conspicuous signs shall be posted informing the consumer of how to differentiate between the Additional Agent Merchandise and Merchandise.