## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **UBI LIQUIDATING CORP., et al.,[1]** | **Case No. 10-13005 (KJC)** |
| **Debtors.** | **Jointly Administered** |

---

## DISCLOSURE STATEMENT FOR JOINT PLAN OF
## LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (Bar No. 2981)
Paul N. Heath  (Bar No. 3704)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

Counsel for the Debtors and Debtors in Possession

Dated:  July 20, 2011
        Wilmington, Delaware

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are UBI Liquidating Corp. (3678), 100% Girls Ltd. (4150), 100% Girls of Georgia, Inc. (4159), 100% Girls of New York, Inc. (2149), 100 Percent Girls of New Jersey, Inc. (4167), A.S. Interactive, Inc. (3472), ASL Liquidating Corp. (4541), Ashley Stewart Apparel Corporation (4049), Ashley Stewart Clothing Company, Inc. (4051), ASMCI Liquidating Corp. (4053), ASWL Liquidating Corp. (4152), ASIL 6, Inc. (3996), ASNJ 10, Inc. (4004), Carraizo Alto Apparel Corporation (4651), Church Street Retail, Inc. (5954), Kid Spot Ltd. (2585), Kidspot of Delaware, Inc. (2596), Kidspot of Illinois, Inc. (2606), Kidspot of Michigan, Inc. (2603), Kidspot of New Jersey, Inc. (2601), Kidspot of Ohio, Inc. (4705), Kidspot of Pennsylvania, Inc. (2599), Kidspot of Texas, Inc. (3809), Large Apparel of Alabama, Inc. (0624), Large Apparel of California, Inc. (2129), Large Apparel of Connecticut, Inc. (5161), Large Apparel of District of Columbia, Inc. (8613), Large Apparel of Florida, Inc. (2209), Large Apparel of Georgia, Inc. (3894), Large Apparel of Illinois, Inc. (4650), Large Apparel of Indiana, Inc. (4055), Large Apparel of Louisiana, Inc. (3790), Large Apparel of Maryland, Inc. (5158), Large Apparel of Michigan, Inc. (9420), Large Apparel of Mississippi, Inc. (5913), Large Apparel of Missouri, Inc. (2135), Large Apparel of New Jersey, Inc. (5157), Large Apparel of New York, Inc. (5956), Large Apparel of North Carolina, Inc. (8611), Large Apparel of Ohio, Inc. (3815), Large Apparel of Pennsylvania, Inc. (4057), Large Apparel of South Carolina, Inc. (2029), Large Apparel of Tennessee, Inc. (3895), Large Apparel of Texas, Inc. (3787), Large Apparel of Virginia, Inc. (2809), Large Apparel of Wisconsin, Inc. (3898), Marianne Ltd. (3940), Marianne USPR, Inc. (2193), Marianne VI, Inc. (2206), Metro Apparel of Kentucky, Inc. (7533), Metro Apparel of Massachusetts, Inc. (1367), The Essence of Body & Soul, Ltd. (4165), UACONJI Liquidating Corp. (2976), UACONYI Liquidating Corp. (4103), and UBTHC Liquidating Corp. (5909). The Debtors' corporate offices are located at 100 Metro Way, Secaucus, New Jersey 07094.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. ON OCTOBER 12, 2011 (EASTERN DAYLIGHT TIME), UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE. TO BE COUNTED, THE VOTING AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

THE DEBTORS PROVIDE NO ASSURANCE THAT THE DISCLOSURE STATEMENT (AND THE EXHIBIT HERETO) THAT IS ULTIMATELY APPROVED IN THE CHAPTER 11 CASES (A) WILL CONTAIN ANY OF THE TERMS IN THIS CURRENT DOCUMENT OR (B) WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS CURRENT DOCUMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY SPECULATIVE</u>, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTORS OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE LIQUIDATING TRUSTEE MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE LIQUIDATING TRUSTEE THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS AND THE CREDITORS' COMMITTEE DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DEBTORS FILED THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

# I.    INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") of UBI Liquidating Corp. and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), filed in connection with the Debtors' Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated July 20, 2011 (the "Plan"), a copy of which is attached to this Disclosure Statement as Exhibit A.

## A.    Definitions and Exhibits

### 1.    Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

### 2.    Exhibits

All exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.

## B.    Notice to Creditors

### 1.    Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims and Equity Interests of their rights under the Plan, (iii) assists holders of Claims entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated September 7, 2011, the Bankruptcy Court approved this Disclosure Statement, finding that it contains "adequate information" as that term is used in Section 1125(a)(1) of the Bankruptcy Code. However, the Bankruptcy Court has not passed on the merits of the Plan. Creditors should carefully read the Disclosure Statement, in its entirety, before voting on the Plan.

**IT IS THE OPINION OF THE DEBTORS THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS. THEREFORE, THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO APPROVE THE PLAN.**

PLEASE READ THE DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN FOR THE CONVENIENCE OF CREDITORS AND EQUITY INTEREST HOLDERS, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES. ACCORDINGLY, IF THERE EXISTS ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

## C.    Disclosure Statement Enclosures

Accompanying the Disclosure Statement are the following enclosures:

RLF1 5334707v. 2

1. **Disclosure Statement Approval Order**

A copy of the order of the Bankruptcy Court, dated September 7, 2011, approving the Disclosure Statement and, among other things, establishing procedures for voting on the Plan and scheduling the hearing to consider, and the deadline for objecting to, confirmation of the Plan (the "Disclosure Statement Order").

2. **Notice of Confirmation Hearing**

A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice").

3. **Ballots**

One or more ballots (and return envelopes) for voting to accept or reject the Plan, unless you are not entitled to vote to accept or reject the Plan and are deemed to accept or reject the Plan, and therefore, are not entitled to vote. See Article III below for an explanation of which parties in interest are entitled to vote.

### D. Inquiries

If you have any questions about the packet of materials that you have received, please contact Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, (302) 651-7700, Attn: L. Katherine Good, Esq., during normal business hours.

## II. OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES

### A. Debtors' Prepetition Business Operations

1. **Business**

Prior to the sale of their business, the Debtors owned and operated retail stores under the Ashley Stewart brand name. The Ashley Stewart concept was founded in 1991 and has grown to become a nationally-recognized brand for fashion-forward and inspirational apparel for plus sized urban women. According to an October 2009 industry survey by the NPD Group, a nationally recognized firm specializing in apparel research, plus sized African American women ranked Ashley Stewart third of all retailers, behind only Wal-Mart and Lane Bryant, as their favorite place to shop. Ashley Stewart operates broadly in the women's apparel market, which the NPD Group estimates is approximately $107 billion. Within women's fashion, Ashley Stewart focuses on the plus sized market, which is estimated to be over $18 billion and growing. Within this subset of the market, Ashley Stewart focuses on the underserved urban market, particularly the African American and Hispanic consumer, two of the fastest growing segments of the U.S. population. Ashley Stewart is one of the few concepts focusing directly on these particular niche markets.

As of the Petition Date, the Debtors operated approximately 210 stores in 26 states with approximately 2,100 employees, the majority of which were minority women. The store base was reinforced by a strong online presence through AshleyStewart.com, providing both a marketing tool as well as an additional outlet for Ashley Stewart customers. Following the closing of the sale of the Debtors' assets to the Purchaser on October 29, 2010, the Purchaser has continued to operate the Ashley Stewart retail chain. Prior to 2009, the Debtors also operated stores under the Marianne brand name.

### B. Secured Debt

1. **Prepetition Credit Facility**

The Debtors were borrowers under that certain Loan and Security Agreement, dated as of September 3, 2004, by and between, among others, Urban Brands, Inc. and certain of its affiliates, as borrowers, and

Bank of America (successor by merger to LaSalle Retail Finance, a division of LaSalle Business Credit, LLC, as agent for LaSalle Bank Midwest National Association, f/k/a Standard Federal Bank National Association), as lender, as amended, and any and all amendments thereto and extensions thereof, and all security agreements and instruments related thereto (the "Prepetition Facility"). The Prepetition Facility was an asset-based facility with a maturity date of September 10, 2010 (pursuant to certain extensions). The availability for borrowings and letter of credit obligations under the Prepetition Facility was capped at $6.5 million and was further limited to an amount supported by a borrowing base consisting of certain cash, certain accounts receivable and eligible inventory. As of the Petition Date, the Debtors owed approximately $2,251,651 plus interest on the facility with an additional $2,366,324 in outstanding letters of credit (all of which were fully collateralized by the Debtors' cash). All amounts owing under the Prepetition Facility were paid in full with a portion of the proceeds of the DIP Facility.

## C.  Unsecured Debt

### 1.  Senior Unsecured Notes

In April 2004, the Debtors entered into a note purchase agreement with a group of institutional investors including Trimaran, the Debtors' largest equity holder, and certain officers, employees and consultants of the Debtors. From August 2007 to November 2009, the Debtors entered into five additional note purchase agreements to raise additional capital. In total, the Debtors sold $58,500,000 in senior unsecured notes pursuant to the note purchase agreements (the "Notes"). As of the Petition Date, the Debtors owed approximately $81,300,000 on account of outstanding principal and interest on the Notes, over $79,000,000 of which was owed to Trimaran. As discussed more fully in Section II.F.3.c below, with the consent of Trimaran, the Claims of Trimaran were purchased by the Purchaser who agreed to waive those Claims. Thus, the Debtors currently remain obligated only for notes issued to certain officers, employees and consultants of the Debtors.

### 2.  Trade Debt

As an operator of a large retail chain operation, the Debtors purchased inventory from approximately 150 vendors located throughout the world. The Debtors purchased merchandise under normal purchase commitments in the ordinary course of business. As of the Petition Date, the Debtors estimate that they owed in excess of $45 million for merchandise and other unsecured obligations for goods and services.

### 3.  Leasehold Obligations

Prior to the Petition Date, the Debtors leased all of their retail stores as well as their corporate headquarters location. 186 of the Debtors' leases were assumed and assigned to the Purchaser or affiliates of the Purchaser, and the Purchaser has paid all Cure Amount Claims related to those 186 leases.

## D.  Equity Interests

### 1.  Old Common and Preferred Stock

The equity interests in UBI Liquidating Corp. (the "Old Common and Preferred Stock") were not publicly traded. All of the Old Common and Preferred Stock is held by Trimaran, UBI Holding Corporation, or by certain officers, employees or consultants of the Debtors.

### 2.  Subsidiary Debtor Equity Interests

UBI Liquidating Corp. (f/k/a Urban Brands, Inc.) is the direct or indirect parent company of each of the other Debtors.

### 3.  Events Leading to the Debtors' Chapter 11 Filing

Despite the strength of their brand names and success at individual store locations, the Debtors began suffering from cash flow and liquidity problems in 2007. The Debtors' financial difficulties continued in

2008 with the slow down in the overall economy. As part of a strategic initiative to strengthen their balance sheet and improve their liquidity by focusing exclusively on the Ashley Stewart brand, in February 2008, the Debtors began divesting themselves of all of their Marianne stores. The proceeds from the Marianne divestitures, coupled with the reduction of the working capital investment needed to support the Marianne brand name, provided improvement in operating results and cash flow during fiscal year 2009 (ending January 30, 2010). Unfortunately, although the Debtors significantly reduced their net losses from approximately $44.3 million in 2008 to $28.6 million in 2009, the business continued to operate at a loss. Additionally, from fiscal year 2008 to fiscal year 2009, the Debtors net sales decreased from $179.6 million to $174.6 million.

The Debtors' Marianne and Ashley Stewart brands each enjoyed profitable expansion until sometime in 2007, when the Debtors began suffering from cash flow and liquidity problems, especially in their Marianne division. The Debtors' Ashley Stewart division likewise began to struggle during the second half of 2008 as a result of an overall weak economy. Both divisions of the Debtors' business required significantly larger capital expenditures than the Debtors had anticipated in terms of the expansion of the newly acquired Marianne division and the marketing and promotion of each brand. From August 2007 to November 2009, the Debtors attempted to address these capital needs through the issuance of $58.5 million in Notes.

Additionally, in January 2009, the Debtors sold their Marianne division and began to focus solely on the Ashley Stewart brand. In fiscal 2009, despite a difficult economy and limited liquidity, the current management team turned the business around. From 2008 to 2009, about 14% or $11 million of corporate expenses were cut, 7 stores were closed, and same store sales turned positive, averaging +5.2% from September 2009 through January 2010, with leaner and more productive inventory. In Q1 2010, the Debtors achieved sales of $47 million, a comparative same store sales increase of 3.7%. As noted above, however, the Debtors' business continued to operate at a loss and the Debtors' net sales continued to decrease.

In early 2010, the Debtors approached Bank of America regarding an extension of the maturity date under the Prepetition Facility. Bank of America expressed a reluctance to provide a long-term extension of the maturity date or provide addition financing to the Debtors, but did agree to a series of amendments to the Prepetition Facility that provided periodic extensions of the maturity date. These amendments, however, also resulted in additional fees being owed to Bank of America and restrictions on loan availability under the Prepetition Facility.

As a result of this liquidity constraint, the Debtors sought (albeit unsuccessfully) to locate a new lender and, thereafter, retained an investment banker to assist in their search for additional equity and/or mezzanine financing. In April 2010, the Debtors engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist in raising additional financing. During the course of the marketing effort, Oppenheimer contacted approximately 40 potential investors, but was unable to reach a definitive agreement with any of these interested parties. Following these exhaustive efforts to locate additional capital, the Debtors determined that their best alternative to preserve their business as a going concern and maximize the value of their assets was to pursue a sale of all or substantially all the Debtors' assets.

Accordingly, in August 2010, Oppenheimer expanded its marketing efforts to solicit interest from prospective purchasers of the Debtors and their assets as a going-concern. Prior to the Petition Date, the Debtors executed confidentiality agreements with seven prospective acquirers. After discussions with a number of these interested parties, the Purchaser, an affiliate of GB Merchant Partners, LLC, emerged as the party submitting the highest and best offer for substantially all of the Debtors' assets. Accordingly, the Debtors, with the approval of their board of directors, engaged in active negotiations with the Purchaser regarding a potential going concern transaction and, on September 8, 2010, the Debtors and the Purchaser executed a non-binding letter of intent. Following the execution of the letter of intent, the Debtors and their advisors actively negotiated with the Purchaser regarding the definitive terms and conditions of a stalking horse asset purchase agreement (the "Stalking Horse Asset Purchase Agreement"). On September 21, 2010, the Debtors commenced the Bankruptcy Cases by filing chapter 11 petitions with the Bankruptcy Court. Shortly after filing the Bankruptcy Cases, the Debtors entered into the Stalking Horse Asset Purchase Agreement with the Purchaser in order to maximize the value of their assets for their Estates. As is discussed in more detail in Section II.F.3.c below, on September 22, 2010, the Debtors filed a motion seeking approval of bid procedures and the sale of substantially all of the Debtors' assets and related relief (the "Sale Motion").

### E. The Chapter 11 Cases

#### 1. Commencement of Chapter 11 Cases

On the Petition Date, September 21, 2010, each of the Debtors filed a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors retained the law firm of Richards, Layton & Finger, P.A. as their counsel. Additionally, the Debtors retained PricewaterhouseCoopers LLP ("PwC") as their financial advisor.

#### 2. Appointment of the Committee

On October 1, 2010, the Creditors' Committee was appointed by the Office of the United States Trustee pursuant to Section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases. The Creditors' Committee is comprised of Angel Made in Heaven, Inc., Natural Collection Corp., Signsource, Inc., Rosenthal & Rosenthal, Inc., GGP Limited Partnership, Simon Property Group, Inc., and International Inspirations, Ltd. The Creditors' Committee is represented by the law firms of Cooley LLP and Ballard Spahr LLP. The Creditors' Committee retained Loughlin Meghji + Company as its financial advisor.

#### 3. Events During the Pendency of the Chapter 11 Cases

##### a. First Day Motions

On the Petition Date, the Debtors filed a number of motions and other pleadings (the "First Day Motions") to ensure an orderly transition into chapter 11, including (i) a motion to pay prepetition wages and other benefits to the Debtors' employees; (ii) a motion to honor certain prepetition obligations to customers; (iii) a motion relating to the continued use of the Debtors' existing cash management system, bank accounts, business forms and investment and deposit guidelines; (iv) motions relating to case administration and the employment of BMC Group, Inc. as the Debtors' claims and noticing agent; (v) a motion to obtain postpetition debtor in possession financing and the use of cash collateral; (vi) a motion to establish procedures for determining adequate assurance for the provision of utility services; (vii) a motion to pay certain prepetition governmental obligations and taxes; (viii) a motion to continue and maintain insurance policies; (xi) a motion to pay certain prepetition common carrier, warehouse and related obligations; and (x) a motion for an order confirming the administrative expense status of undisputed obligations for postpetition delivery of goods and services. The First Day Motions were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the United States Trustee and other parties in interest.

##### b. The DIP Financing Motion and DIP Credit Agreement

In order for the Debtors to maintain their operations through the closing of a going- concern sale, it was necessary for the Debtors to obtain postpetition financing through the closing of such going-concern sale. After extensive and arm's length negotiations with Bank of America, the Debtors entered into the DIP Facility. The DIP Facility was approved on an interim basis by the Bankruptcy Court on September 22, 2010, and the First Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Other Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral by the Debtors and Providing for Adequate Protection, and (4) Modifying the Automatic Stay [Docket No. 188] (the "Final DIP Order") was entered by the Bankruptcy Court on October 13, 2010.

Pursuant to its terms, the DIP Facility included a revolving credit facility of up to $6 million. The proceeds of the DIP Facility were used: (a) solely for (i) working capital and general corporate purposes, (ii) payment of costs of administration of the Bankruptcy Cases, to the extent set forth in the Debtors' 13 week cash flow projection, as the same was amended from time to time and the carve-out provided for in the Final DIP Order, and (iii) payment of certain adequate protection payments, (b) upon entry of the Final DIP Order, all letters of credit issued and all obligations on account of cash management services and bank products incurred under the Prepetition Facility were deemed issue and incurred under the DIP Facility and deemed to constitute "Obligations" thereunder,

and (c) upon entry of the Final DIP Order, payment in full of the remaining indebtedness under the Prepetition Facility. The amounts outstanding under the DIP Facility were paid in full from the proceeds of the sale of substantially all of the Debtors' assets to the Purchaser.

c.    The Asset Sales

Shortly after filing the Bankruptcy Cases, the Debtors entered into the Stalking Horse Asset Purchase Agreement. On September 22, 2010, the Debtors filed the Sale Motion seeking approval of bid procedures and the sale of substantially all of the Debtors' assets.

On October 4, 2010, the Bankruptcy Court held a hearing on portions of the relief requested in the Sale Motion and entered a bidding procedures order, which (A) established bidding and auction procedures (the "Bidding Procedures") in connection with the potential sale of the Assets free and clear of all liens, claims, interests and encumbrances; (B) approved bid protections, including a break-up fee to the Purchaser in accordance with the Stalking Horse Asset Purchase Agreement; (C) scheduled an auction (the "Auction") and set a date and time for a sale hearing (the "Sale Hearing"), and approving the form and manner of notice thereof; (D) established procedures for noticing and determining Cure Claim Amounts for executory contracts and unexpired leases to be assigned; and (E) granted certain related relief.

Solicitation materials with respect to the sale were sent to approximately one hundred-one (101) parties. Thirty-nine (39) entities executed nondisclosure agreements with the Debtors, were given access to an electronic data room containing confidential, proprietary operational, financial and strategic information, and performed due diligence. Management meetings were held with representatives and outside professionals of approximately fifteen (15) parties, and the Debtors' management and PwC, the Debtors' financial advisors, provided assistance to potential bidders with their diligence efforts. In addition to the information provided, potential bidders were given access to management, the distribution center, stores, landlords, vendors and other third parties.

On October 22, 2010, prior to the bid deadline, the Debtors received bid packages from three additional bidders. After reviewing the bids, the Debtors determined that all three bids were qualified bids under the court approved Bidding Procedures.

On October 25, 2010 and continuing into October 26, 2010, the Debtors conducted the Auction. The Auction included over thirty rounds of spirited and competitive bidding from all four bidders. During the course of the Auction, Trimaran negotiated the purchase of Trimaran's Claims with each bidder, and reach agreement with the Purchaser, the effect of which was to remove in excess of $79,000,000 from the Claims pool and substantially increase general unsecured creditors' recoveries. During the Auction, the Purchaser agreed to buy Trimaran's Claims in exchange for a minority interest in the Purchaser, and release those Claims at Closing. As part of the agreement, the Debtors also released their and the Estates' claims against Trimaran. The agreement was disclosed and consented to by the Debtors and the Creditors' Committee. Trimaran's agreement with the Purchaser served to instantaneously increase projected unsecured creditors' estimated recoveries in these Chapter 11 Cases significantly. Shortly thereafter, the Purchaser was selected as the successful and winning bidder. The Debtors determined, in their business judgment and in consultation with the Creditors' Committee, that the final offer by the Purchaser constituted the highest and best offer for substantially all of the Debtors' assets and provided a greater recovery for the Debtors' Estates than would have been provided by any other available alternative.

The Purchaser's final bid contemplated a continuation of the business at a minimum of 175 of the retail locations operated by the Debtors prior to the Petition Date and included the following consideration:

- cash consideration of $15.67 million, subject to certain adjustments;

- purchase of Trimaran's Claims, estimated by the Debtors in excess of $79,000,000;

6

- satisfaction of claims of certain holders of administrative expense claims arising under Section 503(b)(9) of the Bankruptcy Code up to $2.8 million;[2]

- satisfaction of all payroll-related expenses accrued prior to the Closing Date (as defined below), subject to an aggregate amount not to exceed $870,000;

- satisfaction of all Cure Claim Amounts for executory contracts and unexpired leases assumed and assigned to the Purchaser or its designees;

- satisfaction of all the pro-rated rent, common-area maintenance, and other monthly charges for the period between September 21, 2010 and September 30, 2010, and entitled to administrative status under Section 503(b) of the Bankruptcy Code, under any rejected Unexpired Lease, subject to an aggregate amount not to exceed $151,606.00

- assumption of customer liabilities, including gift cards, returns, merchandise credit and other related obligations, in an aggregate amount not to exceed $1.6 million;

- satisfaction or waiver of $1.4 million of Cure Claim Amounts related to executory contracts and unexpired leases in excess of the 175 leases the Purchaser committed to assume;

- payment of any transfer tax obligations of the Debtors arising from the sale of the Assets to the Purchaser, subject to an aggregate amount not to exceed $450,000.00;

- satisfaction or waiver of $1 million of unsecured, non-priority claims;

- assumption of severance benefits up to an aggregate amount not to exceed $1,463,000; and

- assumption of unused and outstanding vacation, sick days, personal days or leave earned and/or accrued by employees up to an aggregate amount not to exceed $129,000.

On October 27, 2010, the Bankruptcy Court conducted the Sale Hearing and approved the sale of the Assets to the Purchaser. The sale to the Purchaser closed on October 29, 2010 (the "Closing Date").

Following the closing of the sale to the Purchaser, the Debtors and the Creditors' Committee worked with the Purchaser to complete the purchase price reconciliation contemplated by the asset purchase agreement between the parties as well as to reconcile other post-Closing Date obligations under the Asset Purchase Agreement and other amounts owing among the Debtors and the Purchaser and its designees under the Asset Purchase Agreement, including, among other things, certain employee payroll amounts and benefit claims, costs of the inventory required under the Asset Purchase Agreement, certain tax obligations. On August 4, 2011, the Debtors, the Creditors' Committee and the Purchaser executed a settlement agreement resolving the outstanding disputes regarding these reconciliations and obligations (the "Settlement Agreement"). On August 12, 2011, the Debtors and the Creditors' Committee filed a motion seeking approval of the Settlement Agreement (the "9019 Motion"). The 9019 Motion was scheduled for hearing on September 7, 2011. On September 8, 2011, the Bankruptcy Court entered an order approving the Settlement Agreement.

d.     Extension of Exclusive Periods

The Debtors have sought and obtained from the Bankruptcy Court orders, (i) extending the period during which the Debtors have the exclusive right to file a chapter 11 plan through and including July 20, 2011 and

---

[2] Pursuant to the Purchase Agreement, the Purchaser agreed to pay such claims within one hundred eighty (180) days of the Closing Date. The Settlement Agreement established August 29, 2011, as the deadline by which objections to Administrative Claims arising under Section 503(b)(9) of the Bankruptcy Code must be Filed. On August 29, 2011, the Debtors, in consultation with the Purchaser and the Creditors' Committee, filed two objections to Administrative Claims arising under Section 503(b)(9) of the Bankruptcy Code.

(ii) extending the period during which the Debtors have the exclusive right to solicit acceptances thereof through and including October 31, 2011.

e.  Schedules and Statements and Claims Bar Dates

On October 21 and 22, 2010, each of the Debtors filed its respective schedules of assets and liabilities and statement of financial affairs pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007.

By motion dated November 5, 2010 (the "Bar Date Motion"), the Debtors sought the Bankruptcy Court's authorization to establish certain bar dates for filing proofs of claim against the Debtors' Estates and seeking allowance of administrative expense claims. Pursuant to the Bar Date Order entered November 23, 2010, the Bankruptcy Court granted the Bar Date Motion, establishing January 24, 2011 at 5:00 p.m. (prevailing Central Time) as the bar date for filing proofs of claim against the Debtors' Estates (the "General Claim Bar Date"). On November 24, 2010, the Debtors served, among other things, notice of the General Claims Bar Date in accordance with the Bar Date Order. As of the General Claim Bar Date, the Debtors had received or scheduled the following claims:

| Claim Priority | Total Number of Claims Filed/Scheduled | Total Face Amount of Claims Filed/Scheduled[3] |
| --- | --- | --- |
| Secured Claims | 72 | $7,035,706.37 |
| Administrative Claims | 92 | $2,972,363.22 |
| Priority Claims | 295 | $3,327,099.41 |
| General Unsecured Claims | 1926 | $385,925,482.63 |

The Debtors currently are in the process of reviewing proofs of claim filed against their Estates and prosecuting claims objections in that regard. The Debtors expect to file several omnibus claims objections over the coming months. Consequently, the Debtors anticipate that the figures set forth above, which reflect the face amount of claims filed or scheduled, will be reduced significantly following the claims reconciliation process.

## III.  OVERVIEW OF THE PLAN

### A.  General

This section of the Disclosure Statement summarizes the Plan, which is set forth in its entirety as Exhibit A hereto. This summary is qualified in its entirety by reference to the Plan. YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests" are classified rather than "creditors" and "shareholders" because such entities may hold claims and equity interests in more than one class. Under Section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims in such class. Class 4

---

[3] The figures reflected herein reflect the amounts asserted in proofs of claim or as scheduled by the Debtors. There are claims asserted against, or scheduled by the Debtors that are contingent, unliquidated, or disputed, for which no monetary value has been assigned herein.

(General Unsecured Claims) is impaired under the Plan. Only holders of Class 4 Claims are entitled to accept or reject the Plan. Ballots are being furnished to all holders of Class 4 Claims to submit their vote to accept or reject the Plan.

A chapter 11 plan may also specify that certain classes of claims or equity interests are to have their claims or equity interests remain unaltered by the plan. Such classes are referred to as "not impaired," and because of the favorable treatment accorded to such classes, they are conclusively deemed to have accepted the plan and therefore need not be solicited to vote to accept or reject the plan. The holder of Class 1 Bank of America Secured Lender Claim, Class 2 Other Secured Claims and Class 3 Priority Non-Tax Claims under the Plan are not impaired and are conclusively deemed to have accepted the Plan. Holders of such Claims are, therefore, not entitled to vote to accept or reject the Plan. Therefore, based on the foregoing, no ballots are enclosed for holders of such claims.

### B. Assets for Distribution Under the Plan

As soon as is reasonably practicable after the Effective Date (to the extent such amounts have not already been remitted), the Liquidating Trustee shall remit to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Bank of America Secured Lender Claims and Allowed Priority Non-Tax Claims an amount in Cash equal to the Allowed amount of such Claims, or such lesser amounts as agreed to by such holders. Additionally, the Plan provides that the UBI Liquidating Trust shall make payment to the holders of Allowed Claims in connection with Accrued Professional Compensation as and when such Claims become due and payable by Final Order of the Bankruptcy Court authorizing and approving the payment of such Claims in accordance with Article II of the Plan.

### C. Summary Table of Classification and Treatment of Claims and Equity Interests under the Plan

Claims and Equity Interests are divided into five (5) classes under the Plan, and the proposed treatment of Claims and Equity Interests in each Class is described in the Plan and in the chart set forth below. Such classification takes into account the different nature and priority of the Claims and Equity Interests. The Plan contains one class each for Bank of America Secured Lender Claims (Class 1), Other Secured Claims (Class 2), Priority Non-Tax Claims (Class 3), General Unsecured Claims (Class 4), and Equity Interests (Class 5). Classes 1, 2 and 3 are not impaired under the Plan and Classes 4 and 5 are impaired under the Plan. The meaning of "impairment," and the consequences thereof in connection with voting on the Plan, are set forth in section III.A above.

The estimated percentage recovery to holders of General Unsecured Claims is dependent on, among other things, the amount remaining after payment of all Allowed Administrative Claims, Claims in connection with Professional Compensation, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims, the net recoveries of the Debtors, the Creditors' Committee and/or the Liquidating Trustee on account of the Avoidance Actions, and the total amount of General Unsecured Claims that become Allowed Claims. There can be no assurance that the estimated claims amounts are correct, and actual claim amounts may be significantly different from the estimates. The following table is qualified in its entirety by reference to the Plan, a copy of which is annexed hereto as <u>Exhibit A</u>. In no case will any creditor receive more than 100% of its Allowed Claim.

RLF1 5334707v. 2

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| N/A | Administrative Expense Claims | $219,193.05 | - Recovery: 100%<br><br>- Unimpaired<br><br>- Each holder of an Allowed Administrative Claim shall be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (i) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (iii) at such time and upon such terms as may be agreed upon by such holder and the Debtors; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court. |
| N/A | Priority Tax Claims | $1,072,297.09 | - Recovery: 100%<br><br>- Unimpaired<br><br>- Except to the extent that a holder of an Allowed Priority Tax Claim against a Debtor agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall be paid the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. |
| Class 1 | Bank of America Secured Lender Claims | $2,251,651.00[4] | - Recovery: 100% (Paid in full during pendency of Chapter 11 Cases)<br><br>- Unimpaired<br><br>- To the extent it has not already been paid prior to the Effective Date, Bank of America shall receive those amounts that it is entitled to receive on account of the Bank of America Secured Lender Claims. |

---

[4] It is the position of the Debtors that the Bank of America Secured Lender Claims were paid in full during the pendency of the Chapter 11 Cases. As such, it is not contemplated that Bank of America will receive any further distributions on account of the Class 1 Bank of America Secured Lender Claims pursuant to the Plan.

RLF1 5334707v. 2

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| Class 2 | Other Secured Claims | $90,345.87 | - Recovery: 100%<br><br>- Unimpaired<br><br>- On or as soon as practicable after the Effective Date, the UBI Liquidating Trust shall pay each holder of an Allowed Other Secured Claim, at the UBI Liquidating Trust's sole and exclusive election, in full and final satisfaction of such Allowed Other Secured Claim, except to the extent any holder of an Allowed Other Secured Claim agrees to a different treatment, either: (i) the collateral securing such Allowed Other Secured Claim, or (ii) Cash in an amount equal to the value of such collateral. |
| Class 3 | Priority Non-Tax Claims | $74,970.71 | - Recovery: 100%<br><br>- Unimpaired<br><br>- Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the UBI Liquidating Trust on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, the UBI Liquidating Trust shall pay to each holder of an Allowed Priority Non-Tax Claim, in Cash, the full amount of such Allowed Priority Non-Tax Claim, in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Priority Non-Tax Claim. |
| Class 4 | General Unsecured Claims | $33,345,299.63 | - Recovery: Estimated to be 3.0 - 7.0%<br><br>- Impaired<br><br>- On or as soon as practicable after the Initial Distribution Date, the UBI Liquidating Trust shall pay each holder of an Allowed General Unsecured Claim, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund pursuant to one or more distributions. |

RLF1 5334707v. 2

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| Class 5 | Equity Interests | N/A | - Recovery: None<br><br>- Impaired<br><br>- Holders of Equity Interests shall neither receive nor retain any property under the Plan. On the Effective Date, the Equity Interests shall be deemed cancelled. |

### D. Provisions Governing Distributions Under the Plan

#### 1. Initial Distribution Date

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the UBI Liquidating Trust shall make, or shall make adequate reserves for, the Distributions required to be made under the Plan.

#### 2. Establishment of Disputed Reserves

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the UBI Liquidating Trust shall establish a separate Disputed Reserve for Disputed Claims, each of which Disputed Reserves shall be administered by the UBI Liquidating Trust. The UBI Liquidating Trust shall reserve in Cash or other property, for Distribution on account of each Disputed Claim, the full asserted amount (or such lesser amount as may be estimated by the Bankruptcy Court in accordance with Article VI.B of the Plan) with respect to each Disputed Claim.

#### 3. Maintenance of Disputed Reserves

The UBI Liquidating Trust shall hold property in the Disputed Reserves in trust for the benefit of the holders of Claims ultimately determined to be Allowed. Each Disputed Reserve shall be closed and extinguished by the UBI Liquidating Trust when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Reserve, all Cash (including any Cash Investment Yield) or other property held in that Disputed Reserve shall revest in and become the property of the UBI Liquidating Trust. All funds or other property that vest or revest in the UBI Liquidating Trust pursuant to Article V of the Plan shall be (a) used to pay the fees and expenses of the UBI Liquidating Trust as and to the extent set forth in the Liquidating Trust Agreement, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims.

#### 4. Quarterly Distributions

Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the UBI Liquidating Trust in a Disputed Reserve pursuant to Article V.B of the Plan and Distributed (in full in the case of Administrative Expense Claims, Priority Tax Claims or Priority Non-Tax Claims; and up to its Ratable Proportion with respect to the Claims in Class 4) on the first Quarterly Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Quarterly Distribution Date in accordance with Article V.C. of the Plan.

5. **Record Date for Distributions**

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The UBI Liquidating Trust shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the UBI Liquidating Trust shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim Filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that is known to the UBI Liquidating Trust as of the Record Date.

6. **Delivery of Distributions**

a. General Provisions; Undeliverable Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the UBI Liquidating Trust at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim Filed by such holder or (b) the last known address of such holder if no proof of Claim is Filed or if the Debtors have been notified in writing of a change of address. If any Distribution is returned as undeliverable, the UBI Liquidating Trust may, in its discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the UBI Liquidating Trust deems appropriate, but no Distribution to any such holder shall be made unless and until the UBI Liquidating Trust has determined the then-current address of such holder, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the UBI Liquidating Trust shall be returned to, and held in trust by, the UBI Liquidating Trust until the Distributions are claimed or are deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code, as set forth in Article V.E.3 of the Plan. The UBI Liquidating Trust shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however,* that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Liquidating Trust Agreement.

b. Minimum Distributions

Notwithstanding anything herein to the contrary, if a Distribution to be made to a holder of an Allowed Claim on the Initial Distribution Date or any subsequent date for Distributions would be $50 or less in the aggregate, no such Distribution will be made to that holder unless a request therefor is made in writing to the Liquidating Trustee no later than twenty (20) days after the Effective Date.

c. Unclaimed Property

Except with respect to property not Distributed because it is being held in a Disputed Reserve, Distributions that are not claimed by the expiration of six (6) months from the Effective Date shall be deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code and shall vest or revest in the UBI Liquidating Trust, and the Claims with respect to which those Distributions are made shall be automatically cancelled. After the expiration of that six month period, the claim of any Entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the UBI Liquidating Trust to attempt to locate any holder of an Allowed Claim. All funds or other property that vests or revests in the UBI Liquidating Trust pursuant to Article V of the Plan shall be distributed by the Liquidating Trustee to the other holders of Allowed Claims in accordance with the provisions of the Plan or the Liquidating Trust Agreement.

7. **Transactions on Business Days**

If the Effective Date or any other date on which a transaction is to occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

8. **Manner of Cash Payments Under the Plan or the Liquidating Trust Agreement**

Cash payments made pursuant to the Plan or the Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the UBI Liquidating Trust or by wire transfer from a domestic bank, at the option of the UBI Liquidating Trust.

9. **Time Bar to Cash Payments by Check**

Checks issued by the UBI Liquidating Trust on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to Article V.I of the Plan shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of six (6) months from the Effective Date or ninety (90) days after the date of issuance thereof. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the UBI Liquidating Trust as unclaimed property in accordance with Section 347(b) of the Bankruptcy Code and be distributed as provided in Article V.E.3 of the Plan.

10. **Compliance with Tax Requirements**

In connection with making Distributions under the Plan, to the extent applicable, the UBI Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The UBI Liquidating Trust may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Liquidating Trustee to the appropriate authority. If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.E.1 of the Plan.

11. **No Payments of Fractional Dollars**

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

12. **Interest on Claims**

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

14

13. **Setoff and Recoupment**

The UBI Liquidating Trust may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtors, the Estates or the UBI Liquidating Trust may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Estates or the UBI Liquidating Trust of any right of setoff or recoupment that any of them may have against the holder of any Claim. For the avoidance of doubt, nothing in Section V.M shall limit, alter or otherwise affect the releases and exculpations provided to Trimaran in sections IX.B and IX.C of the Plan and the Sale Order.

E. **Means for Implementation and Execution of the Plan**

1. **Appointment of the Liquidating Trustee and the Liquidating Trust Committee**

On or prior to the Confirmation Date, the Debtors and the Creditors' Committee shall agree upon and appoint the Liquidating Trustee. Additionally, on or prior to the Confirmation Date, the Debtors and the Creditors' Committee shall agree upon and appoint the Liquidating Trust Committee. The Liquidating Trustee shall serve at the direction of the Liquidating Trust Committee and in accordance with the Liquidating Trust Agreement and the Plan; *provided, however*, the Liquidating Trust Committee may not direct the Liquidating Trustee or the members of the Liquidating Trust Committee to act inconsistently with their duties under the Liquidating Trust Agreement and the Plan. The Liquidating Trust Committee may terminate the Liquidating Trustee at any time in accordance with the provisions of the Liquidating Trust Agreement.

2. **Formation of the UBI Liquidating Trust**

On the Effective Date, the UBI Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, *inter alia*, (a) administering the Liquidating Trust Fund, (b) resolving all Disputed Claims, (c) pursuing the Retained Causes of Action, and (d) making all Distributions to the Beneficiaries provided for under the Plan. The UBI Liquidating Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d).

3. **Funding of the UBI Liquidating Trust**

On the Effective Date, the Liquidating Trust Fund shall vest automatically in the UBI Liquidating Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Fund to the UBI Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Fund will be treated for tax purposes as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Beneficiaries to the UBI Liquidating Trust in exchange for the beneficial interests in the UBI Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of the UBI Liquidating Trust. Upon the transfer of the Liquidating Trust Fund, the UBI Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Fund, and the Debtors will have no further interest in or with respect to the Liquidating Trust Fund. As soon as possible after the Effective Date, but in no event later than sixty (60) days thereafter, (i) the Liquidating Trust Committee shall inform the UBI Liquidating Trust in writing of the fair market value of the Liquidating Trust Fund as of the Effective Date, based on its good faith determination, and (ii) the Liquidating Trustee shall establish appropriate means to apprise the Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the UBI Liquidating Trust, the Beneficiaries and the Liquidating Trust Committee) for all federal income tax purposes.

4. **Rights and Powers of the Liquidating Trustee**

The Liquidating Trustee shall be deemed the Estates' representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule

15

2004 of the Bankruptcy Rules (to act on behalf of the UBI Liquidating Trust, including without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate the assets transferred to the Liquidating Trust Fund on the Effective Date; (3) prosecute, settle, abandon or compromise any Retained Causes of Action; (4) make Distributions as contemplated hereby, (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; and (7) employ and compensate professionals and other agents, *provided, however*, that any such compensation shall be made only out of the Liquidating Trust Fund) to the extent not inconsistent with the status of the UBI Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

## 5. Fees and Expenses of the UBI Liquidating Trust

Except as otherwise ordered by the Bankruptcy Court, the Liquidating Trust Expenses incurred on or after the Effective Date shall be paid in accordance with the UBI Liquidating Trust Agreement without further order of the Bankruptcy Court.

## 6. Semi-Annual Reports to Be Filed by the UBI Liquidating Trust

The UBI Liquidating Trust shall File semi-annual reports regarding the liquidation or other administration of property comprising the Liquidating Trust Fund, the Distributions made by it and other matters required to be included in such report in accordance with the Liquidating Trust Agreement. In addition, the UBI Liquidating Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation Article 1.671-4(a).

## 7. Directors/Officers/Equity/Assets of the Debtors on the Effective Date

On the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned or to have been removed without cause, *provided, however*, that the Debtors shall retain at least one acting officer for the purposes of complying with Article IV.G.2 of the Plan at the expense of the UBI Liquidating Trust. On the Effective Date, all the then existing Equity Interests in the Debtors (including all instruments evidencing such Equity Interests) shall be cancelled and extinguished without further action under any applicable agreement, law, regulation or rule.

## 8. Liquidation of the Debtors

a. All of the Debtors shall be deemed to have been liquidated as of the Effective Date, and all Equity Interests in any Debtor shall automatically be cancelled and extinguished as of the Effective Date without the need for any further action by the Bankruptcy Court or any Entity.

b. Notwithstanding the foregoing, as soon as practicable after the Effective Date, each of the Debtors shall: (a) file its certificate of dissolution or such similar document, together with all other necessary corporate documents, to effect its dissolution under the applicable laws of its state of incorporation or domicile; and (b) complete and file its final federal, state and local tax returns, and pursuant to Section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. The filing by each Debtor of its certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors of each such Debtor.

c. On the Effective Date, each Debtor shall assign, transfer and distribute to the UBI Liquidating Trust the Liquidating Trust Assets, including all of the Debtors' books and records. For purposes of the Plan, books and records include computer generated or computer maintained books and

16

records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of any Debtor maintained by or in the possession of third parties, wherever located.

d.      As soon as is reasonably practicable following the Effective Date and upon the filing by or on behalf of the Debtors of a certification to that effect with the Bankruptcy Court, the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each of the Debtors or payments, including, without limitation, the payment of any franchise or similar taxes to the state or commonwealth of incorporation or organization of such Entity, to be made in connection therewith; *provided, however,* that the Debtors or the Liquidating Trustee shall file with the Office of the Secretary of State for their respective states of incorporation or domicile a certificate of dissolution or such similar document which may be executed by an officer of the Debtors without the need for approval by the Board of Directors or stockholders.

### 9.      Operations of the Debtors Between the Confirmation Date and the Effective Date

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.

### 10.      Establishment of the Administrative Bar Date

a.      The Plan establishes the Administrative Bar Date, which was approved by the Bankruptcy Court pursuant to the Confirmation Order.

b.      Except as otherwise provided in Article IV.I.4 or Article II.A of the Plan, on or before 5:00 p.m., prevailing Eastern time, on the Administrative Bar Date, each holder of an Administrative Claim shall file with the Bankruptcy Court a request for payment of Administrative Claim (a) by mailing, hand delivering or delivering by courier service such request for payment of Administrative Claim to the Clerk of the Bankruptcy Court at 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 or (b) by Filing such request with the Bankruptcy Court.

c.      The request for payment of an Administrative Claim will be timely Filed only if it is *actually received* by the Bankruptcy Court by 5:00 p.m., prevailing Eastern Time, on the Administrative Bar Date.

d.      Notice of the Administrative Bar Date shall be provided within seven (7) days of the Effective Date.

e.      Notwithstanding anything in Article IV.I.2 of the Plan, the Professionals shall not be required to file a request for payment of any Administrative Claim on or before the Administrative Bar Date for Professional compensation, as such Professionals will instead file final fee applications as required by the Bankruptcy Code, Bankruptcy Rules and the Confirmation Order.

### 11.      Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Chapter 11 Cases are closed.

### 12.      Cancellation of Equity Interests

a.      On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates and other documents evidencing the Equity Interests shall be deemed automatically cancelled and shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto, including any

obligation of the Debtors to pay any franchise or similar type taxes on account of such Equity Interests, shall be discharged.

           b.      On the Effective Date, except to the extent otherwise provided herein, all obligations of the Debtors under any indenture shall be discharged.

### 13.      Creditors' Committee

As of the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases. The retention and employment of the Professionals retained by the Creditors' Committee shall terminate as of the Effective Date, *provided, however*, that the Creditors' Committee shall exist, and its Professionals shall be retained, after such date with respect to (a) applications Filed pursuant to Sections 330 and 331 of the Bankruptcy Code and (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order.

### F.      Procedures for Resolving and Treating Disputed Claims

#### 1.      No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not Distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed. Nothing in the Plan, however, shall be construed to prohibit or require payment or distribution on account of any undisputed portions of a Claim. Nothing in the Plan shall preclude the Liquidating Trustee from making Distributions on account of the undisputed portions of Disputed Claims.

#### 2.      Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Liquidating Trustee and the Liquidating Trust Committee shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code) to make, File, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims. The costs of pursuing the objections to Claims shall be borne by the UBI Liquidating Trust. From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent, subject to the approval of the Liquidation Trust Committee in accordance with the terms of the Liquidation Trust Agreement, the Liquidation Trustee elects to withdraw any such objection or the Liquidation Trustee and the claimant elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

#### 3.      Objection Deadline

All objections to Disputed Claims shall be Filed and served upon the holders of each such Claim not later than six (6) months after the Effective Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

#### 4.      Estimation of Claims

At any time, (a) prior to the Effective Date, the Debtors, and (b) subsequent to the Effective Date, the Liquidating Trustee, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the UBI Liquidating Trust have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute

either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the UBI Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 5. Disallowance of Claims

Except as otherwise agreed, any and all proofs of Claim Filed after the General Bar Date or the Governmental Bar Date, as applicable, shall not be treated as creditors for purposes of voting and distribution pursuant to Bankruptcy Rule 3003(c)(2) and pursuant to the General Bar Date Order, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed. Any Claims held by Entities from which property is recoverable under Section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, provided that such Cause of Action is a Retained Cause of Action, shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors.

### 6. Adjustment to Claims Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Noticing Agent at the direction of the Debtors or the Liquidating Trustee, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### G. Treatment of Executory Contracts and Unexpired Leases

### 1. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except for the executory contracts and unexpired leases listed on Exhibit II of the Plan, if any, and except to the extent that a Debtor either previously has assumed, assumed and assigned or rejected an executory contract or unexpired lease by an order of the Bankruptcy Court, including, but not limited to, the Sale Order, or has filed a motion to assume or assume and assign an executory contract or unexpired lease prior to the Effective Date, each executory contract and unexpired lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to Section 365 of the Bankruptcy Code. Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtors, their Estates and all parties in interest in the Chapter 11 Cases.

### 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after the Effective Date. Notice of the deadline for filing Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan shall be provided within seven (7) days of the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be

subject to the discharge and permanent injunction set forth in Article X.E of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

### 3. Executory Contracts and Unexpired Leases to Be Assumed

#### a. Assumption Generally

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to Section 365 of the Bankruptcy Code, the Debtors shall assume each of the respective executory contracts and unexpired leases, if any, listed on Exhibit II of the Plan; *provided, however,* that the Debtors reserve the right, at any time prior to the Effective Date, to, in consultation with the Creditors' Committee, amend Exhibit II of the Plan to: (a) delete any executory contract or unexpired lease listed therein, thus providing for its rejection pursuant hereto; or (b) add any executory contract or unexpired lease to Exhibit II of the Plan, thus providing for its assumption pursuant to Article VII.C of the Plan. The Debtors shall provide notice of any amendments to Exhibit II to the parties to the executory contracts or unexpired leases affected thereby and to the parties on the then-applicable service list in the Bankruptcy Cases. Nothing herein shall constitute an admission by a Debtor that any contract or lease is an executory contract or unexpired lease or that a Debtor has any liability thereunder.

#### b. Assumptions of Executory Contracts and Unexpired Leases

Each executory contract or unexpired lease assumed under Article VII.C of the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease.

#### c. Assignments Related to Post-Effective Date Transactions

As of the Effective Date, any executory contract or unexpired lease assumed under Article VII.C of the Plan shall be deemed assigned to the Liquidating Trust, pursuant to Section 365 of the Bankruptcy Code.

### 4. Payments Related to the Assumption of Executory Contracts and Unexpired Leases

The Cure Amount Claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code: (1) by payment of the Cure Amount Claim in Cash on or after the Effective Date; or (2) on such other terms as are agreed to by the parties to such executory contract or unexpired lease. Pursuant to Section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest. If there is an unresolved dispute regarding: (1) the amount of any Cure Amount Claim; (2) the ability of the Liquidating Trustee or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by Section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of such dispute by the parties or the entry of a Final Order resolving the dispute and approving the assumption.

### H. Conditions Precedent to Effective Date of the Plan

#### 1. Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date that must be satisfied or waived:

  a.  The Confirmation Order has become a Final Order.

  b.  The Confirmation Order shall be in full force and effect.

c.      Notwithstanding the foregoing, the Debtors reserve, in their sole discretion, the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in Article VIII.A. of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

I.      **Release, Injunction and Related Provisions**

1.      **Compromise and Settlement**

Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

2.      **Releases**

a.      **Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, without limitation:  (a) the satisfaction and elimination of debt and all other good and valuable consideration paid pursuant to the Plan or otherwise; and (b) the services of the Debtors' officers and directors in facilitating the expeditious implementation of the sales of substantially all of the Debtors' assets, each of the Debtors hereby provides a full release, waiver and discharge to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date in any way related to the Debtors, including, without limitation, those that any of the Debtors or the UBI Liquidating Trust would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan;.**

b.      **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or the Liquidating Trustee.**

3.      **Exculpation**

**Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all Claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, Liquidating Trust Agreement, DIP Facility, or any other contract, instrument, release or other agreement or document created or entered into in connection with the**

Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Sale or the liquidation of the Debtors; *provided, however*, that the foregoing provisions of Article IX.C of the Plan shall have no effect on the liability of any Exculpated Party (other than Trimaran to the extent set forth in the Sale Order) that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided, further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above-reference documents.

        **4.**      **Release by Holders of Claims and Interests**

        a.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Releasing Parties (i.e. holders of Claims voting to accept the Plan) shall be deemed to have forever released, waived and discharged all causes of action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date in any way related to the Debtors, the Chapter 11 Cases or the Plan against the Releasees.

        **5.**      **Injunction**

        a.      Pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Debtors; *provided, however*, upon confirmation of the Plan and the occurrence of the Effective Date and Distributions under the Plan, Claimants may not seek payment or recourse against or otherwise be entitled to any Distribution from the Liquidating Trust Assets except as expressly provided in this Plan and the Liquidating Trust Agreement.

        b.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest, from:

        (i)      commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors' Estates, the UBI Liquidating Trust, their successors and assigns, and any of their assets and properties;

        (ii)      enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor's Estate, the UBI Liquidating Trust, their successors and assigns, and any of their assets and properties;

        (iii)      creating, perfecting or enforcing any encumbrance of any kind against any Debtor's Estate, the UBI Liquidating Trust, their successors and assigns and any of their assets and properties;

        (iv)      asserting any right of setoff or subrogation of any kind against any obligation due from any Debtor's Estate, the UBI Liquidating Trust or their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of claim; or

        (v)      commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

c. **From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, their Estates, their successors and assigns, and any of their assets and properties, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.**

6. **Releases of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against property of the Estates shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest shall revert to the Debtors and the Liquidating Trustee.

7. **Substantive Consolidation**

a. The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating all of the Estates of all of the Debtors into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan. Intercompany Claims and Intercompany Interests are deemed to be satisfied and resolved by the substantive consolidation provided for herein.

b. The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the substantive consolidation of the Debtors and their respective Estates for all purposes relating to the Plan, including for purposes of voting, confirmation and Distributions. If this substantive consolidation is approved, then for all purposes associated with the confirmation and consummation of the Plan, all assets and liabilities of the Debtors shall be treated as though they were merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor shall be considered eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors. Moreover, (a) no Distribution shall be made under the Plan on account of any Claim held by any one of the Debtors against any of the other Debtors and such Intercompany Claims will be extinguished; (b) no Distribution shall be made under the Plan on account of any Intercompany Interest held by any one of the Debtors in any of the other Debtors except to the extent necessary to effect the substantive consolidation provided for herein; (c) all guaranties of any one of the Debtors of the obligations of any of the other Debtors shall be eliminated so that any Claim against any one of the Debtors, and any guaranty thereof executed by any of the other Debtors, shall be one obligation of the consolidated Debtors' Estates; and (d) every Claim that is timely Filed or to be Filed in the Chapter 11 Cases of any of the Debtors shall be deemed Filed against the consolidated Estates and shall be one Claim against, and one obligation of, the Estates.

c. In addition, notwithstanding any provision of the Plan to the contrary, any Holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts shall be Allowed only once as if such Claim were against a single Debtor.

d. Any alleged defaults under any applicable agreement, including executory contracts and unexpired leases, with the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

8. **Preservation of Rights of Action**

RLF1 5334707v. 2

a.    Vesting of Causes of Action

(i)    Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that the Debtors may hold against any Entity shall vest upon the Effective Date in the UBI Liquidating Trust.

(ii)    Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Retained Causes of Action, in accordance with the terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

(iii)    Retained Causes of Action and any recoveries therefrom shall remain the sole property of the UBI Liquidating Trust (for the sole benefit of the holders of General Unsecured Claims), as the case may be, and holders of Claims shall have no right to any such recovery.

b.    Preservation of All Causes of Action Not Expressly Settled or Released

(i)    Unless a Retained Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such Retained Cause of Action for later adjudication by the Debtors or the Liquidating Trustee (including, without limitation, Retained Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Retained Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B.1 of the Plan) or any other Final Order (including the Confirmation Order). In addition, the Debtors and Liquidating Trustee expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent or unliquidated.

## J. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including, without limitation, jurisdiction to:

a. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

b. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

c. resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XI.C of the Plan adding executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

d. ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date, *provided, however,* that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

f. enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement or the Disclosure Statement;

g. resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

h. issue and enforce injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

i. enforce Article IX.A, Article IX.B, Article IX.C and Article IX.D of the Plan;

j. enforce the Injunction set forth in Article IX.E of the Plan;

k. resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

l. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

m.    resolve any other matters that may arise in connection with or relate to the Settlement, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

n.    enter an order and/or the decree contemplated in Fed. R. Bankr. P. 3022 concluding the Chapter 11 Cases.

## K.    Miscellaneous Provisions

### 1.    Final Fee Applications

The deadline for submission by Professionals of applications for Bankruptcy Court approval of Professional Compensation shall be forty-five (45) days after the Effective Date.

### 2.    Payment of Statutory Fees

All fees payable pursuant to Section 1930 of title 28 of the United States Code after the Effective Date, as determined by the Bankruptcy Court at a hearing pursuant to Section 1128 of the Bankruptcy Code, shall be paid prior to the closing of the Chapter 11 Cases on the earlier of when due or the Effective Date, or as soon thereafter as practicable by the UBI Liquidating Trust.

### 3.    Modification of Plan

Subject to the limitations contained in the Plan: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, after consultation with the Creditors' Committee, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy Section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Liquidating Trustee, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 4.    Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, after consultation with the Creditors' Committee, and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

### 5.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 6.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

26

7. **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

8. **Article 1146 Exemption**

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

9. **Section 1125(e) Good Faith Compliance**

The Debtors, the Creditors' Committee and its individual members, and each of their respective Representatives, shall be deemed to have acted in "good faith" under Section 1125(e) of the Bankruptcy Code.

10. **Further Assurances**

The Debtors, Liquidating Trustee, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

11. **Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

> UBI Liquidating Corp., et al.
> 100 Metro Way
> Secaucus, New Jersey 07094-1906
> Attn: Stephen Feldman
>
> *With a copy to:*
>
> Richards, Layton & Finger, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware 19899
> Attn: Mark D. Collins, Esq.
>    Paul N. Heath, Esq.
>
> - and -

Cooley LLP
1114 Avenue of the Americas
New York, New York 10036
Attn: Lawrence C. Gottlieb, Esq.
Cathy Hershcopf, Esq.
Michael A. Klein, Esq.

### 12. Filing of Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 13. No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Fed. R. Bankr. P. 3020(e) and 7062.

### 14. Aid and Recognition

The Debtors or Liquidating Trustee, as the case may be, shall, as needed to effect the terms of the Plan, request the aid and recognition of any court or judicial, regulatory or administrative body in any province or territory of Canada or any other nation or state.

## IV. ALTERNATIVES TO THE PLAN

The Plan reflects the discussions held among the Debtors and the Creditors' Committee. The Debtors have determined that the Plan is the most practical means of providing maximum recoveries to creditors. Alternatives to the Plan that have been considered and evaluated by the Debtors and the Creditors' Committee during the course of these Chapter 11 Cases include (a) liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code and (b) an alternative chapter 11 plan. The Debtors' consideration of these alternatives to the Plan has led the Debtors to conclude that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable, and in a manner that minimizes certain inherent risks in any other course of action available to the Debtors. An analysis comparing this Plan with a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code is attached hereto as Exhibit B.

### A. Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under Section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case, a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, holders of certain Allowed Claims may receive lesser distributions on account of their Allowed Claims and would likely have to wait a longer period of time to receive any such distributions than they would under the Plan.

### B. Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors or any other party in interest may attempt to formulate an alternative chapter 11 plan which might provide for the liquidation of the Debtors' assets other than as provided in the Plan. However, since substantially all of the Debtors' assets have already been liquidated and the Plan provides for the distribution of the proceeds of the liquidation and any non-liquidated assets in accordance with the priorities established by the Bankruptcy Code, the Debtors believe that any alternative chapter 11 plan will be substantially similar to the Plan. Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such

period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for in the Plan. Thus, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims.

## V. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Circular 230 Disclaimer: To ensure compliance with requirements imposed by the Internal Revenue Service (the "IRS"), we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code of 1986, as amended (the "IRC"), or (ii) promoting, marketing or recommending to another party any transaction or tax matter(s) addressed herein.

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors and to holders of General Unsecured Claims. This summary does not address the federal income tax consequences to holders of Interests and to holders whose Claims or Interests (i) are paid in full, in Cash, or that are otherwise not Impaired under the Plan (i.e., Allowed Bank of America Secured Lender Claim, Allowed Administrative Claims, Priority Non-Tax Claims, Priority Tax Claims and Other Secured Claims) or (ii) that are not receiving any distribution under the Plan.

This summary is based on the IRC, the Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS currently in effect. These authorities are all subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below.

This summary does not address foreign, state or local income tax consequences, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, investors in pass-through entities, broker-dealers and tax-exempt organizations). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim.

Due to the possibility of changes in law, differences in the nature of various Claims, differences in individual Claim holders' methods of accounting, and the potential for disputes as to legal and factual matters, the federal income tax consequences described herein are subject to significant uncertainties. No ruling has been applied for or obtained from the IRS, and no opinion of counsel has been requested or obtained by the Debtors with respect to any of the tax aspects of the Plan. No representations are being made regarding the particular tax consequences of the Plan to the Debtors or any holder of a Claim or Interest.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.**

### A. Federal Income Tax Consequences to Holders of General Unsecured Claims

In accordance with the Plan, the Debtors' assets will be transferred by the Debtors to the UBI Liquidating Trust for the benefit of holders of General Unsecured Claims against the Debtors (such holders are referred to in this section as "Unsecured Creditors").

29

The federal income tax consequences to Unsecured Creditors will differ and will depend on factors specific to each such Creditor, including, but not limited to: (i) whether the Unsecured Creditor's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Unsecured Creditor's Claim, (iii) the Unsecured Creditor's holding period for the claim, (iv) whether the Unsecured Creditor is a United States person or a foreign person for United States federal income tax purposes, (v) whether the Unsecured Creditor reports income on the accrual or cash basis method, and (vi) whether the Unsecured Creditor has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

Generally, an Unsecured Creditor will recognize gain or loss equal to the difference between the "amount realized" by such Creditor and such Creditor's adjusted tax basis in his, her or its Claim. The amount realized is equal to the value of such Creditor's Pro Rata share of the proceeds of the Debtors' assets received under the Plan. Any gain or loss realized by an Unsecured Creditor should constitute ordinary income or loss to such creditor unless such Claim is a capital asset in the hands of such Unsecured Creditor. If a Claim is a capital asset and it has been held for more than one year, such Creditor will realize long-term capital gain or loss. An Unsecured Creditor will typically recognize gain or loss on the Effective Date as a result of the transfer of Cash of the Debtors to the UBI Liquidating Trust for the benefit of such Unsecured Creditor in accordance with the plan.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH UNSECURED CREDITOR. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH CREDITOR OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN.**

### B. Federal Income Tax of the Liquidating Trust

#### 1. Transfer of Assets to the Liquidating Trust

Pursuant to the Plan, as of the Effective Date, holders of Allowed Claims against the Debtors are required for all federal income tax purposes, to treat the Liquidating Trust Fund transferred by the Debtors to the UBI Liquidating Trust as having been transferred directly to such holders (with each such holder receiving an undivided interest in the specific Liquidating Trust Fund, the proceeds of which such holder may receive provided distribution in respect of its interests in the UBI Liquidating Trust are made), and then transferred by such holders to the UBI Liquidating Trust in exchange for beneficial interests therein.

#### 2. Classification as a Liquidating Trust

The UBI Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). In Revenue Procedure 82-58, as modified and amplified by Revenue Procedures 91-15 and 94-45 (the "Revenue Procedures"), the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a bankruptcy plan. The UBI Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with the Revenue Procedures, all parties (including the Debtors, the Liquidating Trustee and holders of Allowed Unsecured Claims) are required to treat, for federal income tax purposes, the UBI Liquidating Trust as a grantor trust of which its creditor-beneficiaries are the owners and grantors, and the following discussion assumes that the UBI Liquidating Trust would be so treated for federal income tax purposes. However, no ruling has been requested from the IRS concerning the tax status of the UBI Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the UBI Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequence to the UBI Liquidating Trust and its creditor-beneficiaries could vary from those discussed herein (including the potential for an entity-level tax).

#### 3. Tax Reporting

For federal income tax purposes, all parties (including the Debtors, the Liquidating Trustee, and holders of Allowed Claims) will treat the UBI Liquidating Trust as a grantor trust of which such holders are the owners and grantors. Thus, each holder (and any subsequent holders) of interests in the UBI Liquidating Trust will be treated as the direct owner of an undivided interest, for all federal income tax purposes, in the specific assets of the UBI Liquidating Trust, the proceeds of which such holder may received provided distributions in respect of its interest in the UBI Liquidating Trust are made. Accordingly, each holder of a beneficial interest in the UBI Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of any income, gain, loss, deduction or credit recognized or incurred by the UBI Liquidating Trust. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The federal income tax reporting obligations of a holder of a beneficial interest in the UBI Liquidating Trust is not dependent upon the UBI Liquidating Trust distributing any Cash or other proceeds. Therefore, a holder of a beneficial interest in the UBI Liquidating Trust may incur a federal income tax liability regardless of the fact that the UBI Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of any beneficial interests in the UBI Liquidating Trust it holds, the holder may be entitled to a subsequent loss or deduction. In general, a distribution of Cash from the UBI Liquidating Trust to a holder of a beneficial interest will not be subject to tax.

The Liquidating Trustee will file with the IRS returns for the UBI Liquidating Trust as a grantor trust pursuant to Regulation § 1.671-4(a). The Liquidating Trustee will also send to each holder of a beneficial interest in the UBI Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

### C.    Withholding and Reporting

Payments of interest, dividends and certain other payments are generally subject to backup withholding at the rate of 28% unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor. The Liquidating Trustee may be required to withhold the applicable percentage of any payments made to a holder who does not provide his, her or its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the taxpayer by the IRS to the extent that the backup withholding results in an overpayment of tax by such taxpayer in such taxable year.

**THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.**

## VI.    SOLICITATION AND VOTING PROCEDURES

On September 8, 2011, the Bankruptcy Court entered the Disclosure Statement Order approving the adequacy of the Disclosure Statement and approving the Solicitation Procedures. In addition to approving the Solicitation Procedures, the Disclosure Statement Order established certain dates and deadlines, including the date for the Confirmation Hearing, the deadline for parties to object to confirmation, the Voting Record Date and the Voting Deadline. The Disclosure Statement Order also approved the forms of Ballots and certain confirmation-related notices. The Disclosure Statement Order and the Solicitation Procedures should be read in conjunction with the Disclosure Statement. Capitalized terms used herein that are not otherwise defined in the Disclosure Statement or Plan shall have the meanings ascribed to them in the Solicitation Procedures.

31

## A.    Solicitation Package

### 1.    Contents of Solicitation Package

The following materials, all of which shall be submitted to holders of Claims eligible to vote on the Plan on a compact disc in PDF format, shall constitute the Solicitation Package, *provided, however*, that all holders of Claims eligible to vote on the Plan shall receive a Ballot only in paper format:

- Plan;

- Disclosure Statement;

- Disclosure Statement Order;

- Confirmation Hearing Notice; and

- appropriate Ballot and voting instructions.

### 2.    Distribution of Solicitation Package

The Debtors shall serve, or caused to be served, all of the materials in the Solicitation Package on holders of Class 4 General Unsecured Claims on a compact disc in PDF format (other than the Ballots which shall be served in paper format).

The Debtors shall serve, or caused to be served, a Confirmation Hearing Notice and the appropriate Notice of Non-Voting Status on holders of Class 1 Bank of America Secured Lender Claims, Class 2 Other Secured Claims, Class 3 Priority Non-Tax Claims and Class 5 Equity Interests.

The Debtors also shall serve, or cause to be served, all of the materials in the Solicitation Package (except Ballots) on a compact disc in PDF format on (i) the United States Trustee for the District of Delaware; (ii) counsel to the Creditors' Committee; (iii) counsel to Bank of America; and (iv) all entities requesting notice pursuant to Bankruptcy Rule 2002 as of the Voting Record Dates.

The Confirmation Hearing Notice shall inform parties that the Plan, the Plan Supplement, the Disclosure Statement, the Disclosure Statement Order and all other Solicitation Package materials (except Ballots) can be obtained by: (a) accessing the Debtors' website at www.bmcgroup.com/urbanbrands requesting a paper copy from BMC Group, Inc., the Debtors' claims, solicitation and voting agent (the "Voting Agent" or "BMC"), by writing to BMC Group, Inc., Attn: Urban Brands Ballot Processing, P.O. Box 3020, Chanhassen, MN 55317-3020.

In addition, the Debtors will mail, or cause to be mailed, the Solicitation Package to any of the persons or entities listed below:

- all persons or entities, as applicable, who, on or before the Voting Record Date, have timely Filed a proof of claim (or an untimely proof of claim that has been allowed as timely by the Bankruptcy Court under applicable law on or before the Voting Record Date): (i) that has not been expunged, disallowed, disqualified or suspended prior to the Voting Record Date; and (ii) that is not the subject of a pending objection on the Voting Record Date;

- all persons or entities, as applicable, listed in the Debtors' Schedules as holding a noncontingent, liquidated, undisputed Claim as of the Voting Record Date, except to the extent that such Claim was paid, expunged, disallowed, disqualified or suspended prior to the Voting Record Date;

- all persons or entities, as applicable, that hold Claims pursuant to an agreement or settlement with the Debtors executed prior to the Voting Record Date, as reflected in

32

a court pleading, stipulation, term sheet, agreement or other document Filed with the Bankruptcy Court, in an Order entered by the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, regardless of whether a proof of Claim has been Filed;

- the holder of any Disputed Claim that has been temporarily allowed to vote pursuant to a Resolution Event;

- the Securities and Exchange Commission;

- the Internal Revenue Service; and

- the United States Attorney for the District of Delaware.

The Debtors shall make every reasonable effort to ensure that creditors who have more than one Claim in a Class (as defined in the Plan) receive no more than one set of the Solicitation Package materials.

In addition to the above, the Debtors shall, one time after the Disclosure Statement Hearing, publish the Confirmation Hearing Notice in *The New York Times* (National Edition) to provide notification to those persons who may not receive notice by mail.

**B.      Voting Instructions and General Tabulation Procedures**

**1.      Voting Record Dates**

The Bankruptcy Court has approved September 7, 2011, as the Voting Record Date.

**2.      Voting Deadline**

The Bankruptcy Court has approved October 12, 2011 at 5:00 p.m. (Eastern Daylight Time), as the Voting Deadline. The Debtors may extend the Voting Deadline without further order of the Bankruptcy Court, however, the Debtors will document any such extension in the Voting Report.

For holders of all Claims or Equity Interests, BMC will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation. BMC will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

**TO BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN, BALLOTS CAST BY HOLDERS AND MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY BMC BY THE VOTING DEADLINE, AT THE ADDRESS LISTED ON THE APPLICABLE BALLOT, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER OR PERSONAL DELIVERY. THE BALLOTS WILL CLEARLY INDICATE WHERE THE BALLOT MUST BE RETURNED.**

Ballots must be **actually received** by the Voting Agent by the Voting Deadline as follows:

**If sent by First Class Mail**:

BMC Group, Inc.,
Attn: Urban Brands Ballot Processing
P.O. Box 3020
Chanhassen, MN 55317-3020

**If sent by Messenger or Overnight Courier**:

BMC Group, Inc.
Attn: Urban Brands Ballot Processing
18750 Lake Drive East
Chanhassen, MN 55317

If you have any questions on the procedures for voting on the Plan, please call the Voting Agent at the following telephone number:
**(888) 909-0100**

---

**IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT WHEN SUBMITTING A VOTE.**

EACH BALLOT WILL CONTAIN A PROVISION STATING THAT A VOTING CREDITOR, BY VOTING, ACKNOWLEDGES HIS, HER OR ITS CONSENT TO THE RELEASE, EXCULPATION AND RELEASE PROVISIONS OF THE PLAN, AS FOLLOWS:

**BY VOTING, I FURTHER ACKNOWLEDGE THAT:**

**(I)      A VOTE TO ACCEPT THE PLAN IS ALSO A VOTE TO ACCEPT THE RELEASES SET FORTH IN ARTICLE IX OF   THE PLAN.**

**(II)      I CAN DECLINE TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN  BY NOT VOTING OR VOTING TO REJECT THE PLAN.**

FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL BMC TOLL FREE AT (888) 909-0100.

To obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement or other Solicitation Package materials (except Ballots), please refer to BMC's website at www.bmcgroup.com/urbanbrands or request a copy from BMC, by writing to BMC Group, Inc., Attn: Urban Brands Ballot Processing, P.O. Box 3020, Chanhassen, MN 55317-3020.

Ballots received after the Voting Deadline will not be counted by the Debtors in connection with the Debtors' request for confirmation. The method of delivery of Ballots to be sent to BMC is at the election and risk of each Creditor, except as otherwise provided, a Ballot will be deemed delivered only when BMC actually receives the original executed Ballot. In all cases, sufficient time should be allowed to assure timely delivery. An original executed Ballot is required. Ballots should not be sent to any of the Debtors, the Debtors' agents (other than

34

BMC), or the Debtors' financial or legal advisors, and any Ballots sent to such parties will not be counted. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of Section 1127 of the Bankruptcy Code and the terms of the Plan regarding modification).

### 3. Who May Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if no party in interest has objected to such claim or interest, and the claim or interest is impaired by the plan but the plan does not make Distributions on account of such claim or interest. If the holder of an impaired claim or interest will not receive any Distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

Pursuant to Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof, or notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), reinstates the maturity of such claim or interest as it existed before the default, compensates the holder of such claim or interest for any damages incurred as a result of reasonable reliance on the holder's legal right to an accelerated payment, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder thereof.

Only the following holders of Impaired Claims and Equity Interests in Voting Classes shall be entitled to vote on the Plan with regard to such Claims:

- Holders of Class 4 General Unsecured Claims;

- Holders of Claims in Class 4 for which proofs of Claim have been timely Filed, as reflected on the Claims Register as of the Voting Record Dates; *provided, however,* that holders of Claims subject to a pending objection shall not be entitled to vote unless they become eligible through a Resolution Event, as set forth in more detail in the Solicitation Procedures; *provided further, however,* that if the Debtors object to a Claim on a reduce and allow basis the Claimant may, absent a Resolution Event, vote such Claim at the amount asserted by the Debtors;

- Holders of Claims in Class 4 that are listed in the Schedules, with the exception of those Claims that are scheduled as contingent, unliquidated or disputed (excluding such scheduled Claims that have been superseded by a timely Filed proof of Claim);

- Holders whose Claims in Class 4 arise pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Bankruptcy Court, in an order of the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a proof of Claim has been Filed; and

- the assignee of a transferred Claim in Class 4 (whether a timely Filed or scheduled Claim) shall be permitted to vote such Claim only if the transfer or assignment has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Dates.

### 4. Temporary Allowance of Disputed Claims for Voting Purposes

The Solicitation Procedures generally provide that holders of Disputed Claims or Disputed Interests will not be entitled to vote unless a Resolution Event occurs, *provided, however,* that if the claim is

objected to on a reduce and allow basis, such person or entity shall receive a ballot and be entitled to vote for the amount asserted by the Debtors. No later than two (2) Business Days after a Resolution Event, BMC shall distribute a Ballot to the relevant holder of the Disputed Claim or Disputed Interest, which must be returned to BMC by no later than the Voting Deadline.

**5.      Establishing Claim Amounts**

In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each vote:

- The Claim amount settled and/or agreed upon by the Debtors, as reflected in a document filed with the Bankruptcy Court, in an order of the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court;

- The Claim amount Allowed (temporarily or otherwise) under the procedures set forth herein;

- The Claim amount contained in a proof of Claim that has been timely Filed by the applicable Bar Date (or deemed timely Filed by the Bankruptcy Court under applicable law) except for any amounts in such proofs of Claim asserted on account of any interest accrued after the Petition Date; *provided, however,* that Ballots cast by holders whose Claims are not listed on the Schedules, but who timely File a proof of Claim in an unliquidated or unknown amount that are not the subject of an objection, will count for satisfying the numerosity requirement of Section 1126(c) of the Bankruptcy Code, and will count as Ballots for Claims in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of Section 1126(c) of the Bankruptcy Code; *provided further, however,* that to the extent the Claim amount contained in the proof of Claim is different from the Claim amount set forth in a stipulation or order Filed with the Bankruptcy Court as referenced in the Solicitation Procedures, the Claim amount in the stipulation or order Filed with the Bankruptcy Court shall supersede the Claim set forth on the respective proof of Claim;

- The Claim amount listed in the Schedules, provided that such Claim is not scheduled as contingent, disputed or unliquidated and has not been paid;

- In the absence of any of the foregoing, zero.

**6.      Ballot Tabulation**

The following voting procedures and standard assumptions shall be used in tabulating Ballots:

- Except as otherwise provided herein, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors shall reject such Ballot as invalid and, therefore, decline to count it in connection with confirmation;

- The Voting Agent will date and time-stamp all Ballots when received. The Voting Agent shall retain the original Ballots and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Bankruptcy Court;

- As soon as reasonably practicable before the Confirmation Hearing, unless such other date is set by the Bankruptcy Court, the Debtors will File the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate

every irregular Ballot including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking original signatures or lacking necessary information, or damaged (an "Irregular Ballot"). The Voting Report shall indicate the Debtors' intentions with regard to such Irregular Ballots;

- The method of delivery of Ballots to be sent to the Voting Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Voting Agent actually receives the executed Ballot;

- An original executed Ballot is required to be submitted by the Entity submitting such Ballot;

- No Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Voting Agent) or the Debtors' financial or legal advisors, and if so sent will not be counted;

- The Debtors expressly reserve the right to amend from time to time the terms of the Plan in accordance with the terms thereof (subject to compliance with the requirements of Section 1127 of the Bankruptcy Code and the terms of the Plan regarding modification);

- If multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot;

- Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes;

- A person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity must indicate such capacity when signing and, if required or requested by the applicable Nominee or its agent, the Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder or beneficial holder;

- The Debtors, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

- Neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

- Unless waived or as ordered by the Bankruptcy Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

- In the event a designation of lack of good faith is requested by a party-in-interest under Section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will

37

be counted for purposes of determining whether the Plan has been accepted and/or rejected;

- Subject to any contrary order of the Bankruptcy Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided, however,* that any such rejections will be documented in the Voting Report;

- If a Claim has been estimated or otherwise allowed for voting purposes only by an order of the Bankruptcy Court, such Claim shall be temporarily allowed in the amount so estimated or allowed by the Bankruptcy Court for voting purposes only, and not for purposes of allowance or Distribution

- If an objection to a Claim is Filed prior to the Voting Record Date, such Claim shall be treated in accordance with the procedures set forth herein; and

- The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Creditor; (ii) any Ballot cast by an Entity that does not hold a Claim in a Class that is entitled to vote on the Plan; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no proof of Claim was timely Filed; (iv) any unsigned Ballot or lacking an original signature; (v) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; and (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein.

## VII. CONFIRMATION PROCEDURES

### A. Confirmation Hearing

**The Confirmation Hearing will commence on October 19, 2011 at 1:00 p.m. (Eastern Daylight Time),** before The Honorable Kevin J. Carey, Chief United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

### The Plan Objection Deadline is 4:00 p.m. (Eastern Daylight Time) on October 12, 2011.

All Plan Objections must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

The Debtors' proposed schedule will provide Entities sufficient notice of the Plan Objection Deadline, which will be at least the 28 days as required by Bankruptcy Rule 2002(b). The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

---

**THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

---

Following the Disclosure Statement Hearing, the Debtors will publish the Solicitation Notice, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date the Confirmation Hearing is first scheduled, in the National Edition of *The New York Times* on a date no later than 15 days prior to the Voting Deadline to provide notification to those Entities that may not receive notice by mail.

RLF1 5334707v. 2

**Plan Objections must be served on all of the following parties:**

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins
Paul N. Heath
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
*Counsel to the Debtors*

**COOLEY LLP**
Lawrence C. Gottlieb
Cathy Hershcopf
Michael A. Klein
1114 Avenue of the Americas
New York, New York 10036
*Counsel to the Creditors' Committee*

**UNITED STATES TRUSTEE**
David Buchbinder
Office of the United States Trustee
for the District of Delaware
844 King Street, Room 2207
Lockbox #35
Wilmington, Delaware 19899-0035

**CLERK OF THE BANKRUPTCY COURT**
United States Bankruptcy Court
for the District of Delaware
824 Market Street, 5th Floor, Courtroom 5
Wilmington, Delaware 19801

B.      **Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The Debtors and the Creditors' Committee believe:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- Either each holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to Section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to Section 1129(b) of the Bankruptcy Code.

- Except to the extent the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and Other Secured Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

RLF1 5334707v. 2

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees on the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

## 1. Best Interests of Creditors Test

Often called the "best interests" test, Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property with a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation Distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation Distribution to the plan Distribution that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

The Debtors and the Creditors' Committee believe that the value of any Distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Plan because, among other reasons, (i) conversion to chapter 7 would require appointment of a chapter 7 trustee, which likely would delay and reduce the present value of Distributions; and (ii) the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for Distribution.

## 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation. Indeed, Section 1123(b)(4) of the Bankruptcy Code permits liquidation plans that "provide for the sale of all or substantially all of the property of the estate, and the Distribution of the proceeds of such sale among holders of claims or interests" in chapter 11 proceedings and, thus, such a plan does not violate the requirements of Section 1129(a). Moreover, when a liquidating plan of reorganization is tested against Section 1129(a)(11), the feasibility standard is greatly simplified. In the context of a liquidating plan, feasibility is established by demonstrating the debtor's ability to make the payments anticipated by the plan and specifying the timing of the debtor's liquidation. Notably, there is no requirement that such payments will be guaranteed.

The Plan provides for the liquidation of the Debtors by the transfer and sale of property and payment of the debts. Further, the Debtors maintain that there is a reasonable expectation that the payments required to be made during the term of the Plan will, in fact, be made.

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires that, as a condition to confirmation, except as described below, each class of claims or equity interests that is impaired under a plan, accepts the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Class 4 is Impaired under the Plan, and as a result, the holders of Claims in such Class are entitled to vote on the Plan. Pursuant to Section 1129 of the Bankruptcy Code, the holders of Claims in Class 4 must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, a Class of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under Section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it; *provided, however*, that the plan has been accepted by at least one impaired class. Pursuant to Section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 5. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 6. Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirement that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a Distribution under the plan.

To the extent that Class 4 votes to reject the Plan, the Debtors further reserve the right to seek to modify the Plan.

The votes of holders of Class 5 Equity Interests are not being solicited because, under Article III of the Plan, there will be no Distribution to the holders of Class 5 Equity Interests Claims and all Class 5 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise. Class 5 is, therefore, conclusively deemed to have rejected the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

Notwithstanding the deemed rejection by Class 5 and any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

C.    **Contact for More Information**

Any interested party desiring further information about the Plan may contact legal counsel to the Debtors by writing to Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn.: L. Katherine Good and/or calling (302) 651-7700.

## VIII.   PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

RLF1 5334707v. 2

## A.    Certain Bankruptcy Law Considerations

### 1.    Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors and the Creditors' Committee believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created seven Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

### 2.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 3.    Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, including, among other requirements, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of Distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of Distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in the Plan. If the Plan is not confirmed, it is unclear what Distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a Distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no Distribution of property whatsoever under the Plan.

### 4.    Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has

accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5. Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 7. Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan

The Distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect Distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### B. Risk Factors That May Affect Distributions Under The Plan

#### 1. Debtors Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes

A number of unknown factors make certainty in creditor recoveries impossible. First, the Debtors cannot know with any certainty, at this time, the number or amount of Claims in Class 4 that will ultimately be Allowed. Second, the Debtors cannot know with any certainty, at this time, the number or size of Claims senior to Class 4 or unclassified Claims that will ultimately be Allowed.

#### 2. Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on General Unsecured Claims

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan.

### C. Disclosure Statement Disclaimer

#### 1. Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

#### 2. Disclosure Statement Was Not Approved by the Securities and Exchange Commission

Although a copy of this Disclosure Statement was served on the Securities and Exchange Commission, and the Securities and Exchange Commission was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it, this Disclosure Statement was not Filed with the Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3. Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual Distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 4. No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Equity Interests or any other parties-in-interest.

### 6. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate Claims, File and prosecute objections to Claims and Equity Interests, and the Liquidating Trustee may object to Claims or bring Causes of Action after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims, Causes of Action or Objections to Claims.

### 7. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Liquidating Trustee to object to that holder's Allowed Claim, or to bring Causes of Action or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

### 8. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**9.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**10.      No Representations Outside the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, you should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Committee and the United States Trustee.

**D.      Liquidation Under Chapter 7**

If the Plan is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for Distribution in accordance with the priorities established by the Bankruptcy Code.

**IX.      CONCLUSION**

**THE DEBTORS SUBMIT THAT THE PLAN COMPLIES IN ALL RESPECTS WITH CHAPTER 11 OF THE BANKRUPTCY CODE AND RECOMMEND TO HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN THAT THEY VOTE TO ACCEPT THE PLAN.  THE DEBTORS REMIND SUCH HOLDERS THAT, TO BE COUNTED, EACH BALLOT, SIGNED AND MARKED TO INDICATE THE HOLDER'S VOTE MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN 5:00 P.M. (EASTERN DAYLIGHT TIME) ON OR BEFORE OCTOBER 12, 2011, AT THE FOLLOWING ADDRESS:  IF BY FIRST CLASS MAIL, BMC GROUP, INC., ATTN: URBAN BRANDS BALLOT PROCESSING, P.O. BOX 3020, CHANHASSEN, MN 55317-3020; IF BY MESSENGER OR OVERNIGHT COURIER, BMC GROUP, INC., ATTN: URBAN BRANDS BALLOT PROCESSING, 18750 LAKE DRIVE EAST, CHANHASSEN, MN 55317.**

RLF1 5334707v. 2

Dated: July 20 , 2011

UBI LIQUIDATING CORP.

By:
Its: Chief Restructuring Officer

Dated: July 20 , 2011

100% GIRLS LTD.

By:
Its: Chief Restructuring Officer

Dated: July 20 , 2011

100% GIRLS LTD. OF GEORGIA, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20 , 2011

100% GIRLS LTD. OF NEW YORK, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20 , 2011

100% GIRLS LTD. OF NEW JERSEY, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20 , 2011

A.S. INTERACTIVE, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20 , 2011

ASL LIQUIDATING CORP.

By:
Its: Chief Restructuring Officer

47

Dated: July 20, 2011

ASHLEY STEWART APPAREL CORPORATION

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

ASHLEY STEWART CLOTHING COMPANY, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

ASMCI LIQUIDATING CORP.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

ASWL LIQUIDATING CORP.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

ASIL 6, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

ASNJ 10, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

CARRAIZO ALTO APPAREL CORPORATION

By: _____
Its: Chief Restructuring Officer

48

Dated: July 20, 2011

CHURCH STREET RETAIL, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

KID SPOT LTD.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

KIDSPOT OF DELAWARE, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

KIDSPOT OF ILLINOIS, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

KIDSPOT OF MICHIGAN, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

KIDSPOT OF NEW JERSEY, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

KIDSPOT OF OHIO, INC.

By: _____
Its: Chief Restructuring Officer

49

Dated:   July 20, 2011

KIDSPOT OF PENNSYLVANIA, INC.

By: _____

Its:   Chief Restructuring Officer

Dated:   July 20, 2011

KIDSPOT OF TEXAS, INC.

By: _____

Its:   Chief Restructuring Officer

Dated:   July 20, 2011

LARGE APPAREL OF ALABAMA, INC.

By: _____

Its:   Chief Restructuring Officer

Dated:   July 20, 2011

LARGE APPAREL OF CALIFORNIA, INC.

By: _____

Its:   Chief Restructuring Officer

Dated:   July 20, 2011

LARGE APPAREL OF CONNECTICUT, INC.

By: _____

Its:   Chief Restructuring Officer

Dated:   July 20, 2011

LARGE APPAREL OF DISTRICT OF COLUMBIA, INC.

By: _____

Its:   Chief Restructuring Officer

Dated:   July 20, 2011

LARGE APPAREL OF FLORIDA, INC.

By: _____

Its:   Chief Restructuring Officer

50

Dated: July 20, 2011

LARGE APPAREL OF GEORGIA, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF ILLINOIS, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF INDIANA, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF LOUISIANA, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF MARYLAND, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF MICHIGAN, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF MISSISSIPPI, INC.

By:
Its: Chief Restructuring Officer

51

Dated: July 20, 2011

LARGE APPAREL OF MISSOURI, INC.

By:

Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF NEW JERSEY, INC.

By:

Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF NEW YORK, INC.

By:

Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF NORTH CAROLINA, INC.

By:

Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF OHIO, INC.

By:

Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF PENNSYLVANIA, INC.

By:

Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF SOUTH CAROLINA, INC.

By:

Its: Chief Restructuring Officer

52

Dated: July 20, 2011

LARGE APPAREL OF TENNESSEE, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF TEXAS, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF VIRGINIA, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

LARGE APPAREL OF WISCONSIN, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

MARIANNE LTD.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

MARIANNE USPR, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

MARIANNE VI, INC.

By:
Its: Chief Restructuring Officer

Dated: July 20, 2011

METRO APPAREL OF KENTUCKY, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

METRO APPAREL OF MASSACHUSETTS, INC.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

THE ESSENCE OF BODY & SOUL, LTD.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

UACONJI LIQUIDATING CORP.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

UACONYI LIQUIDATING CORP.

By: _____
Its: Chief Restructuring Officer

Dated: July 20, 2011

UBTHC LIQUIDATING CORP.

By: _____
Its: Chief Restructuring Officer

54